UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA, Plaintiff,
vs.
ILYA LICHTENSTEIN, Defendant.
* * * * * * * * * * * * * * * *

Criminal Action No. 23-00239-CKK

Washington, D.C.
November 14, 2024
2:06 p.m.

SENTENCING HEARING
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

JESSICA PECK, ESQ.
U.S. DEPARTMENT OF JUSTICE
1301 New York Avenue, Northwest
Suite 655
Washington, D.C. 20005

CATHERINE PELKER, ESQ.
CHRISTOPHER BROWN, ESQ.
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, Northwest
Washington, D.C. 20005

JOLIE ZIMMERMAN, ESQ.
UNITED STATES ATTORNEY'S OFFICE
FOR THE DISTRICT OF COLUMBIA
601 D Street, Northwest
Washington, D.C. 20530

FOR THE DEFENDANT:

SAMSON ENZER, ESQ.
KIERSTEN A. FLETCHER, ESQ.
JASON M. ECKER, ESQ.
CAHILL, GORDON & REINDEL, LLP
32 Old Slip
New York, New York 10005

FOR U.S. PROBATION: HANA FIELD

REPORTED BY: LISA EDWARDS, RDR, CRR
Official Court Reporter
United States District Court for the District of Columbia
333 Constitution Avenue, Northwest
Room 6706
Washington, D.C. 20001
(202) 354-3269

THE COURT: Good afternoon, everyone.

Give me a moment.

(Thereupon, the Defendant entered the courtroom and the following proceedings were had:)

THE COURT: When you speak, you can take -- come up to the podium and you can take your mask off. Otherwise, we can't really get a good record.

Let's call the case.

THE COURTROOM DEPUTY: Criminal Case 23-239-1, the United States versus Ilya Lichtenstein.

Counsel, would you please identify yourself for the record, starting with the Government.

MS. PECK: Jessica Peck for the Government. I'm joined at counsel table with Alden Pelker, Jolie Zimmerman and Chris Brown, also from the Government.

THE COURT: Good afternoon.

MR. ENZER: Good afternoon, your Honor. Samson Enzer from Cahill Gordon for Defendant, Ilya Lichtenstein, who is seated here at the table, along with my colleagues, Kiersten Fletcher and Jason Ecker, also from the Cahill firm for Mr. Lichtenstein.

And in the gallery are some of his supporters, including his parents, his brother, his wife and his wife's parents.

THE COURT: Is it "Lichtenstein" or "stein"?

Which would he prefer, sir?

THE DEFENDANT: "Lichtenstein."

THE COURT: "Stein"? Okay.

And good afternoon, Mr. Lichtenstein.

There are two things that I want to clarify before we proceed. One is the forfeiture orders. As I understand it, there was an original one. There was an amended one which I signed October 25th. And I believe there is a -- one new additional one. Is it one or two additional ones? I just want to clarify.

MS. PECK: We have one new amended order of forfeiture for your Honor. And apologies.

THE COURT: Has that one been consented to by Mr. Lichtenstein and Ms. Morgan or not?

MS. PECK: Yes. Counsel for both Defendants did not oppose our filing the amended order.

THE COURT: Is there something on the record that says that? I may have missed it, but I didn't see it.

MS. PECK: I believe it's in our motion.

THE COURT: I'll go back and take a look. But I want to make sure on the record we indicate whether or not there's any consent or opposition. And then I'll, of course, go ahead.

The second -- while you're there, the second is, you have filed a request to delay the restitution hearing,

which is not a problem. I can do that. What I will do is, at the end of the sentencing, is pick a particular day; and I would be inclined -- having looked at it and seen what papers have been filed, it sounds as if they're contested. So I may set a briefing schedule. So remind me to do that in terms of if there's questions about the validity of any of the particular claims.

So I will go ahead and grant that, and I'll pick a date at the end.

MS. PECK: Yes, your Honor.

THE COURT: The other question related to that is, I'm assuming that the -- what I think you have said is the self-identified persons that are doing victim impact, they would be the ones that would be discussed at the restitution hearing. Is that correct?

MS. PECK: Yes, potentially.

THE COURT: Okay.

MS. PECK: And I think your Honor was notified we do have two people in the audience today, one from Bitfinex, Barry Berke of Gibson Dunn, who's representing Bitfinex here. We also have Nathanael Andrews from Perkins Coie, in case your Honor wanted to hear from them on the restitution issue. It sounds like we're going to be pushing that out, so --

THE COURT: My feeling would be to -- I mean,

certainly, you know, the crime makes it quite clear what the company suffered. So the question is whether they get any additional sum, whether they get restitution. So I would prefer to do it as part of the restitution hearing where there seems to be, reading the papers, some dispute as to whether legally they're entitled.

So I would like that briefed so I can have an intelligent -- an informed restitution hearing about people's claims and make sure that, you know, I have all of the information, which of course they would have an opportunity to also -- whoever is making a claim would have a right to fill it out, look at it legally, which is what I need to have. Looking through it, it's more factual for the most part. So if that works.

Your colleague wants to tell you something.

(Confers with co-counsel privately.)

MS. PECK: Apologies. The motion for the second amended forfeiture order does not actually note the Defendant's consent.

So if we could potentially get your consent on the record, that would be great. Thank you.

THE COURT: Okay. So if you could indicate -- well, why don't we just take care of it while we're discussing it as to whether there's consent to it.

MS. FLETCHER: Yes, your Honor. I'm happy to

confirm that Mr. Lichtenstein consents to the entry of the second amended forfeiture order.

THE COURT: Okay. So can you contact, then, counsel for Ms. Morgan and find out what her position is?

MS. PECK: Absolutely.

THE COURT: I'd prefer to get it in writing or we can do something on the record.

MS. PECK: We obtained it via email, but we'll follow up this afternoon and have him send something that we can forward to the Court.

THE COURT: However you want to do it. I just need to make sure I know whether there's consent or not. The sentencing for Ms. Morgan is Monday.

MS. PECK: And I'm being told that counsel for Heather Morgan is actually in the gallery, if you would like to hear from him now.

THE COURT: Well, we can take care of it.

Sir, if you want to come up, identify yourself, and then just indicate to me your position one way or the other.

Good afternoon.

MR. GOROKHOV: Good afternoon, your Honor. Eugene Gorokhov here for Ms. Morgan.

We consent to the order.

Thank you, your Honor.

THE COURT: Then I'll go ahead. It wasn't clear to me whether, looking at the two things, that -- I wanted to make sure I understood them correctly.

All right.

MS. PECK: Thank you, your Honor.

THE COURT: Then let me proceed.

Mr. Lichtenstein entered a plea to Count 1, money-laundering conspiracy. The statutory maximum is 20 years in jail. The maximum fine is $500,000 or two times the value of the property involved.

What I have is a presentence report that was revised November 12th in keeping with -- and consistent with my memorandum opinion and order dated November 12th where I took care of the objections; the Government's memorandum in aid of sentencing and motion for downward departure; the Government's supplement to the downward departure and sentencing memo; the Defendant's sentencing memorandum -- I believe it's 20 letters, as well as a forensic neuropsychological evaluation; the amended preliminary order of forfeiture, which was the one I had already signed, but I will now sign the new one. I'll do it today so it will be as of this date, the 14th. The other one was on October 25th.

Also, the second motion, which we've just talked about, to amend -- and I'll sign that one; and the

Government's notice of delayed restitution hearing. And that one I will -- as I've indicated, I will go ahead and delay it so that we can have an opportunity to get all of the information that's needed.

And I will include the two notices of self-identified victims, would be the ones that presumably we would discuss and, as I've indicated, I will set a briefing schedule since that evidently seems to be contested.

In terms of objections, I resolved them in my November 12th memorandum opinion, which indicated that, as to the two points for enhanced role in the conspiracy, I found that it was inapplicable. For the two points for adjustment for obstruction of justice, I found it was inapplicable. For the deduction of three points for adjustment for incomplete conspiracy, I found that the three points' deduction does apply.

So there is a revised -- not formally, but revised presentence report that reflects that.

And so I've provided the new calculations to the presentence report writer.

So with that resolved, the advisory sentencing guidelines, the base offense is 34. Under Section 1956, which is an additional two points, which I believe it's because the underlying object of the conspiracy would

include the wire fraud -- sophisticated laundering is two points; incomplete conspiracy is minus three points, which comes to 35; minus three points for acceptance of responsibility; and minus two points for zero points in the criminal history, for a total offense level of 30.

There are no convictions, so he's in Criminal History Category I.

And the advisory sentencing guideline for offense level 30, Criminal History Category I, the custody is 97 to 121 months; supervised release is one to three years; probation, ineligible; fine, 30,000 to 500,000; restitution will be determined; the special assessment of $100.

At this point, the Government has filed a motion under seal for a downward departure from the advisory sentencing guidelines pursuant to Section 5K1.1 of the guidelines based on what the Government describes as, quote, "extraordinary cooperation," unquote, which started shortly after his arrest. So the Defendant was arrested on February 8th, 2022. Detention hearing, February 14th, 2022. And his cooperation started on March 3rd, 2022.

The Court will not explicate the nature of the cooperation, as it's information subject to a sealing order. Suffice it to say that the motion to depart downward is easily granted on the grounds that the Government described in their pleadings, which I'm adopting. It was titled

Sealed Supplement to the Motion For Downward Departure.

Accordingly, I'm granting the Government's motion for a downward departure pursuant to 5K1.1 on the grounds that were cited by the Government. So both counsel at this point can pursue in their allocution the fact that I've granted the downward departure without waiting to see whether I was going to do it or not.

So for those parts of the presentence report that are undisputed, my findings are pursuant to Federal Rule of Criminal Procedure 32(i)(3)(A). For those parts that are disputed, my findings in the opinion relating to the opinion of November 12th are pursuant to Federal Rule of Criminal Procedure 32(i)(3)(B).

I'll adopt the presentence report, which includes my resolution of the objections as I've stated in the opinion.

So at this point, I can hear from the Government, defense counsel and the Defendant if he wishes to address the Court.

MS. PECK: Thank you, your Honor.

We're obviously aware that the Court has already reviewed our submitted materials, so I'll be as brief as possible, and I'm only going to emphasize the points that we would like to highlight involving some of the 3553(a) factors for today.

First, regarding the nature and circumstances of the offense, we want to talk about the seriousness of the crimes here.

THE COURT: Slow down a little bit.

MS. PECK: The Defendant's conduct was extremely serious. He hacked into a victim's computer network, collected valuable personal information and then exploited his unauthorized access.

He created a computer script designed to steal as much Bitcoin as he could, and he did steal Bitcoin. He stole around 120,000 Bitcoin, worth around $72 million in 2016 at the time of the hack, and worth about $10 billion today.

We think it's important to note that the Defendant's computer-hacking activities and subsequent laundering scheme were deliberate, not impulsive or the result of a crime of opportunity.

He devoted a lot of time and a lot of effort into both of his schemes. First, he learned about Bitfinex's network infrastructure, so the computers and infrastructure needed to make Bitfinex operate.

He spent months designing a detailed plan to hack into their network.

He also devoted substantial time and effort between 2016, at the time of the hack, and 2022, at the time

of his arrest, trying to liquidate those stolen funds.

Specifically, he spent time learning the best ways to engage in money laundering so that he would be able to make use of the stolen funds. Around 2016 through 2022, it was very hard to spend Bitcoin to buy anything that we need in our daily lives.

He was very good at learning how to launder these funds. Many of the investigators who worked on this case or are familiar with the money laundering involved in this case have said that it is the most complicated money laundering that they had ever seen at the time.

Another key point is that the Defendant not only engaged in these criminal activities from behind his computer keyboard at home, but he also went out into the world and obtained assistance from others.

He obviously enlisted his wife, Heather Morgan, to assist him in his laundering, and they did things like traveling to Ukraine and Kazakhstan to meet with couriers delivering money mule packages for bank accounts.

They were meticulous and devoted to laundering these funds, which was a difficult task, given the volume of Bitcoin that the Defendant had stolen.

In total, he and Ms. Morgan were able to launder about 21 percent of what he stole, which is about 25,000 Bitcoin. At the time of the hack, that 25,000 Bitcoin was

worth around $14 million. At the time of the Defendant's arrest in 2022, those funds were worth about a billion dollars.

So again, we would like to underscore for the Court the seriousness of the Defendant's crimes here.

Second, regarding the history and characteristics of the Defendant, we understand that he overcame a challenging childhood and has no official criminal record. He's definitely a smart, skilled and talented person to have gone from his initial circumstances to where he ended up in Silicon Valley and then Manhattan.

However, the theft from Bitfinex was not his first hack. At a young age, he chose to use his intelligence to engage in hacking and financial fraud, which had a troubling trajectory. And while we appreciate the defense's submission and the details surrounding the Defendant's personal life, so things like his family ties, his issues with drugs and alcohol throughout his life, according to 5H1.1 -- sorry -- 1.4 and 5H1.6, drug and alcohol dependence and family ties are generally not permissible considerations at sentencing.

The Government believes that the Defendant's pattern of behavior weighs in favor of a significant sentence here, but our assessment of the value of the Defendant's cooperation and his circumstances are reflected

in our sentencing recommendation, which I will discuss further in a moment.

Third, regarding general deterrence, we believe a sentence of incarceration here will send a needed message to other criminals in this space who might otherwise think that they can hack into a victim's network without receiving any punishment.

Here, though, the Defendant chose to cooperate with the Government immediately, which is very important. He took full responsibility for his actions, and as discussed in the Government's sealed filing, the Defendant's assistance has benefited numerous investigations and cases.

So while the need for general deterrence weighs strongly in favor of a sentence of further incarceration, it's important to acknowledge substantial assistance provided by individuals charged with this type of nonviolent crime.

To the extent that the sentence will send a message to other cybercriminals, we want to emphasize that an important message for us is that it would highlight the significant benefits to those who decide to cooperate early with the Government.

Regarding specific deterrence, given the Defendant's decision to --

THE COURT: Slow down. Slow down. The court

reporter is struggling here a little, though she's excellent. Go ahead.

MS. PECK: Regarding specific deterrence, given the Defendant's decision to cooperate almost immediately in this case, the Government is not as concerned about specific deterrence as it relates to the Defendant.

Fourth, and finally, the need to avoid unwanted sentence disparities: As the Court read in our submission, we are unaware of any factually similar money-laundering conspiracy or conspiracy to defraud cases involving the same elements here.

In this case, we have a massive theft, $72 million in 2016, worth $10 billion today. We also have significant technical sophistication. But we have a Defendant who chose to cooperate with law enforcement right after being arrested.

The defense cites six examples of cases in their sentencing memo that they think involve similar sophistication and scale. There's one case that they cite from the D.C. District and then five cases that they cite from the Southern District of New York.

However, those cases are all factually distinguishable from this situation. For example, the only D.C. District case that they mention involved Defendant Daniel Zancan. In 2017, Zancan was arrested after he stole

$4 million from his employer, and he stole those $4 million because he was conned into thinking that the Mafia was threatening to hurt his mistress.

So in other words, he committed those crimes out of duress, not because he was interested or wanted to commit the crime, as is the case with the Defendant.

So again, this Defendant is in a wholly different circumstance.

The Southern District of New York cases that are cited in the Defendant's sentencing memorandum involve fraud, stealing funds from a darknet market called Silk Road, the operation of a virtual currency exchange in violation of the Bank Secrecy Act, and the theft of $10 million from elderly victims through a telemarketing scam.

Again, none of those cases are on point; and that's why in our submission we explained that we were not able to find examples of any factually similar scenarios here.

Because of that, and for all the reasons that we've outlined today and in the Government's sentencing memorandum, we believe that a downward departure from the guidelines range is appropriate and we recommend a sentence of 60 months at offense level 25.

We believe a sentence of five years' incarceration

 is appropriate and sufficient but not greater than necessary to support the purpose of --

THE COURT: I think you meant supervised release.

MS. PECK: Yes. Apologies.

THE COURT: Okay. I see what you're saying. All right.

MS. PECK: Unless you have further questions, we'll rest on our papers.

THE COURT: No. I think one of your colleagues wanted to give you something, though.

MS. PECK: We just had one point of clarification, your Honor.

The modified PSR update improperly added the minus two zero-point offender, which was not previously included and is not applicable to the Defendant here, because of the personal harm caused to Bitfinex, which is why the calculation was meant to be 32. Sorry.

THE COURT: Well, I ruled on it. That's why you got a written memorandum opinion.

MS. PECK: Okay.

THE COURT: I'm granting it.

MS. PECK: Thank you.

THE COURT: Counsel?

MR. ENZER: Thank you, your Honor.

We do not dispute -- there is no dispute here --

that the crime that Mr. Lichtenstein committed was very serious, and in many ways tragic. It was tragic that a person with such promise at 28, who had created his own company and has such talent and ability, fell into such a dark place with abuse of Adderall and feelings of pressure that he chose to hack into the Bitfinex exchange, steal the Bitcoin, launder it, and involve his wife, among others.

We don't dispute that. It is -- it is a fact. It is tragic. It is terrible. And for what it's worth, Mr. Lichtenstein is full of remorse and shame over that and his family is full of shame and remorse over that.

But that is not the end of the story here. And it shouldn't be the end of the story. Because he is more than the biggest mistakes of his life. And there is also no dispute that ever since being arrested -- indeed, I would submit even before -- he has done everything he can to rectify the harm that he has caused through his conduct. He has done that by fully accepting responsibility. He has done that by cooperating to a degree that the Government itself calls extraordinary.

And the Government talked a lot about the amount of money that was taken. But what they didn't say is that more than 96 percent of those funds have been recovered. And a significant portion of that was recovered as a result of his assistance.

Now, I think there are several very important mitigating facts here. One is his full and utter and complete acceptance of responsibility.

The second is his cooperation to such a degree that the Government has called it extraordinary. His -- which included -- I'm going to talk more about the details of it -- but it includes testifying in a public trial that helped the Government secure a very important conviction, and endangering himself at a time when he was and is incarcerated in a place where cooperators, where rats, snitches, get beat up or even killed, because that is not acceptable in the custodial environment of a federal jail.

And it's also important to note, he has been in jail for nearly three years. Him and Heather, the love of his life, they were married -- they had their wedding in November of 2021. Just a few months later, in February of 2022, he was arrested. He has been in custody since then.

The bulk of his young marriage, he has been in jail. They have been in marriage over phone and -- over telephone and emails and letter.

And although there is so much hanging over him, although he is ashamed and has been publicly ridiculed, he has done everything he can to look forward in life and make the best of the situation. He has approached cooperation with the same vigor, the same intensity, the same commitment

that he approached every entrepreneurial project that he ever had, even down -- back when he was a kid taking apart toys to understand how they worked and taking apart computers to understand how they worked.

He has been a model inmate. As an inmate, he works in the jail. He works in the library. He helps teach other inmates finances and supports them. And, indeed, your Honor has a letter of support from one of the fellow inmates attesting to that. And he has focused on what he can do in the next chapter of his life. And there's no dispute here that this is someone who should be returned to society and has a bright future. You heard it from the Government. You've heard it from us. You've heard it from letters of support.

He is a genius, a computer genius. He could make real contributions to society as somebody who helps with cybersecurity and helping companies with anti-money laundering compliance. There's a whole industry of penetration testing, companies that hire folks like Mr. Lichtenstein. And the Government says, you know, he committed the most complicated scheme. That's why he's such a valuable asset. And he wants to put that skill to work. And it's time to let him do that.

We ask your Honor that he be given a sentence of time served. The Government has said he's a low risk of

recidivism. That's their -- those are their words. And they have said -- they have no -- they don't have concerns about specific deterrence.

I would submit to you, your Honor, the record here shows there is no risk of recidivism for him. He is never going to commit another crime in his life. He's never going to spit gum on the sidewalk again in his life.

And to the extent the Court has any concerns, supervised release is a tool that can be used to ensure that he has proper supervision when he gets out, as is home incarceration. If the Court wants to release him from prison and give him a term of home incarceration, that is also a suitable -- an accommodation that can be done short of continuing to keep him in custody, which will serve no good purpose.

Now, we respectfully submit that his cooperation alone warrants a sentence of time served in this case.

His cooperation was early. The Government acknowledges that he cooperated very quickly after being arrested. But as we put forth in our submission, he was prepared -- he was contemplating cooperation even before that. The circumstances here were that he learned of the Government's investigation before they did a search warrant of his house and before they arrested him.

THE COURT: Well, they did some -- getting rid of

some evidence, didn't they?

MR. ENZER: I'm sorry, your Honor?

THE COURT: Didn't they get rid of some evidence as well?

MR. ENZER: Certainly. They certainly did. But they didn't run. They didn't go to Dubai or a country that doesn't extradite. And he had the means to do it.

And I'm not telling you, your Honor, that he's a saint. But I am saying he was not going to run from this. He knew he was going to accept responsibility. That was his intention. And we were in a dialogue with the Government about his possible cooperation. His wife had a surgery. They said: Let her have the surgery. You'll have time. We haven't made a charging decision. They ended up arresting him earlier than expected before he could respond to their offer. Okay?

What I'm saying is, it was possible he would have cooperated without being arrested. And all of that goes to the factor of early cooperation, one of the factors in weighing whether his assistance was substantial.

The second is the quality of it. The Government has called it extraordinary. And their sealed submission and our sealed submission go into the details. I know your Honor has read them.

The public aspect of it is he testified at the

trial of Mr. Sterlingov, who ran a very significant money-laundering operation called Bitcoin Fog. Mr. Lichtenstein helped the Government prepare, helped them understand the technology. And his testimony helped them secure a very important conviction.

And in that trial, the defense lawyer broadcast on social media that Mr. Lichtenstein was cooperating. That put him in danger. He did it anyway. And he's willing to testify at further trials for the Government.

And there's other things in the sealed submissions that go into how his assistance was helpful. And I'm not going to go into all that, your Honor --

THE COURT: That's why it's sealed.

MR. ENZER: Sorry?

THE COURT: That's why it's sealed.

MR. ENZER: Right.

One thing I think I can talk about is that he was completely truthful. In his first proffer with the Government -- and mind you, this is at a moment when he does not have an agreement; he does not have assurance that his assistance to them will be rewarded -- he gave them what they needed to recover over $100 million in funds. That was a huge leap of faith.

And that is a leap of faith that deserves recognition. It deserves to be rewarded.

And not just for his sake, but for the Government's sake. When they go to try to flip the next cooperator, they should have in their arsenal the fact that, in this district, cooperators are rewarded when they take that leap of faith.

And as I've already mentioned, your Honor, he put himself in personal danger.

The Government has talked about deterrence. But the flip side of deterrence is the importance of signaling to the world that those who assist the Government in prosecuting serious wrongdoing and put themselves in harm's way to do so will receive a benefit.

And he's done close to three years in prison as well. So I find it hard to believe that anyone evaluating the overall record would say that he got a slap on the wrist. It has not been a cakewalk for him, to be in the jail he's been in.

And as we note in our submission, your Honor, what the Government is proposing here is really a 50 percent reduction from the bottom of the guidelines range.

That is not an extraordinary reduction. If his cooperation is truly extraordinary, as they say it is, he should get a reduction that is commensurate with extraordinary --

THE COURT: Which I believe is around 70 percent,

you're asking?

MR. ENZER: I believe that's correct, your Honor.

And the average, as we know, in the 2023 source book of federal sentencing statistics, the average for money laundering sentences is -- cooperators is 62 percent. That's the average.

In terms of the nature -- we think that the Section 3553(a) factors also counsel in favor of a sentence of time served, separate and apart from cooperation.

In terms of the nature and circumstances of the offense, what we'd like to highlight is there are mitigating facts surrounding the crime. He was 28. He was under immense pressure. He was abusing Adderall. And as set forth in the report, the medical report that we put in with our submission, that can impair judgment. We're not saying this was an impulsive decision. But when someone is abusing -- is under the cloud of drug abuse from Adderall, that can seriously impair their judgment. And what's important about that is, today, he is older. He is more mature. He has learned from these mistakes and he has been drug-free for the entire time.

And he is completely willing and would welcome a condition of supervised release requiring that he go to drug treatment, mental health counseling. He is committed to never again abusing drugs in his life.

In addition, your Honor, in terms of the nature and circumstances of the offense, he has pled guilty and admitted to the entire conspiracy.

But in terms of looking at the facts of what happened with the funds, it's important to note the vast bulk of the funds were never spent. That's why they were recovered: They were never spent. I think that the facts of what happened here show that he was in over his -- he got in over his skis. He was curious. He did this terrible thing. For many months he didn't even touch the funds. Many of the funds he never moved.

That conflict, just like his acceptance of responsibility, is a sign that he is a person who is capable of being rehabilitated and has been. The conflict, the internal conflict that is shown by the way he behaved, is also a sign that this is not an evil person. This is a good person who made some very big mistakes. But he will not make those mistakes again.

His history and characteristics: Again, these weigh in favor of leniency here. He is not a person who was born of immense wealth and committed this crime out of greed. He came from extremely modest beginnings.

Your Honor has read the papers. He was in the Soviet Union, experienced poverty there with his family, antisemitism and discrimination. They came here as

refugees. They started in Chicago in one of the poorest neighborhoods. Their first furniture -- they got their first furniture on the street as throw-aways from other families.

And I think that he has, throughout his life, had this sense of desperation, desperation that he needs to succeed, that he needs to succeed for himself and for his family. And that had a very negative impact in the case of this crime. But it can be turned to great good when he is released because of the mindset he has today.

And he comes from a good family, a family that is shocked and embarrassed by this conduct, but that stands by him. His wife stands by him. His parents stand by him. And his in-laws stand by him. They know him. They have lived through this. And the fact that they stand by him is a reflection of their judgment that he is not going to ever do this again.

And as I've said, he is a computer genius and can put it to great productive use, and wants to do that in the next chapter of his life.

In terms of just punishment, respect for the law and deterrence, on balance, he has done close to three years in prison, and this is in an environment where he has personally witnessed over 12 assaults in the jail. It is terrible for him there because he has a very serious back

condition, scoliosis, a very serious digestive condition, GERD, and night terrors. He has night terrors when he sleeps.

All of this combines to make being in prison and sometimes sleeping on the floor, concrete, terrible. There are rodents all over the place, mice, rats, cockroaches. He got COVID there. They didn't give him a vaccine. And there are lockdowns all the time. Sometimes they last for days. On several occasions, they lasted a full month where he has to be contained for 22 hours, can't talk to his family, can't talk to his wife, can't talk to his lawyers.

