# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>- v —<br><br>ILYA LICHTENSTEIN AND HEATHER MORGAN,<br><br>        Defendants. | No. 23-CR-239 (CKK) |

## DECLARATION OF BJORN DE WOLF

I, Bjorn de Wolf, make this declaration pursuant to 28 U.S.C. § 1746.  I hereby state as follows:

1.    I have worked at iFinex Inc. ("**Bitfinex**") since 2015.  During this time, I have worked in a variety of roles, including leading Bitfinex's customer support department from 2015-2018.  I currently serve as an internal advisor focused on complex questions across departments.  I submit this declaration in support of Third-Party Intervenor and Victim Bitfinex's Memorandum of Law in Support of the Government's Request for Restitution.  Except as otherwise indicated, I have personal knowledge of the facts set forth below.

2.    Bitfinex is a British Virgin Islands company and the operator of one of the world's oldest cryptocurrency exchanges.  Founded in 2012, the Bitfinex cryptocurrency exchange enables customers to buy, sell, and store various types of virtual currency, including but not limited to Bitcoin.  Like exchanges for traditional assets, Bitfinex offers its customers the ability to make simple spot trades (i.e., basic bids and offers to buy and sell assets), as well as the ability to conduct more sophisticated trades.  In 2016, those transactions included short sales, margin trading, and other financed transactions.

3.      Historically, Bitfinex has predominately served non-U.S. customers.  Since approximately 2018, Bitfinex does not permit U.S. persons to become Bitfinex customers.

4.      In early 2016, Bitfinex used multi-signature wallets that required multiple private keys to access the cryptocurrency stored therein and authorize transactions of that cryptocurrency.  Bitfinex held at least two private keys to the vast majority of its cryptocurrency wallets.  Bitfinex held at least one private key for each of its cryptocurrency wallets.  Bitfinex also contracted with a third-party service called BitGo.  In general, BitGo held one of the private keys to the Bitfinex wallets.  BitGo could only use its single private key (together with one of Bitfinex's private keys) to authorize Bitfinex wallet transactions following instructions from Bitfinex.

5.      Customers were able to fund a Bitfinex account by, among other things, depositing Bitcoin into a specific wallet address on the Bitfinex exchange.  At the time, Bitfinex created one or more wallet addresses corresponding to each customer's Bitfinex account to use for depositing Bitcoin.  Bitfinex controlled the multiple private keys necessary to authorize transactions using these deposit wallet addresses, including its own private keys and a single private key held by BitGo.

6.      For a limited time in 2016 before the Hack, certain U.S. customers who had margin accounts on the Bitfinex exchange could obtain a single private key to the multi-signature deposit wallet addresses associated with their accounts.  Those customers still lacked the two private keys necessary to directly authorize transactions using the wallets.  Bitfinex and BitGo each still held at least one of the private keys to the U.S. margin customer wallets.

7.      Bitfinex also routinely created and controlled thousands of other wallet addresses to hold Bitcoin and facilitate transactions on the Bitfinex platform.

8.      Bitfinex customers entered transactions on the Bitfinex exchange through the Bitfinex website because they did not hold the private keys needed to authorize transactions involving the Bitfinex deposit wallet addresses.  Customer trades and positions would not immediately or necessarily be reflected on the blockchain.  Instead, Bitfinex would periodically use its private keys to reconcile and settle customer positions and balances by transferring Bitcoin between the various Bitfinex exchange wallet addresses.  Only Bitfinex was able to control the movement of Bitcoin into and out of wallets on the Bitfinex exchange.

9.      On or about August 2, 2016, Bitfinex's systems were compromised.  The hacker, who I now understand to be Ilya Lichtenstein, stole approximately 119,754 Bitcoins from Bitfinex wallets using Bitfinex's private keys.

10.     The Stolen Bitcoin comprised approximately 36% of Bitfinex's total assets at the time of the Hack.  Bitfinex acted urgently to protect the remaining Bitcoin and other cryptocurrency assets on the Bitfinex exchange.  Bitfinex used its private keys to move all Bitcoin and other cryptocurrency assets on the Bitfinex exchange to Bitfinex wallets that were still secure.  Bitfinex referred the incident to global law enforcement organizations, including the Federal Bureau of Investigation and Department of Justice.

11.     After the theft, Bitfinex honored all customer positions and balances, including Bitcoin positions and balances, regardless of whether they involved stolen Bitcoin.  Bitfinex settled all open finance positions based on the market value of assets—including Bitcoin—at the time of the Hack.

12.     Bitfinex then temporarily allocated its losses pro rata across all customer accounts and assets, regardless of whether they held Bitcoin.  This temporary haircut had nothing to do with whether any Bitcoin associated with a Bitfinex customer account was stolen, or whether the

- 3 -

Bitfinex customers even held Bitcoin at all. Bitfinex then issued "BFX" tokens to each customer in an amount equal to the loss temporarily applied to the customer's account. For each $1 of loss assigned to a customer account, Bitfinex issued 1 BFX token to that customer with a face value of $1. Customers could also assign their right to compensation and legal claims related to the hack to other Bitfinex customers by selling them their BFX tokens.

13.     Bitfinex also permitted qualifying customers to exchange their BFX tokens for newly issued iFinex stock. Customers exchanged tens of millions of BFX tokens for iFinex stock. Customers who participated in such transactions entered subscription agreements with iFinex and received one share of iFinex stock for each BFX token the customer redeemed. Some customers also exchanged their BFX tokens for iFinex stock through intermediaries.

14.     Customers who elected to redeem BFX tokens for iFinex stock before November 30, 2016, additionally received RRT tokens as part of their compensation. There are approximately 30 million outstanding RRT tokens still held by Bitfinex customers. Should Bitfinex recover Stolen Bitcoins, it intends to first use approximately $30 million of the recovered assets toward redeeming the RRT tokens in full by making payments to those Bitfinex customers.

15.     As customers exchanged more and more BFX tokens for Bitfinex stock and RRT tokens, Bitfinex also redeemed the remaining outstanding BFX tokens for their full value. For each BFX token, Bitfinex redeemed it by providing the token holder $1 in value. By April 3, 2017—just eight months after the Hack—Bitfinex paid customers (or their assignees) millions of dollars to redeem all outstanding BFX tokens that had not already been exchanged for Bitfinex stock, erasing all remaining temporary customer losses relating to the Hack.

16.     Bitfinex customers who held their BFX tokens received the entire value of their assets at the time of the Hack.  And Bitfinex customers who exchanged their BFX tokens for iFinex stock earned significant profits as Bitfinex thrived and paid hundreds of millions of dollars in dividends.

17.     I have reviewed certain correspondence from individuals to the Court or Government regarding the Hack.  ECF Nos. 173-1, 175-1.  Most of these individuals appear to be Bitfinex customers.  However, some of the submissions by individuals contain statements that appear to be inconsistent with Bitfinex and/or public blockchain records.  For example, not all of these individuals held Bitcoin at the time of the Hack, let alone Bitcoin that was stolen.  As far as I am aware, since August 2016, no Bitfinex customers have brought legal claims against Bitfinex regarding their compensation related to the Hack.

I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 27th day of January, 2025.

Bjorn de Wolf