UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**LEAVE TO FILE GRANTED**
Judge CKolla-Kotly 2/14/25

UNITED STATES OF AMERICA

v.

ILYA LICHTENSTEIN, et al.,

Defendants.

CRIMINAL NO. 23-cr-239 (CKK)

# MOTION TO INTERVENE

COMES NOW Rafał Bielenia, proceeding Pro Se ("Movant"), respectfully submits this Motion to Intervene to present conclusive evidence demonstrating that certain statements made by iFinex Inc. ("Bitfinex") in the document titled "iFINEX INC. MOTION TO INTERVENE AND REQUEST FOR LEAVE TO APPEAR AS AN INTERESTED PARTY UNDER THE CRIME VICTIM'S RIGHTS ACT AND THE MANDATORY VICTIM RESTITUTION ACT", ECF No. 229, filed with this Court on January 29, 2025, are factually incorrect.

## STATEMENT OF FACTS

1. **Bitfinex's assertion of rightful ownership of stolen Bitcoin based on their possession of customer wallets private keys is inaccurate.**
    a. The fact that Bitfinex held private keys to these wallets merely establishes that **they acted as custodians of customers' Bitcoin and, in doing so, failed to ensure the safety of these funds.**
    b. As of August 2016 and prior to the hack, **customers' Bitcoin were held in individual, segregated wallets, each belonging exclusively to a single customer.**
    c. **These Bitcoin were never owned by Bitfinex and remained the sole property of the customers.** Bitfinex repeatedly confirmed in 2016 that these segregated wallets also belonged to the customers. The mere possession of private keys by Bitfinex does not negate this fact.
    d. **Accordingly, the Bitcoin were stolen not from Bitfinex itself, but directly from the customers.** Below, I provide conclusive evidence to support these assertions.
    e. On August 2, 2016, immediately following the hack, Bitfinex confirmed on its official Twitter account that each user had their own wallet, stating: *"We've stated several times that our Bitgo implementation removed hot/cold wallet* **as every user had their own wallet***".*
    f. (Evidence is included in Exhibit A, Twitter post: https://x.com/bitfinex/status/760543472713695232)
    g. On June 21, 2016, Bitfinex confirmed on its official Twitter account that each customer wallet was segregated, stating: *"Absolutely not true.* **Especially considering we don't have the hot wallet setup for btc anymore. We use segregated wallets***".*
    h. (Evidence is included in Exhibit A, Twitter post: https://x.com/bitfinex/status/745209233138933761)
    i. On June 22, 2016, Bitfinex confirmed on its official Twitter account that customers wallets were segregated, stating: *"****user funds are secured via segregated multi-sig wallets** with a 3rd party, BitGo".*
    j. (Evidence is included in Exhibit A, Twitter post: https://x.com/bitfinex/status/745395192614707200)
    k. The official Bitfinex website as of June 9, 2016, in the Features page, section titled "Segregated Wallets", clearly stated: *"Bitfinex has teamed up with BitGo* **to offer each user their own independent**

*multi-signature wallet allowing for independent verification of bitcoin on the Blockchain. This provides near-real-time proof-of-reserves for all the bitcoin stored in users' multi-signature wallets".*

   l. This statement confirms that each customer had their own independent wallet in which their funds were held and it was possible to independently verify this on the Blockchain.
   m. (Evidence is included in Exhibit B, Snapshot of official Bitfinex website, Features page, as of June 9, 2016: http://web.archive.org/web/20160609183416/https://www.bitfinex.com/features)

   n. The official Bitfinex website as of June 9, 2016, in the Security page, section titled "Industry Leading Multi-Sig", clearly stated: *"- Segregated customer wallets; - Verifiable on the Blockchain".*
   o. This statement confirms that customers' Bitcoin were held in segregated wallets and that each customer could verify this on the Blockchain.
   p. (Evidence is included in Exhibit B, Snapshot of official Bitfinex website, Security page, as of June 9, 2016: http://web.archive.org/web/20160609182851/https://www.bitfinex.com/security_policy)

