UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ILYA LICHTENSTEIN, *et. al.*,<br><br>*Defendants,*<br><br>and<br><br>JOHN DOE<br><br>*Claimant and Third-Party Petitioner.* | CRIMINAL NO. 23-cr-239 (CKK) |

## VERIFIED PETITION FOR HEARING TO ADJUDICATE THIRD-PARTY CLAIM ASSERTING LEGAL INTEREST IN FORFEITED PROPERTY

John Doe ("Petitioner"), by and through his counsel, Jenner & Block LLP, petitions this Court for an ancillary hearing, pursuant to 21 U.S.C. § 853(n) and Federal Rule of Criminal Procedure 32.2, and asserts his interest as a claimant with a superior interest to specific property subject to this Court's Second Amended Preliminary Consent Order of Forfeiture dated November 14, 2024 ("Forfeiture Order") in the above-captioned matter.

Petitioner received personal notice of the forfeiture by email on December 17, 2024. A third party asserting a legal interest in property that has been ordered forfeited may challenge the order by requesting, within thirty days, an evidentiary hearing to determine the validity of that interest. 21 U.S.C. § 853(n)(2). This petition is timely under § 853(n)(2), as it is being filed within 30 days of Petitioner's receipt of personal notice.

Petitioner is entitled to recover the property that has been ordered forfeited to the extent that he can establish by a preponderance of the evidence that he either (1) "has a legal right, title,

1

or interest in the property" superior to the defendant at the time of the acts giving rise to the forfeiture, or (2) he is a bona fide purchaser for value (who reasonably had no cause to believe the property was subject to forfeiture when acquired). 21 U.S.C. § 853(n)(6).

As demonstrated below, Petitioner has a legal right, title, and interest in the Bitcoin ("BTC") subject to forfeiture and accordingly seeks an order that such property be returned to him, in the amount of 670.68637 BTC.

**The Parties**

1. Petitioner John Doe is a Bitfinex account holder.

2. Defendants Ilya Lichtenstein and Heather Morgan ("Defendants") are individuals who engaged in a conspiracy to steal and launder approximately 120,000 BTC stolen in August 2016 from account holders of Bitfinex, a cryptocurrency exchange that had custody of assets belonging to its account holders.

3. The United States of America ("United States") has obtained a Preliminary Forfeiture Order that it seeks to enforce against assets that include Petitioner's property.

**Procedural History**

4. In February 2022, federal law enforcement placed the Defendants under arrest for involvement in a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and a conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. The United States filed a sealed complaint in the above-captioned case on February 7, 2022. ECF No. 1.

5. On August 3, 2023, Defendant Ilya Lichtenstein pleaded guilty to one count of Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h). ECF No. 96.

6. On August 3, 2023, Defendant Heather Morgan pleaded guilty to one count of Money Laundering Conspiracy, in violation of 18 U.S.C. § 371 and § 1956(a)(1)(B)(i), and one count of Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371. ECF No. 101.

7. On December 17, 2024, the United States Attorney for the District of Columbia issued a Notice of Criminal Forfeiture Action to Petitioner, enclosing therewith a public notice of the same date, as well as the Second Amended Preliminary Order of Forfeiture (the "Preliminary Order"), pursuant to 18 U.S.C. § 982(a)(1), 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c) (ECF No. 178), and a Corrected Second Amended Attachment A (ECF No. 198-1). A copy of the Notice of Criminal Forfeiture and accompanying enclosures is attached hereto as Exhibit A.

8. The assets identified in the Preliminary Order include approximately 114,601.00727 BTC traced to the hack of Bitfinex, of which at least 670.68637 BTC rightfully belongs to Petitioner.

**Background**

9. In 2016, Bitfinex was one of the world's largest cryptocurrency exchanges. It enabled its users to trade crypto assets. Bitfinex also made arrangements for custody of customer's crypto assets, an agency capacity, while making clear that the account holders, and not Bitfinex, held ownership of the assets in the customers' accounts.