Do we really need to continue to incarcerate him for another two years, as the Government asks?

And if he had been sentenced already to the five-year sentence that they're recommending, because of the credits he would have received under the First Step Act and good time, a five-year sentence would effectively be time served. But he isn't eligible for any of that because he was detained in a jail, a pretrial detention facility, to make it easier for them to access him as a witness. And that's in our submission, your Honor.

THE COURT: I'm not sure I understand that argument.

What does the First Step or anything have to do with where he's detained? I mean, the Marshals Service

chooses a place to hold them. That would ordinarily be in the jail. They put them someplace else. Do I have something that I don't understand here?

MR. ENZER: (Confers with the Defendant privately.)

Your Honor, our understanding is you cannot earn First Step Act credit when you're detained at a pretrial detention center. You have to be designated to a prison to earn the credit.

THE COURT: That's correct. That's correct.

MR. ENZER: And that's what we're saying.

THE COURT: But where he's detained doesn't make any -- in terms of the pretrial, it doesn't matter whether he's at the Alexandria facility or whether he's sitting at the D.C. Jail. I mean, pretrial, they're not going to send him to a Bureau of Prisons place. But if you're talking about you don't earn it until the Bureau of Prisons designation is done, I'd have to go back and look. That -- First Step is not simple.

MR. ENZER: Our point is simply that he is not going to get any of that credit for the three years or close to three -- 33 months he's --

THE COURT: He gets credit for being detained. He gets credit for being detained. So the period of time, whatever sentence he gets, he gets credit for the period

that he's been held.

MR. ENZER: Right.

THE COURT: In terms of deciding whether the First Step works or not, frankly is a fairly complicated calculation in terms of taking a look at it. But, you know, I haven't -- the argument that you made, I didn't understand it as he wouldn't get it because he wasn't sitting at the Bureau of Prisons. He doesn't get it until, presumably, there is actually a sentence imposed, which I think is the issue, not so much where he is. But I think it hinges on whether he's been sentenced.

MR. ENZER: That's right, your Honor. But we think he would have been sentenced earlier if he had been a less prodigious cooperator. If he had not been as effective as a cooperator, we expect he would have been sentenced earlier.

THE COURT: Well, then he might not have gotten credit for the cooperation. This is sort of a -- everybody who cooperates always winds up with a period of time where they cooperate and they don't get sentenced during that period of time. So, you know, there's -- the benefits are -- you weigh the benefits of whether you want to cooperate. It puts it off. But you then have the opportunity to argue that the sentence should be less.

MR. ENZER: Certainly.

In terms of his future, on the issue of deterrence, the Government has acknowledged, and we appreciate them acknowledging, they don't have a concern about specific deterrence, meaning they don't think he's going to recidivate. And so it's really a question of general deterrence.

But we think that what he's been through, close to three years, in light of -- balanced against the mitigating facts and his significant cooperation, that that counsels in favor here of a sentence of time served. And the Government has pointed out that the cases we've cited in terms of unwarranted sentencing disparities are not on point. There are no two cases that are identical.

THE COURT: Well, I would agree with that.

MR. ENZER: Right.

THE COURT: There are no cases that fit this particular model.

MR. ENZER: This is a unique case. We've done our best to marshal cases that are similar enough that they're informative. And they do point to conduct that is, we submit, more serious, or equally as serious, to what Mr. Lichtenstein did. And those individuals received sentences much lower than what the Government is recommending.

And I can say -- I know it's not exactly the same.

But when I was a prosecutor in the Southern District of New York, I handled many cases, including murder cases. And we had many cases where cooperators in murder cases, cooperators who had killed people, received sentences in the range of three to four years when they had cooperated and testified and done what they were required to do to earn a motion under 5K1.1.

Obviously, it's apples to oranges. But if someone who has literally killed can, under the 3553(a) factors and under the 5K1 considerations, when it's all put through the balancing, end up with that kind of sentence, it certainly is appropriate here.

Thank you, your Honor.

THE COURT: So let me see if I understand your argument.

It's approximately a 70 percent reduction. And the reduction that they have discussed, as the Government has discussed, is based on a downward departure based on the 5K1.1.

Your argument appears to be it's based on 5K1.1 and other things.

The other things, are they -- would you view them as departures? Or -- you know, what would you view them as --

MR. ENZER: I would call them --

THE COURT: -- in terms of --

MR. ENZER: -- a variance.

THE COURT: -- what category --

MR. ENZER: I would call them --

THE COURT: -- would you put them in?

MR. ENZER: -- a variance, your Honor.

THE COURT: I'm sorry?

MR. ENZER: I would call them a variance, a downward variance.

THE COURT: That's what I was getting at, because they're factors to be considered, but they don't fit the departure, at least the way the guidelines have been set out.

MR. ENZER: That's right, your Honor. If you're looking at a framework, the cooperation is a departure and it goes under 5K1.1. And our position is that alone justifies a significant enough departure to get him time served. I suppose it's 70 percent.

Putting that aside, under Section 3553(a), those factors justify a downward variance to a sentence of time served. That's our position.

THE COURT: Okay.

I don't know -- did you want to respond to the one technical thing? If you don't, that's up to you.

MS. PECK: I'm sorry to do this. But if it would

be okay, going back to the PSR issue, can we address the issue with Probation's email to the Court in response to your order? Unfortunately, when they did their computation, they ended with a total offense level of 30. The total offense level is meant to be 32.

Your Honor adopted the final PSR, including this --

THE COURT: So you're arguing about the zero-point?

MS. PECK: Exactly. Yes.

THE COURT: Okay.

MS. PECK: And we've briefed for your Honor why we contend that he is excluded from zero-point offender on other grounds. And so --

THE COURT: I have suggested that, having gotten this on the 12th, that if you had an issue, that you should have brought it as opposed to orally here. The other side, nobody has briefed it.

I'll take a break and take a look at it in terms of whether I feel that I was incorrect in granting it. But it would have been better to have raised it -- since you got the memo two days ago. I mean, my order -- that's why I put it in writing, so if people have issues, they come back.

MS. PECK: Your order is correct. Their calculation --

THE COURT: Right.

MS. PECK: -- their updated calculation is incorrect, which we got yesterday. And I apologize that we didn't catch it yesterday. Your Honor, we would have briefed it and responded to it.

THE COURT: Okay. Well, let me hear what your argument is.

MS. PECK: Our argument that we've made previously is that he -- basically, that he caused substantial financial hardship, under 4C1.1(a)(6), to Bitfinex, and so he is excluded from the zero-point offender reduction of two additional points.

Probation was making --

THE COURT: I know which one you're talking about.

MS. PECK: Apologies, your Honor.

THE COURT: That's all right.

MS. PECK: Probation was making the argument that he didn't apply because they were saying that he had the aggravating role. And so when your Honor, in your order, said that he was not qualifying for the aggravating role, Probation then went back to having that minus two for the zero-point offender. But again, our contention is that he is excluded on other grounds.

THE COURT: Okay. Defense?

MS. FLETCHER: Thank you, your Honor.

So while we appreciate the Probation Department's effort to give Mr. Lichtenstein an additional two points, the plea agreement does say and does -- he did stipulate that he caused substantial financial harm to a victim. And so --

THE COURT: You would agree that he should not get the two points?

MS. FLETCHER: Yes, your Honor. The total offense level in, I think, the Government's view and in ours should be 32.

THE COURT: All right. Then what I'll do is I will take a break, make a change before I hear from the Defendant.

(Thereupon a recess was taken, after which the following proceedings were had:)

THE COURT: All right. My memorandum opinion is correct. And in it, it has the total offense level as 32.

I made an incorrect assumption when I received the redone presentence calculations that they had adopted it. That was my fault for not taking a better look at it.

But it clearly should be 32, because that's what I ruled on in my opinion.

So let me correct the record briefly.

The base offense, then, is 34. The two levels based on Section 1956 added -- two levels added,

sophisticated laundering; and minus three for the -- is reduced by three based on the acceptance of responsibility -- well, incomplete laundering. That's right. Incomplete conspiracy. Acceptance of responsibility, minus three. Which comes to 32.

So the range is 32, Criminal History I. Custody is 121 months to 151 months. Supervised release is one to three years. Probation is -- he'd be ineligible for. The fine is 35,000 to 500,000. Restitution is to be determined. The special assessment is $100.

So let me hear from Mr. Lichtenstein if he wishes to address the Court.

THE DEFENDANT: Your Honor, I am here today because eight years ago I made a terrible mistake. I stole a lot of money. I devised a complex money-laundering scheme. I lied to friends, family and financial institutions.

I know now that just because my criminal activity took place in cyberspace rather than in the physical world, that does not make what I did any less serious.

I am so, so sorry. I deeply regret squandering the opportunities that were given to me and wasting my talents on crime instead of positive contributions to society.

I was a very different person back then. But that

is no excuse. I don't want to make any excuses for my unacceptable behavior. I want to take full responsibility for my actions and to make amends in any way that I can.

First and foremost, I want to apologize to all of the users, employees and shareholders of Bitfinex who have been impacted by my bad acts.

I've been a technology entrepreneur myself. And I know how stressful running a business can be. I am deeply sorry for any additional stress that I have caused you to experience. And I want you to know that from the very beginning of this case, I have done everything I could to ensure all assets are recovered and restitution is paid in full.

In the future, I hope to have the opportunity to meet with Bitfinex to help fix all of the security issues that I had discovered.

I want to apologize to the Government. I am aware that significant government resources were expended on investigating and prosecuting this case. And I hope that the assistance that I have provided over the last three years has in some small way begun to make up for that.

And I want to apologize to my family. I was raised to be better than this. I have put you through a lot of heartache, and I will work hard every day to make it up to you.

I have now been incarcerated in pretrial detention for almost 1,000 days. That is a lot of time to think. That is a lot of long days and longer nights to reflect on where I went wrong in my life and how to make certain that it will never happen again.

There was not much to do in jail except watch TV or read. I chose to read. And I read anything I could get my hands on.

Occasionally, I was able to get hold of a newspaper. One section of the newspaper fascinated me more than anything else: the obituaries. These short stories that summed up an entire life affected me powerfully.

I was struck by how all of these ordinary people were remembered for all of the good they had done throughout their lives. And I thought: If my obituary were written today, what would it say about me? That I was a thief? A money-launderer? A criminal? This idea stayed with me. Thinking about how my life would be summed up got lodged in my brain and wouldn't leave. I thought about how my actions would be evaluated, and I hated myself. I hated myself.

But then I resolved: I will not let my life be defined by the worst thing I have ever done. I have to find a way to pay my debt to society, not only through years in jail, but also by doing good. And I realized that it is not too late to tip the balance of my life in the right

direction.

I have a particular set of skills. And I believe that I can apply those skills to a productive and successful career in the cybersecurity industry.

Our nation faces so many cyber threats from both domestic criminals and foreign adversaries. I know that if I apply myself, I can make a real difference in the fight against cybercrime.

I desperately want to start being part of the solution and not part of the problem.

My goal is to stop more crime than I have perpetrated. And I plan to dedicate my life to that effort.

Finally, I would like to ask the Court for leniency for my wife, Heather, who will be sentenced in a few days. Heather is only involved in this case because of me. And I am completely responsible for everything that has happened.

If you are thinking of giving Heather any more prison time, please give that time to me instead. I deserve it so much more than her. Heather means everything to me, and this is all my fault.

Thank you.

THE COURT: Thank you.

All right. In addition to the advisory sentencing guidelines, the Court considers the pleadings, arguments and

record in this case, in addition to the following information, in determining a fair, appropriate and reasonable sentence in conformance with the factors set out in 18 USC 3553(a) and subsequent sections.

The Defendant is 37 years old. There is no criminal history, prior history.

In terms of education, he has a college degree in psychology. He is self-taught in the extraordinary skills that he evidently has in computers. He also has an OSHA certification that he obtained in 2023.

In terms of job history, which I'll do in a very summary form, from 12/20 until his arrest he was a venture partner for Pioneer Fund. He worked part-time in independent research, completed investigations and evaluated investments. And he earned a small percentage of equity in the company.

From 2014 to his arrest, he was an advisor to his wife's company, helped build a business, and he took no salary.

From March of 2018 to December of 2019, he was the CEO and CTO of Endpass, a software company. He had nine employees. That wound down in 2020. He provided computer programming services.

From May 2011 to May 2016, he was the CEO and cofounder of MixRank, a software company that had around 30

employees. He left when he had differences with his cofounder.

In 2007 he founded Nexus Global, a digital marketing agency. That was closed in 2010. And then, in June of 2013, the corporation dissolved involuntarily. This was a company that he set up while he was in college.

In high school, he operated a successful online computer recycling and refurbishing business. So he has been using his computer skills, which I would agree are extraordinary, since high school in terms of setting up, as an entrepreneur, different businesses that he had an interest in and that he was able to be successful up to a point at.

In terms of finances, the cryptocurrency accounts have been forfeited. Other proceeds that are forfeited will be setting aside assets subject to the forfeiture. So at this point, I will find no financial ability to pay a fine in addition to the restitution that he will be required to pay, as well as the forfeiture.

[redacted]



So the part that talks about substance abuse through the mental health should be put under seal.

In terms of physical condition, he has a particular condition of his back that provides pain to him, which is a condition that is, as far as I know, a permanent condition.

On a personal basis, he was born in Russia to an intact union. His father now is employed as a property manager. His mother is a biochemist. His parents reside in Illinois. He has a younger brother who's a healthcare consultant who was born in the United States. His parents are naturalized citizens.

The Defendant immigrated in 1994. In 1999, he became a U.S. citizen. He's not subject to removal. He

does still maintain, evidently, a Russian citizenship. He came when he was around -- to the United States when he was around six.

While the Defendant resided in Russia until he was six, he lived in what has been described as impoverished circumstances. At this point the Soviet Union was collapsing. There was a lot of antisemitism and he and his family were certainly victims of it.

His family, with the Defendant, immigrated to the U.S., as I said. They first went to a city in Illinois where they had some issues as well. And then, ultimately, they were able to move to the suburbs.

Their grandparents came to take care of the Defendant and his younger brother. His parents worked. His father received his master's degree and his mother a doctorate.

The father eventually worked in IT at an earlier time, and his mother was a researcher.

The Defendant had some adjustment issues when he arrived in the United States. He didn't speak English and there were different issues in terms of adjusting and integrating into American life. And evidently, as a child, when he first came to the United States, he was bullied for being, in essence, different.

He has positive contacts and support from his

family. The letters certainly attest to that.

In 2019, he married the Co-Defendant, Heather Morgan. They have no children at this point.

He's lived in Russia, Chicago and Madison, Wisconsin, for college, a period in San Francisco from 2010 to 2017, New York. And on his release, he plans on living with his wife.

Some of this I've redacted. Ordinarily, I probably would give a little bit more detail. But some of the information, we were requested to redact it, so -- the information that is in the redacted material is what I've considered, even though I've elided over, you know, what some of these things are. But I know what the actual information is.

In terms of the offense, the easiest thing, in terms of presenting it, is to go through what he actually agreed to in terms of his statement of offense.

I don't know that I need to give the background regarding virtual currency, the Bank Secrecy Act and FinCEN. I think I will start with the scheme to defraud, which is Paragraph 12.

Beginning in or around late winter and early spring of 2016, Lichtenstein knowingly and willingly devised a scheme to defraud victim BCE by means of materially false or fraudulent pretenses, representations or promises.

Lichtenstein conducted online research and reconnaissance of the computer infrastructure used by victim BCE. While physically located in the United States, Lichtenstein identified and compromised computer servers belonging to victim BCE outside the United States. Lichtenstein utilized a number of advanced hacking tools and techniques, commonly known as exploits, to gain unauthorized access to these computer servers.

Lichtenstein also used penetrating testing software frequently used by cybercriminals, as well as cybersecurity practitioners, because this software provides data about security vulnerabilities and assists in simulating a cyberattack on a computer system to see how the system would respond.

Lichtenstein concealed his activities through a variety of means, including by routing his internet traffic through Tor network, through compromised computers that he purchased via a dedicated remote desktop protocol, marketplace, and through intermediate proxy servers, servers that act as a gateway between users and the internet, including SOCKS, residential proxies rented via online marketplaces. SOCKS, or socket secure, is an internet protocol that exchanges network packets between a client and server by using a proxy server.

Lichtenstein worked late at night to give the

appearance that he was operating from another country. Though the servers that Lichtenstein initially compromised did not provide access to virtual currency wallets, Lichtenstein was able to use his access to compromise additional servers and subsequently defeat numerous security measures on victim BCE's network. Lichtenstein ultimately gained access to the keys, or credentials, used to authorize transactions involving virtual currencies held by victim BCE, including funds belonging to customers of victim BCE.

In or about August 2016, Lichtenstein used his access to victim BCE's keys to fraudulently authorize more than 2,000 transactions in which approximately 119,754 BTC was transferred from victim BWC's wallets to an outside wallet, Wallet 1 CGA 4S.

Under Lichtenstein's custody and control, at the time of the hack, the stolen virtual currency was valued at approximately 71 million.

Following the hack, Lichtenstein took steps to conceal his activity, including by returning to victim BCE's computer systems and deleting access credentials and certain log files that might lead investigators to determine that someone had gained unauthorized access.

In the course of the hack, Lichtenstein, while located in the United States, transmitted and caused to be transmitted writings, signs and signals by means of wire

communication in interstate and foreign commerce over the internet to victim BCE's computer servers located outside the United States.

During the course of the reconnaissance phase of the hack of victim BCE, Lichtenstein gained unauthorized access to victim BCE's customer log-in credentials. Lichtenstein used these customer credentials to engage in credential spraying; that is, using the customer credentials stolen from victim BCE to attempt to log into other accounts, targeting user accounts at other virtual currency exchanges.

As a result of these efforts, Lichtenstein fraudulently obtained access to customer accounts at a second virtual currency exchange, BCE A, and stole an estimated several hundred thousand dollars' worth of funds from BCE A customer accounts. Lichtenstein commingled these funds with the funds stolen from victim BCE.

Prior to the hack of victim BCE, Lichtenstein engaged in earlier, less significant hacking and financial fraud activity, including as a juvenile.

Lichtenstein developed an interest in virtual currency and darknet markets, including through various illicit transactions on darknet markets.

Prior to 2016 and separate from his theft from victim BCE, Lichtenstein located credentials to BCE A's

application programming interface that allowed him to withdraw funds through the exchange, API.

Lichtenstein used his access to steal approximately $200,000 from BCE A.

In addition, in or around 2015, Lichtenstein illicitly obtained and transferred a small amount of PayCoin, an alternative form of virtual currency.

Now, obviously, I'm using what he had indicated when we read the thing. Obviously, we know what the company is. But I'm going to use what he agreed to.

Lichtenstein studied how transactions are traced on the blockchain and formulated a detailed plan that was designed to reduce any perceived illicit taint of the funds over time.

First, Lichtenstein left the stolen funds sitting dormant in Wallet 1 CGA 4S until beginning in or around January of 2017, when Lichtenstein began to move a portion of the stolen BTC out of that Wallet 1, I'll call it, in a series of small complex transactions across multiple accounts and platforms.

This shuffling, which created a voluminous number of transactions, was designed to conceal the path of the stolen BTC, making it difficult for law enforcement to track/trace the funds.

Next, Lichtenstein moved some of the stolen funds

from Wallet 1 to another large staging wallet, from the staging wallet into other wallets which were not otherwise linked or associated through numerous accounts at multiple darknet marketplaces, including AlphaBay and Hydra, using multiple segregated input and withdrawal addresses, and through CoinJoins, mixers and exchanges that did not require "know your customer" information about their users.

Following the hack, Lichtenstein enlisted Morgan's help in laundering the stolen funds.

Morgan was initially unaware of the specific origin of Lichtenstein's proceeds, although she participated with Lichtenstein in efforts to conceal and obscure the source of the funds, while knowing and understanding that the funds were the result of some unspecified, unlawful and fraudulent activity.

Sometime after the hack, but by no later than in or around early 2020, Lichtenstein explicitly told Morgan that Lichtenstein was responsible for the 2016 hack of victim BCE.

The following steps were taken in furtherance of the money-laundering scheme. A: Setting up numerous accounts as USFIs and VCEs to stay below transaction thresholds that would require enhanced customer due diligence by financial institutions.

B: Converting stolen funds into fiat currency

through Russian and Ukranian bank accounts and then withdrawing the laundered funds at U.S.-based ATMs.

Converting stolen BTC into a virtual currency named Monero XMR, which is an anonymity-enhancing virtual currency with a non-transparent blockchain via exchanges that did not require KYC.

D: Using intermediate unhosted wallets to avoid exchange-to-exchange transactions that would undermine the anonymity benefits of using XMR, darknet markets and CoinJoins, mixers, such as Bitcoin Fog, Helix and ChipMixer.

E: Converting a portion of the stolen funds to Tether, USDT, and USD Coin (USDC), which are both stable coins pegged to the U.S. dollar, as a means of avoiding the price volatility associated with holding other virtual currencies, such as BTC, the price of which fluctuates daily.

F: Using exchanges with high sale limits and setting up multiple accounts at numerous exchanges in order to launder large amounts of stolen funds.

G: Using preexisting KYC-verified accounts purchased from illicit vendors offering profiles designed to defeat exchange AML controls.

And H: Using accounts at USFIs and VCEs opened under Lichtenstein's and Morgan's true names and/or the names of their businesses, including accounts VCE 5, 6, 7,

8, 9 and 10.

And I: Converting a portion of the stolen funds into gold coins, which were further concealed by Morgan when she buried them at a location that has since been disclosed to law enforcement, which has been recovered, the gold coins, in full.

In engaging in the above-referenced conduct, Lichtenstein at times, with other assistance, employed numerous money-laundering techniques, including, but not limited to, using accounts set up with fictitious identities, moving the stolen funds in a series of small amounts, totaling thousands of transactions, as opposed to moving the funds all at once or in larger amounts, utilizing computer programs to automate transactions, a laundering technique that allows for many transactions to take place in a short period of time, layering the stolen funds by depositing them into accounts at a variety of VCEs and darknet markets, and then withdrawing the funds, which obfuscates the trail of the transaction history by breaking up the fund flow, converting the BTC to other forms of virtual currency, including anonymity-enhanced virtual currency in a practice known as, quote, "chain hopping," unquote, and using U.S.-based business accounts to legitimize activity.

Lichtenstein was assisted by Morgan with setting

up accounts with fictitious identities and using U.S.-based business accounts to legitimize the laundering transaction.

Additionally, over the course of their conspiracy, Lichtenstein, at times with Morgan's assistance, at his direction, converted stolen funds through the use of debit cards linked to foreign bank accounts. The foreign bank accounts were registered to Russian and Ukranian money mules who worked for brokers and who typically created the accounts in person at the foreign banks.

The accounts were then offered for sale by brokers on darknet markets and cybercriminal forums.

Lichtenstein acquired numerous accounts through such platforms, the purchased account packages, including a debt coded, a debit card, as well as identity document scans and the SIM cards associated with the phone used to establish the account.

Lichtenstein had the packages delivered to him during trips with Morgan to Kazakhstan and Ukraine. The packages were typically shipped via a shipping service or handed off by a courier in a prearranged public meeting place such as a train station.

Lichtenstein then sent BTC to Russian and Eastern European-based instant exchange platforms, which converted the BTC to fiat currency and deposited the corresponding fiat funds into the Russian and Ukranian bank accounts.

Lichtenstein and Morgan would travel to ATMs in the United States and use the purchased debit cards to withdraw funds.

Lichtenstein and Morgan would bring multiple cards per trip and use only one card per ATM to avoid suspicion.

In or around November 2021, Lichtenstein and Morgan learned that records related to an account held by Lichtenstein and used in furtherance of the conspiracy had been disclosed to U.S. law enforcement.

The provider controlling the account failed to process a valid and timely extension of a nondisclosure order issued by the U.S. District Court for the District of Columbia and notified Lichtenstein in violation of the court order.

The service provider had the obligation, as I understand it.

Upon receipt of the notice, Lichtenstein and Morgan took steps to further conceal their activity. For example, Lichtenstein deleted data from devices in the United States and abroad. And Lichtenstein and Morgan threw a computing device down a garbage chute when said computing device contained relevant inculpatory evidence related to this criminal scheme.

False statements and deceptions targeting virtual currency exchanges and other U.S. financial institutions:

During the period from in or around August 2016 through in or around February 2022, Lichtenstein and Morgan used false and fictitious identifying information to establish accounts, made false and fraudulent representations, and lied to and deceived VCEs and other U.S. financial institutions that they used to launder the illegal proceeds of the 2016 hack of victim BCE, including the following.

A: Between on or about August 22nd, 2016, and on or about April 20th, 2017, Lichtenstein established multiple accounts at VCE 1 using email addresses from the same India-based email provider and in the names of third parties unrelated to Lichtenstein.

B: In or around February and March 2017, Lichtenstein declined to respond to inquiries from VCE 1's employees requesting that the registered accountholders for seven of the accounts provide additional identifying information to verify their account ownership. As a result, VCE 1 froze the accounts.

C: On or about February 28th, 2017, in response to inquiries from employees from VCE 7, as part of VCE 7's AML KYC policies, Lichtenstein falsely and fraudulently represented that he would be using his VCE 7 account to trade only his own virtual currency that he had acquired as a result of his early investment in BTC.

D: In or about February 2018, Lichtenstein established an account at USFI 5 for Lichtenstein and Morgan's company and, in doing so, represented to USFI 5 that the primary payments into the account would be from software as a service customer payments. In actuality, Lichtenstein and Morgan used the account to launder the proceeds of the hack of victim BCE.

E: On or about January 8th, 2019, in response to a KYC verification email from VCE 10, Lichtenstein wrote to representatives from VCE 10 falsely and fraudulently stating that he has, quote, "been investing in mining BTC since 2013, so the source of funds would be those early crypto assets," unquote.

F: On or about June 27th, 2019, in response to an inquiry from a representative from VCE 7 about how her business interacted with virtual currency and how her new institutional account would be used, Morgan falsely and fraudulently responded. So -- I don't need to bring up the rest of that.