   q. The official Bitfinex website as of June 9, 2016, in the Bitfinex Terms of Service page, section 5.1, clearly stated: "**all bitcoins in your Multi-Signature Wallets belong to and are owned by you**".
   r. This confirms that both wallets from which customers' Bitcoin were stolen and customer' Bitcoin belonged solely to the customers.
   s. (Evidence is included in Exhibit B, Snapshot of official Bitfinex website, Bitfinex Terms of Service page, as of June 9, 2016: http://web.archive.org/web/20160609181027/https://www.bitfinex.com/terms)

   t. On August 7, 2016, Bitfinex's official representative, Zane Tackett, published a list of all affected wallets on Reddit. **This post established that Bitfinex's initial stance was that customers' Bitcoin were stolen from segregated wallets belonging to customers, not from Bitfinex itself.**
   u. Bitfinex first introduced Tackett as its representative in an email sent on August 3, 2016, stating: *"Our representative, Zane Tackett, will be posting updates on reddit (/u/zanetackett)".*
   v. The Reddit post reads: *"Txid and Bitcoin Addresses Connected To The Bitfinex Theft A lot of people have requested a list of addresses and transactions related to the theft. I believe there are already lists out there as several people have sent me some, but here is an official one: http://pastebin.com/2XSASEEZ We'll continue to post updates as they become available."*
   w. (Evidence is included in Exhibit B, Reddit post: https://www.reddit.com/r/Bitcoin/comments/4wizdn/txid_and_bitcoin_addresses_connected_to_the/)

2. **Bitfinex's assertion of fully compensating customers for their losses is inaccurate. While Bitfinex did undertake steps toward compensation, this compensation was, at best, partial and did not make customers whole for their losses.**
   a. Bitfinex's narrative relies on the "BFX tokens terms" dated August 31, 2016. However, the tokens were distributed to customers on August 10, 2016, twenty-one days prior to these terms. Bitfinex's failure to provide the "BFX tokens terms" that were in effect at distribution on August 10, 2016, suggests the possibility of retroactive alterations after the tokens had been distributed to customers.
   b. The BFX tokens were distributed on August 10, 2016, **without release or waiver**, serving merely as a mechanism – a placeholder to account for the USD value of customers' uncompensated losses at the time of the hack.
   c. Other than a general mention that Bitfinex might redeem these tokens at a value of $1 per token at some point in the future, **there were no guarantees, no compensation plan, and no specifics regarding the date or exact mechanism of this redemption.**
   d. Bitfinex allowed trading of these tokens on its platform starting August 10, 2016, **without guarantees, exact dates, or specific plans for redemption.**
   e. On that day and for weeks thereafter, BFX tokens traded at a fraction of their supposed value. Therefore, the **low probability of full redemption was not only my personal opinion but also the market's consensus, which estimated the likelihood of such a scenario at only 20%-30%, as reflected in the token's price.**

f. **Only weeks later did Bitfinex begin subtly changing the narrative that BFX tokens were distributed as part of a compensation plan,** which is simply not true because no specific compensation plan existed at the time of distribution.
g. **It is also important to note that customers whose assets were stolen are entitled to the full return of their stolen assets, rather than merely the USD value at the time of the hack,** as Bitfinex would prefer to present it. Below, I provide conclusive evidence to support these assertions.

h. Bitfinex website was taken down on August 2, 2016, following the hack, and reopened on August 10, 2016. During this period, customers were unable to perform any actions, and all communication was one-sided.
i. On August 2, 2016, Bitfinex sent the first email confirming the security breach and the suspension of the platform, stating: *"Today we discovered a security breach that requires us to halt all trading on Bitfinex, as well as halt all digital token deposits to and withdrawals from Bitfinex. (...)* ***We are investigating the breach to determine what happened, but we know that some of our users have had their bitcoins stolen. We are undertaking a review to determine which users have been affected by the breach.*** *While we conduct this initial investigation and secure our environment, bitfinex.com will be taken down and the maintenance page will be left up."*
j. **Bitfinex clearly stated that they determined Bitcoin were stolen directly from their customers, not from Bitfinex itself.**
k. (Email evidence is included in Exhibit C).