10. Attached are copies of the Bitfinex Terms of Service in place before and after the at the time of the 2016 hack, pulled from the internet archive, web.archive.org. *See* Exhibit B (June 9, 2016 Terms of Service) and Exhibit C (August 8, 2016 Terms of Service).

11. At all relevant times, Bitfinex's Terms of Service provided that Bitcoin and other crypto assets in customer accounts was the property of the customers, not the property of Bitfinex. For example, the Bitfinex Terms of Service make clear that Petitioner's spot purchases

3

of BTC on the Bitfinex platform occurred and were settled between fully funded buyers and sellers on the Site. Ex. B at § 3. The Terms of Service further make clear that Bitfinex and BitGo (which assisted with custody), served only in an agency capacity and that "[n]either Bitfinex nor BitGo acts as principals, counterparties, or market-makers in the transactions effected through trading on Bitfinex." Ex. B at § 4.4. Moreover, the Terms of Service provide that "all bitcoins in your Multi-Signature Wallets belong to and are owned by you." *See* Ex. B at § 5.1.

12. On August 2, 2016, approximately 120,000 Bitcoin were stolen from wallets associated with Bitfinex, "including funds belonging to customers" of the Bitfinex exchange. ECF No. 95 at ¶ 14. Those 120,000 BTC made up about 36.06% of the total assets on Bitfinex.

13. Following the hack and theft of users' BTC, Bitfinex comingled the remaining assets in its custody as part of a unilateral decision to "ratably allocate" the losses from the hack among all its users. As part of this process, Bitfinex updated all users' asset balances to reflect 63.95% of their pre-hack balance across all assets. This had the effect of forcibly converting 36.06% of customer's non-BTC assets to BTC, and using that BTC to partially restore customers' pre-hack BTC balances.

14. In 2022, the Defendants were arrested on money laundering charges in connection with the Bitfinex hack. At the time, the government was able to recover approximately 94,643.29837084 Bitcoin, as well as other crypto assets, from the wallet Defendants used in the hack. *See* Ex. A at Amended Attachment A; *see also* Dkt. No. 146 at 25. Subsequent to Defendants' arrest, the government seized 16,514.182 additional BTC traceable to the hack.

Criminal Complaint, Exhibit A, ¶ 6, Dkt. No. 1-1; Ex. A at Amended Attachment A.[1] Altogether, the government was able to recover 114,601.00727 BTC, representing the vast majority of the BTC stolen from Bitfinex account holders.

**Petitioner's Property**

15. The seized property that Petitioner seeks to be released and returned to him consists of BTC owned by Petitioner that was custodied through Bitfinex and stolen in the hack, as identified on Exhibit A at Amended Attachment A, net of the amount Petitioner recovered as a result of Bitfinex's ratable reallocation of assets.

16. Petitioner held two accounts on Bitfinex at the time of the hack, opened in early 2014 and early 2016. In total, Petitioner's Bitfinex wallets held approximately 1,735 BTC immediately prior to the hack, in addition to other assets, as follows:

| User ID | Pre-Hack BTC Balance | Pre-Hack ETH Balance | Pre-Hack USD Balance |
|---|---|---|---|
|  | 1733.56637 BTC | 6841.82085 ETH | n/a |
|  | 1.44 BTC | n/a | $4,513.25 |

**Account**

17. The Bitfinex account verification with User ID ▮▮▮▮ is verified in Petitioner's name.

18. Petitioner acquired the BTC in the account with User ID ▮▮▮▮ pursuant to an exchange of ETH for BTC. First, Petitioner deposited ETH that already belonged to Petitioner

---

[1] To the extent there is any difficulty tracing the particular BTC seized by the government to particular wallets used by Bitfinex to custody Petitioner's and other account holders' assets, it is because tracing has been complicated by Defendants' criminal money laundering activities.