G: On or about July 2nd, 2019, Morgan further represented to VCE about the source of her cryptocurrency deposits. She gave false information. Those funds were, in fact, proceeds of the hack of victim BCE.

At all times relevant to this indictment, VCE 1, VCE 7, VCE 10 and USFI 5 were financial institutions doing

business in the United States and were subject to the Bank Secrecy Act and were registered with FinCEN.

Each of the accounts referenced above was used by Lichtenstein and Morgan to launder the illegal proceeds of the 2016 hack of victim BCE.

And the Government tracing has shown that the majority of the funds deposited into each account was derived directly or indirectly from the same stolen funds.

One purpose of Lichtenstein and Morgan's deception was to frustrate the AML KYC and due diligence efforts by the above-referenced VCEs and other financial institutions and thereby to prevent the transmission of SARs mandated under the Bank Secrecy Act to FinCEN and the U.S. Department of the Treasury in the District of Columbia.

So -- there are certain conclusions, but I think that certainly gives enough of a background as to what was involved with it.

Mr. Lichtenstein has also received several letters of support, so let me indicate what they have contained.

His mother provided details about his background, his talents, challenges and his accomplishments. Clearly, the Defendant comes from a very supportive and close-knit family. All of them have asked that he be given another chance.

His father, now an asset manager of the Housing

Authority of Cook County, Illinois, also discusses the challenges of coming to a new country and the struggles to integrate into a different society than the Russian society that they had left for a better life.

Both parents evidently feel that his move away from them to San Francisco was detrimental and his new company was a success but that it took a toll on him. And they describe the special relationship between the Defendant with his younger brother.

His wife describes some of her life, how she met the Defendant, how the friendship developed, her respect for his talents and, ultimately, the relationship that led to the marriage, gives accounts of instances where the Defendant, as an overworked executive, still took the time to take care of her, and also does discuss the addiction to Adderall. She does indicate that she thought that the therapy that he engaged in was helpful.

A friend who met him in grade school stayed in touch over the last 30 years. They bonded over shared interests in science, engineering and computers. He describes those childhood conversations as magical and remembers their family and how he and the Defendant shared career advice and that the Defendant welcomed him into his home.

His brother describes the Defendant that has a

special place in his life. There's 12 years' difference, evidently, in age. He states, quote, "I absorb passion, dedication, kindness and humility directly from and would be the person -- would not be the person I am without him," unquote.

He obviously cares for his family, in terms of the Defendant. And one example that was given, among others, was his taking a month off from his work to care for their grandmother. He also, the brother, describes the Defendant as a naturally curious person with a passion for technology.

Another friend who was connected to the Defendant's wife indicates they had met around 13 years ago, describes the supportive and loving relationship between the Defendant and his wife.

The mother-in-law: How supportive the Defendant is of his wife and encouraged her to start her own company, argues -- then she argues for leniency for the Defendant. The mother-in-law describes the Defendant and her daughter as two bright entrepreneurs that are excited to resume their life together and to start a family, unquote.

A friend who also has a professional relationship with the Defendant -- they met as tech entrepreneurs over 15 years ago -- in addition to his professional accomplishments, he describes the Defendant as having a good heart.

Another friend of ten years describes the Defendant as having empathy and care, not only for his family, but others.

There's other friends, also a mentor and advisor. They met at a technology conference -- he's a first -- the friend was a first-time entrepreneur -- and how selfless the Defendant was in giving him advice and support.

Another person describes the Defendant as warm and caring as a person and as a friend, and helped -- the Defendant helped his friend as a newcomer to the San Francisco area.

Leisure law librarian at the adult detention center -- he evidently works at the -- the Defendant works at the library -- that he has been assisting in the library, and she was favorably impressed with the Defendant and his work ethic.

Another friend who met in the Alexandria Detention Center described the Defendant as empathetic, earned respect from others, loyal and devoted to his wife and family.

The Defendant's father-in-law indicates that the Defendant has maintained a positive attitude while detained, has worked hard to maintain a healthy relationship with his wife during their separation; although the Defendant is stressed in jail, his wife is also as well, and he understands that.

Three other friends discuss specific incidents to describe the good character and how generous the Defendant is with his time and talents.

Another friend of the Defendant's wife, a technology executive, also describes the loving relationship that the Defendant has with his wife.

There is a forensic report that sets out a specific diagnosis which resulted in the use of the medication Adderall. It does indicate the addiction to Adderall that the Defendant has had. And I think, in sum, it indicates that it would -- the combination would make him more impulsive or inclined to be impulsive.

The supporters -- and I've gone through -- I read all of the letters as they come in, because they certainly present a different picture than usually the person that I see as committing the crime. So it's important to look at, and read, what others see or what other experiences have with them.

I have to say that the supporters describe somebody that doesn't match up with the Defendant in terms of his committing this crime. And certainly -- the crime was from 2016 to 2022, which is quite a long period of time.

The planning, the implementing of the hack was deliberate, took time, was very meticulously planned. And the -- also certainly the money laundering was also over a

period of time. Certainly the diagnosis and the addiction may have been an factor. But his criminal conduct I don't think can be said to be impulsive. We have -- the charges -- he's pleading to five years of engaging in very specific money laundering, which would be inconsistent with a view that these were impulsive decisions, which the forensic psychiatrist has described.

This is a very serious offense. The Government describes the initial theft by the Defendant, quote, as "one of the largest thefts from a virtual currency exchange," unquote, involving billions, ultimately.

The Government as well described the Defendant as, quote, "one of the greatest money launderers that the Government has encountered in the cryptocurrency space," unquote. And the Defendant successfully avoided detection for years, they note. I'm sure that these are not the accolades that you would want.

Starting in 2016, you devised -- you carried out a scheme to steal money from Bitfinex, one of the largest virtual currency exchanges in operation at the time. You set out details in very careful, sophisticated, meticulous actions you took to hack at the time.

The stolen virtual currency was valued at around 71 million and, by the next five years, you had laundered, you and your wife, millions of dollars' worth of stolen

funds. So I do not see them as being impulsive, but as being very deliberate actions. The hack and the theft caused serious solvency issues at Bitfinex.

The D.C. Circuit has concluded that laundering illegal proceeds represents a distinct injury to society, concealing and facilitating the underlying crime, the hack and the theft in this case, and interfering with law enforcement's ability to, quote, "detect illicit abuses of the financial system," unquote, which of course affects society by, quote, "impeding effort to track ill-gotten gains."

According to the Government, the Defendant and the wife spent stolen assets to support their lifestyle. Some of the laundered funds were left -- that were left at the time of the arrest so that they had not been moved out I think were -- what was laundered was 21 percent stolen from Bitfinex. In 2016, they would have been 14 million, I believe. In 2022, I think they're a billion in terms of the value.

The Defendant was forthcoming once arrested, but not before. So the arrest served to end their criminal conduct.

I would say, although defense counsel indicates that he was thinking of it, it wasn't done voluntarily until he was actually arrested.

I would also indicate that -- what would be contrary to the idea that he did this beforehand is, when they learned of the investigation, they destroyed some of the evidence.

In looking at the deterrence to the Defendant, he was an entrepreneur in high school, in college. He used his computer skills at two successful businesses. He certainly could have used his evidently extraordinary skills lawfully, but didn't do so.

Obviously, if not deterred, you're going to face serious consequences in the future.

Remorse for me is a factor. It's different than accepting responsibility. You accept responsibility. That means you accept that you did it.

Remorse has a different factor. And it's important, because it means that you understand what you did and it's something you should not do again. So that is a factor that I look at.

I have to say the statement that Mr. Lichtenstein made today, which I'll credit -- it's sort of hard to know whether people believe it or not, but I'll accept that you do -- certainly showed remorse and a full understanding of exactly what you did and the damage that you've done to both businesses, people, individuals. And there are consequences to your family as well.

The general deterrence, which is a particularly important factor, to other crypto criminals, you know, in terms of sophisticated schemes, investigations, they're very complex. They are generally very lengthy. And the ones that I have had, they're expensive and use a lot of resources.

So it's important to send a message that you can't commit these crimes with impunity, that there are consequences to it.

In terms of parity, I think this crime is unique in so many ways. I did look at the cases that defense counsel brought up, but I think they really don't match up. A lot of cases don't, when you look at them, but this one particularly I think is so massive that it's just not comparable to the other crypto crimes that were set out, both the scale, the technical sophistication and the cryptocurrency laundering.

But I think the Government evidently has looked at parity between the Defendant and his wife, and that seems -- as I understand it, that is one of the issues that he will be doing it.

Sort of positive aspects of this and other considerations: The cooperation has been substantial and effective. I have not set it out in detail. I don't think it's appropriate to put it on the public record. But it

certainly was substantial and effective. Counsel has indicated that some of it has come to light.

There will be a restitution order, and efforts have been made to retrieve the funds that were stolen.

The Defendant has not equivocated at all in terms of what he did. He has family support, which I always feel -- and, obviously, friends -- which I feel is important. They understand the crime that he committed, or know about it, but I think they're still there to support him.

He has no criminal convictions, which I think is important.

As background issues, I don't see them as -- you know, as a basis for a variance, the difficult background, early difficulties. His addiction that he has -- evidently appears to have conquered, and his diagnosis, the Court has looked at them. I don't think it's enough to -- you know, to do a variance beyond what I think should be considered as the downward departure under 5K1.1.

So I've granted the 5K1.1. The range is 121 to 151. The Government has requested a 60-month sentence, which is five years. The Government's reduction from the 121, just looking at the bottom, is basically 50.4 percent.

The Defendant, through counsel, has asked for time served, which is two years, nine months, and a couple of --

I think six days or something like that, which is around 70 percent.

In terms of the value of the cooperation, I do take into account that the Government is in the best position to determine the value of the cooperation in terms of -- because they basically have used this information, and they certainly have been very forthcoming about the usefulness and importance of the information he's provided and his cooperation.

I think over a 50 percent reduction is certainly commensurate with other cases that I've had where there's been cooperation, and at least defense counsel put on the record the one public proceeding. And I think it's a fair reduction based on combining the serious nature of the crime weighed against his cooperation.

So the sentence that I will impose is going to be the 60 months.

I hope, on release, that you will use your obviously extraordinary skills lawfully, as you have indicated you would, and that the life you lead at that point on release will define you in the future, and not your criminal conduct, which is obviously what you want to make sure of.

So pursuant to the Sentencing Reform Act of 1984, and in consideration of the provisions of 18 USC Section

3553, as well as the advisory sentencing guidelines, it is the judgment the Court that you, Ilya Lichtenstein, are hereby committed to the custody of the Bureau of Prisons for a term of 60 months on Count 1.

You are further sentenced to serve a 36-month, three-year, term of supervised release as to Count 1.

In addition, you are ordered to pay a special assessment of $100 in accordance with the statute.

While on supervision, you'll abide by the following mandatory conditions as well as discretionary conditions recommended by the Probation Office in Part D, sentencing options, of the presentence report, which are imposed to establish the basic expectations for your conduct while on supervision.

The mandatory conditions include: You must not commit another federal, state or local crime; you must not unlawfully possess a controlled substance; you must refrain from any unlawful use of a controlled substance; you must submit to one drug test within 15 days of placement on supervision and at least two periodic drug tests thereafter as determined by the protocol of the Probation Office.

They have particular protocols. If your tests are negative, you don't have to do it as often. If they're positive, they tend to require you to do -- but it's a set protocol.

You must cooperate in the collection of DNA as directed by the probation officer unless that's already been done.

You must make restitution in accordance with the various statutes authorizing a sentence of restitution. And we will set the restitution hearing and deal with that.

You'll comply with the following special conditions. These are all connected to the nature of the crime, and that's why I'm putting them in as conditions.

Cybercrime management: You are ordered to participate in cybercrime management and will inform your officer of all computer devices possessed or accessible to you. This includes desktop or laptop computers, smartphones, smart watches and tablets, smart appliances, internet things. Devices include hub or personal assistant devices, all network-accessing devices, including internet-connectible gaming systems.

You will not acquire or access any new or additional computer devices unless approved by your officer. That's the probation officer.

You will also inform your probation officer of all of your computer devices, internet service providers and social media user accounts, local and online services, both on entering supervision and in the event that you create or receive additional user accounts.

Computer monitoring with the internet: You are permitted use of standard computer devices, desktop/laptop computers, smartphones, tablets, with internet access and will permit the U.S. Probation Office to configure, manage and install monitoring software on all your approved standard computer devices. Your standard computer devices are limited to those that can be configured, managed and monitored by the U.S. Probation Office.

The configuration, management and monitoring of your standard computer devices shall be specific to your court-ordered conditions, risk and needs and cybercrime management requirements.

Computer search or computer monitoring: You must allow the U.S. Probation Office to conduct initial and periodic unannounced searches of any computer devices or network systems used or possessed by you.

Initial searches of computer devices and network systems will be conducted to determine if they contain or allow access to any materials or capabilities which would violate the Court's ordered conditions, or programs, applications, settings, configurations that would be problematic for monitoring software and cybercrime management program requirements.

Periodic unannounced searches of these devices and systems would be conducted to verify that the monitoring

software is functional, that required configurations are unaltered and that no circumvention efforts have been made to alter the device's operations or functionality.

Computer device payment: You are responsible for the monitoring or management costs for your approved computer devices. If that becomes an issue, you can come back to the Court on it.

Internet application restriction: You shall not access any services designed to encrypt, disguise, mask, anonymize your online activity, such as Tor, 12P, Freenet, Freepto, Tox, virtual private networks or other anonymizing applications, services or sites.

Computer restriction: Your use of standard computer devices, desktop/laptop computers, smartphones, tablets is restricted to legitimate and necessary purposes. Examples of a legitimate and necessary use are employment, education, religious activities, treatment services, medical services, communication with friends, family and attorney, personal finance and legal obligations.

Computer device restriction: You may be limited to two standard computer devices, desktop/laptop computer, smartphones, tablets, unless otherwise approved by your officer. That's the probation officer.

Search/seizure: You must submit your computer devices, other electronic communications, network or cloud

storage, data storage devices or media to a search conducted by a United States probation officer.

The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation of release.

You must warn any other occupant that the premises may be subject to searches pursuant to this condition.

That relates based on the fact of the uses that -- of the technology that the Defendant -- and these have been all approved by the Court of Appeals as conditions that the Court can put in as conditions on supervised release.

The last one is the financial one, and that relates to the type of crime in terms of it involving finances. So you must provide the probation officer access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the U.S. Attorney's Office.

Substance abuse treatment: You must participate in an inpatient and/or outpatient substance abuse treatment program, follow the rules and regulations of that program.

The probation officer will supervise your participation in the program as to provider, location, modality, duration, intensity.

Substance abuse testing: You must submit to substance abuse testing to determine if you've used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

You must participate in an evaluation and, if recommended, a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program; again, provider, location, modality, duration, intensity.

The psychologist had some recommendations relating to what -- programs from a mental health perspective and his other diagnosis, which I think you should share with Probation in terms of -- and you may want to share them with the Bureau of Prisons, for that matter. They do -- they will accept medical records, and it may be useful to provide it to them before his designation. There is the office here in D.C. that, if you provide it to them, they will use that in making some decisions about where he may go and what kind of services he may need.

You are ordered to make restitution to the victim in this case in an amount to be determined. I will not

include any interest, and the Court is waiving any interest or penalties. I'm finding that you don't have the ability to pay a fine, and therefore waive imposition of a fine in this case.

The financial obligations are immediately payable to the Clerk of the Court for the U.S. District Court.

Within 30 days of any change of address, you'll notify the Clerk of the Court of the change until such time as any financial obligations are paid in full.

The Probation Office shall release presentence investigation reports to all appropriate agencies, which includes the U.S. Probation Office in the approved district of residence, in order to execute the sentence. Treatment agencies shall return the presentence report to the Probation Office on the Defendant's completion or termination from treatment.

I will allow supervision to be transferred, if that is appropriate, if he's living someplace else. I am not transferring jurisdiction, however.

We also have various forfeiture orders that the Court has entered. So is the forfeiture, as I understand it, a forfeiture money judgment in the amount of -- is that going forward? Or how are you doing this? I can put it in there with separate orders, if that's a better way of doing.

MS. PECK: We've actually removed that from the

amended forfeiture order, your Honor.

THE COURT: So what we have, then, is basically the forfeitures that I will be signing, the very last one that you produced. Is that correct?

MS. PECK: Yes, your Honor. Thank you.

THE COURT: The last thing is the notice of appeal. It's easier to discuss it in terms of what you agreed to.

You agree to give up, insofar as such waiver is permitted by law, the right to appeal the conviction in this case on any basis, including, but not limited to, claims the statute that's involved is unconstitutional or your conduct doesn't fall within the scope of the statute.

So at this point, you've given up that right to take a direct appeal.

However, if a higher court at a later point determines that the statute and/or your conduct doesn't fall within the statute, as the statute is unconstitutional, then you can take a collateral appeal to take advantage, assuming it's retroactive, of that new ruling.

At this point, the statute has been deemed constitutional, and your conduct to fall within the statute.

You are also agreeing to waive the right to appeal the sentence, which would include any term of imprisonment, forfeiture, award of restitution, term or condition of

supervised release, authority of the Court to set conditions of release, and the manner in which the sentence was determined.

The exceptions are if I sentence you above the statutory maximum, which I did not, or the guideline range, which I didn't either.

But notwithstanding these agreements, you retain the right to appeal on the basis of ineffective assistance of counsel, but not to raise on appeal other issues regarding the conviction or sentence.

There are also restrictions that are in the plea agreement that you have about collateral attacks other than the one I just spoke about, which would be under 2255, et cetera, where you're giving up that right except to the extent if you -- if the motion is based on newly discovered evidence or on a claim that you received ineffective assistance of counsel. And you did reserve the right, if there are changes in the guidelines, to be able to file a motion to have it apply to you retroactively.

If you do any kind of direct appeal, it has to be filed within 14 days of entry of judgment or, if the Government is filing an appeal, within 14 days after they file it.

Again, if you can't afford the appeal, you can ask for permission to file it without cost to you. You can also

ask to have counsel appointed for you.

Under the *Hunter* decision, which was decided in 2016, I will ask if there's any objections, anything else that needs to be brought up that has not been discussed that needs to be.

Probation?

THE PROBATION OFFICER: No, your Honor. Thank you.

THE COURT: Government?

MS. PECK: No, your Honor.

THE COURT: Defense counsel?

MR. ENZER: One moment, your Honor.

THE COURT: I will add one other thing that -- in terms of the sentence, which is that he's to receive credit for time served from February 8th of 2022. And I can make a recommendation to a particular place in the Bureau of Prisons if you wish me to.

MR. ENZER: One moment, your Honor.

THE COURT: Sure.

MR. ENZER: (Confers with the Defendant privately.)

Your Honor, we would respectfully request that Mr. Lichtenstein be designated -- a recommendation from the Court that the Bureau of Prisons designate him to FCI Otisville.

THE COURT: I'm sorry. I missed that.

MR. ENZER: FCI Otisville, the prison camp there.

THE COURT: Okay. I don't have a problem with that.

MR. ENZER: And that he be considered for the RDAP program to deal with his substance abuse.

THE COURT: One thing is, not all the places have the RDAP program. So one of the things you might do is --

Do you know, Probation, if Otisville has RDAP?

THE PROBATION OFFICER: I don't know, your Honor, off the top of my head.

THE COURT: You might want to check. The judgment will probably be done tomorrow. So if you want to check and see, because, if there's a conflict, then the question is which one you want.

MR. ENZER: Will do, your Honor.

THE COURT: And I would strongly suggest that you provide some of the information, if you want to, to the Bureau of Prisons. That may be helpful.

MR. ENZER: Will do, your Honor. Thank you.

THE COURT: So in terms of the forfeiture, I will be signing the second amended one, which I have.

And in terms of setting a time for the restitution hearing, do you have a time at this point or is this something that you want to get back to me on?

MS. PECK: Your Honor, we'll discuss and get back to you very soon.

THE COURT: Okay. What I would ask is if you can, you know, find out a time that appears to be appropriate for everybody after the 90 days. And then if you would also suggest a briefing schedule, because it does look like there's some conflicts about who's asking for the restitution.

MS. PECK: Yes. Absolutely, your Honor.

THE COURT: In terms of the restitution hearing, one question is, do you wish to have Mr. Lichtenstein present? We might be able to do it with Zoom, depending on wherever -- wherever he is. Sometimes they have Zoom; sometimes they don't.

MR. ENZER: Your Honor, we do not need Mr. Lichtenstein to be physically present. If there's Zoom, great. If not, no problem.

We checked. Otisville does not have RDAP. Our preference would be that he be designated to Otisville, notwithstanding that.

THE COURT: Okay. That's fine.

I'll put in RDAP anyway because they have -- they develop the programs on and off in different places. They come and go. So they may develop it at a later point.

MR. ENZER: Thank you, your Honor.

THE COURT: I do need a signed thing. I will double-check, wherever it is he winds up, as to whether they have Zoom. If they do -- I'm assuming he's not going to want to go back and forth. Unless you want to wait for the 90 days in terms of setting it.

MR. ENZER: Correct, your Honor.

THE COURT: All right. The parties are excused.

Mr. Lichtenstein, I hope that I don't see you back here. Do good things. You can.

MS. PECK: Apologies, your Honor. One last thing. We need to move to dismiss the complaint. He was originally arrested on a complaint.

THE COURT: All right. I will do so.

(Proceedings concluded.)

**CERTIFICATE**

I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.

Dated this 19th day of November, 2024.

/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269

## $

**$10** [3] - 12:12, 16:13, 17:14
**$100** [4] - 10:12, 24:22, 38:10, 69:8
**$14** [1] - 14:1
**$200,000** [1] - 50:4
**$500,000** [1] - 8:9
**$72** [2] - 12:11, 16:12

## /

**/s** [1] - 82:12

## 1

**1** [10] - 8:7, 48:14, 50:16, 50:18, 51:1, 56:11, 56:19, 57:24, 69:4, 69:6
**1's** [1] - 56:15
**1,000** [1] - 40:2
**1.4** [1] - 14:19
**10** [4] - 53:1, 57:9, 57:10, 57:25
**10005** [1] - 1:25
**119,754** [1] - 48:12
**12** [3] - 28:24, 46:21, 60:1
**12/20** [1] - 42:12
**120,000** [1] - 12:11
**121** [4] - 10:10, 38:7, 67:20, 67:23
**12P** [1] - 72:10
**12th** [5] - 8:12, 8:13, 9:11, 11:12, 35:16
**13** [1] - 60:12
**1301** [1] - 1:14
**14** [4] - 1:6, 64:17, 77:21, 77:22
**14th** [2] - 8:22, 10:19
**15** [2] - 60:22, 69:19
**151** [2] - 38:7, 67:21
**18** [2] - 42:4, 68:25
**1956** [2] - 9:23, 37:25
**1984** [1] - 68:24
**1994** [1] - 44:24
**1999** [1] - 44:24
**19th** [1] - 82:10

## 2

**2,000** [1] - 48:12
**20** [2] - 8:8, 8:18
**20001** [2] - 2:5, 82:14
**20005** [2] - 1:15, 1:18

**2007** [1] - 43:3
**2010** [2] - 43:4, 46:5
**2011** [1] - 42:24
**2013** [2] - 43:5, 57:12
**2014** [1] - 42:17
**2015** [1] - 50:5
**2016** [17] - 12:12, 12:25, 13:4, 16:13, 42:24, 46:23, 48:10, 49:24, 51:18, 56:1, 56:7, 56:9, 58:5, 62:22, 63:18, 64:17, 78:3
**2017** [6] - 16:25, 46:6, 50:17, 56:10, 56:14, 56:20
**2018** [2] - 42:20, 57:1
**2019** [5] - 42:20, 46:2, 57:8, 57:14, 57:20
**202** [2] - 2:5, 82:15
**2020** [2] - 42:22, 51:17
**2021** [2] - 20:16, 55:6
**2022** [11] - 10:19, 10:20, 12:25, 13:4, 14:2, 20:17, 56:2, 62:22, 64:18, 78:15
**2023** [2] - 26:3, 42:10
**2024** [2] - 1:6, 82:10
**20530** [1] - 1:21
**20th** [1] - 56:10
**21** [2] - 13:24, 64:16
**22** [1] - 29:10
**2255** [1] - 77:13
**22nd** [1] - 56:9
**23-00239-CKK** [1] - 1:3
**23-239-1** [1] - 3:9
**25** [1] - 17:24
**25,000** [2] - 13:24, 13:25
**25th** [2] - 4:8, 8:23
**27th** [1] - 57:14
**28** [2] - 19:3, 26:12
**28th** [1] - 56:20
**2:06** [1] - 1:7
**2nd** [1] - 57:20

## 3

**30** [6] - 10:5, 10:9, 35:4, 42:25, 59:19, 75:7
**30,000** [1] - 10:11
**32** [8] - 1:24, 18:17, 35:5, 37:10, 37:17, 37:21, 38:5, 38:6
**32(i)(3)(A)** [1] - 11:10

**32(i)(3)(B)** [1] - 11:13
**33** [1] - 30:22
**333** [2] - 2:4, 82:14
**34** [2] - 9:23, 37:24
**35** [1] - 10:3
**35,000** [1] - 38:9
**354-3269** [2] - 2:5, 82:15
**3553** [1] - 69:1
**3553(a** [5] - 11:24, 26:8, 33:9, 34:19, 42:4
**36-month** [1] - 69:5
**37** [1] - 42:5
**3rd** [1] - 10:20

## 4

**4** [2] - 17:1
**4C1.1(a)(6** [1] - 36:10
**4S** [2] - 48:14, 50:16

## 5

**5** [4] - 52:25, 57:2, 57:3, 57:25
**50** [2] - 25:19, 68:10
**50.4** [1] - 67:23
**500,000** [2] - 10:11, 38:9
**5H1.1** [1] - 14:19
**5H1.6** [1] - 14:19
**5K1** [1] - 33:10
**5K1.1** [8] - 10:15, 11:3, 33:7, 33:19, 33:20, 34:16, 67:19, 67:20

## 6

**6** [1] - 52:25
**60** [3] - 17:24, 68:17, 69:4
**60-month** [1] - 67:21
**601** [1] - 1:21
**62** [1] - 26:5
**655** [1] - 1:15
**6706** [1] - 2:4