l. In an email sent on August 6, 2016, Bitfinex confirmed a generalized loss percentage at 36.07%. They mentioned they would explain the full methodology used to arrive at this number, but they never did: *"After much thought, analysis, and consultation, we have arrived at the conclusion that losses must be generalized across all accounts and assets. This is the closest approximation to what would happen in a liquidation context.* ***Upon logging into the platform, customers will see that they have experienced a generalized loss percentage of 36.067%. In a later announcement we will explain in full detail the methodology used to compute these losses."***
m. In the same email, Bitfinex first introduced BFX tokens as an accounting mechanism to record each customer's discrete loss: *"We are actively discussing various strategic options with numerous potential investors as part of our strategy to fully compensate our customers. Such discussions, however, are in early stages and will likely take time to play out. In the meantime,* ***In place of the loss in each wallet, we are crediting a token labeled BFX to record each customer's discrete losses. Tokens will be distributed without release or waiver.*** *The BFX tokens will remain outstanding until redeemed in full by Bitfinex or possibly exchanged—upon the creditor's request and Bitfinex's acceptance—for shares of iFinex Inc. We are still sorting out many details on this; we will post further updates in the coming days."*
n. **Bitfinex clearly stated that these tokens were distributed without release or waiver.** This was the true nature of these tokens at the time of distribution, despite their later actions to present them in a more favorable light.
o. **Although Bitfinex did mention that they may redeem these tokens at some point in the future there were no guarantees, no exact date and no exact plans. This reassurance only seemed like a strategy to contain the panic and prevent customers from leaving the platform.**
p. (Email evidence is included in Exhibit C).

q. In an email sent on August 8, 2016, Bitfinex confirmed that **BFX tokens were designed to reflect only the USD value of stolen Bitcoin at the time of the hack rather than the full value of stolen Bitcoin**: *"Please take this time to log in and review your account and balances, taking note of the adjustments caused by the closing of open margin positions and the application of the* ***Extraordinary Loss Adjustment. The loss adjustment is represented by your balance in "BFX" tokens which are priced at 1.00 USD until we are able to allow trading of that token, likely within the next week.*** *The trading of BFX tokens may be restricted for US customers."*
r. In this email, Bitfinex also mentioned for the first time that these tokens would be tradeable on Bitfinex platform.
s. (Email evidence is included in Exhibit C).

    t. On August 10, 2016 – the day the platform reopened – Bitfinex confirmed that BFX tokens were available for trading. However, there was no redemption plan, no specific date or mechanism and many questions remained unanswered. **Despite Bitfinex's reassurances of transparency and that questions regarding the theft and distribution of losses would be discussed later, they never were:** *"Today, August 10th, 2016, at 16:00:00 UTC we will be enabling additional platform features as we continue to restore service after the incident on August 2nd. Exchange trading will be enabled for all currencies and pairs, while deposits and withdrawals will be enabled for BTC, ETC, ETH, and USD - with LTC and Tether to follow shortly thereafter.* ***Exchange trading will also be enabled for the BFX token on pairs BFXUSD and BFXBTC. We are working on tokenizing BFX via the Omni Layer to allow withdrawals for the BFX token, but we are still working out some protocol level details."****;* ***"We are aware that many questions remain and we intend to discuss the theft, the distribution of losses, and our recovery plan in follow-up announcements. We are trying to be as transparent as we can be while we continue to try to make the best of a terrible situation.*** *We regret the loss that took place, but we continue to remain confident in Bitcoin, the trading community, and our plan to compensate our customers. As always, we remain open to constructive commentary and suggestions from all sides."*

    u. (Email evidence is included in Exhibit C).