5

into his Bitfinex ETH deposit wallet. Then, beginning on August 1, 2016 and finishing prior to the hack on August 2, 2016, Petitioner exchanged a portion of that ETH for 1733.56637 BTC. The exchange was executed through a series of separately identifiable transactions, all of which were processed prior to the hack. Bitfinex account records available to Petitioner reflect the exchange transactions by which Petitioner's acquisition of BTC was completed, including the internal Bitfinex transaction IDs, Order IDs, amounts, and time-stamps for each transaction.

**Account** ▮

19. The Bitfinex account verification with User ID ▮ is verified in Petitioner's name.

20. Petitioner deposited BTC into in the account with User ID ▮ from various sources in the years prior to the hack, by purchasing them in various direct, or over-the-counter ("OTC") transactions prior to depositing them with Bitfinex. Petitioner acquired the ownership of those BTC Petitioner was the sole owner of all of the BTC that he deposited into his Bitfinex account. While Petitioner deposited BTC at various times between 2014 and 2016, substantially all of the BTC in his account at the time of the hack arose from a deposit of 1.82633867 BTC on March 6, 2016, which accounted for nearly all of his post-deposit balance of 1.83138487 BTC. The BTC balance in Petitioner's ▮ account changed thereafter as a result of margin funding and trading fee transactions, culminating in a balance of 1.44085144 BTC immediately prior to the hack. Bitfinex account records available to Petitioner reflect the deposits and subsequent transactions, including the internal Bitfinex transaction IDs, Order IDs, amounts, and time-stamps for each transaction.

21. On information and belief, for both of Petitioner's accounts, Bitfinex's internal transaction records identify the wallets in which Petitioner's BTC was held and the particular

6

seller(s) with whom Petitioner's transactions were matched, and from whom Petitioner thereby acquired legal ownership of the BTC for each particular transaction. While the assets are traceable, Bitfinex's internal transaction records are therefore necessary to match Petitioner's BTC transactions and holdings to specific on-chain holdings and movements of BTC.

22. Through the above-referenced transactions, prior to the hack Petitioner acquired legal interest and title to the particular BTC seized by the government that is traceable to the Bitfinex hack, superior to any other person or entity's legal interest in that BTC, in the amount of his entire BTC balance.

**The Theft and Partial Recovery of Stolen Assets From Petitioner's Bitfinex Accounts**

23. On information and belief, records internal to Bitfinex will confirm the particular wallet addresses at which the BTC owned by Petitioner was held, and will confirm that all or substantially all of the Petitioner's BTC was stolen by Defendants during the hack.

24. In August 2016, after the hack, Petitioner recovered a portion of the value of his stolen BTC from Bitfinex as a result of Bitfinex's reallocation of assets referenced above. Petitioner therefore asserts this petition seeking recovery of his lost BTC after accounting for his net recovery from the reallocation of assets by Bitfinex. After the re-allocation, Petitioner's account balances were as follows:

| User ID | Post-Hack BTC Balance | Post-Hack ETH Balance | Post-Hack USD Balance |
|---|---|---|---|
| ▮ | 1108.32097 BTC | 4374.18135 ETH | n/a |
| ▮ | 0.92 BTC | n/a | $2,584.79 |

25. First, the re-allocation of assets had the effect of forcibly converting 36.06% of Petitioner's ETH and USD to BTC. As part of this process, Bitfinex reduced Petitioner's ETH balance in the account with User ID ▮ by 2467.6395 ETH, and also reduced the USD

7

balance in his account with User ID ▓▓▓ by $1,988.46, as compared to the pre-hack balances. Based on the exchange rates used by Bitfinex for purposes of the reallocation, the ETH converted by Bitfinex was equivalent to 41.62907 BTC and the USD converted by Bitfinex was equivalent to 3.2919 BTC, for a total of 44.92097 BTC.