## 7

**7** [5] - 52:25, 56:21, 56:23, 57:15, 57:25
**7's** [1] - 56:21
**70** [4] - 25:25, 33:16, 34:18, 68:1
**71** [2] - 48:17, 63:24

## 8

**8** [1] - 53:1
**8th** [3] - 10:19, 57:8, 78:15

## 9

**9** [1] - 53:1
**90** [2] - 80:5, 81:5
**950** [1] - 1:18
**96** [1] - 19:23
**97** [1] - 10:9

## A

**A's** [1] - 49:25
**abide** [1] - 69:9
**ability** [5] - 19:4, 43:17, 64:8, 75:2, 82:7
**able** [9] - 13:3, 13:23, 17:18, 40:9, 43:12, 45:12, 48:4, 77:18, 80:12
**above-referenced** [2] - 53:7, 58:11
**abroad** [1] - 55:20
**absolutely** [2] - 7:5, 80:9
**absorb** [1] - 60:2
**abuse** [8] - 19:5, 26:17, 44:12, 73:23, 73:24, 74:4, 74:5, 79:6
**abuses** [1] - 64:8
**abusing** [3] - 26:13, 26:17, 26:25
**accept** [5] - 23:10, 65:13, 65:14, 65:21, 74:19
**acceptable** [1] - 20:12
**acceptance** [5] - 10:3, 20:3, 27:12, 38:2, 38:4
**accepting** [2] - 19:18, 65:13
**access** [17] - 12:8, 29:20, 47:8, 48:3, 48:4, 48:7, 48:11, 48:20, 48:22, 49:6, 49:13, 50:3, 70:18, 71:3, 71:19, 72:9, 73:18
**accessible** [1] - 70:12
**accessing** [1] -

70:16
**accolades** [1] - 63:17
**accommodation** [1] - 22:13
**accomplishments** [2] - 58:21, 60:24
**accordance** [2] - 69:8, 70:4
**according** [2] - 14:18, 64:12
**accordingly** [1] - 11:2
**account** [12] - 54:13, 54:16, 55:7, 55:10, 56:18, 56:23, 57:2, 57:4, 57:6, 57:17, 58:7, 68:4
**accountholders** [1] - 56:16
**accounts** [33] - 13:19, 43:14, 49:10, 49:13, 49:16, 50:20, 51:3, 51:22, 52:1, 52:18, 52:20, 52:23, 52:25, 53:10, 53:17, 53:23, 54:1, 54:2, 54:6, 54:7, 54:9, 54:10, 54:12, 54:25, 56:4, 56:11, 56:17, 56:19, 58:3, 59:13, 70:23, 70:25
**accurate** [1] - 82:4
**acknowledge** [1] - 15:15
**acknowledged** [1] - 32:2
**acknowledges** [1] - 22:19
**acknowledging** [1] - 32:3
**acquire** [1] - 70:18
**acquired** [2] - 54:12, 56:24
**Act** [7] - 17:13, 29:16, 30:7, 46:19, 58:2, 58:13, 68:24
**act** [1] - 47:20
**Action** [1] - 1:3
**actions** [5] - 15:10, 39:3, 40:19, 63:22, 64:2
**activities** [4] - 12:15, 13:13, 47:15, 72:17
**activity** [7] - 38:18, 48:19, 49:20, 51:15, 53:24, 55:18, 72:10
**acts** [1] - 39:6
**actual** [1] - 46:13
**actuality** [1] - 57:5

**add** [1] - 78:13
**added** [3] - 18:13, 37:25
**Adderall** [6] - 19:5, 26:13, 26:17, 59:16, 62:9, 62:10
**addiction** [4] - 59:15, 62:9, 63:1, 67:15
**addition** [7] - 27:1, 41:24, 42:1, 43:18, 50:5, 60:23, 69:7
**additional** [11] - 4:9, 6:3, 9:24, 36:12, 37:2, 39:9, 48:5, 56:17, 70:19, 70:25
**additionally** [1] - 54:3
**address** [4] - 11:18, 35:1, 38:12, 75:7
**addresses** [2] - 51:5, 56:11
**adjusting** [1] - 45:21
**adjustment** [3] - 9:14, 9:16, 45:19
**admitted** [1] - 27:3
**adopt** [1] - 11:14
**adopted** [2] - 35:6, 37:19
**adopting** [1] - 10:25
**adult** [1] - 61:12
**advanced** [1] - 47:6
**advantage** [1] - 76:19
**adversaries** [1] - 41:6
**advice** [2] - 59:23, 61:7
**advisor** [2] - 42:17, 61:4
**advisory** [5] - 9:22, 10:8, 10:14, 41:24, 69:1
**affected** [1] - 40:12
**affects** [1] - 64:9
**afford** [1] - 77:24
**afternoon** [7] - 3:1, 3:16, 3:17, 4:4, 7:9, 7:21, 7:22
**age** [2] - 14:13, 60:2
**agencies** [2] - 75:11, 75:14
**agency** [1] - 43:4
**aggravating** [2] - 36:19, 36:20
**ago** [4] - 35:22, 38:14, 60:12, 60:23
**agree** [4] - 32:14, 37:6, 43:9, 76:9
**agreed** [3] - 46:17, 50:10, 76:8
**agreeing** [1] - 76:23
**agreement** [3] - 24:20, 37:3, 77:12
**agreements** [1] - 77:7
**ahead** [5] - 4:23, 5:8, 8:1, 9:2, 16:2
**aid** [1] - 8:15
**alcohol** [2] - 14:18, 14:19
**Alden** [1] - 3:14
**Alexandria** [2] - 30:14, 61:17
**allocution** [1] - 11:5
**allow** [3] - 71:14, 71:19, 75:17
**allowed** [1] - 50:1
**allows** [1] - 53:15
**almost** [2] - 16:4, 40:2
**alone** [2] - 22:17, 34:16
**AlphaBay** [1] - 51:4
**alter** [1] - 72:3
**alternative** [1] - 50:7
**amend** [1] - 8:25
**amended** [8] - 4:7, 4:11, 4:16, 6:18, 7:2, 8:19, 76:1, 79:22
**amends** [1] - 39:3
**AMERICA** [1] - 1:3
**American** [1] - 45:22
**AML** [3] - 52:22, 56:22, 58:10
**amount** [4] - 19:21, 50:6, 74:25, 75:22
**amounts** [3] - 52:19, 53:12, 53:13
**Andrews** [1] - 5:21
**anonymity** [3] - 52:4, 52:9, 53:21
**anonymity-enhanced** [1] - 53:21
**anonymity-enhancing** [1] - 52:4
**anonymize** [1] - 72:10
**anonymizing** [1] - 72:11
**anti** [1] - 21:17
**anti-money** [1] - 21:17
**antisemitism** [2] - 27:25, 45:7
**anyway** [2] - 24:8, 80:22
**apart** [3] - 21:2, 21:3, 26:9
**API** [1] - 50:2
**apologies** [5] - 4:12, 6:17, 18:4, 36:15, 81:10
**apologize** [4] - 36:3, 39:4, 39:17, 39:22
**appeal** [10] - 76:7, 76:10, 76:15, 76:19, 76:23, 77:8, 77:9, 77:20, 77:22, 77:24
**Appeals** [1] - 73:14
**appearance** [1] - 48:1
**aPPEARANCES** [1] - 1:12
**apples** [1] - 33:8
**appliances** [1] - 70:14
**applicable** [1] - 18:15
**application** [2] - 50:1, 72:8
**applications** [2] - 71:21, 72:12
**apply** [5] - 9:17, 36:18, 41:3, 41:7, 77:19
**appointed** [1] - 78:1
**appreciate** [3] - 14:15, 32:3, 37:1
**approached** [2] - 20:24, 21:1
**appropriate** [8] - 17:23, 18:1, 33:12, 42:2, 66:25, 75:11, 75:18, 80:4
**approved** [6] - 70:19, 71:5, 72:5, 72:22, 73:14, 75:12
**April** [1] - 56:10
**area** [1] - 61:11
**areas** [1] - 73:6
**argue** [1] - 31:24
**argues** [2] - 60:17
**arguing** [1] - 35:8
**argument** [7] - 29:23, 31:6, 33:15, 33:20, 36:7, 36:8, 36:17
**arguments** [1] - 41:25
**arrest** [7] - 10:18, 13:1, 14:2, 42:12, 42:17, 64:15, 64:21
**arrested** [11] - 10:18, 16:16, 16:25, 19:15, 20:17, 22:20, 22:24, 23:18, 64:20, 64:25, 81:12
**arresting** [1] - 23:14
**arrived** [1] - 45:20
**arsenal** [1] - 25:3
**ashamed** [1] - 20:22
**aside** [2] - 34:19, 43:16
**aspect** [1] - 23:25
**aspects** [1] - 66:22
**assaults** [1] - 28:24
**assessment** [4] - 10:12, 14:24, 38:10, 69:8
**asset** [2] - 21:22, 58:25
**assets** [4] - 39:12, 43:16, 57:13, 64:13
**assist** [2] - 13:17, 25:10
**assistance** [12] - 13:15, 15:12, 15:15, 19:25, 23:20, 24:11, 24:21, 39:20, 53:8, 54:4, 77:8, 77:17
**assistant** [1] - 70:15
**assisted** [1] - 53:25
**assisting** [1] - 61:14
**assists** [1] - 47:12
**associated** [3] - 51:3, 52:14, 54:15
**assuming** [3] - 5:12, 76:19, 81:3
**assumption** [1] - 37:18
**assurance** [1] - 24:20
**ATM** [1] - 55:5
**ATMs** [2] - 52:2, 55:1
**attacks** [1] - 77:12
**attempt** [2] - 49:9, 74:6
**attest** [1] - 46:1
**attesting** [1] - 21:9
**attitude** [1] - 61:21
**attorney** [1] - 72:18
**ATTORNEY'S** [1] - 1:20
**Attorney's** [1] - 73:21
**audience** [1] - 5:19
**August** [3] - 48:10, 56:1, 56:9
**authority** [1] - 77:1
**Authority** [1] - 59:1
**authorize** [3] - 48:7, 48:11, 73:19
**authorizing** [1] - 70:5
**automate** [1] - 53:14
**Avenue** [4] - 1:14, 1:18, 2:4, 82:14
**average** [3] - 26:3, 26:4, 26:6
**avoid** [3] - 16:7, 52:7, 55:5
**avoided** [1] - 63:15
**avoiding** [1] - 52:13
**award** [1] - 76:25
**aware** [2] - 11:21, 39:17
**aways** [1] - 28:3

## B

**background** [5] - 46:18, 58:16, 58:20, 67:13, 67:14
**bad** [1] - 39:6
**balance** [2] - 28:22, 40:25
**balanced** [1] - 32:8
**balancing** [1] - 33:11
**Bank** [4] - 17:13, 46:19, 58:1, 58:13
**bank** [5] - 13:19, 52:1, 54:6, 54:25
**banks** [1] - 54:9
**Barry** [1] - 5:20
**base** [2] - 9:23, 37:24
**based** [11] - 10:16, 33:18, 33:20, 37:25, 38:2, 54:23, 56:12, 68:14, 73:12, 77:15
**basic** [1] - 69:13
**basis** [4] - 44:18, 67:14, 76:11, 77:8
**BCE** [19] - 46:24, 47:3, 47:5, 48:9, 49:5, 49:9, 49:14, 49:16, 49:17, 49:18, 49:25, 50:4, 51:19, 56:7, 57:7, 57:23, 58:5
**BCE's** [5] - 48:6, 48:11, 48:19, 49:2, 49:6
**beat** [1] - 20:11
**became** [1] - 44:25
**becomes** [1] - 72:6
**BEFORE** [1] - 1:10
**beforehand** [1] - 65:2
**began** [1] - 50:17
**beginning** [3] - 39:11, 46:22, 50:16
**beginnings** [1] - 27:22
**begun** [1] - 39:21
**behaved** [1] - 27:15
**behavior** [2] - 14:23, 39:2
**behind** [1] - 13:13
**believes** [1] - 14:22
**belonging** [2] - 47:5,

48:9
**below** [1] - 51:22
**benefit** [1] - 25:12
**benefited** [1] - 15:12
**benefits** [4] - 15:21,
31:21, 31:22, 52:9
**Berke** [1] - 5:20
**best** [5] - 13:2,
20:24, 32:19, 68:4,
82:7
**better** [5] - 35:21,
37:20, 39:23, 59:4,
75:24
**between** [7] - 12:25,
47:20, 47:23, 56:9,
59:8, 60:13, 66:19
**beyond** [1] - 67:18
**big** [1] - 27:17
**biggest** [1] - 19:14
**billion** [4] - 12:12,
14:2, 16:13, 64:18
**billions** [1] - 63:11
**biochemist** [1] -
44:20
**bit** [2] - 12:4, 46:9
**Bitcoin** [10] - 12:10,
12:11, 13:5, 13:22,
13:25, 19:7, 24:2,
52:10
**Bitfinex** [12] - 5:19,
5:20, 12:21, 14:12,
18:16, 19:6, 36:10,
39:5, 39:15, 63:19,
64:3, 64:17
**Bitfinex's** [1] - 12:19
**blockchain** [2] -
50:12, 52:5
**bonded** [1] - 59:19
**book** [1] - 26:4
**born** [3] - 27:21,
44:18, 44:22
**bottom** [2] - 25:20,
67:23
**brain** [1] - 40:19
**break** [2] - 35:19,
37:12
**breaking** [1] - 53:19
**brief** [1] - 11:22
**briefed** [4] - 6:7,
35:12, 35:18, 36:5
**briefing** [3] - 5:5, 9:8,
80:6
**briefly** [1] - 37:23
**bright** [2] - 21:12,
60:19
**bring** [2] - 55:4,
57:18
**broadcast** [1] - 24:6
**brokers** [2] - 54:8,
54:10

**brother** [6] - 3:23,
44:21, 45:14, 59:9,
59:25, 60:9
**brought** [3] - 35:17,
66:12, 78:4
**BROWN** [1] - 1:17
**Brown** [1] - 3:15
**BTC** [10] - 48:12,
50:18, 50:23, 52:3,
52:15, 53:20, 54:22,
54:24, 56:25, 57:11
**build** [1] - 42:18
**bulk** [2] - 20:18, 27:6
**bullied** [1] - 45:23
**Bureau** [8] - 30:16,
30:17, 31:8, 69:3,
74:18, 78:16, 78:24,
79:19
**buried** [1] - 53:4
**business** [7] - 39:8,
42:18, 43:8, 53:23,
54:2, 57:16, 58:1
**businesses** [4] -
43:11, 52:25, 65:7,
65:24
**buy** [1] - 13:5
**BWC's** [1] - 48:13
**BY** [1] - 2:2

## C

**Cahill** [2] - 3:18, 3:20
**CAHILL** [1] - 1:24
**cakewalk** [1] - 25:16
**calculation** [4] -
18:17, 31:5, 35:25,
36:2
**calculations** [2] -
9:20, 37:19
**camp** [1] - 79:2
**cannot** [1] - 30:6
**capabilities** [1] -
71:19
**capable** [1] - 27:13
**card** [2] - 54:14, 55:5
**cards** [4] - 54:6,
54:15, 55:2, 55:4
**care** [7] - 6:23, 7:17,
8:14, 45:13, 59:15,
60:8, 61:2
**career** [2] - 41:4,
59:23
**careful** [1] - 63:21
**cares** [1] - 60:6
**caring** [1] - 61:9
**carried** [1] - 63:18
**case** [20] - 3:8, 5:22,
13:8, 13:9, 16:5,
16:12, 16:19, 16:24,

17:6, 22:17, 28:8,
32:18, 39:11, 39:19,
41:15, 42:1, 64:7,
74:25, 75:4, 76:11
**Case** [1] - 3:9
**cases** [18] - 15:12,
16:10, 16:17, 16:20,
16:22, 17:9, 17:16,
32:11, 32:13, 32:16,
32:19, 33:2, 33:3,
66:11, 66:13, 68:11
**catch** [1] - 36:4
**Category** [2] - 10:7,
10:9
**category** [1] - 34:3
**CATHERINE** [1] -
1:16
**caused** [7] - 18:16,
19:17, 36:9, 37:4,
39:9, 48:24, 64:3
**Center** [1] - 61:18
**center** [2] - 30:8,
61:13
**CEO** [2] - 42:21,
42:24
**certain** [3] - 40:4,
48:20, 58:15
**certainly** [17] - 6:1,
23:5, 31:25, 33:11,
45:8, 46:1, 58:16,
62:14, 62:21, 62:25,
63:1, 65:7, 65:22,
67:1, 68:7, 68:10
**CERTIFICATE** [1] -
82:1
**certification** [1] -
42:10
**certify** [1] - 82:4
**cetera** [1] - 77:14
**CGA** [2] - 48:14,
50:16
**chain** [1] - 53:22
**challenges** [2] -
58:21, 59:2
**challenging** [1] -
14:8
**chance** [1] - 58:24
**change** [3] - 37:12,
75:7, 75:8
**changes** [1] - 77:18
**chapter** [2] - 21:10,
28:20
**character** [1] - 62:2
**characteristics** [2] -
14:6, 27:19
**charged** [1] - 15:16
**charges** [1] - 63:4
**charging** [1] - 23:14
**check** [3] - 79:12,
79:13, 81:2

**checked** [1] - 80:18
**Chicago** [2] - 28:1,
46:4
**child** [1] - 45:22
**childhood** [2] - 14:8,
59:21
**children** [1] - 46:3
**ChipMixer** [1] -
52:10
**chooses** [1] - 30:1
**chose** [5] - 14:13,
15:8, 16:14, 19:6,
40:7
**Chris** [1] - 3:15
**CHRISTOPHER** [1] -
1:17
**chute** [1] - 55:21
**Circuit** [1] - 64:4
**circumstance** [1] -
17:8
**circumstances** [7] -
12:1, 14:10, 14:25,
22:22, 26:10, 27:2,
45:6
**circumvention** [1] -
72:2
**cite** [2] - 16:19, 16:20
**cited** [3] - 11:4,
17:10, 32:11
**cites** [1] - 16:17
**citizen** [1] - 44:25
**citizens** [1] - 44:23
**citizenship** [1] - 45:1
**city** [1] - 45:10
**claim** [2] - 6:11,
77:16
**claims** [3] - 5:7, 6:9,
76:11
**clarification** [1] -
18:11
**clarify** [2] - 4:5, 4:10
**clear** [2] - 6:1, 8:1
**clearly** [2] - 37:21,
58:21
**Clerk** [2] - 75:6, 75:8
**client** [1] - 47:23
**close** [5] - 25:13,
28:22, 30:21, 32:7,
58:22
**close-knit** [1] - 58:22
**closed** [1] - 43:4
**cloud** [2] - 26:17,
72:25
**Co** [1] - 46:2
**co** [1] - 6:16
**co-counsel** [1] - 6:16
**Co-Defendant** [1] -
46:2
**cockroaches** [1] -
29:6

**coded** [1] - 54:14
**cofounder** [2] -
42:25, 43:2
**Coie** [1] - 5:21
**Coin** [1] - 52:12
**CoinJoins** [2] - 51:6,
52:10
**coins** [3] - 52:13,
53:3, 53:6
**collapsing** [1] - 45:7
**collateral** [2] - 76:19,
77:12
**colleague** [1] - 6:15
**colleagues** [2] -
3:19, 18:9
**collected** [1] - 12:7
**collection** [1] - 70:1
**COLLEEN** [1] - 1:10
**college** [4] - 42:7,
43:6, 46:5, 65:6
**Columbia** [4] - 2:3,
55:13, 58:14, 82:13
**COLUMBIA** [2] - 1:1,
1:20
**combination** [1] -
62:11
**combines** [1] - 29:4
**combining** [1] -
68:14
**coming** [1] - 59:2
**commensurate** [2] -
25:23, 68:11
**commerce** [1] - 49:1
**commingled** [1] -
49:16
**commit** [4] - 17:5,
22:6, 66:8, 69:16
**commitment** [1] -
20:25
**committed** [7] - 17:4,
19:1, 21:21, 26:24,
27:21, 67:8, 69:3
**committing** [2] -
62:16, 62:21
**commonly** [1] - 47:7
**communication** [2] -
49:1, 72:18
**communications** [1] -
72:25
**companies** [2] -
21:17, 21:19
**company** [11] - 6:2,
19:4, 42:16, 42:18,
42:21, 42:25, 43:6,
50:9, 57:3, 59:7,
60:16
**comparable** [1] -
66:15
**complaint** [2] -
81:11, 81:12

**complete** [2] - 20:3, 82:6
**completed** [1] - 42:14
**completely** [3] - 24:18, 26:22, 41:16
**completion** [1] - 75:15
**complex** [3] - 38:15, 50:19, 66:4
**compliance** [1] - 21:18
**complicated** [3] - 13:10, 21:21, 31:4
**comply** [1] - 70:7
**compromise** [1] - 48:4
**compromised** [3] - 47:4, 47:17, 48:2
**computation** [1] - 35:3
**computer** [37] - 12:6, 12:9, 12:15, 13:14, 21:15, 28:18, 42:22, 43:8, 43:9, 47:2, 47:4, 47:8, 47:13, 48:20, 49:2, 53:14, 65:7, 70:12, 70:19, 70:22, 71:1, 71:2, 71:6, 71:10, 71:13, 71:15, 71:17, 72:4, 72:6, 72:13, 72:14, 72:20, 72:21, 72:24
**computer-hacking** [1] - 12:15
**computers** [8] - 12:20, 21:4, 42:9, 47:17, 59:20, 70:13, 71:3, 72:14
**computing** [2] - 55:21
**conceal** [4] - 48:19, 50:22, 51:12, 55:18
**concealed** [2] - 47:15, 53:3
**concealing** [1] - 64:6
**concern** [1] - 32:3
**concerned** [1] - 16:5
**concerns** [2] - 22:2, 22:8
**concluded** [2] - 64:4, 81:14
**conclusions** [1] - 58:15
**concrete** [1] - 29:5
**condition** [11] - 26:23, 29:1, 44:14, 44:15, 44:16, 44:17, 73:4, 73:5, 73:11, 76:25
**conditions** [10] - 69:10, 69:11, 69:15, 70:8, 70:9, 71:11, 71:20, 73:14, 73:15, 77:1
**conduct** [14] - 12:5, 19:17, 28:12, 32:20, 53:7, 63:2, 64:22, 68:22, 69:13, 71:14, 73:3, 76:12, 76:17, 76:22
**conducted** [5] - 47:1, 71:18, 71:25, 73:1, 73:7
**conference** [1] - 61:5
**Confers** [1] - 6:16
**confers** [2] - 30:4, 78:20
**configuration** [1] - 71:9
**configurations** [2] - 71:21, 72:1
**configure** [1] - 71:4
**configured** [1] - 71:7
**confirm** [1] - 7:1
**conflict** [4] - 27:12, 27:14, 27:15, 79:14
**conflicts** [1] - 80:7
**conformance** [1] - 42:3
**connected** [2] - 60:11, 70:8
**connectible** [1] - 70:17
**conned** [1] - 17:2
**conquered** [1] - 67:16
**consent** [6] - 4:22, 6:19, 6:20, 6:24, 7:12, 7:24
**consented** [1] - 4:13
**consents** [1] - 7:1
**consequences** [3] - 65:11, 65:24, 66:9
**consideration** [1] - 68:25
**considerations** [3] - 14:20, 33:10, 66:23
**considered** [4] - 34:11, 46:12, 67:18, 79:5
**considers** [1] - 41:25
**consistent** [1] - 8:12
**conspiracy** [11] - 8:8, 9:12, 9:16, 9:25, 10:2, 16:10, 27:3, 38:4, 54:3, 55:8
**constitutes** [1] - 82:4
**Constitution** [2] - 2:4, 82:14
**constitutional** [1] - 76:22
**consultant** [1] - 44:22
**consultation** [1] - 74:11
**contact** [1] - 7:3
**contacts** [1] - 45:25
**contain** [2] - 71:18, 73:6
**contained** [3] - 29:10, 55:22, 58:19
**contemplating** [1] - 22:21
**contend** [1] - 35:13
**contention** [1] - 36:22
**contested** [2] - 5:4, 9:9
**continue** [1] - 29:12
**continuing** [1] - 22:14
**contrary** [1] - 65:2
**contributions** [2] - 21:16, 38:23
**control** [1] - 48:15
**controlled** [2] - 69:17, 69:18
**controlling** [1] - 55:10
**controls** [1] - 52:22
**conversations** [1] - 59:21
**converted** [2] - 54:5, 54:23
**converting** [5] - 51:25, 52:3, 52:11, 53:2, 53:20
**conviction** [4] - 20:8, 24:5, 76:10, 77:10
**convictions** [2] - 10:6, 67:11
**Cook** [1] - 59:1
**cooperate** [7] - 15:8, 15:21, 16:4, 16:15, 31:20, 31:23, 70:1
**cooperated** [3] - 22:19, 23:18, 33:5
**cooperates** [1] - 31:19
**cooperating** [2] - 19:19, 24:7
**cooperation** [22] - 10:17, 10:20, 10:22, 14:25, 20:4, 20:24, 22:16, 22:18, 22:21, 23:12, 23:19, 25:22, 26:9, 31:18, 32:9, 34:15, 66:23, 68:3, 68:5, 68:9, 68:12, 68:15
**cooperator** [3] - 25:3, 31:14, 31:15
**cooperators** [5] - 20:10, 25:4, 26:5, 33:3, 33:4
**corporation** [1] - 43:5
**correct** [9] - 5:15, 26:2, 30:10, 35:24, 37:17, 37:23, 76:4, 81:6
**correctly** [1] - 8:3
**corresponding** [1] - 54:24
**cost** [1] - 77:25
**costs** [1] - 72:5
**counsel** [19] - 3:11, 3:14, 4:15, 6:16, 7:4, 7:14, 11:4, 11:18, 18:23, 26:8, 64:23, 66:12, 67:1, 67:24, 68:12, 77:9, 77:17, 78:1, 78:11
**counseling** [1] - 26:24
**counsels** [1] - 32:9
**Count** [3] - 8:7, 69:4, 69:6
**country** [3] - 23:6, 48:1, 59:2
**County** [1] - 59:1
**couple** [1] - 67:25
**courier** [1] - 54:20
**couriers** [1] - 13:18
**course** [6] - 4:23, 6:10, 48:23, 49:4, 54:3, 64:9
**COURT** [77] - 1:1, 3:1, 3:5, 3:16, 3:25, 4:3, 4:13, 4:17, 4:20, 5:11, 5:17, 5:25, 6:22, 7:3, 7:6, 7:11, 7:17, 8:1, 8:6, 12:4, 15:25, 18:3, 18:5, 18:9, 18:18, 18:21, 18:23, 22:25, 23:3, 24:13, 24:15, 25:25, 29:22, 30:10, 30:12, 30:23, 31:3, 31:17, 32:14, 32:16, 33:14, 34:1, 34:3, 34:5, 34:7, 34:10, 34:22, 35:8, 35:11, 35:15, 36:1, 36:6, 36:14, 36:16, 36:24, 37:6, 37:11, 37:16, 41:23, 76:2, 76:6, 78:9, 78:11, 78:13, 78:19, 79:1, 79:3, 79:7, 79:12, 79:17, 79:21, 80:3, 80:10, 80:21, 81:1, 81:7, 81:13
**Court** [29] - 2:2, 2:3, 7:10, 10:21, 11:19, 11:21, 14:5, 16:8, 22:8, 22:11, 35:2, 38:12, 41:13, 41:25, 55:12, 67:16, 69:2, 72:7, 73:14, 73:15, 75:1, 75:6, 75:8, 75:21, 77:1, 78:24, 82:12, 82:13
**court** [4] - 15:25, 55:13, 71:11, 76:16
**Court's** [1] - 71:20
**court-ordered** [1] - 71:11
**courtroom** [1] - 3:3
**COURTROOM** [1] - 3:9
**COVID** [1] - 29:7
**create** [1] - 70:24
**created** [4] - 12:9, 19:3, 50:21, 54:8
**credential** [1] - 49:8
**credentials** [6] - 48:7, 48:20, 49:6, 49:7, 49:8, 49:25
**credit** [9] - 30:7, 30:9, 30:21, 30:23, 30:24, 30:25, 31:18, 65:20, 78:14
**credits** [1] - 29:16
**crime** [21] - 6:1, 12:17, 15:17, 17:6, 19:1, 22:6, 26:12, 27:21, 28:9, 38:23, 41:11, 62:16, 62:21, 64:6, 66:10, 67:8, 68:14, 69:16, 70:9, 73:17
**crimes** [5] - 12:3, 14:5, 17:4, 66:8, 66:15
**criminal** [12] - 3:9, 10:5, 13:13, 14:8, 38:18, 40:17, 42:6, 55:23, 63:2, 64:21, 67:11, 68:22
**Criminal** [6] - 1:3, 10:6, 10:9, 11:10, 11:12, 38:6
**criminals** [3] - 15:5, 41:6, 66:2
**CRR** [3] - 2:2, 82:3, 82:12
**crypto** [3] - 57:12, 66:2, 66:15
**cryptocurrency** [4] -