    v. On August 27, 2016 – seventeen days after the tokens were distributed and became tradeable – Bitfinex's CEO sent an email to all customers. In this email, **Bitfinex started subtly changing the narrative that BFX tokens were distributed as part of compensation plan, despite the fact that on August 10, 2016, those tokens were just an accounting mechanism and distributed without release or waiver. Even in this email – seventeen days after the tokens became tradeable – there was no exact plan, no exact date and no guarantees of full redemption, only vague considerations:** *"To recognize the loss you experienced and which needs to be repaid,* ***we issued BFX tokens with a face value of 1 USD to all users in proportion to their loss.*** *These tokens should be seen as notional placeholders or contingent obligations, and our aim is to redeem all outstanding tokens at their full face value."; "In order to redeem these tokens, we are exploring several options: (1) the recovery of the stolen coins; (2) outside investment in Bitfinex; (3) operating our trading platform with periodic redemption of the tokens issued and outstanding; (4) exchanging BFX for equity in Bitfinex."; "After the incident on August 2nd, the platform was re-launched in stages: On August 7th, the team brought the site up in a read-only mode so users could login and view the states of their accounts.* ***On August 10th, we relaunched withdrawals, deposits, and exchange trading for all pairs. At that time we made two new pairs available - BFX/USD and BFX/BTC - so that you can exchange the new BFX tokens for BTC or USD if you wish.*** *Two days later, on August 12th, we re-enabled margin trading for non-U.S. residents."*

    - (Email evidence is included in Exhibit C).

3. **It was never possible, under any scenario whatsoever, to exchange BFX tokens or their proceeds for the actual amount of the uncompensated portion of Bitcoin stolen.**
    a. Customers who decided to take a risk and retain their BFX tokens until the unlikely event of full redemption materialized on April 3, 2017, were unable to recover their original assets in full.
    b. At the time of the security breach, Bitcoin was valued at approximately $604. By the redemption date of April 3, 2017, the value had increased to approximately $1,150.
    c. Bitfinex unilaterally imposed upon its customers the position that they were entitled only to the USD value of their assets at the time of the breach, rather than the full return of their stolen assets. The BFX tokens were specifically structured to reflect solely the USD value of customers losses at the time of the breach.
    d. **This structure resulted in customers who held BFX tokens until full redemption recovering only approximately 50% of their original uncompensated holdings.**
    e. To illustrate: If a customer had 100 Bitcoin stolen from their own segregated wallet on August 2, 2016, Bitfinex returned approximately 64 Bitcoin on August 10, 2016 and issued approximately 21,746 BFX tokens to account for the uncompensated portion of 36 Bitcoin. Upon redeeming these tokens at $1 each on April 3,

2017, the proceeds of $21,746 would have enabled the purchase of only approximately 18.9 Bitcoin at prevailing market rates.
   f. **Even in this optimal scenario, the customer remains uncompensated for 17.1 Bitcoin.** Many customers, recognizing Bitfinex's demonstrated inability to ensure security of customer funds and the low probability of full redemption, chose to sell their tokens immediately at market values significantly below $1 per token, resulting in even greater losses.
   g. **It is unreasonable to expect depositors to engage in speculative behavior to recover their assets,** particularly when such speculation would, at best, only return the USD value of their holdings at the time of the breach.
   h. **Referring back to the example above, the customer remains uncompensated for 17.1 Bitcoin.** These Bitcoin were subsequently recovered and seized from the hacker and have always been the rightful property of the customer, having been stolen directly from their own wallet.
   i. The fundamental question remains: **What legal basis exists for Bitfinex to claim ownership of property that was never theirs, they never compensated the customer for, and whose title was never transferred to Bitfinex?**
   j. All evidence supporting these assertions is included in Exhibit D.