26. In other words, 44.92097 BTC that was placed back into Petitioner's account was not a recovery of stolen BTC or a benefit to Petitioner at all, but simply a forced conversion of Petitioner's own remaining assets from ETH and USD to BTC.

27. After converting Petitioner's non-BTC assets, Bitfinex updated Petitioner's BTC balances to reflect a total balance across both accounts of 1109.24097 BTC. Thus, in addition to the 44.92097 BTC attributable to the conversion of Petitioner's own non-BTC assets, the reallocation provided Petitioner a recovery of 1,064.32 BTC.

28. As a result, after the re-allocation, Petitioner's remaining legal interest in the BTC that had been stolen by Defendants—calculated as Petitioner's pre-hack balance of 1,735.00637 BTC, less the recovery of 1,064.32 BTC that Petitioner received as part of the reallocation of losses—was **670.68637 BTC**.[2]

**The BFX Tokens**

29. After the hack, Bitfinex issued claim tokens (called "BFX") purporting to provide users a "contingent obligation" that Bitfinex *may*, at its "sole option," redeem the tokens for their stated dollar value in the future. BFX tokens were issued without any agreement that the receipt

---

[2] To the extent Petitioner was provided a net recovery of BTC in the reallocation, that recovery would have come from other Bitfinex account holders' assets, which Bitfinex used for the reallocation. As a result, of the 1,735 BTC stolen from Petitioner, the other account holders whose assets were used to provide a net recovery may assert a right to step into the shoes of Petitioner to the extent of the net 1,064.32 BTC that was re-allocated to Petitioner from their assets.

of those tokens relinquished any customer's legal interest in the stolen BTC. Quite the opposite, Petitioner and other Bitfinex users were expressly told that the BFX tokens were granted to them "without reduction of or other release or waiver of any claims [users] may have against the Bitfinex Group." Attached at <u>Exhibit D</u> is a copy of the BFX token terms issued by Bitfinex.

30.     Bitfinex subsequently enabled trading such that BFX tokens could be sold on the secondary market. When trading commenced, BFX tokens immediately began trading at a steep discount to their purported face value, reflecting the fact that they were not actually worth the stated face value that Bitfinex purported to place on them.

**Legal Basis for Petitioner's Right to the Property**

31.     Legal title to the subject property in the amount of 670.68637 BTC was vested, at all relevant times, with Petitioner. He deposited his own assets into his Bitfinex wallets, and traded with those assets. Through those actions, Petitioner was the legal owner of over 1,735 Bitcoin in his accounts prior to the hack.

32.     Petitioner held legal title to his Bitcoin in his Bitfinex accounts pursuant to Bitfinex's Terms of Service. The Bitfinex Terms of Service make clear that all spot purchases of BTC occurred between fully funded buyers and sellers on the Site, that Bitfinex served only in an agency capacity, and that "[n]either Bitfinex nor BitGo acts as principals, counterparties, or market-makers in the transactions effected through trading on Bitfinex." Ex. B at §§ 3, 4.4.

33.     Therefore, Petitioner acquired the legal right to his BTC from the sellers of BTC on the Bitfinex platform whose sell orders were matched with his purchase orders. Bitfinex records will be able to establish the particular sellers with whom each transaction was matched and enable tracing of the relevant BTC to the stolen assets.[3]

---

[3] In the alternative, to the extent tracing with the benefit of internal Bitfinex records were to establish that Petitioner's BTC was not among the BTC stolen by Defendants (which Petitioner

34. Moreover, the Terms of Service provided that Petitioner's assets would be held in Multi-Signature Wallets established with BitGo and that "all bitcoins in your Multi-Signature Wallets belong to and are owned by you." Ex. B at § 5.1. Those terms confirm that Bitfinex operated as a platform to facilitate custody and exchange of BTC over which its customers retained ownership, and not as a bank in which deposits might be considered to be the assets of the company.