43:14, 57:21, 63:14, 66:17
**CTO** [1] - 42:21
**curious** [2] - 27:9, 60:10
**currencies** [2] - 48:8, 52:15
**currency** [20] - 17:12, 46:19, 48:3, 48:16, 49:10, 49:14, 49:22, 50:7, 51:25, 52:3, 52:5, 53:21, 53:22, 54:24, 55:25, 56:24, 57:16, 63:10, 63:20, 63:23
**custodial** [1] - 20:12
**custody** [6] - 10:9, 20:17, 22:14, 38:6, 48:15, 69:3
**customer** [8] - 49:6, 49:7, 49:8, 49:13, 49:16, 51:7, 51:23, 57:5
**customers** [1] - 48:9
**cyber** [1] - 41:5
**cyberattack** [1] - 47:13
**cybercrime** [5] - 41:8, 70:10, 70:11, 71:11, 71:22
**cybercriminal** [1] - 54:11
**cybercriminals** [2] - 15:19, 47:10
**cybersecurity** [3] - 21:17, 41:4, 47:11
**cyberspace** [1] - 38:19

## D

**D.C** [11] - 1:6, 1:15, 1:18, 1:21, 2:5, 16:20, 16:24, 30:15, 64:4, 74:21, 82:14
**daily** [2] - 13:6, 52:16
**damage** [1] - 65:23
**danger** [2] - 24:8, 25:7
**Daniel** [1] - 16:25
**dark** [1] - 19:5
**darknet** [7] - 17:11, 49:22, 49:23, 51:4, 52:9, 53:18, 54:11
**data** [3] - 47:12, 55:19, 73:1
**date** [2] - 5:9, 8:22
**Dated** [1] - 82:10
**dated** [1] - 8:13
**daughter** [1] - 60:18
**days** [12] - 29:8, 35:22, 40:2, 40:3, 41:15, 68:1, 69:19, 75:7, 77:21, 77:22, 80:5, 81:5
**deal** [2] - 70:6, 79:6
**debit** [3] - 54:5, 54:14, 55:2
**debt** [2] - 40:23, 54:14
**deceived** [1] - 56:5
**December** [1] - 42:20
**deception** [1] - 58:9
**deceptions** [1] - 55:24
**decide** [1] - 15:21
**decided** [1] - 78:2
**deciding** [1] - 31:3
**decision** [5] - 15:24, 16:4, 23:14, 26:16, 78:2
**decisions** [2] - 63:6, 74:22
**declined** [1] - 56:15
**dedicate** [1] - 41:12
**dedicated** [1] - 47:18
**dedication** [1] - 60:3
**deduction** [2] - 9:15, 9:17
**deemed** [1] - 76:21
**deeply** [2] - 38:21, 39:8
**defeat** [2] - 48:5, 52:22
**Defendant** [63] - 1:7, 3:3, 3:18, 10:18, 11:18, 13:12, 13:22, 14:7, 15:8, 16:6, 16:14, 16:24, 17:6, 17:7, 18:15, 30:4, 37:13, 42:5, 44:24, 45:4, 45:9, 45:14, 45:19, 46:2, 58:22, 59:8, 59:11, 59:14, 59:22, 59:23, 59:25, 60:7, 60:9, 60:14, 60:15, 60:17, 60:18, 60:22, 60:24, 61:2, 61:7, 61:8, 61:10, 61:13, 61:15, 61:18, 61:21, 61:23, 62:2, 62:6, 62:10, 62:20, 63:9, 63:12, 63:15, 64:12, 64:20, 65:5, 66:19, 67:5, 67:24, 73:13, 78:20
**DEFENDANT** [3] - 1:22, 4:2, 38:13
**Defendant's** [17] - 6:19, 8:17, 12:5, 12:15, 14:1, 14:5, 14:16, 14:22, 14:25, 15:11, 15:24, 16:4, 17:10, 60:12, 61:20, 62:4, 75:15
**Defendants** [1] - 4:15
**defense** [8] - 11:18, 16:17, 24:6, 36:24, 64:23, 66:11, 68:12, 78:11
**defense's** [1] - 14:15
**define** [1] - 68:21
**defined** [1] - 40:22
**definitely** [1] - 14:9
**defraud** [3] - 16:10, 46:20, 46:24
**degree** [4] - 19:19, 20:4, 42:7, 45:15
**delay** [2] - 4:25, 9:3
**delayed** [1] - 9:1
**deleted** [1] - 55:19
**deleting** [1] - 48:20
**deliberate** [3] - 12:16, 62:24, 64:2
**delivered** [1] - 54:17
**delivering** [1] - 13:19
**depart** [1] - 10:23
**Department** [1] - 58:13
**DEPARTMENT** [2] - 1:14, 1:17
**Department's** [1] - 37:1
**departure** [11] - 8:15, 8:16, 10:14, 11:3, 11:6, 17:22, 33:18, 34:12, 34:15, 34:17, 67:19
**Departure** [1] - 11:1
**departures** [1] - 33:23
**dependence** [1] - 14:19
**deposited** [2] - 54:24, 58:7
**depositing** [1] - 53:17
**deposits** [1] - 57:22
**DEPUTY** [1] - 3:9
**derived** [1] - 58:8
**describe** [3] - 59:8, 62:2, 62:19
**described** [5] - 10:24, 45:5, 61:18, 63:7, 63:12
**describes** [12] - 10:16, 59:10, 59:21, 59:25, 60:9, 60:13, 60:18, 60:24, 61:1, 61:8, 62:5, 63:9
**deserve** [1] - 41:19
**deserves** [2] - 24:24, 24:25
**designate** [1] - 78:24
**designated** [3] - 30:8, 78:23, 80:19
**designation** [2] - 30:18, 74:20
**designed** [5] - 12:9, 50:13, 50:22, 52:21, 72:9
**designing** [1] - 12:22
**desktop** [2] - 47:18, 70:13
**desktop/laptop** [3] - 71:2, 72:14, 72:21
**desperately** [1] - 41:9
**desperation** [2] - 28:6
**destroyed** [1] - 65:3
**detail** [2] - 46:9, 66:24
**detailed** [2] - 12:22, 50:12
**details** [5] - 14:16, 20:6, 23:23, 58:20, 63:21
**detained** [7] - 29:19, 29:25, 30:7, 30:12, 30:23, 30:24, 61:21
**detect** [1] - 64:8
**detection** [1] - 63:15
**Detention** [1] - 61:17
**detention** [5] - 10:19, 29:19, 30:8, 40:1, 61:12
**determine** [4] - 48:21, 68:5, 71:18, 74:5
**determined** [5] - 10:12, 38:9, 69:21, 74:25, 77:3
**determines** [1] - 76:17
**determining** [1] - 42:2
**deterred** [1] - 65:10
**deterrence** [14] - 15:3, 15:13, 15:23, 16:3, 16:6, 22:3, 25:8, 25:9, 28:22, 32:2, 32:4, 32:6, 65:5, 66:1
**detrimental** [1] - 59:6
**develop** [2] - 80:23, 80:24
**developed** [2] - 49:21, 59:11
**device** [4] - 55:21, 55:22, 72:4, 72:20
**device's** [1] - 72:3
**devices** [19] - 55:19, 70:12, 70:15, 70:16, 70:19, 70:22, 71:2, 71:6, 71:10, 71:15, 71:17, 71:24, 72:6, 72:14, 72:21, 72:25, 73:1
**devised** [3] - 38:15, 46:23, 63:18
**devoted** [4] - 12:18, 12:24, 13:20, 61:19
**diagnosis** [4] - 62:8, 63:1, 67:16, 74:16
**dialogue** [1] - 23:11
**difference** [2] - 41:7, 60:1
**differences** [1] - 43:1
**different** [10] - 17:7, 38:25, 43:11, 45:21, 45:24, 59:3, 62:15, 65:12, 65:15, 80:23
**difficult** [3] - 13:21, 50:23, 67:14
**difficulties** [1] - 67:15
**digestive** [1] - 29:1
**digital** [1] - 43:3
**diligence** [2] - 51:24, 58:10
**direct** [2] - 76:15, 77:20
**directed** [1] - 70:2
**direction** [2] - 41:1, 54:5
**directly** [2] - 58:8, 60:3
**disclosed** [2] - 53:4, 55:9
**discovered** [2] - 39:16, 77:15
**discretionary** [1] - 69:10
**discrimination** [1] - 27:25
**discuss** [6] - 9:7, 15:1, 59:15, 62:1, 76:7, 80:1
**discussed** [5] - 5:14, 15:11, 33:17, 33:18, 78:4
**discusses** [1] - 59:1
**discussing** [1] - 6:24
**disguise** [1] - 72:9
**dismiss** [1] - 81:11
**disparities** [2] - 16:8,

32:12
**dispute** [6] - 6:5, 18:25, 19:8, 19:15, 21:10
**disputed** [1] - 11:11
**dissolved** [1] - 43:5
**distinct** [1] - 64:5
**distinguishable** [1] - 16:23
**district** [3] - 25:4, 75:12, 82:13
**District** [12] - 2:3, 2:3, 16:20, 16:21, 16:24, 17:9, 33:1, 55:12, 58:14, 75:6, 82:13
**DISTRICT** [4] - 1:1, 1:1, 1:10, 1:20
**DNA** [1] - 70:1
**doctorate** [1] - 45:16
**document** [1] - 54:14
**dollar** [1] - 52:13
**dollars** [1] - 14:3
**dollars'** [2] - 49:15, 63:25
**domestic** [1] - 41:6
**done** [17] - 19:16, 19:18, 19:19, 20:23, 22:13, 25:13, 28:22, 30:18, 32:18, 33:6, 39:11, 40:14, 40:22, 64:24, 65:23, 70:3, 79:13
**dormant** [1] - 50:16
**double** [1] - 81:2
**double-check** [1] - 81:2
**down** [6] - 12:4, 15:25, 21:2, 42:22, 55:21
**downward** [11] - 8:15, 8:16, 10:14, 10:23, 11:3, 11:6, 17:22, 33:18, 34:9, 34:20, 67:19
**Downward** [1] - 11:1
**drug** [6] - 14:19, 26:17, 26:21, 26:23, 69:19, 69:20
**drug-free** [1] - 26:21
**drugs** [2] - 14:18, 26:25
**Dubai** [1] - 23:6
**due** [2] - 51:23, 58:10
**Dunn** [1] - 5:20
**duration** [2] - 74:2, 74:13
**duress** [1] - 17:5
**during** [5] - 31:20, 49:4, 54:18, 56:1, 61:23

## E

**early** [8] - 15:21, 22:18, 23:19, 46:22, 51:17, 56:25, 57:12, 67:15
**earn** [4] - 30:6, 30:9, 30:17, 33:6
**earned** [2] - 42:15, 61:18
**easier** [2] - 29:20, 76:7
**easiest** [1] - 46:15
**easily** [1] - 10:24
**Eastern** [1] - 54:22
**Ecker** [1] - 3:20
**ECKER** [1] - 1:23
**education** [2] - 42:7, 72:17
**EDWARDS** [2] - 2:2, 82:3
**Edwards** [1] - 82:12
**effective** [3] - 31:14, 66:24, 67:1
**effectively** [1] - 29:17
**effort** [5] - 12:18, 12:24, 37:2, 41:12, 64:10
**efforts** [5] - 49:12, 51:12, 58:10, 67:3, 72:2
**eight** [1] - 38:14
**either** [1] - 77:6
**elderly** [1] - 17:14
**electronic** [1] - 72:25
**elements** [1] - 16:11
**elided** [1] - 46:12
**eligible** [1] - 29:18
**email** [5] - 7:8, 35:2, 56:11, 56:12, 57:9
**emails** [1] - 20:20
**embarrassed** [1] - 28:12
**empathetic** [1] - 61:18
**empathy** [1] - 61:2
**emphasize** [2] - 11:23, 15:19
**employed** [2] - 44:19, 53:8
**employees** [5] - 39:5, 42:22, 43:1, 56:16, 56:21
**employer** [1] - 17:1
**employment** [1] - 72:16
**encountered** [1] - 63:14
**encouraged** [1] - 60:16
**encrypt** [1] - 72:9
**end** [6] - 5:2, 5:9, 19:12, 19:13, 33:11, 64:21
**endangering** [1] - 20:9
**ended** [3] - 14:10, 23:14, 35:4
**Endpass** [1] - 42:21
**enforcement** [4] - 16:15, 50:23, 53:5, 55:9
**enforcement's** [1] - 64:8
**engage** [3] - 13:3, 14:14, 49:7
**engaged** [3] - 13:13, 49:19, 59:17
**engaging** [2] - 53:7, 63:4
**engineering** [1] - 59:20
**English** [1] - 45:20
**enhanced** [3] - 9:12, 51:23, 53:21
**enhancing** [1] - 52:4
**enlisted** [2] - 13:16, 51:8
**ensure** [2] - 22:9, 39:12
**entered** [3] - 3:3, 8:7, 75:21
**entering** [1] - 70:24
**entire** [3] - 26:21, 27:3, 40:12
**entitled** [1] - 6:6
**entrepreneur** [4] - 39:7, 43:11, 61:6, 65:6
**entrepreneurial** [1] - 21:1
**entrepreneurs** [2] - 60:19, 60:22
**entry** [2] - 7:1, 77:21
**environment** [2] - 20:12, 28:23
**ENZER** [32] - 1:22, 3:17, 18:24, 23:2, 23:5, 24:14, 24:16, 26:2, 30:4, 30:11, 30:20, 31:2, 31:12, 31:25, 32:15, 32:18, 33:25, 34:2, 34:4, 34:6, 34:8, 34:14, 78:12, 78:18, 78:20, 79:2, 79:5, 79:16, 79:20, 80:15, 80:25, 81:6
**Enzer** [1] - 3:18
**equally** [1] - 32:21
**equity** [1] - 42:15
**equivocated** [1] - 67:5
**ESQ** [7] - 1:13, 1:16, 1:17, 1:19, 1:22, 1:23, 1:23
**essence** [1] - 45:24
**establish** [3] - 54:16, 56:4, 69:13
**established** [2] - 56:10, 57:2
**estimated** [1] - 49:15
**et** [1] - 77:14
**ethic** [1] - 61:16
**Eugene** [1] - 7:22
**European** [1] - 54:23
**European-based** [1] - 54:23
**evaluated** [2] - 40:20, 42:14
**evaluating** [1] - 25:14
**evaluation** [2] - 8:19, 74:8
**event** [1] - 70:24
**eventually** [1] - 45:17
**evidence** [6] - 23:1, 23:3, 55:22, 65:4, 73:6, 77:16
**evidently** [10] - 9:8, 42:9, 45:1, 45:22, 59:5, 60:2, 61:13, 65:8, 66:18, 67:15
**evil** [1] - 27:16
**exactly** [3] - 32:25, 35:10, 65:23
**example** [3] - 16:23, 55:19, 60:7
**examples** [3] - 16:17, 17:18, 72:16
**excellent** [1] - 16:2
**except** [2] - 40:6, 77:14
**exceptions** [1] - 77:4
**exchange** [9] - 17:12, 19:6, 49:14, 50:2, 52:8, 52:22, 54:23, 63:10
**exchange-to-exchange** [1] - 52:8
**exchanges** [8] - 47:23, 49:11, 51:6, 52:5, 52:17, 52:18, 55:25, 63:20
**excited** [1] - 60:19
**excluded** [3] - 35:13, 36:11, 36:23
**excuse** [1] - 39:1
**excused** [1] - 81:7
**excuses** [1] - 39:1
**execute** [1] - 75:13
**executive** [2] - 59:14, 62:5
**exists** [1] - 73:4
**expect** [1] - 31:15
**expectations** [1] - 69:13
**expected** [1] - 23:15
**expended** [1] - 39:18
**expensive** [1] - 66:5
**experience** [1] - 39:10
**experienced** [1] - 27:24
**experiences** [1] - 62:17
**explained** [1] - 17:17
**explicate** [1] - 10:21
**explicitly** [1] - 51:17
**exploited** [1] - 12:7
**exploits** [1] - 47:7
**extension** [1] - 55:11
**extent** [3] - 15:18, 22:8, 77:15
**extradite** [1] - 23:7
**extraordinary** [11] - 10:17, 19:20, 20:5, 23:22, 25:21, 25:22, 25:24, 42:8, 43:10, 65:8, 68:19
**extremely** [2] - 12:5, 27:22

## F

**face** [1] - 65:10
**faces** [1] - 41:5
**facilitating** [1] - 64:6
**facility** [2] - 29:19, 30:14
**fact** [6] - 11:5, 19:8, 25:3, 28:15, 57:23, 73:12
**factor** [6] - 23:19, 63:2, 65:12, 65:15, 65:18, 66:2
**factors** [7] - 11:25, 23:19, 26:8, 33:9, 34:11, 34:20, 42:3
**facts** [5] - 20:2, 26:12, 27:4, 27:7, 32:9
**factual** [1] - 6:13

**factually** [3] - 16:9, 16:22, 17:18
**failed** [1] - 55:10
**failure** [1] - 73:8
**fair** [2] - 42:2, 68:13
**fairly** [1] - 31:4
**faith** [3] - 24:23, 24:24, 25:5
**fall** [3] - 76:13, 76:17, 76:22
**false** [5] - 46:24, 55:24, 56:3, 56:4, 57:22
**falsely** [3] - 56:22, 57:10, 57:17
**familiar** [1] - 13:9
**families** [1] - 28:4
**family** [22] - 14:17, 14:20, 19:11, 27:24, 28:8, 28:11, 29:10, 38:16, 39:22, 45:8, 45:9, 46:1, 58:23, 59:22, 60:6, 60:20, 61:3, 61:19, 65:25, 67:6, 72:18
**far** [1] - 44:16
**fascinated** [1] - 40:10
**father** [5] - 44:19, 45:15, 45:17, 58:25, 61:20
**father-in-law** [1] - 61:20
**fault** [2] - 37:20, 41:21
**favor** [5] - 14:23, 15:14, 26:8, 27:20, 32:10
**favorably** [1] - 61:15
**FCI** [2] - 78:24, 79:2
**February** [8] - 10:19, 20:16, 56:2, 56:14, 56:20, 57:1, 78:15
**federal** [3] - 20:12, 26:4, 69:16
**Federal** [2] - 11:9, 11:12
**feelings** [1] - 19:5
**fell** [1] - 19:4
**fellow** [1] - 21:8
**few** [2] - 20:16, 41:15
**fiat** [3] - 51:25, 54:24, 54:25
**fictitious** [3] - 53:10, 54:1, 56:3
**FIELD** [1] - 2:1
**fight** [1] - 41:7
**file** [3] - 77:18, 77:23, 77:25
**filed** [4] - 4:25, 5:4, 10:13, 77:21
**files** [1] - 48:21
**filing** [3] - 4:16, 15:11, 77:22
**fill** [1] - 6:12
**final** [1] - 35:6
**finally** [2] - 16:7, 41:13
**finance** [1] - 72:19
**finances** [3] - 21:7, 43:14, 73:18
**financial** [18] - 14:14, 36:10, 37:4, 38:16, 43:17, 49:19, 51:24, 55:25, 56:6, 57:25, 58:11, 64:9, 73:16, 73:19, 73:20, 73:21, 75:5, 75:9
**FinCEN** [3] - 46:19, 58:2, 58:13
**findings** [2] - 11:9, 11:11
**fine** [7] - 8:9, 10:11, 38:9, 43:17, 75:3, 80:21
**firm** [1] - 3:20
**first** [12] - 12:1, 12:19, 14:12, 24:18, 28:2, 28:3, 39:4, 45:10, 45:23, 50:15, 61:5, 61:6
**First** [5] - 29:16, 29:24, 30:7, 30:19, 31:3
**first-time** [1] - 61:6
**fit** [2] - 32:16, 34:11
**five** [7] - 16:20, 17:25, 29:15, 29:17, 63:4, 63:24, 67:22
**five-year** [2] - 29:15, 29:17
**fix** [1] - 39:15
**FLETCHER** [4] - 1:23, 6:25, 36:25, 37:8
**Fletcher** [1] - 3:20
**flip** [2] - 25:2, 25:9
**floor** [1] - 29:5
**flow** [1] - 53:20
**fluctuates** [1] - 52:15
**focused** [1] - 21:9
**Fog** [2] - 24:2, 52:10
**folks** [1] - 21:19
**follow** [3] - 7:9, 73:25, 74:9
**following** [9] - 3:4, 37:15, 42:1, 48:18, 51:8, 51:20, 56:8, 69:10, 70:7
**FOR** [5] - 1:1, 1:13, 1:20, 1:22, 2:1
**foregoing** [1] - 82:4
**foreign** [5] - 41:6, 49:1, 54:6, 54:9
**foremost** [1] - 39:4
**forensic** [3] - 8:18, 62:7, 63:7
**forfeited** [2] - 43:15
**forfeiture** [13] - 4:6, 4:12, 6:18, 7:2, 8:20, 43:16, 43:19, 75:20, 75:21, 75:22, 76:1, 76:25, 79:21
**forfeitures** [1] - 76:3
**form** [2] - 42:12, 50:7
**formally** [1] - 9:18
**forms** [1] - 53:20
**formulated** [1] - 50:12
**forth** [3] - 22:20, 26:14, 81:4
**forthcoming** [2] - 64:20, 68:7
**forums** [1] - 54:11
**forward** [3] - 7:10, 20:23, 75:23
**founded** [1] - 43:3
**four** [1] - 33:5
**fourth** [1] - 16:7
**framework** [1] - 34:15
**Francisco** [3] - 46:5, 59:6, 61:11
**frankly** [1] - 31:4
**fraud** [4] - 10:1, 14:14, 17:11, 49:20
**fraudulent** [3] - 46:25, 51:15, 56:4
**fraudulently** [5] - 48:11, 49:13, 56:22, 57:10, 57:18
**free** [1] - 26:21
**Freenet** [1] - 72:10
**Freepto** [1] - 72:11
**frequently** [1] - 47:10
**friend** [9] - 59:18, 60:11, 60:21, 61:1, 61:6, 61:9, 61:10, 61:17, 62:4
**friends** [5] - 38:16, 61:4, 62:1, 67:7, 72:18
**friendship** [1] - 59:11
**froze** [1] - 56:19
**frustrate** [1] - 58:10
**full** [11] - 15:10, 19:10, 19:11, 20:2, 29:9, 39:2, 39:13, 53:6, 65:22, 75:9, 82:5
**fully** [1] - 19:18
**functional** [1] - 72:1
**functionality** [1] - 72:3
**fund** [1] - 53:20
**Fund** [1] - 42:13
**funds** [43] - 13:1, 13:4, 13:8, 13:21, 14:2, 17:11, 19:23, 24:22, 27:5, 27:6, 27:10, 27:11, 48:9, 49:15, 49:17, 50:2, 50:13, 50:15, 50:24, 50:25, 51:9, 51:13, 51:14, 51:25, 52:2, 52:11, 52:19, 53:2, 53:11, 53:13, 53:16, 53:18, 54:5, 54:25, 55:3, 57:12, 57:22, 58:7, 58:8, 64:1, 64:14, 67:4
**furniture** [2] - 28:2, 28:3
**furtherance** [2] - 51:20, 55:8
**future** [5] - 21:12, 32:1, 39:14, 65:11, 68:21