# CONCLUSION

WHEREFORE, I respectfully caution the Court that permitting voluntary restitution of 94,643.29837084 Bitcoin to Bitfinex, thereby circumventing established procedures of the U.S. Department of Justice Asset Forfeiture Program, would risk legitimizing potential theft on a massive scale and establish a dangerous precedent.
If Bitfinex's claim proves meritorious, they may pursue compensation through standard procedures, on equal terms with all other victims. There exists no reasonable justification for providing Bitfinex preferential treatment in this matter.

# ATTACHMENTS

Attached are Exhibit A, Exhibit B, Exhibit C and Exhibit D, which contain all the aforementioned evidence supporting the assertions made regarding the events surrounding the BFX tokens and the security breach at Bitfinex.

# CERTIFICATE OF SERVICE

I, Rafał Bielenia, hereby certify that on February 10, 2025, a true and correct copy of the foregoing document was served upon the following individuals by the methods indicated below:

**CAHILL GORDON & REINDEL LLP**
- **Anirudh Bansal**
  32 Old Slip, New York, NY 10005
  Email: abansal@cahill.com
- **Angela F. Collins**
  1990 K Street, N.W., Suite 950, Washington, DC 20006
  Email: acollins@cahill.com
- **Jason Michael Ecker**
  32 Old Slip, New York, NY 10005
  Email: jecker@cahill.com
- **Samson Enzer**
  32 Old Slip, New York, NY 10005
  Email: SEnzer@cahill.com
- **Kiersten A. Fletcher**

32 Old Slip, New York, NY 10005
Email: kfletcher@cahill.com

**U.S. DEPARTMENT OF JUSTICE**
- **Rick E. Blaylock, Jr.**
  601 D Street, NW, Washington, DC 20004
  Email: rick.blaylock.jr@usdoj.gov
- **Christopher Brodie Brown**
  DOJ-Nsd, 950 Pennsylvania Avenue NW, Ste 6744a, Washington, DC 20530
  Email: Christopher.Brown8@usdoj.gov
- **Jessica Peck**
  1301 New York Ave NW, Suite 655, Washington, DC 20005
  Email: jessica.peck@usdoj.gov
- **Catherine Pelker**
  950 Pennsylvania Ave NW, Washington, DC 20530
  Email: catherine.pelker@usdoj.gov
- **Jolie Zimmerman**
  U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
  555 Fourth Street, NW, Washington, DC 20530
  Email: jolie.zimmerman@usdoj.gov

**JENNER & BLOCK LLP**
- **David Bitkower**
  1099 New York Avenue, NW, Suite 900, Washington, DC 20001
  Email: dbitkower@jenner.com

**GREENSTEIN, DELMORE & LUCHS, P.C.**
- **James Donald Sadowski**
  1620 L Street, N.W., Suite 900, Washington, DC 20036
  Email: jds@gdllaw.com

**GIBSON, DUNN & CRUTCHER LLP**
- **Stephanie Lauren Brooker**
  1700 M Street, N.W., Washington, DC, 20036-4504
  Email: sbrooker@gibsondunn.com

**ZUCKERMAN SPAEDER, LLP**
- **Aitan D. Goelman**
  1800 M Street NW, Suite 1000, Washington, DC 20036
  Email: agoelman@zuckerman.com
- **Christopher R MacColl**
  1800 M Street NW, Suite 1000, Washington, DC 20036
  Email: cmaccoll@zuckerman.com

**METHOD OF SERVICE**

The foregoing document was served via email to the parties listed above.
Executed: February 10, 2025.

## DECLARATION

I hereby declare, under penalty of perjury, that the foregoing document and all exhibits attached to this document are true, accurate, and complete representations of the documents and records they depict, and that they have not been altered or modified in any way.

Respectfully submitted,

*Rafał Bielenia* (signature)

*Signature*
Rafał Bielenia
Pro Se Movant
Armii Krajowej 4/32
15-661 Białystok, Poland
Email: rafal@bielenia.pl
Dated: February 10, 2025