35. In short, pursuant to its Terms of Service, Bitfinex never had legal ownership of the BTC in Petitioner's account and served only as an agent facilitating the purchase, custody, and transfer of those Bitcoins between Petitioner and other account holders. Petitioner therefore had a legal right to the BTC in his account at the time of the hack, superior to that of any other potential claimant.

36. Legal title to Petitioner's BTC was never passed to the Defendants, who unlawfully stole Petitioner's property from the Bitfinex wallets. As the Supreme Court noted nearly 150 years ago, "It is hardly necessary to say that the title of the true owner of personal property cannot be impaired by the unauthorized acts of one not the owner. Taking possession of the property…can have no effect upon the right of the owner." *The Idaho*, 93 U.S. 575, 583-84 (1876).

37. Petitioner's acceptance and subsequent sale of BFX tokens (at the prevailing market rate that reflected a steep discount to the purported face value) also did not make

---

believes is unlikely based on reports that BTC wallets were drained in descending order of the BTC balance), then the effect of the reallocation was to use Petitioner's assets to provide recoveries to other account holders whose assets were stolen. If that were the case, it would be Petitioner who would step into the shoes of those other account holders, having the superior legal right to the seized BTC as an innocent owner (and bona fide purchaser) to the extent the reallocation provided such other account holders with BTC derived from Petitioner's assets, which Petitioner expects would be determinable from Bitfinex's internal records.

Petitioner whole, nor waive or compromise his legal right to or interest in his BTC. The BFX Token Terms clearly state, "The token has been issued to you without reduction of or release or waiver of any claims you may have." Ex. D. Nor could the BFX tokens constitute adequate consideration for relinquishment of any right or interest, as they represented only a contingent obligation to redemption at the "sole option" of Bitfinex at an unstated time in the future. *Id.*

38. While Petitioner's acceptance of BTC as part of the reallocation of assets might arguably transfer the right in a portion of that reallocated BTC to the account holders' whose assets were used to fund that reallocation, Petitioner never conveyed to Defendants, Bitfinex, or any anyone else any right to or ownership interest in the subject property that he was unable to recover. At no relevant time did any person or entity other than Petitioner have any title to that subject property. Petitioner's right to the subject property renders the Forfeiture Order invalid as to the subject property.

39. Accordingly, Petitioner's net interest in the seized property amounts to 670.68637 BTC of the BTC traceable to the hack as identified on Exhibit A at Amended Attachment A. To the extent more precise tracing of assets is necessary, Petitioner respectfully requests discovery from Bitfinex of the internal records of Bitfinex necessary to identify the counterparties to his transactions and to trace the on-chain movements of BTC held in his and their accounts.

**WHEREFORE**, Petitioner respectfully requests that the subject property in the amount of 670.68637 BTC be returned and that this Petition be granted in its entirety, together with such other and further relief as this Court deems equitable and proper.

Date: January 16, 2025

                                      Respectfully submitted,

                                      By: /s/ *David Bitkower*
                                      David Bitkower
                                      **JENNER & BLOCK LLP**
                                      1099 New York Avenue NW
                                      Suite 900
                                      Washington, DC 20001-4412
                                      Telephone: (202) 639-6000
                                      dbitkower@jenner.com

                                      Kayvan B. Sadeghi (*pro hac vice pending)*
                                      Shailee D. Sharma (*pro hac vice forthcoming*)
                                      Sara E. Cervantes (*pro hac vice pending*)
                                      **JENNER & BLOCK LLP**
                                      1155 Avenue of the Americas
                                      New York, NY 10036-2711
                                      Telephone: (212) 891-1600
                                      ksadeghi@jenner.com
                                      ssharma@jenner.com
                                      scervantes@jenner.com

## **DECLARATION**

I attest and declare under penalty of perjury that my claim is not frivolous and the facts and information stated in this petition and provided in support of my claim are true and correct to the best of my knowledge and belief.

_____████_____
**Signature**

████_____
**Printed Name**

15 Jan 2025
_____
**Date**