**G**

**gain** [1] - 47:7
**gained** [3] - 48:7, 48:22, 49:5
**gains** [1] - 64:11
**gallery** [2] - 3:22, 7:15
**gaming** [1] - 70:17
**garbage** [1] - 55:21
**gateway** [1] - 47:20
**general** [4] - 15:3, 15:13, 32:6, 66:1
**generally** [2] - 14:20, 66:4
**generous** [1] - 62:2
**genius** [3] - 21:15, 28:18
**GERD** [1] - 29:2
**Gibson** [1] - 5:20
**given** [8] - 13:21, 15:23, 16:3, 21:24, 38:22, 58:23, 60:7, 76:14
**Global** [1] - 43:3
**goal** [1] - 41:11
**gold** [2] - 53:3, 53:5
**Gordon** [1] - 3:18
**GORDON** [1] - 1:24
**GOROKHOV** [1] - 7:22
**Gorokhov** [1] - 7:23
**GOVERNMENT** [1] - 1:13
**government** [2] - 39:18, 78:9
**Government** [43] - 3:12, 3:13, 3:15, 10:13, 10:16, 10:24, 11:4, 11:17, 14:22, 15:9, 15:22, 16:5, 19:19, 19:21, 20:5, 20:8, 21:12, 21:20, 21:25, 22:18, 23:11, 23:21, 24:3, 24:9, 24:19, 25:8, 25:10, 25:19, 29:13, 32:2, 32:10, 32:23, 33:17, 39:17, 58:6, 63:8, 63:12, 63:14, 64:12, 66:18, 67:21, 68:4, 77:22
**Government's** [10] - 8:14, 8:16, 9:1, 11:2, 15:11, 17:21, 22:23, 25:2, 37:9, 67:22
**grade** [1] - 59:18
**grandmother** [1] - 60:9
**grandparents** [1] - 45:13
**grant** [1] - 5:8
**granted** [3] - 10:24, 11:6, 67:20
**granting** [3] - 11:2, 18:21, 35:20
**great** [4] - 6:21, 28:9, 28:19, 80:17
**greater** [1] - 18:1
**greatest** [1] - 63:13
**greed** [1] - 27:22
**grounds** [5] - 10:24, 11:3, 35:14, 36:23, 73:9
**guideline** [2] - 10:8, 77:5
**guidelines** [9] - 9:23, 10:15, 10:16, 17:23, 25:20, 34:12, 41:25, 69:1, 77:18
**guilty** [1] - 27:2
**gum** [1] - 22:7

**H**

**hack** [23] - 12:12, 12:22, 12:25, 13:25,

14:13, 15:6, 19:6, 48:16, 48:18, 48:23, 49:5, 49:18, 51:8, 51:16, 51:18, 56:7, 57:7, 57:23, 58:5, 62:23, 63:22, 64:2, 64:6
**hacked** [1] - 12:6
**hacking** [4] - 12:15, 14:14, 47:6, 49:19
**HANA** [1] - 2:1
**handed** [1] - 54:20
**handled** [1] - 33:2
**hands** [1] - 40:8
**hanging** [1] - 20:21
**happy** [1] - 6:25
**hard** [5] - 13:5, 25:14, 39:24, 61:22, 65:20
**hardship** [1] - 36:10
**harm** [3] - 18:16, 19:17, 37:4
**harm's** [1] - 25:11
**hated** [2] - 40:20
**head** [1] - 79:11
**health** [4] - 26:24, 44:13, 74:9, 74:15
**healthcare** [1] - 44:21
**healthy** [1] - 61:22
**hear** [6] - 5:22, 7:16, 11:17, 36:6, 37:12, 38:11
**heard** [3] - 21:12, 21:13
**hearing** [9] - 4:25, 5:15, 6:4, 6:8, 9:1, 10:19, 70:6, 79:24, 80:10
**HEARING** [1] - 1:9
**heart** [1] - 60:25
**heartache** [1] - 39:24
**Heather** [8] - 7:15, 13:16, 20:14, 41:14, 41:15, 41:18, 41:20, 46:2
**held** [3] - 31:1, 48:8, 55:7
**Helix** [1] - 52:10
**help** [2] - 39:15, 51:9
**helped** [7] - 20:8, 24:3, 24:4, 42:18, 61:9, 61:10
**helpful** [3] - 24:11, 59:17, 79:19
**helping** [1] - 21:17
**helps** [2] - 21:6, 21:16
**hereby** [2] - 69:3, 82:3
**high** [4] - 43:7, 43:10, 52:17, 65:6
**higher** [1] - 76:16
**highlight** [3] - 11:24, 15:20, 26:11
**himself** [3] - 20:9, 25:7, 28:7
**hinges** [1] - 31:10
**hire** [1] - 21:19
**history** [7] - 10:5, 14:6, 27:19, 42:6, 42:11, 53:19
**History** [3] - 10:7, 10:9, 38:6
**hold** [2] - 30:1, 40:9
**holding** [1] - 52:14
**home** [4] - 13:14, 22:10, 22:12, 59:24
**Honor** [54] - 3:17, 4:12, 5:10, 5:18, 5:22, 6:25, 7:22, 7:25, 8:5, 11:20, 18:12, 18:24, 21:8, 21:24, 22:4, 23:2, 23:8, 23:24, 24:12, 25:6, 25:18, 26:2, 27:1, 27:23, 29:21, 30:6, 31:12, 33:13, 34:6, 34:14, 35:6, 35:12, 36:4, 36:15, 36:19, 36:25, 37:8, 38:13, 76:1, 76:5, 78:7, 78:10, 78:12, 78:18, 78:22, 79:10, 79:16, 79:20, 80:1, 80:9, 80:15, 80:25, 81:6, 81:10
**HONORABLE** [1] - 1:10
**hope** [4] - 39:14, 39:19, 68:18, 81:8
**hopping** [1] - 53:22
**hours** [1] - 29:10
**house** [1] - 22:24
**Housing** [1] - 58:25
**hub** [1] - 70:15
**huge** [1] - 24:23
**humility** [1] - 60:3
**hundred** [1] - 49:15
**Hunter** [1] - 78:2
**hurt** [1] - 17:3
**Hydra** [1] - 51:4

**I**

**idea** [2] - 40:17, 65:2
**identical** [1] - 32:13
**identified** [3] - 5:13, 9:6, 47:4
**identify** [2] - 3:11, 7:18
**identifying** [2] - 56:3, 56:17
**identities** [2] - 53:11, 54:1
**identity** [1] - 54:14
**ill** [1] - 64:10
**ill-gotten** [1] - 64:10
**illegal** [3] - 56:7, 58:4, 64:5
**illicit** [4] - 49:23, 50:13, 52:21, 64:8
**illicitly** [1] - 50:6
**Illinois** [3] - 44:21, 45:10, 59:1
**ILYA** [1] - 1:6
**Ilya** [3] - 3:10, 3:18, 69:2
**immediately** [3] - 15:9, 16:4, 75:5
**immense** [2] - 26:13, 27:21
**immigrated** [2] - 44:24, 45:9
**impact** [2] - 5:13, 28:8
**impacted** [1] - 39:6
**impair** [2] - 26:15, 26:18
**impeding** [1] - 64:10
**implementing** [1] - 62:23
**importance** [2] - 25:9, 68:8
**important** [16] - 12:14, 15:9, 15:15, 15:20, 20:1, 20:8, 20:13, 24:5, 26:19, 27:5, 62:16, 65:16, 66:2, 66:7, 67:8, 67:12
**impose** [1] - 68:16
**imposed** [2] - 31:9, 69:13
**imposition** [1] - 75:3
**impoverished** [1] - 45:5
**impressed** [1] - 61:15
**imprisonment** [1] - 76:24
**improperly** [1] - 18:13
**impulsive** [7] - 12:16, 26:16, 62:12, 63:3, 63:6, 64:1
**impunity** [1] - 66:8
**in-laws** [1] - 28:14
**inapplicable** [2] - 9:13, 9:15
**incarcerate** [1] - 29:12
**incarcerated** [2] - 20:10, 40:1
**incarceration** [5] - 15:4, 15:14, 17:25, 22:11, 22:12
**incidents** [1] - 62:1
**inclined** [2] - 5:3, 62:12
**include** [6] - 9:5, 10:1, 69:15, 70:15, 75:1, 76:24
**included** [2] - 18:14, 20:6
**includes** [4] - 11:14, 20:7, 70:13, 75:12
**including** [17] - 3:23, 33:2, 35:6, 47:16, 47:21, 48:9, 48:19, 49:20, 49:22, 51:4, 52:25, 53:9, 53:21, 54:13, 56:7, 70:16, 76:11
**incomplete** [4] - 9:16, 10:2, 38:3, 38:4
**inconsistent** [1] - 63:5
**incorrect** [3] - 35:20, 36:3, 37:18
**inculpatory** [1] - 55:22
**indeed** [2] - 19:15, 21:7
**independent** [1] - 42:14
**India** [1] - 56:12
**India-based** [1] - 56:12
**indicate** [7] - 4:21, 6:22, 7:19, 58:19, 59:16, 62:9, 65:1
**indicated** [6] - 9:2, 9:7, 9:11, 50:8, 67:2, 68:20
**indicates** [4] - 60:12, 61:20, 62:11, 64:23
**indictment** [1] - 57:24
**indirectly** [1] - 58:8
**individuals** [3] - 15:16, 32:22, 65:24
**industry** [2] - 21:18, 41:4
**ineffective** [2] - 77:8, 77:16
**ineligible** [2] - 10:11, 38:8
**inform** [2] - 70:11, 70:21
**information** [18] - 6:10, 9:4, 10:22, 12:7, 42:2, 46:10, 46:11, 46:14, 51:7, 56:3, 56:18, 57:22, 68:6, 68:8, 73:19, 73:20, 73:21, 79:18
**informative** [1] - 32:20
**informed** [1] - 6:8
**infrastructure** [3] - 12:20, 47:2
**initial** [4] - 14:10, 63:9, 71:14, 71:17
**injury** [1] - 64:5
**inmate** [2] - 21:5
**inmates** [2] - 21:7, 21:8
**inpatient** [1] - 73:24
**input** [1] - 51:5
**inquiries** [2] - 56:15, 56:21
**inquiry** [1] - 57:15
**insofar** [1] - 76:9
**install** [1] - 71:5
**instances** [1] - 59:13
**instant** [1] - 54:23
**instead** [2] - 38:23, 41:19
**institutional** [1] - 57:17
**institutions** [6] - 38:17, 51:24, 55:25, 56:6, 57:25, 58:11
**intact** [1] - 44:19
**integrate** [1] - 59:3
**integrating** [1] - 45:22
**intelligence** [1] - 14:13
**intelligent** [1] - 6:8
**intensity** [3] - 20:25, 74:3, 74:13
**intention** [1] - 23:11
**interacted** [1] - 57:16
**interest** [4] - 43:12, 49:21, 75:1
**interested** [1] - 17:5
**interests** [1] - 59:20
**interface** [1] - 50:1
**interfering** [1] - 64:7
**intermediate** [2] - 47:19, 52:7
**internal** [1] - 27:15
**internet** [10] - 47:16, 47:20, 47:22, 49:2, 70:15, 70:17, 70:22, 71:1, 71:3, 72:8
**internet-connectible** [1] -

70:17
**interstate** [1] - 49:1
**investigating** [1] - 39:19
**investigation** [3] - 22:23, 65:3, 75:11
**investigations** [3] - 15:12, 42:14, 66:3
**investigators** [2] - 13:8, 48:21
**investing** [1] - 57:11
**investment** [1] - 56:25
**investments** [1] - 42:15
**involuntarily** [1] - 43:5
**involve** [3] - 16:18, 17:10, 19:7
**involved** [6] - 8:10, 13:9, 16:24, 41:15, 58:17, 76:12
**involving** [5] - 11:24, 16:10, 48:8, 63:11, 73:17
**issue** [7] - 5:23, 31:10, 32:1, 35:1, 35:2, 35:16, 72:6
**issued** [1] - 55:12
**issues** [10] - 14:17, 35:23, 39:15, 45:11, 45:19, 45:21, 64:3, 66:20, 67:13, 77:9
**IT** [1] - 45:17
**itself** [1] - 19:20

## J

**jail** [12] - 8:9, 20:12, 20:14, 20:19, 21:6, 25:17, 28:24, 29:19, 30:2, 40:6, 40:24, 61:24
**Jail** [1] - 30:15
**January** [2] - 50:17, 57:8
**Jason** [1] - 3:20
**JASON** [1] - 1:23
**JESSICA** [1] - 1:13
**Jessica** [1] - 3:13
**job** [1] - 42:11
**joined** [1] - 3:14
**JOLIE** [1] - 1:19
**Jolie** [1] - 3:14
**JUDGE** [1] - 1:10
**judgment** [7] - 26:15, 26:18, 28:16, 69:2, 75:22, 77:21, 79:12
**July** [1] - 57:20
**June** [2] - 43:5, 57:14
**jurisdiction** [1] - 75:19
**JUSTICE** [2] - 1:14, 1:17
**justice** [1] - 9:14
**justifies** [1] - 34:17
**justify** [1] - 34:20
**juvenile** [1] - 49:20

## K

**Kazakhstan** [2] - 13:18, 54:18
**keep** [1] - 22:14
**keeping** [1] - 8:12
**key** [1] - 13:12
**keyboard** [1] - 13:14
**keys** [2] - 48:7, 48:11
**kid** [1] - 21:2
**KIERSTEN** [1] - 1:23
**Kiersten** [1] - 3:20
**killed** [3] - 20:11, 33:4, 33:9
**kind** [3] - 33:11, 74:22, 77:20
**kindness** [1] - 60:3
**knit** [1] - 58:22
**knowing** [1] - 51:13
**knowingly** [1] - 46:23
**known** [2] - 47:7, 53:22
**KOLLAR** [1] - 1:10
**KOLLAR-KOTELLY** [1] - 1:10
**KOTELLY** [1] - 1:10
**KYC** [5] - 52:6, 52:20, 56:22, 57:9, 58:10
**KYC-verified** [1] - 52:20

## L

**laptop** [1] - 70:13
**large** [2] - 51:1, 52:19
**larger** [1] - 53:13
**largest** [2] - 63:10, 63:19
**last** [7] - 29:8, 39:20, 59:19, 73:16, 76:3, 76:6, 81:10
**lasted** [1] - 29:9
**late** [3] - 40:25, 46:22, 47:25
**launder** [7] - 13:7, 13:23, 19:7, 52:19, 56:6, 57:6, 58:4
**laundered** [4] - 52:2, 63:24, 64:14, 64:16
**launderer** [1] - 40:17
**launderers** [1] - 63:13
**laundering** [24] - 8:8, 10:1, 12:16, 13:3, 13:9, 13:10, 13:17, 13:20, 16:9, 21:18, 24:2, 26:5, 38:1, 38:3, 38:15, 51:9, 51:21, 53:9, 53:14, 54:2, 62:25, 63:5, 64:4, 66:17
**law** [11] - 16:15, 28:21, 50:23, 53:5, 55:9, 60:15, 60:18, 61:12, 61:20, 64:7, 76:10
**lawfully** [2] - 65:8, 68:19
**laws** [1] - 28:14
**lawyer** [1] - 24:6
**lawyers** [1] - 29:11
**layering** [1] - 53:16
**lead** [2] - 48:21, 68:20
**leap** [3] - 24:23, 24:24, 25:5
**learned** [5] - 12:19, 22:22, 26:20, 55:7, 65:3
**learning** [2] - 13:2, 13:7
**least** [3] - 34:12, 68:12, 69:20
**leave** [1] - 40:19
**led** [1] - 59:12
**left** [5] - 43:1, 50:15, 59:4, 64:14
**legal** [1] - 72:19
**legally** [2] - 6:6, 6:12
**legitimate** [2] - 72:15, 72:16
**legitimize** [2] - 53:24, 54:2
**leisure** [1] - 61:12
**lengthy** [1] - 66:4
**leniency** [3] - 27:20, 41:14, 60:17
**less** [4] - 31:14, 31:24, 38:20, 49:19
**letter** [2] - 20:20, 21:8
**letters** [5] - 8:18, 21:13, 46:1, 58:18, 62:14
**level** [7] - 10:5, 10:9, 17:24, 35:4, 35:5, 37:9, 37:17
**levels** [2] - 37:24, 37:25
**librarian** [1] - 61:12
**library** [3] - 21:6, 61:14
**Lichtenstein** [79] - 3:10, 3:18, 3:21, 3:25, 4:2, 4:4, 4:14, 7:1, 8:7, 19:1, 19:10, 21:20, 24:3, 24:7, 32:22, 37:2, 38:11, 46:23, 47:1, 47:4, 47:6, 47:9, 47:15, 47:25, 48:2, 48:4, 48:6, 48:10, 48:18, 48:23, 49:5, 49:7, 49:12, 49:16, 49:18, 49:21, 49:25, 50:3, 50:5, 50:11, 50:15, 50:17, 50:25, 51:8, 51:12, 51:17, 51:18, 53:8, 53:25, 54:4, 54:12, 54:17, 54:22, 55:1, 55:4, 55:6, 55:8, 55:13, 55:17, 55:19, 55:20, 56:2, 56:10, 56:13, 56:15, 56:22, 57:1, 57:2, 57:6, 57:9, 58:4, 58:9, 58:18, 65:19, 69:2, 78:23, 80:11, 80:16, 81:8
**LICHTENSTEIN** [1] - 1:6
**Lichtenstein's** [3] - 48:15, 51:11, 52:24
**lied** [2] - 38:16, 56:5
**life** [23] - 14:17, 14:18, 19:14, 20:15, 20:23, 21:10, 22:6, 22:7, 26:25, 28:5, 28:20, 40:4, 40:12, 40:18, 40:21, 40:25, 41:12, 45:22, 59:4, 59:10, 60:1, 60:20, 68:20
**lifestyle** [1] - 64:13
**light** [2] - 32:8, 67:2
**limited** [4] - 53:10, 71:7, 72:20, 76:11
**limits** [1] - 52:17
**linked** [2] - 51:3, 54:6
**liquidate** [1] - 13:1
**Lisa** [1] - 82:12
**LISA** [2] - 2:2, 82:3
**literally** [1] - 33:9
**lived** [3] - 28:15, 45:5, 46:4
**lives** [2] - 13:6, 40:15
**living** [2] - 46:6, 75:18
**LLP** [1] - 1:24
**local** [2] - 69:16, 70:23
**located** [4] - 47:3, 48:24, 49:2, 49:25
**location** [3] - 53:4, 74:2, 74:13
**lockdowns** [1] - 29:8
**lodged** [1] - 40:18
**log** [3] - 48:21, 49:6, 49:9
**log-in** [1] - 49:6
**look** [12] - 4:20, 6:12, 20:23, 30:18, 31:5, 35:19, 37:20, 62:16, 65:18, 66:11, 66:13, 80:6
**looked** [3] - 5:3, 66:18, 67:17
**looking** [6] - 6:13, 8:2, 27:4, 34:15, 65:5, 67:23
**love** [1] - 20:14
**loving** [2] - 60:13, 62:5
**low** [1] - 21:25
**lower** [1] - 32:23
**loyal** [1] - 61:19

## M

**Madison** [1] - 46:4
**Mafia** [1] - 17:2
**magical** [1] - 59:21
**maintain** [2] - 45:1, 61:22
**maintained** [1] - 61:21
**majority** [1] - 58:7
**manage** [1] - 71:4
**managed** [1] - 71:7
**management** [6] - 70:10, 70:11, 71:9, 71:12, 71:23, 72:5
**manager** [2] - 44:20, 58:25
**mandated** [1] - 58:12
**mandatory** [2] - 69:10, 69:15
**Manhattan** [1] - 14:11
**manner** [2] - 73:8, 77:2
**March** [3] - 10:20, 42:20, 56:14

**market** [1] - 17:11
**marketing** [1] - 43:4
**marketplace** [1] - 47:19
**marketplaces** [2] - 47:22, 51:4
**markets** [5] - 49:22, 49:23, 52:9, 53:18, 54:11
**marriage** [3] - 20:18, 20:19, 59:13
**married** [2] - 20:15, 46:2
**marshal** [1] - 32:19
**Marshals** [1] - 29:25
**mask** [2] - 3:6, 72:9
**massive** [2] - 16:12, 66:14
**master's** [1] - 45:15
**match** [2] - 62:20, 66:12
**material** [1] - 46:11
**materially** [1] - 46:24
**materials** [2] - 11:22, 71:19
**matter** [2] - 30:13, 74:18
**mature** [1] - 26:20
**maximum** [3] - 8:8, 8:9, 77:5
**mean** [4] - 5:25, 29:25, 30:15, 35:22
**meaning** [1] - 32:4
**means** [8] - 23:7, 41:20, 46:24, 47:16, 48:25, 52:13, 65:14, 65:16
**meant** [3] - 18:3, 18:17, 35:5
**measures** [1] - 48:6
**media** [3] - 24:7, 70:23, 73:1
**medical** [3] - 26:14, 72:17, 74:19
**medication** [1] - 62:9
**meet** [2] - 13:18, 39:15
**meeting** [1] - 54:20
**memo** [3] - 8:17, 16:18, 35:22
**memorandum** [8] - 8:13, 8:14, 8:17, 9:11, 17:10, 17:22, 18:19, 37:16
**mental** [4] - 26:24, 44:13, 74:9, 74:15
**mention** [1] - 16:24
**mentioned** [1] - 25:6
**mentor** [1] - 61:4
**message** [4] - 15:4, 15:19, 15:20, 66:7
**met** [6] - 59:10, 59:18, 60:12, 60:22, 61:5, 61:17
**methods** [1] - 74:7
**meticulous** [2] - 13:20, 63:21
**meticulously** [1] - 62:24
**mice** [1] - 29:6
**might** [6] - 15:5, 31:17, 48:21, 79:8, 79:12, 80:12
**million** [10] - 12:11, 14:1, 16:12, 17:1, 17:14, 24:22, 48:17, 63:24, 64:17
**millions** [1] - 63:25
**mind** [1] - 24:19
**mindset** [1] - 28:10
**mining** [1] - 57:11
**minus** [7] - 10:2, 10:3, 10:4, 18:13, 36:21, 38:1, 38:5
**missed** [2] - 4:18, 79:1
**mistake** [1] - 38:14
**mistakes** [4] - 19:14, 26:20, 27:17, 27:18
**mistress** [1] - 17:3
**mitigating** [3] - 20:2, 26:11, 32:8
**mixers** [2] - 51:6, 52:10
**MixRank** [1] - 42:25
**modality** [2] - 74:2, 74:13
**model** [2] - 21:5, 32:17
**modest** [1] - 27:22
**modified** [1] - 18:13
**moment** [5] - 3:2, 15:2, 24:19, 78:12, 78:18
**Monday** [1] - 7:13
**Monero** [1] - 52:4
**money** [21] - 8:8, 13:3, 13:9, 13:10, 13:19, 16:9, 19:22, 21:17, 24:2, 26:4, 38:15, 40:17, 51:21, 53:9, 54:7, 62:25, 63:5, 63:13, 63:19, 75:22
**money-launderer** [1] - 40:17
**money-laundering** [6] - 8:8, 16:9, 24:2, 38:15, 51:21, 53:9
**monitored** [1] - 71:8
**monitoring** [7] - 71:1, 71:5, 71:9, 71:13, 71:22, 71:25, 72:5
**month** [2] - 29:9, 60:8
**months** [11] - 10:10, 12:22, 17:24, 20:16, 27:10, 30:22, 38:7, 67:25, 68:17, 69:4
**Morgan** [23] - 4:14, 7:4, 7:13, 7:15, 7:23, 13:16, 13:23, 46:3, 51:10, 51:17, 53:3, 53:25, 54:18, 55:1, 55:4, 55:7, 55:18, 55:20, 56:2, 57:6, 57:17, 57:20, 58:4
**Morgan's** [5] - 51:8, 52:24, 54:4, 57:3, 58:9
**most** [3] - 6:14, 13:10, 21:21
**mother** [6] - 44:20, 45:15, 45:18, 58:20, 60:15, 60:18
**mother-in-law** [2] - 60:15, 60:18
**Motion** [1] - 11:1
**motion** [10] - 4:19, 6:17, 8:15, 8:24, 10:13, 10:23, 11:2, 33:7, 77:15, 77:19
**move** [4] - 45:12, 50:17, 59:5, 81:11
**moved** [3] - 27:11, 50:25, 64:15
**moving** [2] - 53:11, 53:13
**MR** [32] - 3:17, 7:22, 18:24, 23:2, 23:5, 24:14, 24:16, 26:2, 30:4, 30:11, 30:20, 31:2, 31:12, 31:25, 32:15, 32:18, 33:25, 34:2, 34:4, 34:6, 34:8, 34:14, 78:12, 78:18, 78:20, 79:2, 79:5, 79:16, 79:20, 80:15, 80:25, 81:6
**MS** [37] - 3:13, 4:11, 4:15, 4:19, 5:10, 5:16, 5:18, 6:17, 6:25, 7:5, 7:8, 7:14, 8:5, 11:20, 12:5, 16:3, 18:4, 18:7, 18:11, 18:20, 18:22, 34:25, 35:10, 35:12, 35:24, 36:2, 36:8, 36:15, 36:17, 36:25, 37:8, 75:25, 76:5, 78:10, 80:1, 80:9, 81:10
**mule** [1] - 13:19
**mules** [1] - 54:7
**multiple** [6] - 50:19, 51:3, 51:5, 52:18, 55:4, 56:10
**murder** [2] - 33:2, 33:3
**must** [15] - 69:15, 69:16, 69:17, 69:18, 70:1, 70:4, 71:13, 72:24, 73:7, 73:10, 73:18, 73:23, 74:4, 74:6, 74:8

## N

**named** [1] - 52:4
**names** [3] - 52:24, 52:25, 56:12
**Nathanael** [1] - 5:21
**nation** [1] - 41:5
**naturalized** [1] - 44:23
**naturally** [1] - 60:10
**nature** [7] - 10:21, 12:1, 26:7, 26:10, 27:1, 68:14, 70:8
**nearly** [1] - 20:14
**necessary** [3] - 18:1, 72:15, 72:16
**need** [12] - 6:13, 7:12, 13:5, 15:13, 16:7, 29:12, 46:18, 57:18, 74:23, 80:15, 81:1, 81:11
**needed** [4] - 9:4, 12:21, 15:4, 24:22
**needs** [5] - 28:6, 28:7, 71:11, 78:4, 78:5
**negative** [2] - 28:8, 69:23
**neighborhoods** [1] - 28:2
**network** [11] - 12:6, 12:20, 12:23, 15:6, 47:17, 47:23, 48:6, 70:16, 71:16, 71:17, 72:25
**network-accessing** [1] - 70:16
**networks** [1] - 72:11
**neuropsychological** [1] - 8:19
**never** [7] - 22:5, 22:6, 26:25, 27:6, 27:7, 27:11, 40:5
**New** [7] - 1:14, 1:25, 16:21, 17:9, 33:2, 46:6
**new** [9] - 4:9, 4:11, 8:21, 9:20, 57:16, 59:2, 59:6, 70:18, 76:20
**newcomer** [1] - 61:10
**newly** [1] - 77:15
**newspaper** [2] - 40:10
**next** [5] - 21:10, 25:2, 28:20, 50:25, 63:24
**Nexus** [1] - 43:3
**night** [3] - 29:2, 47:25
**nights** [1] - 40:3
**nine** [2] - 42:21, 67:25
**nobody** [1] - 35:18
**non** [1] - 52:5
**non-transparent** [1] - 52:5
**nondisclosure** [1] - 55:11
**none** [1] - 17:16
**nonviolent** [1] - 15:16
**Northwest** [5] - 1:14, 1:18, 1:21, 2:4, 82:14
**note** [6] - 6:18, 12:14, 20:13, 25:18, 27:5, 63:16
**notes** [1] - 82:5
**notice** [3] - 9:1, 55:17, 76:6
**notices** [1] - 9:5
**notified** [2] - 5:18, 55:13
**notify** [1] - 75:8
**notwithstanding** [2] - 77:7, 80:20
**November** [8] - 1:6, 8:12, 8:13, 9:11, 11:12, 20:16, 55:6, 82:10
**number** [2] - 47:6, 50:21
**numerous** [7] - 15:12, 48:5, 51:3, 51:21, 52:18, 53:9, 54:12

## O

**obfuscates** [1] - 53:19

**obituaries** [1] - 40:11
**obituary** [1] - 40:15
**object** [1] - 9:25
**objections** [4] - 8:14, 9:10, 11:15, 78:3
**obligation** [1] - 55:15
**obligations** [3] - 72:19, 75:5, 75:9
**obscure** [1] - 51:12
**obstruct** [1] - 74:6
**obstruction** [1] - 9:14
**obtained** [5] - 7:8, 13:15, 42:10, 49:13, 50:6
**obviously** [10] - 11:21, 13:16, 33:8, 50:8, 50:9, 60:6, 65:10, 67:7, 68:19, 68:22
**occasionally** [1] - 40:9
**occasions** [1] - 29:9
**occupant** [1] - 73:10
**October** [2] - 4:8, 8:23
**OF** [5] - 1:1, 1:3, 1:14, 1:17, 1:20
**offender** [4] - 18:14, 35:13, 36:11, 36:22
**offense** [15] - 9:23, 10:5, 10:8, 12:2, 17:24, 26:11, 27:2, 35:4, 35:5, 37:8, 37:17, 37:24, 46:15, 46:17, 63:8
**offer** [1] - 23:16
**offered** [1] - 54:10
**offering** [1] - 52:21
**Office** [9] - 69:11, 69:21, 71:4, 71:8, 71:14, 73:22, 75:10, 75:12, 75:15
**office** [2] - 73:20, 74:20
**OFFICE** [1] - 1:20
**OFFICER** [2] - 78:7, 79:10
**officer** [12] - 70:2, 70:12, 70:19, 70:20, 70:21, 72:23, 73:2, 73:3, 73:18, 74:1, 74:11
**Official** [1] - 2:2
**official** [2] - 14:8, 82:12
**often** [1] - 69:23
**Old** [1] - 1:24
**old** [1] - 42:5
**older** [1] - 26:19
**once** [2] - 53:13, 64:20
**one** [51] - 4:6, 4:7, 4:9, 4:11, 4:13, 5:19, 7:19, 8:20, 8:21, 8:22, 8:25, 9:2, 10:10, 16:19, 18:9, 18:11, 20:2, 21:8, 23:19, 24:17, 28:1, 34:23, 36:14, 38:7, 40:10, 55:5, 58:9, 60:7, 63:9, 63:13, 63:19, 66:13, 66:20, 68:13, 69:19, 73:16, 76:3, 77:13, 78:12, 78:13, 78:18, 79:7, 79:8, 79:15, 79:22, 80:11, 81:10
**ones** [4] - 4:9, 5:14, 9:6, 66:4
**online** [5] - 43:7, 47:1, 47:21, 70:23, 72:10
**opened** [1] - 52:23
**operate** [1] - 12:21
**operated** [1] - 43:7
**operating** [1] - 48:1
**operation** [3] - 17:12, 24:2, 63:20
**operations** [1] - 72:3
**opinion** [8] - 8:13, 9:11, 11:11, 11:16, 18:19, 37:16, 37:22
**opportunities** [1] - 38:22
**opportunity** [5] - 6:11, 9:3, 12:17, 31:24, 39:14
**oppose** [1] - 4:16
**opposed** [2] - 35:17, 53:12
**opposition** [1] - 4:22
**options** [1] - 69:12
**orally** [1] - 35:17
**oranges** [1] - 33:8
**order** [18] - 4:11, 4:16, 6:18, 7:2, 7:24, 8:13, 8:19, 10:22, 35:3, 35:22, 35:24, 36:19, 52:18, 55:12, 55:14, 67:3, 75:13, 76:1
**ordered** [5] - 69:7, 70:10, 71:11, 71:20, 74:24
**orders** [3] - 4:6, 75:20, 75:24
**ordinarily** [2] - 30:1, 46:8
**ordinary** [1] - 40:13
**origin** [1] - 51:11
**original** [1] - 4:7
**originally** [1] - 81:11
**OSHA** [1] - 42:9
**otherwise** [4] - 3:6, 15:5, 51:2, 72:22
**Otisville** [5] - 78:25, 79:2, 79:9, 80:18, 80:19
**outlined** [1] - 17:21
**outpatient** [1] - 73:24
**outside** [3] - 47:5, 48:13, 49:2
**overall** [1] - 25:15
**overcame** [1] - 14:7
**overworked** [1] - 59:14
**own** [3] - 19:3, 56:24, 60:16
**ownership** [1] - 56:18

## P

**p.m** [1] - 1:7
**packages** [4] - 13:19, 54:13, 54:17, 54:19
**packets** [1] - 47:23
**paid** [2] - 39:12, 75:9
**pain** [1] - 44:15
**papers** [4] - 5:4, 6:5, 18:8, 27:23
**Paragraph** [1] - 46:21
**parents** [7] - 3:23, 3:24, 28:13, 44:20, 44:22, 45:14, 59:5
**parity** [2] - 66:10, 66:19
**part** [7] - 6:4, 6:14, 41:9, 41:10, 42:13, 44:12, 56:21
**Part** [1] - 69:11
**part-time** [1] - 42:13
**participate** [3] - 70:11, 73:23, 74:8
**participated** [1] - 51:11
**participation** [2] - 74:1, 74:12
**particular** [7] - 5:2, 5:7, 32:17, 41:2, 44:15, 69:22, 78:16
**particularly** [2] - 66:1, 66:14
**parties** [2] - 56:12, 81:7
**partner** [1] - 42:13
**parts** [2] - 11:8, 11:10
**passion** [2] - 60:2, 60:10
**path** [1] - 50:22
**pattern** [1] - 14:23
**pay** [5] - 40:23, 43:17, 43:19, 69:7, 75:3
**payable** [1] - 75:5
**PayCoin** [1] - 50:7
**payment** [1] - 72:4
**payments** [2] - 57:4, 57:5
**PECK** [35] - 1:13, 3:13, 4:11, 4:15, 4:19, 5:10, 5:16, 5:18, 6:17, 7:5, 7:8, 7:14, 8:5, 11:20, 12:5, 16:3, 18:4, 18:7, 18:11, 18:20, 18:22, 34:25, 35:10, 35:12, 35:24, 36:2, 36:8, 36:15, 36:17, 75:25, 76:5, 78:10, 80:1, 80:9, 81:10
**Peck** [1] - 3:13
**pegged** [1] - 52:13
**PELKER** [1] - 1:16
**Pelker** [1] - 3:14
**penalties** [1] - 75:2
**penetrating** [1] - 47:9
**penetration** [1] - 21:19
**Pennsylvania** [1] - 1:18
**people** [6] - 5:19, 33:4, 35:23, 40:13, 65:21, 65:24
**people's** [1] - 6:9
**per** [2] - 55:5
**perceived** [1] - 50:13
**percent** [11] - 13:24, 19:23, 25:19, 25:25, 26:5, 33:16, 34:18, 64:16, 67:23, 68:2, 68:10
**percentage** [1] - 42:15
**period** [9] - 30:24, 30:25, 31:19, 31:21, 46:5, 53:16, 56:1, 62:22, 63:1
**periodic** [3] - 69:20, 71:15, 71:24
**Perkins** [1] - 5:21
**permanent** [1] - 44:16
**permissible** [1] - 14:20
**permission** [1] - 77:25
**permit** [1] - 71:4
**permitted** [2] - 71:2, 76:10
**perpetrated** [1] - 41:12
**person** [14] - 14:9, 19:3, 27:13, 27:16, 27:17, 27:20, 38:25, 54:9, 60:4, 60:10, 61:8, 61:9, 62:15
**personal** [7] - 12:7, 14:17, 18:16, 25:7, 44:18, 70:15, 72:19
**personally** [1] - 28:24
**persons** [1] - 5:13
**perspective** [1] - 74:15
**phase** [1] - 49:4
**phone** [2] - 20:19, 54:15
**physical** [2] - 38:19, 44:14
**physically** [2] - 47:3, 80:16
**pick** [2] - 5:2, 5:8
**picture** [1] - 62:15
**Pioneer** [1] - 42:13
**place** [10] - 19:5, 20:10, 29:6, 30:1, 30:16, 38:19, 53:15, 54:21, 60:1, 78:16
**placement** [1] - 69:19
**places** [2] - 79:7, 80:23
**Plaintiff** [1] - 1:4
**plan** [3] - 12:22, 41:12, 50:12
**planned** [1] - 62:24
**planning** [1] - 62:23
**plans** [1] - 46:6
**platforms** [3] - 50:20, 54:13, 54:23
**plea** [3] - 8:7, 37:3, 77:11
**pleading** [1] - 63:4
**pleadings** [2] - 10:25, 41:25
**pled** [1] - 27:2
**podium** [1] - 3:6
**point** [24] - 10:13, 11:5, 11:17, 13:12, 17:16, 18:11, 18:14, 30:20, 32:12, 32:20, 35:9, 35:13, 36:11, 36:22, 43:13, 43:17,

45:6, 46:3, 68:21, 76:14, 76:16, 76:21, 79:24, 80:24
**pointed** [1] - 32:11
**points** [13] - 9:12, 9:13, 9:15, 9:24, 10:2, 10:3, 10:4, 11:23, 36:12, 37:2, 37:7
**points'** [1] - 9:17
**policies** [1] - 56:22
**poorest** [1] - 28:1
**portion** [4] - 19:24, 50:17, 52:11, 53:2
**position** [5] - 7:4, 7:19, 34:16, 34:21, 68:5
**positive** [5] - 38:23, 45:25, 61:21, 66:22, 69:24
**possess** [1] - 69:17
**possessed** [2] - 70:12, 71:16
**possible** [3] - 11:23, 23:12, 23:17
**potentially** [2] - 5:16, 6:20
**poverty** [1] - 27:24
**powerfully** [1] - 40:12
**practice** [1] - 53:22
**practitioners** [1] - 47:11
**prearranged** [1] - 54:20
**preexisting** [1] - 52:20
**prefer** [3] - 4:1, 6:4, 7:6
**preference** [1] - 80:19
**preliminary** [1] - 8:19
**premises** [1] - 73:10
**prepare** [1] - 24:3
**prepared** [1] - 22:21
**present** [3] - 62:15, 80:12, 80:16
**presentence** [9] - 8:11, 9:19, 9:21, 11:8, 11:14, 37:19, 69:12, 75:10, 75:14
**presenting** [1] - 46:16
**pressure** [2] - 19:5, 26:13
**presumably** [2] - 9:6, 31:8
**pretenses** [1] - 46:25
**pretrial** [5] - 29:19, 30:7, 30:13, 30:15, 40:1
**prevent** [1] - 58:12
**previously** [2] - 18:14, 36:8
**price** [2] - 52:14, 52:15
**primary** [1] - 57:4
**prison** [7] - 22:12, 25:13, 28:23, 29:4, 30:8, 41:19, 79:2
**Prisons** [8] - 30:16, 30:17, 31:8, 69:3, 74:18, 78:17, 78:24, 79:19
**private** [1] - 72:11
**privately** [3] - 6:16, 30:5, 78:21
**probation** [14] - 10:11, 36:13, 36:17, 38:8, 70:2, 70:20, 70:21, 72:23, 73:2, 73:3, 73:18, 73:20, 74:1, 74:10
**Probation** [13] - 36:21, 37:1, 69:11, 69:21, 71:4, 71:8, 71:14, 74:17, 75:10, 75:12, 75:15, 78:6, 79:9
**PROBATION** [3] - 2:1, 78:7, 79:10
**Probation's** [1] - 35:2
**problem** [4] - 5:1, 41:10, 79:3, 80:17
**problematic** [1] - 71:22
**Procedure** [2] - 11:10, 11:13
**proceed** [2] - 4:6, 8:6
**proceeding** [1] - 68:13
**Proceedings** [1] - 81:14
**proceedings** [3] - 3:4, 37:15, 82:6
**proceeds** [7] - 43:15, 51:11, 56:7, 57:7, 57:23, 58:4, 64:5
**process** [1] - 55:11
**prodigious** [1] - 31:14
**produced** [2] - 76:4, 82:6
**productive** [2] - 28:19, 41:3
**professional** [2] - 60:21, 60:23
**proffer** [1] - 24:18
**profiles** [1] - 52:21
**program** [9] - 71:23, 73:25, 74:2, 74:9, 74:10, 74:12, 79:6, 79:8
**programming** [2] - 42:23, 50:1
**programs** [4] - 53:14, 71:20, 74:15, 80:23
**prohibited** [1] - 74:6
**project** [1] - 21:1
**promise** [1] - 19:3
**promises** [1] - 46:25
**proper** [1] - 22:10
**property** [2] - 8:10, 44:19
**proposing** [1] - 25:19
**prosecuting** [2] - 25:11, 39:19
**prosecutor** [1] - 33:1
**protocol** [4] - 47:18, 47:23, 69:21, 69:25
**protocols** [1] - 69:22
**provide** [6] - 48:3, 56:17, 73:18, 74:19, 74:21, 79:18
**provided** [6] - 9:20, 15:16, 39:20, 42:22, 58:20, 68:8
**provider** [6] - 55:10, 55:15, 56:12, 74:2, 74:11, 74:13
**providers** [1] - 70:22
**provides** [2] - 44:15, 47:11
**provisions** [1] - 68:25
**proxies** [1] - 47:21
**proxy** [2] - 47:19, 47:24
**PSR** [3] - 18:13, 35:1, 35:6
**psychiatrist** [1] - 63:7
**psychologist** [1] - 74:14
**psychology** [1] - 42:8
**public** [5] - 20:7, 23:25, 54:20, 66:25, 68:13
**publicly** [1] - 20:22
**punishment** [2] - 15:7, 28:21
**purchased** [4] - 47:18, 52:21, 54:13, 55:2
**purpose** [3] - 18:2, 22:15, 58:9
**purposes** [1] - 72:15
**pursuant** [6] - 10:15, 11:3, 11:9, 11:12, 68:24, 73:11
**pursue** [1] - 11:5
**pushing** [1] - 5:23
**put** [18] - 21:22, 22:20, 24:8, 25:6, 25:11, 26:14, 28:19, 30:2, 33:10, 34:5, 35:22, 39:23, 44:13, 66:25, 68:12, 73:15, 75:23, 80:22
**puts** [1] - 31:23
**putting** [2] - 34:19, 70:9

**Q**

**qualifying** [1] - 36:20
**quality** [1] - 23:21
**questions** [2] - 5:6, 18:7
**quickly** [1] - 22:19
**quite** [2] - 6:1, 62:22
**quote** [8] - 10:16, 53:22, 57:11, 60:2, 63:9, 63:13, 64:8, 64:10

**R**

**raise** [1] - 77:9
**raised** [2] - 35:21, 39:23
**ran** [1] - 24:1
**range** [6] - 17:23, 25:20, 33:5, 38:6, 67:20, 77:5
**rather** [1] - 38:19
**rats** [2] - 20:10, 29:6
**RDAP** [5] - 79:5, 79:8, 79:9, 80:18, 80:22
**RDR** [3] - 2:2, 82:3, 82:12
**read** [9] - 16:8, 23:24, 27:23, 40:7, 50:9, 62:13, 62:17
**reading** [1] - 6:5
**real** [2] - 21:16, 41:7
**realized** [1] - 40:24
**really** [5] - 3:7, 25:19, 29:12, 32:5, 66:12
**reasonable** [4] - 42:3, 73:4, 73:7, 73:8
**reasons** [1] - 17:20
**receipt** [1] - 55:17
**receive** [3] - 25:12, 70:25, 78:14
**received** [7] - 29:16, 32:22, 33:4, 37:18, 45:15, 58:18, 77:16
**receiving** [1] - 15:6
**recess** [1] - 37:14
**recidivate** [1] - 32:5
**recidivism** [2] - 22:1, 22:5
**recognition** [1] - 24:25
**recommend** [1] - 17:23
**recommendation** [3] - 15:1, 78:16, 78:23
**recommendations** [1] - 74:14
**recommended** [2] - 69:11, 74:9
**recommending** [2] - 29:15, 32:24
**reconnaissance** [2] - 47:2, 49:4
**record** [13] - 3:7, 3:12, 4:17, 4:21, 6:21, 7:7, 14:8, 22:4, 25:15, 37:23, 42:1, 66:25, 68:13
**records** [2] - 55:7, 74:19
**recover** [1] - 24:22
**recovered** [5] - 19:23, 19:24, 27:7, 39:12, 53:5
**rectify** [1] - 19:17
**recycling** [1] - 43:8
**redact** [1] - 46:10
**redacted** [2] - 46:8, 46:11
**redone** [1] - 37:19
**reduce** [1] - 50:13
**reduced** [1] - 38:2
**reduction** [9] - 25:20, 25:21, 25:23, 33:16, 33:17, 36:11, 67:22, 68:10, 68:14
**referenced** [3] - 53:7, 58:3, 58:11
**reflect** [1] - 40:3
**reflected** [1] - 14:25
**reflection** [1] - 28:16
**reflects** [1] - 9:19
**Reform** [1] - 68:24
**refrain** [1] - 69:17
**refugees** [1] - 28:1
**refurbishing** [1] - 43:8
**regarding** [7] - 12:1,

14:6, 15:3, 15:23, 16:3, 46:19, 77:10
**registered** [3] - 54:7, 56:16, 58:2
**regret** [1] - 38:21
**regulations** [2] - 73:25, 74:10
**rehabilitated** [1] - 27:14
**REINDEL** [1] - 1:24
**related** [3] - 5:11, 55:7, 55:22
**relates** [3] - 16:6, 73:12, 73:17
**relating** [2] - 11:11, 74:14
**relationship** [6] - 59:8, 59:12, 60:13, 60:21, 61:22, 62:5
**release** [16] - 10:10, 18:3, 22:9, 22:11, 26:23, 38:7, 46:6, 68:18, 68:21, 69:6, 73:9, 73:15, 73:20, 75:10, 77:1, 77:2
**released** [1] - 28:10
**relevant** [2] - 55:22, 57:24
**religious** [1] - 72:17
**remembered** [1] - 40:14
**remembers** [1] - 59:22
**remind** [1] - 5:5
**remorse** [5] - 19:10, 19:11, 65:12, 65:15, 65:22
**remote** [1] - 47:18
**removal** [1] - 44:25
**removed** [1] - 75:25
**rented** [1] - 47:21
**report** [10] - 8:11, 9:19, 9:21, 11:8, 11:14, 26:14, 62:7, 69:12, 75:14
**REPORTED** [1] - 2:2
**reporter** [1] - 16:1
**Reporter** [2] - 2:2, 82:12
**reports** [1] - 75:11
**representations** [2] - 46:25, 56:5
**representative** [1] - 57:15
**representatives** [1] - 57:10
**represented** [3] - 56:23, 57:3, 57:21
**representing** [1] - 5:20
**represents** [1] - 64:5
**request** [2] - 4:25, 78:22
**requested** [3] - 46:10, 67:21, 73:19
**requesting** [1] - 56:16
**require** [4] - 51:6, 51:23, 52:6, 69:24
**required** [3] - 33:6, 43:18, 72:1
**requirements** [2] - 71:12, 71:23
**requiring** [1] - 26:23
**research** [2] - 42:14, 47:1
**researcher** [1] - 45:18
**reserve** [1] - 77:17
**reside** [1] - 44:20
**resided** [1] - 45:4
**residence** [1] - 75:13
**residential** [1] - 47:21
**resolution** [1] - 11:15
**resolved** [3] - 9:10, 9:22, 40:21
**resources** [2] - 39:18, 66:6
**respect** [3] - 28:21, 59:11, 61:18
**respectfully** [2] - 22:16, 78:22
**respond** [4] - 23:15, 34:23, 47:14, 56:15
**responded** [2] - 36:5, 57:18
**response** [4] - 35:2, 56:20, 57:8, 57:14
**responsibility** [11] - 10:4, 15:10, 19:18, 20:3, 23:10, 27:13, 38:3, 38:5, 39:2, 65:13
**responsible** [3] - 41:16, 51:18, 72:4
**rest** [2] - 18:8, 57:19
**restitution** [20] - 4:25, 5:14, 5:22, 6:3, 6:4, 6:8, 9:1, 10:11, 38:9, 39:12, 43:18, 67:3, 70:4, 70:5, 70:6, 74:24, 76:25, 79:23, 80:8, 80:10
**restricted** [1] - 72:15
**restriction** [3] - 72:8, 72:13, 72:20
**restrictions** [1] - 77:11
**result** [6] - 12:17, 19:24, 49:12, 51:14, 56:18, 56:25
**resulted** [1] - 62:8
**resume** [1] - 60:19
**retain** [1] - 77:7
**retrieve** [1] - 67:4
**retroactive** [1] - 76:20
**retroactively** [1] - 77:19
**return** [1] - 75:14
**returned** [1] - 21:11
**returning** [1] - 48:19
**reviewed** [1] - 11:22
**revised** [3] - 8:12, 9:18
**revocation** [1] - 73:9
**rewarded** [3] - 24:21, 24:25, 25:4
**rid** [2] - 22:25, 23:3
**ridiculed** [1] - 20:22
**risk** [3] - 21:25, 22:5, 71:11
**Road** [1] - 17:12
**rodents** [1] - 29:6
**role** [3] - 9:12, 36:19, 36:20
**Room** [1] - 2:4
**routing** [1] - 47:16
**Rule** [2] - 11:9, 11:12
**ruled** [2] - 18:18, 37:22
**rules** [2] - 73:25, 74:10
**ruling** [1] - 76:20
**run** [2] - 23:6, 23:9
**running** [1] - 39:8
**Russia** [3] - 44:18, 45:4, 46:4
**Russian** [6] - 45:1, 52:1, 54:7, 54:22, 54:25, 59:3

## S

**saint** [1] - 23:9
**sake** [2] - 25:1, 25:2
**salary** [1] - 42:19
**sale** [2] - 52:17, 54:10
**Samson** [1] - 3:17
**SAMSON** [1] - 1:22
**San** [3] - 46:5, 59:6, 61:10
**SARs** [1] - 58:12
**scale** [2] - 16:19, 66:16
**scam** [1] - 17:15
**scans** [1] - 54:14
**scenarios** [1] - 17:18
**schedule** [3] - 5:5, 9:8, 80:6
**scheme** [8] - 12:16, 21:21, 38:16, 46:20, 46:24, 51:21, 55:23, 63:19
**schemes** [2] - 12:19, 66:3
**school** [4] - 43:7, 43:10, 59:18, 65:6
**science** [1] - 59:20
**scoliosis** [1] - 29:1
**scope** [1] - 76:13
**script** [1] - 12:9
**seal** [2] - 10:14, 44:13
**Sealed** [1] - 11:1
**sealed** [6] - 15:11, 23:22, 23:23, 24:10, 24:13, 24:15
**sealing** [1] - 10:22
**search** [6] - 22:23, 71:13, 73:1, 73:3, 73:7, 73:8
**search/seizure** [1] - 72:24
**searched** [1] - 73:6
**searches** [4] - 71:15, 71:17, 71:24, 73:11
**seated** [1] - 3:19
**second** [10] - 4:24, 6:17, 7:2, 8:24, 14:6, 20:4, 23:21, 49:14, 79:22
**Secrecy** [4] - 17:13, 46:19, 58:2, 58:13
**Section** [6] - 9:23, 10:15, 26:8, 34:19, 37:25, 68:25
**section** [1] - 40:10
**sections** [1] - 42:4
**secure** [3] - 20:8, 24:5, 47:22
**security** [3] - 39:15, 47:12, 48:5
**see** [11] - 4:18, 11:6, 18:5, 33:14, 47:13, 62:16, 62:17, 64:1, 67:13, 79:14, 81:8
**segregated** [1] - 51:5
**self** [3] - 5:13, 9:6, 42:8
**self-identified** [2] - 5:13, 9:6
**self-taught** [1] - 42:8
**selfless** [1] - 61:6
**send** [5] - 7:9, 15:4, 15:18, 30:15, 66:7
**SENIOR** [1] - 1:10
**sense** [1] - 28:6
**sent** [1] - 54:22
**sentence** [28] - 14:24, 15:4, 15:14, 15:18, 16:8, 17:23, 17:25, 21:24, 22:17, 26:8, 29:15, 29:17, 30:25, 31:9, 31:24, 32:10, 33:11, 34:20, 42:3, 67:21, 68:16, 70:5, 75:13, 76:24, 77:2, 77:4, 77:10, 78:14
**sentenced** [7] - 29:14, 31:11, 31:13, 31:15, 31:20, 41:14, 69:5
**sentences** [3] - 26:5, 32:23, 33:4
**Sentencing** [1] - 68:24
**SENTENCING** [1] - 1:9
**sentencing** [18] - 5:2, 7:13, 8:15, 8:17, 9:22, 10:8, 10:15, 14:21, 15:1, 16:18, 17:10, 17:21, 26:4, 32:12, 41:24, 69:1, 69:12
**separate** [3] - 26:9, 49:24, 75:24
**separation** [1] - 61:23
**series** [2] - 50:19, 53:11
**serious** [12] - 12:6, 19:2, 25:11, 28:25, 29:1, 32:21, 38:20, 63:8, 64:3, 65:11, 68:14
**seriously** [1] - 26:18
**seriousness** [2] - 12:2, 14:5
**serve** [2] - 22:14, 69:5
**served** [10] - 21:25, 22:17, 26:9, 29:18, 32:10, 34:18, 34:21, 64:21, 67:25, 78:15
**server** [2] - 47:24
**servers** [7] - 47:4, 47:8, 47:19, 48:2, 48:5, 49:2
**service** [4] - 54:19, 55:15, 57:5, 70:22
**Service** [1] - 29:25
**services** [7] - 42:23, 70:23, 72:9, 72:12,

72:17, 72:18, 74:23
**set** [14] - 5:5, 9:7, 26:13, 34:12, 41:2, 42:3, 43:6, 53:10, 63:21, 66:15, 66:24, 69:24, 70:6, 77:1
**sets** [1] - 62:7
**setting** [7] - 43:10, 43:16, 51:21, 52:18, 53:25, 79:23, 81:5
**settings** [1] - 71:21
**seven** [1] - 56:17
**several** [4] - 20:1, 29:9, 49:15, 58:18
**shall** [4] - 71:10, 72:8, 75:10, 75:14
**shame** [2] - 19:10, 19:11
**share** [3] - 73:21, 74:16, 74:17
**shared** [2] - 59:19, 59:22
**shareholders** [1] - 39:5
**shipped** [1] - 54:19
**shipping** [1] - 54:19
**shocked** [1] - 28:12
**short** [3] - 22:13, 40:11, 53:16
**shortly** [1] - 10:17
**show** [1] - 27:8
**showed** [1] - 65:22
**shown** [2] - 27:15, 58:6
**shows** [1] - 22:5
**shuffling** [1] - 50:21
**side** [2] - 25:9, 35:17
**sidewalk** [1] - 22:7
**sign** [4] - 8:21, 8:25, 27:13, 27:16
**signaling** [1] - 25:9
**signals** [1] - 48:25
**signed** [3] - 4:8, 8:20, 81:1
**significant** [9] - 14:23, 15:21, 16:13, 19:24, 24:1, 32:9, 34:17, 39:18, 49:19
**signing** [2] - 76:3, 79:22
**signs** [1] - 48:25
**Silicon** [1] - 14:11
**Silk** [1] - 17:11
**SIM** [1] - 54:15
**similar** [4] - 16:9, 16:18, 17:18, 32:19
**simple** [1] - 30:19
**simply** [1] - 30:20
**simulating** [1] - 47:13
**sites** [1] - 72:12
**sitting** [3] - 30:14, 31:7, 50:15
**situation** [2] - 16:23, 20:24
**six** [4] - 16:17, 45:3, 45:5, 68:1
**skill** [1] - 21:22
**skilled** [1] - 14:9
**skills** [7] - 41:2, 41:3, 42:8, 43:9, 65:7, 65:8, 68:19
**skis** [1] - 27:9
**slap** [1] - 25:15
**sleeping** [1] - 29:5
**sleeps** [1] - 29:3
**Slip** [1] - 1:24
**slow** [3] - 12:4, 15:25
**small** [5] - 39:21, 42:15, 50:6, 50:19, 53:11
**smart** [3] - 14:9, 70:14
**smartphones** [4] - 70:14, 71:3, 72:14, 72:22
**snitches** [1] - 20:11
**social** [2] - 24:7, 70:23
**society** [8] - 21:11, 21:16, 38:24, 40:23, 59:3, 64:5, 64:10
**socket** [1] - 47:22
**SOCKS** [2] - 47:21, 47:22
**software** [8] - 42:21, 42:25, 47:10, 47:11, 57:5, 71:5, 71:22, 72:1
**solution** [1] - 41:10
**solvency** [1] - 64:3
**someone** [4] - 21:11, 26:16, 33:8, 48:22
**someplace** [2] - 30:2, 75:18
**sometime** [1] - 51:16
**sometimes** [4] - 29:5, 29:8, 80:13, 80:14
**soon** [1] - 80:2
**sophisticated** [4] - 10:1, 38:1, 63:21, 66:3
**sophistication** [3] - 16:14, 16:19, 66:16
**sorry** [9] - 14:19, 18:17, 23:2, 24:14, 34:7, 34:25, 38:21, 39:9, 79:1
**sort** [3] - 31:18, 65:20, 66:22
**sounds** [2] - 5:4, 5:23
**source** [4] - 26:3, 51:13, 57:12, 57:21
**Southern** [3] - 16:21, 17:9, 33:1
**Soviet** [2] - 27:24, 45:6
**space** [2] - 15:5, 63:14
**special** [6] - 10:12, 38:10, 59:8, 60:1, 69:7, 70:7
**specific** [10] - 15:23, 16:3, 16:5, 22:3, 32:4, 51:10, 62:1, 62:8, 63:5, 71:10
**specifically** [1] - 13:2
**spend** [1] - 13:5
**spent** [5] - 12:22, 13:2, 27:6, 27:7, 64:13
**spit** [1] - 22:7
**spraying** [1] - 49:8
**spring** [1] - 46:23
**squandering** [1] - 38:21
**stable** [1] - 52:12
**staging** [2] - 51:1, 51:2
**stand** [3] - 28:13, 28:14, 28:15
**standard** [6] - 71:2, 71:6, 71:10, 72:13, 72:21
**stands** [2] - 28:12, 28:13
**start** [4] - 41:9, 46:20, 60:16, 60:20
**started** [3] - 10:17, 10:20, 28:1
**starting** [2] - 3:12, 63:18
**state** [1] - 69:16
**statement** [2] - 46:17, 65:19
**statements** [1] - 55:24
**states** [1] - 60:2
**States** [15] - 2:3, 3:10, 44:22, 45:2, 45:20, 45:23, 47:3, 47:5, 48:24, 49:3, 55:2, 55:20, 58:1, 73:2, 82:13
**STATES** [4] - 1:1, 1:3, 1:10, 1:20
**stating** [1] - 57:10
**station** [1] - 54:21
**statistics** [1] - 26:4
**statute** [8] - 69:8, 76:12, 76:13, 76:17, 76:18, 76:21, 76:22
**statutes** [1] - 70:5
**statutory** [2] - 8:8, 77:5
**stay** [1] - 51:22
**stayed** [2] - 40:17, 59:18
**steal** [5] - 12:9, 12:10, 19:6, 50:3, 63:19
**stealing** [1] - 17:11
**stein** [1] - 3:25
**Stein** [1] - 4:3
**stenographic** [1] - 82:5
**Step** [5] - 29:16, 29:24, 30:7, 30:19, 31:4
**steps** [3] - 48:18, 51:20, 55:18
**Sterlingov** [1] - 24:1
**still** [3] - 45:1, 59:14, 67:9
**stipulate** [1] - 37:3
**stole** [6] - 12:11, 13:24, 16:25, 17:1, 38:14, 49:14
**stolen** [25] - 13:1, 13:4, 13:22, 48:16, 49:9, 49:17, 50:15, 50:18, 50:23, 50:25, 51:9, 51:25, 52:3, 52:11, 52:19, 53:2, 53:11, 53:16, 54:5, 58:8, 63:23, 63:25, 64:13, 64:16, 67:4
**stop** [1] - 41:11
**storage** [2] - 73:1
**stories** [1] - 40:11
**story** [2] - 19:12, 19:13
**street** [1] - 28:3
**Street** [1] - 1:21
**stress** [1] - 39:9
**stressed** [1] - 61:24
**stressful** [1] - 39:8
**strongly** [2] - 15:14, 79:17
**struck** [1] - 40:13
**struggles** [1] - 59:2
**struggling** [1] - 16:1
**studied** [1] - 50:11
**subject** [5] - 10:22, 43:16, 44:25, 58:1, 73:11
**submission** [9] - 14:16, 16:8, 17:17, 22:20, 23:22, 23:23, 25:18, 26:15, 29:21
**submissions** [1] - 24:10
**submit** [8] - 19:16, 22:4, 22:16, 32:21, 69:19, 72:24, 73:8, 74:4
**submitted** [1] - 11:22
**subsequent** [2] - 12:15, 42:4
**subsequently** [1] - 48:5
**substance** [9] - 44:12, 69:17, 69:18, 73:23, 73:24, 74:4, 74:5, 74:6, 79:6
**substantial** [7] - 12:24, 15:15, 23:20, 36:9, 37:4, 66:23, 67:1
**suburbs** [1] - 45:12
**succeed** [2] - 28:7
**success** [1] - 59:7
**successful** [4] - 41:3, 43:7, 43:12, 65:7
**successfully** [1] - 63:15
**suffered** [1] - 6:2
**suffice** [1] - 10:23
**sufficient** [1] - 18:1
**suggest** [2] - 79:17, 80:6
**suggested** [1] - 35:15
**suitable** [1] - 22:13
**Suite** [1] - 1:15
**sum** [2] - 6:3, 62:10
**summary** [1] - 42:12
**summed** [2] - 40:12, 40:18
**supervise** [2] - 74:1, 74:12
**supervised** [8] - 10:10, 18:3, 22:9, 26:23, 38:7, 69:6, 73:15, 77:1
**supervision** [7] - 22:10, 69:9, 69:14, 69:20, 70:24, 73:5, 75:17
**Supplement** [1] - 11:1
**supplement** [1] - 8:16
**support** [9] - 18:2, 21:8, 21:14, 45:25, 58:19, 61:7, 64:13,

67:6, 67:9
**supporters** [3] - 3:22, 62:13, 62:19
**supportive** [3] - 58:22, 60:13, 60:15
**supports** [1] - 21:7
**suppose** [1] - 34:18
**surgery** [2] - 23:12, 23:13
**surrounding** [2] - 14:16, 26:12
**suspicion** [2] - 55:5, 73:4
**system** [3] - 47:13, 47:14, 64:9
**systems** [5] - 48:20, 70:17, 71:16, 71:18, 71:25

## T

**table** [2] - 3:14, 3:19
**tablets** [4] - 70:14, 71:3, 72:15, 72:22
**taint** [1] - 50:13
**talent** [1] - 19:4
**talented** [1] - 14:9
**talents** [4] - 38:23, 58:21, 59:12, 62:3
**talks** [1] - 44:12
**tamper** [1] - 74:7
**targeting** [2] - 49:10, 55:24
**task** [1] - 13:21
**taught** [1] - 42:8
**teach** [1] - 21:6
**tech** [1] - 60:22
**technical** [3] - 16:14, 34:24, 66:16
**technique** [1] - 53:15
**techniques** [2] - 47:7, 53:9
**technology** [6] - 24:4, 39:7, 60:10, 61:5, 62:5, 73:13
**telemarketing** [1] - 17:14
**telephone** [1] - 20:20
**ten** [1] - 61:1
**tend** [1] - 69:24
**term** [5] - 22:12, 69:4, 69:6, 76:24, 76:25
**termination** [1] - 75:16
**terms** [39] - 5:6, 9:10, 26:7, 26:10, 27:1, 27:4, 28:21, 30:13, 31:3, 31:5, 32:1, 32:11, 34:1, 35:19, 42:7, 42:11, 43:10, 43:14, 44:14, 45:21, 46:15, 46:16, 46:17, 60:6, 62:20, 64:18, 66:3, 66:10, 67:5, 68:3, 68:5, 73:17, 74:17, 76:7, 78:14, 79:21, 79:23, 80:10, 81:5
**terrible** [5] - 19:9, 27:9, 28:25, 29:5, 38:14
**terrors** [2] - 29:2
**test** [1] - 69:19
**testified** [2] - 23:25, 33:6
**testify** [1] - 24:9
**testifying** [1] - 20:7
**testimony** [1] - 24:4
**testing** [5] - 21:19, 47:9, 74:4, 74:5, 74:7
**tests** [2] - 69:20, 69:22
**Tether** [1] - 52:12
**THE** [86] - 1:1, 1:10, 1:13, 1:20, 1:22, 3:1, 3:5, 3:9, 3:16, 3:25, 4:2, 4:3, 4:13, 4:17, 4:20, 5:11, 5:17, 5:25, 6:22, 7:3, 7:6, 7:11, 7:17, 8:1, 8:6, 12:4, 15:25, 18:3, 18:5, 18:9, 18:18, 18:21, 18:23, 22:25, 23:3, 24:13, 24:15, 25:25, 29:22, 30:10, 30:12, 30:23, 31:3, 31:17, 32:14, 32:16, 33:14, 34:1, 34:3, 34:5, 34:7, 34:10, 34:22, 35:8, 35:11, 35:15, 36:1, 36:6, 36:14, 36:16, 36:24, 37:6, 37:11, 37:16, 38:13, 41:23, 76:2, 76:6, 78:7, 78:9, 78:11, 78:13, 78:19, 79:1, 79:3, 79:7, 79:10, 79:12, 79:17, 79:21, 80:3, 80:10, 80:21, 81:1, 81:7, 81:13
**theft** [7] - 14:12, 16:12, 17:13, 49:24, 63:9, 64:2, 64:7
**thefts** [1] - 63:10
**themselves** [1] - 25:11
**therapy** [1] - 59:17
**thereafter** [1] - 69:20
**thereby** [1] - 58:12
**therefore** [1] - 75:3
**Thereupon** [2] - 3:3, 37:14
**thief** [1] - 40:16
**thinking** [4] - 17:2, 40:18, 41:18, 64:24
**third** [2] - 15:3, 56:12
**thousand** [1] - 49:15
**thousands** [1] - 53:12
**threatening** [1] - 17:3
**threats** [1] - 41:5
**three** [19] - 9:15, 9:16, 10:2, 10:3, 10:10, 20:14, 25:13, 28:22, 30:21, 30:22, 32:8, 33:5, 38:1, 38:2, 38:5, 38:8, 39:20, 62:1, 69:6
**three-year** [1] - 69:6
**thresholds** [1] - 51:23
**threw** [1] - 55:20
**throughout** [3] - 14:18, 28:5, 40:14
**throw** [1] - 28:3
**throw-aways** [1] - 28:3
**ties** [2] - 14:17, 14:20
**timely** [1] - 55:11
**tip** [1] - 40:25
**titled** [1] - 10:25
**today** [11] - 5:19, 8:21, 11:25, 12:13, 16:13, 17:21, 26:19, 28:10, 38:13, 40:16, 65:20
**together** [1] - 60:20
**toll** [1] - 59:7
**tomorrow** [1] - 79:13
**took** [10] - 8:14, 15:10, 38:19, 42:18, 48:18, 55:18, 59:7, 59:14, 62:24, 63:22
**tool** [1] - 22:9
**tools** [1] - 47:6
**top** [1] - 79:11
**Tor** [2] - 47:17, 72:10
**total** [6] - 10:5, 13:23, 35:4, 37:8, 37:17
**totaling** [1] - 53:12
**touch** [2] - 27:10, 59:19
**Tox** [1] - 72:11
**toys** [1] - 21:3
**traced** [1] - 50:11
**tracing** [1] - 58:6
**track** [1] - 64:10
**track/trace** [1] - 50:24
**trade** [1] - 56:24
**traffic** [1] - 47:16
**tragic** [3] - 19:2, 19:9
**trail** [1] - 53:19
**train** [1] - 54:21
**trajectory** [1] - 14:15
**transaction** [3] - 51:22, 53:19, 54:2
**transactions** [10] - 48:8, 48:12, 49:23, 50:11, 50:19, 50:22, 52:8, 53:12, 53:14, 53:15
**transcript** [2] - 82:5, 82:6
**transferred** [3] - 48:13, 50:6, 75:17
**transferring** [1] - 75:19
**transmission** [1] - 58:12
**transmitted** [2] - 48:24, 48:25
**transparent** [1] - 52:5
**travel** [1] - 55:1
**traveling** [1] - 13:18
**Treasury** [1] - 58:14
**treatment** [8] - 26:24, 72:17, 73:23, 73:24, 74:9, 74:11, 75:13, 75:16
**trial** [3] - 20:7, 24:1, 24:6
**trials** [1] - 24:9
**trip** [1] - 55:5
**trips** [1] - 54:18
**troubling** [1] - 14:14
**true** [3] - 52:24, 82:4, 82:5
**truly** [1] - 25:22
**truthful** [1] - 24:18
**try** [1] - 25:2
**trying** [1] - 13:1
**turned** [1] - 28:9
**TV** [1] - 40:6
**two** [26] - 4:5, 4:9, 5:19, 8:2, 8:9, 9:5, 9:12, 9:13, 9:24, 10:1, 10:4, 18:14, 29:13, 32:13, 35:22, 36:11, 36:21, 37:2, 37:7, 37:24, 37:25, 60:19, 65:7, 67:25, 69:20, 72:21
**type** [2] - 15:16, 73:17
**typically** [2] - 54:8, 54:19

## U

**U.S** [17] - 1:14, 1:17, 2:1, 44:25, 45:10, 52:13, 55:9, 55:12, 55:25, 56:6, 58:13, 71:4, 71:8, 71:14, 73:21, 75:6, 75:12
**U.S.-based** [3] - 52:2, 53:23, 54:1
**Ukraine** [2] - 13:18, 54:18
**Ukranian** [3] - 52:1, 54:7, 54:25
**ultimately** [4] - 45:11, 48:6, 59:12, 63:11
**unacceptable** [1] - 39:2
**unaltered** [1] - 72:2
**unannounced** [2] - 71:15, 71:24
**unauthorized** [4] - 12:8, 47:7, 48:22, 49:5
**unaware** [2] - 16:9, 51:10
**unconstitutional** [2] - 76:12, 76:18
**under** [19] - 9:23, 10:14, 26:12, 26:17, 29:16, 33:7, 33:9, 33:10, 34:16, 34:19, 36:10, 44:13, 48:15, 52:24, 58:13, 67:19, 73:3, 77:13, 78:2
**underlying** [2] - 9:25, 64:6
**undermine** [1] - 52:8
**underscore** [1] - 14:4
**understood** [1] - 8:3
**undisputed** [1] - 11:9
**unfortunately** [1] - 35:3
**unhosted** [1] - 52:7
**Union** [2] - 27:24, 45:6
**union** [1] - 44:19
**unique** [2] - 32:18, 66:10
**UNITED** [4] - 1:1, 1:3, 1:10, 1:20
**united** [1] - 2:3
**United** [14] - 3:10,

44:22, 45:2, 45:20, 45:23, 47:3, 47:5, 48:24, 49:3, 55:2, 55:20, 58:1, 73:2, 82:13
**unlawful** [2] - 51:14, 69:18
**unlawfully** [1] - 69:17
**unless** [5] - 18:7, 70:2, 70:19, 72:22, 81:4
**unquote** [8] - 10:17, 53:23, 57:13, 60:5, 60:20, 63:11, 63:15, 64:9
**unrelated** [1] - 56:13
**unspecified** [1] - 51:14
**unwanted** [1] - 16:7
**unwarranted** [1] - 32:12
**up** [30] - 3:6, 7:9, 7:18, 14:10, 20:11, 23:14, 31:19, 33:11, 34:24, 39:21, 39:24, 40:12, 40:18, 43:6, 43:10, 43:12, 51:21, 52:18, 53:10, 53:20, 54:1, 57:18, 62:20, 66:12, 76:9, 76:14, 77:14, 78:4, 81:2
**update** [1] - 18:13
**updated** [1] - 36:2
**USC** [2] - 42:4, 68:25
**USD** [1] - 52:12
**USDC** [1] - 52:12
**USDT** [1] - 52:12
**useful** [1] - 74:19
**usefulness** [1] - 68:8
**user** [3] - 49:10, 70:23, 70:25
**users** [3] - 39:5, 47:20, 51:7
**uses** [1] - 73:12
**USFI** [3] - 57:2, 57:3, 57:25
**USFIs** [2] - 51:22, 52:23
**utilized** [1] - 47:6
**utilizing** [1] - 53:13
**utter** [1] - 20:2

## V

**vaccine** [1] - 29:7
**valid** [1] - 55:11
**validity** [1] - 5:6
**Valley** [1] - 14:11
**valuable** [2] - 12:7, 21:22
**value** [5] - 8:10, 14:24, 64:19, 68:3, 68:5
**valued** [2] - 48:16, 63:23
**variance** [7] - 34:2, 34:6, 34:8, 34:9, 34:20, 67:14, 67:18
**variety** [2] - 47:16, 53:17
**various** [3] - 49:22, 70:5, 75:20
**vast** [1] - 27:5
**VCE** [14] - 52:25, 56:11, 56:15, 56:19, 56:21, 56:23, 57:9, 57:10, 57:15, 57:21, 57:24, 57:25
**VCEs** [5] - 51:22, 52:23, 53:17, 56:5, 58:11
**vendors** [1] - 52:21
**venture** [1] - 42:12
**verification** [1] - 57:9
**verified** [1] - 52:20
**verify** [2] - 56:18, 71:25
**versus** [1] - 3:10
**via** [5] - 7:8, 47:18, 47:21, 52:5, 54:19
**victim** [24] - 5:13, 37:4, 46:24, 47:2, 47:5, 48:6, 48:8, 48:9, 48:11, 48:13, 48:19, 49:2, 49:5, 49:6, 49:9, 49:17, 49:18, 49:25, 51:19, 56:7, 57:7, 57:23, 58:5, 74:24
**victim's** [2] - 12:6, 15:6
**victims** [3] - 9:6, 17:14, 45:8
**view** [4] - 33:22, 33:23, 37:9, 63:6
**vigor** [1] - 20:25
**violate** [1] - 71:20
**violated** [1] - 73:5
**violation** [3] - 17:13, 55:13, 73:6
**virtual** [21] - 17:12, 46:19, 48:3, 48:8, 48:16, 49:10, 49:14, 49:21, 50:7, 52:3, 52:4, 52:14, 53:21, 55:24, 56:24, 57:16, 63:10, 63:20, 63:23, 72:11
**volatility** [1] - 52:14
**volume** [1] - 13:21
**voluminous** [1] - 50:21
**voluntarily** [1] - 64:24
**vs** [1] - 1:5
**vulnerabilities** [1] - 47:12

## W

**wait** [1] - 81:4
**waiting** [1] - 11:6
**waive** [2] - 75:3, 76:23
**waiver** [1] - 76:9
**waiving** [1] - 75:1
**wallet** [3] - 48:14, 51:1, 51:2
**Wallet** [4] - 48:14, 50:16, 50:18, 51:1
**wallets** [4] - 48:3, 48:13, 51:2, 52:7
**wants** [4] - 6:15, 21:22, 22:11, 28:19
**warm** [1] - 61:8
**warn** [1] - 73:10
**warrant** [1] - 22:23
**warrants** [1] - 22:17
**Washington** [6] - 1:6, 1:15, 1:18, 1:21, 2:5, 82:14
**wasting** [1] - 38:22
**watch** [1] - 40:6
**watches** [1] - 70:14
**ways** [3] - 13:2, 19:2, 66:11
**wealth** [1] - 27:21
**wedding** [1] - 20:15
**weigh** [2] - 27:20, 31:22
**weighed** [1] - 68:15
**weighing** [1] - 23:20
**weighs** [2] - 14:23, 15:13
**welcome** [1] - 26:22
**welcomed** [1] - 59:23
**whole** [1] - 21:18
**wholly** [1] - 17:7
**wife** [20] - 3:23, 13:16, 19:7, 23:12, 28:13, 29:11, 41:14, 46:7, 59:10, 60:12, 60:14, 60:16, 61:19, 61:23, 61:24, 62:4, 62:6, 63:25, 64:13, 66:19
**wife's** [2] - 3:23, 42:18
**willing** [2] - 24:8, 26:22
**willingly** [1] - 46:23
**winds** [2] - 31:19, 81:2
**winter** [1] - 46:22
**wire** [2] - 10:1, 48:25
**Wisconsin** [1] - 46:5
**wish** [2] - 78:17, 80:11
**wishes** [2] - 11:18, 38:11
**withdraw** [2] - 50:2, 55:3
**withdrawal** [1] - 51:5
**withdrawing** [2] - 52:2, 53:18
**witness** [1] - 29:20
**witnessed** [1] - 28:24
**words** [2] - 17:4, 22:1
**works** [6] - 6:14, 21:6, 31:4, 61:13
**world** [3] - 13:15, 25:10, 38:19
**worst** [1] - 40:22
**worth** [8] - 12:11, 12:12, 14:1, 14:2, 16:13, 19:9, 49:15, 63:25
**wound** [1] - 42:22
**wrist** [1] - 25:16
**writer** [1] - 9:21
**writing** [2] - 7:6, 35:23
**writings** [1] - 48:25
**written** [2] - 18:19, 40:15
**wrongdoing** [1] - 25:11
**wrote** [1] - 57:9

## X

**XMR** [2] - 52:4, 52:9

## Y

**year** [3] - 29:15, 29:17, 69:6
**years** [23] - 8:9, 10:10, 20:14, 25:13, 28:22, 29:13, 30:21, 32:8, 33:5, 38:8, 38:14, 39:21, 40:23, 42:5, 59:19, 60:12, 60:23, 61:1, 63:4, 63:16, 63:24, 67:22, 67:25
**years'** [2] - 17:25, 60:1
**yesterday** [2] - 36:3, 36:4
**York** [7] - 1:14, 1:25, 16:21, 17:9, 33:2, 46:6
**young** [2] - 14:13, 20:18
**younger** [3] - 44:21, 45:14, 59:9
**yourself** [2] - 3:11, 7:18

## Z

**Zancan** [2] - 16:25
**zero** [6] - 10:4, 18:14, 35:9, 35:13, 36:11, 36:22
**zero-point** [5] - 18:14, 35:9, 35:13, 36:11, 36:22
**ZIMMERMAN** [1] - 1:19
**Zimmerman** [1] - 3:14
**Zoom** [4] - 80:12, 80:13, 80:16, 81:3