# Exhibit List

| | |
|---|---|
| **Exhibit 1** | Bitfinex Terms of Service, version as of June 9, 2016 (pre-hack) (available at https://web.archive.org/web/20160609181027/https:/bitfinex.com/terms) |
| **Exhibit 2** | Bitfinex Terms of Service, version as of August 8, 2016 (post-hack) (available at https://web.archive.org/web/20160808165440/https:/bitfinex.com/terms) |
| **Exhibit 3** | Letter to Judge Kollar-Kotelly dated November 12, 2024 |
| **Exhibit 4** | Bitfinex BFX Token Terms, version as of November 3, 2016 (available at https://web.archive.org/web/20161103084718/https:/bitfinex.com/bfx_token_terms) |
| **Exhibit 5** | 2016 Transaction Ledgers of Petitioner's Accounts |
| **Exhibit 6** | Notice of Forfeiture (Online Publication) |

# Exhibit 1

**web.archive.org** /web/20160609181027/https://www.bitfinex.com/terms



The Wayback Machine - https://web.archive.org/web/20160609181027/https://www.bitfinex.com/terms

# Log In Using Clef

Loading Clef...

Clef is secure two-factor auth with no passwords or tokens. Learn More & Get Connected

# Sign up

Enter the code given by your referrer, and get a 10% discount on your trading fees for the first 30 days. (Optional.)

**Default currency for fees**
Your default currency to deduct fees from (for margin trading, and exchange depending on Exchange fee setting)

Cancel

**What is Clef?**

Clef is a new take on two-factor authentication. It makes logging in easier and more secure.

- **Secure:** Prevents key-logging and "fishing" attacks
- **Fast:** No need to type in username, password and two-factor tokens
- **Fun:** Point your phone at the waveform, and you're in.
- **Trusted:** Used by over 100,000 sites.

Learn more about Clef & Bitfinex

Use the button below to connect Bitfinex & Clef now. Or setup later by visiting bitfinex.com/clef.

**Terms of Service**

Thank you for choosing Bitfinex.com (the **"Site"**). The following terms and conditions of service (these **"Terms of Service"**) apply to customers of the Site. Some of these Terms of Service will apply only to U.S. Persons (as defined below) using the Site. Others apply to all users of the Site. You should read these Terms of Service carefully to determine which provisions apply to you. By using any of the services, functions, or features offered from time to time on the Site (collectively or individually, the **"Services"**), the customer (referred to herein as **"you"** or **"your"**) agrees to these Terms of Service.

These Terms of Service constitute the agreement and understanding with respect to the use of any or all of the Services, and any manner of accessing them, among: you; BitGo, Inc. (**"BitGo"**), the company providing individualized, multi-signature wallets on the Site; and, one of the following parties:

a)  where you are a U.S. Person, BFXNA Inc. (**"BFXNA"**); and,
b)  where you are not a U.S. Person, iFinex Inc. (**"iFinex"**).

For the avoidance of doubt, these Terms of Service have three parties: you, BitGo, and either BFXNA or iFinex. By using the Services, you agree to BitGo's Terms of Use, which are incorporated into these Terms of Service by reference. The following Site policies and pages are also incorporated into these Terms of Service by reference: Privacy Policy; Risk Disclosure Statement; Anti-Spam Policy; and Law Enforcement Requests Policy. In the event of any inconsistency between these Terms of Service and any other pages or policies on the Site, these Terms of Service shall prevail.

By creating an account on the Site or by using any of the Services, you acknowledge that you have read, understand, and completely agree to these Terms of Service in effect from time to time. If you disagree with these Terms of Service or with any subsequent amendments, changes, or updates, you may not use any of the Services; your only recourse in the case of disagreement is to stop using all of the Services and close your account(s) on the Site.

These Terms of Service may be amended, changed, or updated by BFXNA or iFinex, as applicable, without prior notice to you. You should check back often to confirm that your copy and understanding of these Terms of Service is current and correct. Your non-termination or continued use of any Services after the effective date of any amendments, changes, or updates constitutes your acceptance of these Terms of Service, as modified by such amendments, changes, or updates.

The use of the Site, BitGo, or any Services is void where prohibited by applicable law.

1. 1.Interpretation:
   1. 1.1.Definitions: In these Terms of Service and all documents incorporated herein by reference, the following words have the following meanings unless otherwise indicated::
      1. 1.1.1.**"AML"** means anti-money laundering;
      2. 1.1.2.**"Associates"** means iFinex Inc., BFXNA Inc., BitGo, Inc., and each and every one of their respective shareholders, subsidiaries, employees, contractors, agents, directors, officers, partners, affiliates, insurers, and attorneys;
      3. 1.1.3.**"BFXNA"** means BFXNA Inc.;
      4. 1.1.4.**"Bitfinex"** means:
         1. 1.1.4.1.where you are a U.S. Person, BFXNA; and,
         2. 1.1.4.2.where you are not a U.S. Person, iFinex;
      5. 1.1.5.**"BitGo"** means BitGo, Inc.;
      6. 1.1.6.**"CTF"** means counter-terrorist financing;
      7. 1.1.7.**"Digital Tokens"** means blockchain-based assets or rights, or other similar digital representations of rights or assets, including bitcoins, Litecoins, and ethers;

8. 1.1.8.**"Encumbered Wallet"** means a Multi-Signature Wallet subject to one or more Liens;

9. 1.1.9.**"FATF"** means the Financial Action Task Force;

10. 1.1.10.**"Financing Order Book"** has the meaning set out in paragraph 3 of these Terms of Service;

11. 1.1.11.**"Financing Provider"** means any provider of financing from and on her own account on the Site;

12. 1.1.12.**"Financing Recipient"** means any recipient of financing from a Financing Provider on the Site;

13. 1.1.13.**"iFinex"** means iFinex Inc.;

14. 1.1.14.**"Lien"** has the meaning set out in paragraph 4 of these Terms of Service;

15. 1.1.15.**"Losses"** has the meaning set out in paragraph 16 of these Terms of Service;

16. 1.1.16.**"Multi-Signature Wallet"** means a bitcoin wallet on the Site that is built with BitGo technology using a "2 of 3" private key permissioned structure whereby each wallet has three private keys and transacting with bitcoins associated with such wallet requires at least two of the three private keys;

17. 1.1.17.**"Person"** includes an individual, association, partnership, corporation, other body corporate, trust, and any form of legal organization or entity;

18. 1.1.18.**"Personal Information"** means information about an identifiable individual, business, organization, or other entity, but does not include the name, title, business address, or telephone number of an employee of a business, organization, or other entity;

19. 1.1.19.**"Prohibited Use"** has the meaning set out in paragraph 9 of these Terms of Service;

20. 1.1.20.**"Service"** means any of the services, functions, or features offered on the Site;

21. 1.1.21.**"Site"** means the Internet website www.bitfinex.com;

22. 1.1.22.**"SynapsePay"** means Synapse Payments, LLC;

23. 1.1.23.**"Terms of Service"** means these terms and conditions of service, as they may be changed, amended, or updated from time to time, including BitGo's Terms of Use and the following Site policies and pages: Privacy Policy, Risk Disclosure Statement, Anti-Spam Policy; and, Law Enforcement Requests Policy;

24. 1.1.24.**"Trading Order Book"** has the meaning set out in paragraph 3 of these Terms of Service;

25. 1.1.25.**"Unencumbered Wallet"** means a Multi-Signature Wallet not subject to any Liens;

26. 1.1.26.**"U.S. Person"** means:

    1. 1.1.26.1.in the case of an individual, a Person resident in the United States; and,

    2. 1.1.26.2.in any other case,

        1. 1.1.26.2.1.a Person resident in the United States; or,

        2. 1.1.26.2.2.a Person owned 10% or more by one or more Persons resident in the United States or by one or more corporations or entities incorporated in or formed in the United States; and,

27. 27**"you"** or **"your"** means the customer.

2. 2Headings: The headings and sub-headings in these Terms of Service are for ease of reference

only and are not to be taken into account in the construction or interpretation of any provision or provisions to which they refer.

3. 3Extended Meanings: Unless otherwise specified in these Terms of Service, words importing the singular include the plural and vice versa and words importing gender include all genders.

4. 4Governing Law: Subject to paragraph 7 of these Terms of Service, these Terms of Service shall be governed by and construed and enforced in accordance with the laws of the British Virgin Islands, and shall be interpreted in all respects as a British Virgin Islands contract. The venue for any claim or action against or involving Bitfinex shall be in the British Virgin Islands. The venue for any claim or action in connection with the Services against or involving BitGo shall be in the British Virgin Islands. You unconditionally attorn to the jurisdiction of the courts of the British Virgin Islands and all courts competent to hear appeals therefrom. The doctrine of forum non conveniens shall not apply in the selection of forum under these Terms of Service.

2. 2Licence to Use the Site: If you comply with these Terms of Service, Bitfinex grants you the limited right to use the Site and the Services. The right to use the Site and the Services is a non-exclusive, non-transferable, revocable, limited licence, and it is subject to the limitations and obligations in these Terms of Service. Nothing in these Terms of Service gives you any licence (other than as set out in this paragraph), right, title, or ownership of, in, or to the Site or any of the Services.

3. 3 Trading & Other Activities: The Site is a trading environment for the spot purchase and sale of Digital Tokens. The Site permits both unfinanced and financed transactions. Unfinanced purchases are fully funded by trading participants through funds deposited by you. For example, if you deposit $100.00 into your account on the Site, you may then purchase $100.00 worth of bitcoins in an unfinanced transaction. Purchases and sales of bitcoins on the Site, whether in an unfinanced transaction or a financed transaction, are settled by actual delivery of the full amount of the bitcoins or other Digital Tokens by the seller to the purchaser's account against payment in full by the purchaser to the seller's account.

1. Financed transactions in Digital Tokens are permitted through the Site's platform-enabled, peer-to-peer financing functionality. Financing Providers may offer financing from and on their own account if they so choose. Financing Recipients may accept financing from Financing Providers for up to 70% of the value of a Digital Token purchase. For example, if you deposit $30.00 to the Site, you may then obtain financing in an amount not exceeding $70.00 in order to buy $100.00 worth of bitcoins in a financed transaction. In other words, you may accept financing equal to a maximum total bitcoins-to-equity ratio of 3 1/3 to 1.

2. Shorting is another type of financed transaction permitted on the Site's platform. In a typical 'long sale' of bitcoin, the seller enters into a regular spot trade of bitcoin and settles the transaction by delivering bitcoin that the seller owns outright. In a 'short sale' of bitcoin, the seller also enters into a regular spot sale of bitcoin, except that the transaction is settled by delivering bitcoin that the seller has borrowed.

3. Digital Tokens can be borrowed for purposes of short sales through the platform's peer-to-peer financing functionality. The bitcoin borrower may seek offers or make a bid to borrow Digital Tokens on

the Financing Order Book. Bitcoin borrowers are not permitted to borrow more than 70% of the bitcoins sold in a short sale. The fiat proceeds of any short sale serve as collateral for the borrowing of the bitcoins until those bitcoins are repaid.

Trading markets are volatile and shift quickly in terms of liquidity, market depth, and trading dynamics. You are solely responsible for any and all trading and non-trading activity on and for your account on the Site. You acknowledge and agree: to be fully responsible and liable for your trading and non-trading actions and inactions on the Site and all gains and losses sustained from your use of the Site, BitGo, and any of the Services; to be responsible for any negative balance in your account(s) on the Site; to be fully responsible and liable for all of your obligations with respect to any financing activities on the Site; and, to be fully responsible for safeguarding access to, and any information provided through, the Site, BitGo, and any of the Services, including, but not limited to, private keys, user names, passwords, and bank account details.

There is no guarantee against losses on the Site. You may lose more than is in your various wallets on the Site if you engage in financing on the Site. When financing is used for trading, the margin loan carries risk if the value of your bitcoins drops. If the value of your bitcoins drops below a certain level, you are responsible for responding to this market circumstance with cash or additional Digital Tokens satisfactory to Bitfinex. Failure to respond can result in the forced-liquidation of Digital Tokens in your account. Bitfinex cannot guarantee to stop losses even with the ability to force-liquidate any of your positions (due to, for example, market volatility and liquidity). Bitfinex will not be and is not responsible for any Financing Provider losing funds or Digital Tokens to any Financing Recipient on the Site or for any losses incurred by a Financing Recipient.

Bitfinex allows trading participants to use third party peer-to-peer financing from other participants on the platform to trade Digital Tokens. Financing Recipients may obtain financing in one of two general ways: they may place bids for financing on the Site's separate, peer-to-peer financing order book (the <strong>"Financing Order Book"</strong>); or, they may elect to be automatically matched through the Site's order matching engine with one or more Financing Providers on the Financing Order Book at the best prevailing price on the Financing Order Book. Although Bitfinex is not a party to these financing contracts, Bitfinex enforces the contracts established between Financing Providers and Financing Recipients on the Financing Order Book.

The Financing Order Book operates independent of the spot contract trading order book (the **"Trading Order Book"**). Once the desired financing is secured by a Financing Recipient, both financed and unfinanced transactions on the Trading Order Book are indistinguishable from each other to the trade matching engine.

BitGo is not responsible for any trading or financing activity with respect to your Bitfinex account. BitGo's sole responsibilities are set forth in paragraphs 5 and 6 of these Terms of Service and BitGo's Terms of Use. You agree to hold Bitfinex and BitGo harmless from and against any losses from any trading or financing activities of any nature.

The amount of the financing, the term of the financing, and the interest rate are all commercial terms negotiated through the Financing Order Book between Financing Providers and Financing Recipients. For instance, assume that A has $30.00 (in dollars) in her account on the Site. A obtains $70.00 in financing at X interest rate for Y term on the Financing Order Book (thereby becoming a Financing Recipient) from B, a Financing Provider. With that aggregate amount of $100.00, A may purchase $100.00 in bitcoins on the Trading Order Book from C, or from one or more other sellers. A has the right to repay the financing (including any accrued interest) at any time without pre-payment or other penalty. Obtaining financing does not create any obligation to purchase bitcoins on the Trading Order Book. A may also replace financing from B at any time with more favorable financing.

In the above example, the bitcoins purchased by A ($100.00) are subject to a Lien in favor of B up to the total amount of financing secured from B ($70.00 plus any interest component). A may remove any amount of bitcoins from the Site that is not subject to the Lien. If the Financing Recipient's equity falls to or below 15%—calculated as the quotient (expressed as a percentage) obtained by dividing (a) the excess of (i) the market value of the purchased bitcoins over (ii) the total principal amount (plus accrued and unpaid interest) relating to all financing outstanding by (b) the market value used in (a)(i), above—Bitfinex will force the liquidation of the bitcoins in A's account without notice to A, return financing to the Financing Provider, with accrued interest, and return the balance to the Financing Recipient. Bitfinex does not make margin calls. For example, if the purchased bitcoins' value falls from $100.00 to $82.35, the difference between that value and the financing obtained by A would be $82.35 – $70.00, or $12.35. Taken as a percentage of the bitcoins' value, $12.35∕$82.35 equals 15%. In other words, if the value of the bitcoins fell to $82.35 in aggregate, A's bitcoins would be liquidated by Bitfinex on the Trading Order Book, B would be repaid, and any remaining difference ($12.35, exclusive of interest) would be A's to retain.

By contrast, if the market value of bitcoins rises, A may sell her bitcoins and repay the loan. For example, assume the value of A's bitcoins rises to $115.00. Now the difference between the bitcoins' value and the financing is $115.00 – $70.00, or $45.00. Taken as a percentage of the value of the bitcoins, $45.00∕$115.00 equals approximately 39%. Accordingly, A could remove part of her equity, but may not fall below her initial equity requirement. A could also sell the bitcoins on the Trading Order Book, repay the financing to B (plus any interest), and retain the balance on the transaction.

Alternatively, A could satisfy the Lien and unencumber the bitcoins by repaying the financing used to purchase the bitcoins. Unencumbering the bitcoins simply refers to the process of using some combination of unrealized gain or additionally deposited funds, or both, for the purposes of paying off the financing and removing the Lien. In the above example, A could deploy the unrealized gain of $15.00 to partially unencumber the bitcoins owned by her, thereby reducing the financed amount outstanding to B.

You can use the trading features of the Trading Order Book through your 'Exchange Wallet.' You may access the Funding Order Book through your 'Trading Wallet.' Finally, you may deposit funds to Bitfinex using your 'Deposit Wallet.'

4. 4Agency: Neither Bitfinex nor BitGo acts as principals, counterparties, or market-makers in the

transactions effected through trading on Bitfinex or in providing financing for financed trading on Bitfinex. However, Bitfinex administers and enforces contracts among parties engaged in financing activities on the Site. You hereby irrevocably appoint Bitfinex to act as your exclusive agent in respect of any contract on the Site in which you are a Financing Recipient. Specifically, you hereby grant Bitfinex agency, and you authorize and instruct Bitfinex: to implement, levy, monitor, and maintain a lien on all fiat amounts and Digital Tokens in your name or control on the Site in favor of one or more Financing Providers (a "Lien"); and, to liquidate any Digital Tokens in your name or control on the Site if necessary to ensure that any Financing Provider on the Site from whom you have obtained financing is repaid in full.

5. 5Wallets, Key Distributions & Bitgo:

    1. 5.1Multi-Signature Wallet Key Distribution: Multi-Signature Wallets require multiple permissions—through private keys—to transmit funds from a bitcoin wallet. In a traditional bitcoin wallet, each address in that wallet has one associated private key that vests full power in the key holder to sign for and transmit funds from that address. So-called "m of n" multi-signature addresses allow for bitcoin addresses with two or more (n) associated private keys which can be configured to require some subset of them in order to sign transactions from those addresses. For example, each Multi-Signature Wallet is built on a '2 of 3' multi-signature configuration; there are three associated private keys, and any two of those keys can sign for transactions. Notwithstanding the distribution of the private keys and subject to any valid liens, encumbrances, and pending settlements, all bitcoins in your Multi-Signature Wallets belong to and are owned by you. You may, at any time, withdraw bitcoins from your Multi-Signature Wallet to the extent that they are not encumbered by any Liens. You agree that you will not withdraw any amount or bitcoins from the Site that are subject to or encumbered by any Lien, and agree to allow Bitfinex to block a withdrawal, as appropriate, for Encumbered Wallets.

    2. 5.2U.S. Persons Engaged in Financing: If you are a verified U.S. Person engaged in financing on the Site, your financing transactions will be undertaken through Encumbered Wallets. One private key for each Encumbered Wallet is distributed to each of you, BFXNA, and BitGo. For the avoidance of doubt, this structure applies only to wallets of verified U.S. Persons containing bitcoins subject to one or more Liens. One key should be in your exclusive control at all times.

    3. 5.3Other Wallets: If you are not a U.S. Person but are engaged in financing on the Site, or if you are a U.S. Person not engaged in financing on the Site, your transactions on the Site will be undertaken through Unencumbered Wallets. Two private keys for each Unencumbered Wallet are distributed to Bitfinex and one private key is distributed to BitGo. With respect to the Bitfinex private keys, one private key is an operational key and one is a backup key. The backup key is broken up into multiple parts and requires multiple agents of Bitfinex in order to reconstruct it.

    4. 5.4BitGo's Role: BitGo provides certain services to Bitfinex. In connection with its provision of those services to Bitfinex, BitGo holds one private key for each Multi-Signature Wallet and uses those keys to sign transactions as directed by Bitfinex. Unless compelled by an arbitrator or otherwise required by applicable law, BitGo will only use a private key to sign a Multi-Signature Wallet transaction that is first signed by Bitfinex. For the avoidance of doubt, you acknowledge, understand, and agree that BitGo will not use any private key it holds to co-sign multi-signature

transactions as directed by you without the consent of Bitfinex unless compelled by an arbitrator under these Terms of Service.

5. 5.5Instructing BitGo: In the event of any dispute or disagreement between you and BFXNA as to claims on the bitcoins in an Encumbered Wallet, you may instruct BitGo to stop using the private key held by BitGo to sign transactions from the Encumbered Wallet by using the credentials communicated to you by BitGo to access the Encumbered Wallet interface on BitGo and clicking on the "freeze wallet" button. After contacting BitGo, you may agree and settle any dispute with BFXNA or you may compel BFXNA, you, and BitGo to submit to arbitration as set out in these Terms of Service, wherein the merits of any competing arguments and claims about the bitcoins in the Encumbered Wallet shall be finally and conclusively resolved. Any costs of BitGo associated with any customer complaint or instructions to BitGo (separate and apart from arbitral proceedings, if any) shall be borne by the complaining or instructing customer. Any costs of BFXNA associated with any customer complaint or instructions to BFXNA (separate and apart from arbitral proceedings, if any) shall be borne by the complaining or instructing customer. Either BFXNA or BitGo may also invoke arbitration at any time and for any reason. Any and all transactions and activities in your Bitfinex accounts shall cease as of the time that arbitration is invoked or compelled by any party to these Terms of Service, except where necessary to satisfy any Liens or to protect BFXNA. Without limitation, the arbitrator shall be empowered to require you, BitGo, or BFXNA to sign transactions in accordance with her determination. The results of any arbitration under this Agreement shall be finally and conclusively binding on you, BitGo, and Bitfinex. For the avoidance of doubt, BitGo's sole responsibility to you is to act on your instruction to stop co-signing transactions from an Encumbered Wallet associated with your Bitfinex account within a reasonable time after you so instruct BitGo.

6. 6Account Closure: If and when you close your account with Bitfinex and there is a Lien outstanding against any of your funds or Digital Tokens, Bitfinex may satisfy the Lien or invoke arbitration under these Terms of Service, or both. If and when you close your account and there is no Lien outstanding against any of your wallets, funds, or Digital Tokens, this Agreement shall terminate upon account closure. If and when BitGo closes your account and there is a Lien outstanding against any of your wallets, funds, or Digital Tokens, Bitfinex may satisfy the Lien or invoke arbitration under these Terms of Service, or both. If and when BitGo closes your account and there is no Lien outstanding against any of your wallets, funds, or Digital Tokens, this Agreement shall terminate upon account closure. If and when Bitfinex closes your account and there is a Lien outstanding against any of your wallets, funds, or Digital Tokens, Bitfinex may satisfy the Lien or invoke arbitration under these Terms of Service, or both. If and when Bitfinex closes your account and there is no Lien outstanding against any of your wallets, funds, or Digital Tokens, this Agreement shall terminate upon account closure.

7. 7Arbitration: Any dispute, controversy, or claim, arising only from the invocation of arbitration pursuant to paragraphs 5 or 6 of these Terms of Service, shall be exclusively referred to and finally resolved under arbitration in accordance with the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association, as they may be amended from time to time. The number of arbitrators shall be one. The arbitrator shall be Michael J. Lee, an attorney in San Diego, California or a substitute arbitrator agreed to by a majority of the three parties to these Terms of Service. The seat

or legal place of the arbitration shall be San Diego, California. The language of the arbitral proceedings shall be English. Arbitral proceedings may only determine the existence, amounts, and entitlements of any Liens and the existence, amounts, and entitlements of any multi-signature bitcoin wallet in respect of which you hold one of the private keys. The party at fault or the party determined to be more liable than the others, as may be, shall pay the costs of the arbitration and the other parties' costs. Bitfinex and BitGo each reserves the right to require that you post security or a bond as against any costs awards prior to the commencement of the arbitration.

8. 8No Class Proceedings: You, BitGo and Bitfinex, agree that any party hereto may bring claims against the other(s) only on an individual basis and not as a plaintiff or class member in any purported class or representative action or proceeding. Unless the parties agree otherwise, the arbitrator may not consolidate or join more than one Person's or party's claims and may not otherwise preside over any form of a consolidated, representative, or class proceeding. The arbitrator may award relief, including monetary, injunctive, and declaratory relief, only in favor of the party seeking relief, and only to the extent necessary to provide relief necessitated by that party's claim(s). Any relief awarded cannot affect other BitGo or Bitfinex users.

9. 9Prohibited Uses: You may not:

    1. 9.1use the Site, BitGo, or any Services in order to disguise the proceeds of, or to further, any breach of applicable laws or regulations, or to deal in any contraband Digital Tokens, funds, or proceeds;

    2. 9.2trade or obtain financing on the Site, or use BitGo or any Services, with anything other than funds, keys, or Digital Tokens that have been legally obtained by you and that belong to you;

    3. 9.3use the Site, BitGo, or any Services to interfere with or subvert the rights or obligations of Bitfinex or Bitgo or the rights or obligations of any other Site customer or any other third party;

    4. 9.4use the Site, BitGo, or any Services to engage in conduct that is detrimental to Bitfinex, to BitGo, or to any other Site customer or any other third party;

    5. 9.5falsify any account registration details provided to Bitfinex or to BitGo;

    6. 9.6falsify or materially omit any information or provide misleading information requested by Bitfinex or BitGo in the course of, directly or indirectly relating to, or arising from your activities on the Site, BitGo, or the use of any Services, including at registration;

    7. 9.7reverse-engineer, decompile, or disassemble any software running on the Site or BitGo; or,

    8. 9.8attempt to harm Bitfinex or BitGo through your access to the Site, BitGo, or any Services, except that nothing in this subparagraph shall be construed as limiting your free speech rights under applicable law.

   Any use as described in this paragraph shall constitute a **"Prohibited Use."** If either BitGo or Bitfinex determines that you have engaged in any Prohibited Use, Bitfinex or BitGo, or both of them, may address such Prohibited Use through an appropriate sanction, in their sole and absolute discretion. Such sanction may include, but is not limited to, making a report to law enforcement or other authorities and closing your account(s) on the Site.

10. 10Anti-Money Laundering and Counter-Terrorist Financing: Bitfinex is committed to providing you with safe, compliant, and reputable Services. Accordingly, Bitfinex insists on a comprehensive and thorough customer due diligence process and implementation and ongoing analysis and reporting.

This includes monitoring of and for suspicious transactions and mandatory reporting to international regulators.

Bitfinex reserves the right to refuse registration to, or to bar transactions from or to, anyone from or in jurisdictions that do not meet international AML–CTF standards as set out by the FATF; to anyone that is a Politically Exposed Person within the meaning of the FATF's 40 Recommendations; or, that fails to meet any customer due diligence standards, requests, or requirements of BitGo or Bitfinex. In lieu of refusing registration, Bitfinex may perform enhanced customer due diligence procedures. At all times, you may be subject to enhanced customer due diligence procedures in your use of the Site, BitGo, and any Service.

11. 11Intellectual Property: Bitfinex and the Bitfinex logos, trade names, word marks, and design marks (the **"Bitfinex Marks"**) are trademarks of iFinex. You agree not to copy, display, or use the Bitfinex Marks or other content without express, prior, written permission to do so. Unless otherwise indicated, all materials on Bitfinex are © iFinex. BitGo and the BitGo logos, trade names, word marks, and design marks (the **"BitGo Marks"**) are trademarks of BitGo or its subsidiaries.

12. 12Your Representations & Warranties: You represent and warrant to Bitfinex and to BitGo as follows:

    1. 12.1that you are 18 years of age or older (or that you are otherwise permitted to contract under applicable law);
    2. 12.2that you will not use the Site, BitGo, or any Services in order to disguise the proceeds of, or to further, any breach of applicable laws or regulations, or to deal in any contraband Digital Tokens or proceeds;
    3. 12.3that you will not trade or obtain financing on the Site, or use any Services, or BitGo, with anything other than funds or Digital Tokens that have been legally obtained by you and that belong to you;
    4. 12.4that you will not falsify any account registration details provided to Bitfinex or to BitGo;
    5. 12.5that you will not falsify or materially omit any information or provide misleading information requested by Bitfinex or BitGo in the course of, directly or indirectly relating to, or arising from your activities on the Site or use of any Services or of BitGo, including at registration; and,
    6. 12.6that you will fairly and promptly report all income associated with your activity on the Site and BitGo pursuant to applicable law and pay any and all taxes exigible thereon.

13. 13No Representations & Warranties: Bitfinex and BitGo make no representations, warranties, or guarantees to you of any kind. The Site and the Services are offered strictly on an as-is, where-is basis and, without limiting the generality of the foregoing, are offered without any representation as to merchantability or fitness for any particular purpose.

14. 14SynapsePay: This application—being Bitfinex and the Services—is not directly supported by, endorsed, or certified by SynapsePay. SynapsePay gives no warranties and makes no claims about this application. By accepting these Terms of Service, you are also deemed to accept SynapsePay's terms and conditions of service and privacy policy. All funds held within the application are held at SynapsePay's partner bank(s) and are FDIC insured up to a balance of $250,000.00.

15. 15No Advice: Bitfinex and BitGo do not provide any investment advice or advice on trading techniques, models, algorithms, or any other schemes.

16. 16Limitation of Liability & Release: Important: Except as may be provided for in these Terms of Service, Bitfinex and BitGo assume no liability or responsibility for and shall have no liability or responsibility for any claim, application, loss, injury, delay, accident, cost, business interruption costs, or any other expenses (including, without limitation, attorneys' fees or the costs of any claim or suit), nor for any incidental, direct, indirect, general, special, punitive, exemplary, or consequential damages, loss of goodwill or business profits, work stoppage, data loss, computer failure or malfunction, or any and all other commercial losses (collectively, referred to herein as "Losses") directly or indirectly arising out of or related to:

1. 16.1these Terms of Service;
2. 16.2the Site, and your use of it;
3. 16.3BitGo, and your use of it;
4. 16.4your use of BitGo's services;
5. 16.5the Services, and your use of any of them;
6. 16.6the real or perceived value of any currencies or Digital Tokens traded on the Site, or the price of any Digital Token displayed on the Site at any time;
7. 16.7any failure, delay, malfunction, interruption, or decision by BitGo or Bitfinex in operating the Site or providing any Service;
8. 16.8any stolen, lost, or unauthorized use of your account information any breach of security or data breach related to your account information; or
9. 16.9any offer, representation, suggestion, statement, or claim made about Bitfinex, BitGo, the Site, or any Service by any Associate.

You hereby agree to release the Associates from liability for any and all Losses, and you shall indemnify and save and hold the Associates harmless from and against all Losses. The foregoing limitations of liability shall apply whether the alleged liability or Losses are based on contract, negligence, tort, unjust enrichment, strict liability, or any other basis, even if the Associates have been advised of or should have known of the possibility of such losses and damages, and without regard to the success or effectiveness of any other remedies.

**Important**: Notwithstanding anything else in these Terms of Service, in no event shall the combined aggregate liability of all Associates for any Loss hereunder exceed the amount of the amounts paid to Bitfinex in fees in the transaction giving rise, or alleged to give rise, to the Loss. You shall indemnify and hold the Associates harmless from any Losses in excess of such amount.

17. 17No Waiver: Any failure by Bitfinex or BitGo to exercise any of their respective rights, powers, or remedies under these Terms of Service, or any delay by Bitfinex or BitGo in doing so, does not constitute a waiver of any such right, power, or remedy. The single or partial exercise of any right, power, or remedy by Bitfinex or BitGo does not prevent either from exercising any other rights, powers, or remedies.

18. 18Force Majeure: Bitfinex and BitGo are not responsible for damages caused by delay or failure to perform undertakings under these Terms of Service when the delay or failure is due to fires; strikes; floods; power outages or failures; acts of God or the state's enemies; lawful acts of public authorities; any and all market movements, shifts, or volatility; computer, server, or Internet malfunctions; delays

or defaults caused by common carriers; acts or omissions of third parties; or, any other delays, defaults, failures or interruptions that cannot reasonably be foreseen or provided against. In the event of force majeure, Bitfinex and BitGo are excused from any and all performance obligations.

19. 19Assignment: These Terms of Service, and any of the rights, duties, and obligations contained herein, are not assignable by you without prior written consent of Bitfinex and BitGo. These Terms of Service, and any of the rights, duties, and obligations contained herein, are freely assignable by Bitfinex or BitGo, or both of us, without notice or your consent. Any attempt by you to assign these Terms of Service without written consent is void.

20. 20Severability: If any provision of these Terms of Service, as amended from time to time, is determined to be invalid, void, or unenforceable, in whole or in part, by any court of competent jurisdiction, such invalidity, voidness, or unenforceability attaches only to such provision and everything else in these Terms of Service continues in full force and effect.

# Exhibit 2

**web.archive.org** /web/20160808165440/https://www.bitfinex.com/terms



Thank you for choosing Bitfinex.com (the **"Site"**). The following terms and conditions of service (these **"Terms of Service"**) apply to customers of the Site. Some of these Terms of Service will apply only to U.S. Persons (as defined below) using the Site. Others apply to all users of the Site. You should read these Terms of Service carefully to determine which provisions apply to you. By using any of the services, functions, or features offered from time to time on the Site (collectively or individually, the **"Services"**), the customer (referred to herein as **"you"** or **"your"**) agrees to these Terms of Service.

These Terms of Service constitute the agreement and understanding with respect to the use of any or all of the Services, and any manner of accessing them, among: you; BitGo, Inc. (**"BitGo"**), the company providing individualized, multi-signature wallets on the Site; and, one of the following parties:

a)   where you are a U.S. Person, BFXNA Inc. (**"BFXNA"**); and,
b)   where you are not a U.S. Person, iFinex Inc. (**"iFinex"**).

For the avoidance of doubt, these Terms of Service have three parties: you, BitGo, and either BFXNA or iFinex. By using the Services, you agree to BitGo's Terms of Use, which are incorporated into these Terms of Service by reference. The following Site policies and pages are also incorporated into these Terms of Service by reference: Privacy Policy; Risk Disclosure Statement; Anti-Spam Policy; and Law Enforcement Requests Policy. In the event of any inconsistency between these Terms of Service and any other pages or policies on the Site, these Terms of Service shall prevail.

By creating an account on the Site or by using any of the Services, you acknowledge that you have read, understand, and completely agree to these Terms of Service in effect from time to time. If you disagree with these Terms of Service or with any subsequent amendments, changes, or updates, you may not use any of the Services; your only recourse in the case of disagreement is to stop using all of the Services and close your account(s) on the Site.

These Terms of Service may be amended, changed, or updated by BFXNA or iFinex, as applicable, without prior notice to you. You should check back often to confirm that your copy and understanding of these Terms of Service is current and correct. Your non-termination or continued use of any Services after the effective date of any amendments, changes, or updates constitutes your acceptance of these Terms of Service, as modified by such amendments, changes, or updates.

The use of the Site, BitGo, or any Services is void where prohibited by applicable law.

1. 1.Interpretation:
    1. 1.1.Definitions: In these Terms of Service and all documents incorporated herein by reference, the following words have the following meanings unless otherwise indicated::
        1. 1.1.1.**"AML"** means anti-money laundering;
        2. 1.1.2.**"Associates"** means iFinex Inc., BFXNA Inc., BitGo, Inc., and each and every one

of their respective shareholders, subsidiaries, employees, contractors, agents, directors, officers, partners, affiliates, insurers, and attorneys;

3. 1.1.3.**"BFXNA"** means BFXNA Inc.;

4. 1.1.4.**"Bitfinex"** means:

    1. 1.1.4.1.where you are a U.S. Person, BFXNA; and,

    2. 1.1.4.2.where you are not a U.S. Person, iFinex;

5. 1.1.5.**"BitGo"** means BitGo, Inc.;

6. 1.1.6.**"CTF"** means counter-terrorist financing;

7. 1.1.7.**"Digital Tokens"** means blockchain-based assets or rights, or other similar digital representations of rights or assets, including bitcoins, Litecoins, and ethers;

8. 1.1.8.**"Encumbered Wallet"** means a Multi-Signature Wallet subject to one or more Liens;

9. 1.1.9.**"FATF"** means the Financial Action Task Force;

10. 1.1.10.**"Financing Order Book"** has the meaning set out in paragraph 3 of these Terms of Service;

11. 1.1.11.**"Financing Provider"** means any provider of financing from and on her own account on the Site;

12. 1.1.12.**"Financing Recipient"** means any recipient of financing from a Financing Provider on the Site;

13. 1.1.13.**"iFinex"** means iFinex Inc.;

14. 1.1.14.**"Lien"** has the meaning set out in paragraph 4 of these Terms of Service;

15. 1.1.15.**"Losses"** has the meaning set out in paragraph 16 of these Terms of Service;

16. 1.1.16.**"Multi-Signature Wallet"** means a bitcoin wallet on the Site that is built with BitGo technology using a "2 of 3" private key permissioned structure whereby each wallet has three private keys and transacting with bitcoins associated with such wallet requires at least two of the three private keys;

17. 1.1.17.**"Person"** includes an individual, association, partnership, corporation, other body corporate, trust, and any form of legal organization or entity;

18. 1.1.18.**"Personal Information"** means information about an identifiable individual, business, organization, or other entity, but does not include the name, title, business address, or telephone number of an employee of a business, organization, or other entity;

19. 1.1.19.**"Prohibited Use"** has the meaning set out in paragraph 9 of these Terms of Service;

20. 1.1.20.**"Service"** means any of the services, functions, or features offered on the Site;

21. 1.1.21.**"Site"** means the Internet website www.bitfinex.com;

22. 1.1.22.**"SynapsePay"** means Synapse Payments, LLC;

23. 1.1.23.**"Terms of Service"** means these terms and conditions of service, as they may be changed, amended, or updated from time to time, including BitGo's Terms of Use and the following Site policies and pages: Privacy Policy; Risk Disclosure Statement; Anti-Spam Policy; and, Law Enforcement Requests Policy;

24. 1.1.24.**"Trading Order Book"** has the meaning set out in paragraph 3 of these Terms of Service;

25. 1.1.25.**"Unencumbered Wallet"** means a Multi-Signature Wallet not subject to any Liens;

26. 1.1.26.**"U.S. Person"** means:

    1. 1.1.26.1.in the case of an individual, a Person resident in the United States; and,

    2. 1.1.26.2.in any other case,

        1. 1.1.26.2.1.a Person resident in the United States; or,

        2. 1.1.26.2.2.a Person owned 10% or more by one or more Persons resident in the United States or by one or more corporations or entities incorporated in or formed in the United States; and,

27. 27**"you"** or **"your"** means the customer.

2. 2Headings: The headings and sub-headings in these Terms of Service are for ease of reference only and are not to be taken into account in the construction or interpretation of any provision or provisions to which they refer.

3. 3Extended Meanings: Unless otherwise specified in these Terms of Service, words importing the singular include the plural and vice versa and words importing gender include all genders.

4. 4Governing Law: Subject to paragraph 7 of these Terms of Service, these Terms of Service shall be governed by and construed and enforced in accordance with the laws of the British Virgin Islands, and shall be interpreted in all respects as a British Virgin Islands contract. The venue for any claim or action against or involving Bitfinex shall be in the British Virgin Islands. The venue for any claim or action in connection with the Services against or involving BitGo shall be in the British Virgin Islands. You unconditionally attorn to the jurisdiction of the courts of the British Virgin Islands and all courts competent to hear appeals therefrom. The doctrine of forum non conveniens shall not apply in the selection of forum under these Terms of Service.

2. 2Licence to Use the Site: If you comply with these Terms of Service, Bitfinex grants you the limited right to use the Site and the Services. The right to use the Site and the Services is a non-exclusive, non-transferable, revocable, limited licence, and it is subject to the limitations and obligations in these Terms of Service. Nothing in these Terms of Service gives you any licence (other than as set out in this paragraph), right, title, or ownership of, in, or to the Site or any of the Services.

3. 3 Trading & Other Activities: The Site is a trading environment for the spot purchase and sale of Digital Tokens. The Site permits both unfinanced and financed transactions. Unfinanced purchases are fully funded by trading participants through funds deposited by you. For example, if you deposit $100.00 into your account on the Site, you may then purchase $100.00 worth of bitcoins in an unfinanced transaction. Purchases and sales of bitcoins on the Site, whether in an unfinanced transaction or a financed transaction, are settled by actual delivery of the full amount of the bitcoins or other Digital Tokens by the seller to the purchaser's account against payment in full by the purchaser to the seller's account.

1. Financed transactions in Digital Tokens are permitted through the Site's platform-enabled, peer-to-peer financing functionality. Financing Providers may offer financing from and on their own account if they so choose. Financing Recipients may accept financing from Financing Providers for up to 70% of the value of a Digital Token purchase. For example, if you deposit $30.00 to the Site, you may then obtain financing in an amount not exceeding $70.00 in order to buy $100.00 worth of bitcoins in a

financed transaction. In other words, you may accept financing equal to a maximum total bitcoins-to-equity ratio of 3 1/3 to 1.

2. Shorting is another type of financed transaction permitted on the Site's platform. In a typical 'long sale' of bitcoin, the seller enters into a regular spot trade of bitcoin and settles the transaction by delivering bitcoin that the seller owns outright. In a 'short sale' of bitcoin, the seller also enters into a regular spot sale of bitcoin, except that the transaction is settled by delivering bitcoin that the seller has borrowed.

3. Digital Tokens can be borrowed for purposes of short sales through the platform's peer-to-peer financing functionality. The bitcoin borrower may seek offers or make a bid to borrow Digital Tokens on the Financing Order Book. Bitcoin borrowers are not permitted to borrow more than 70% of the bitcoins sold in a short sale. The fiat proceeds of any short sale serve as collateral for the borrowing of the bitcoins until those bitcoins are repaid.

Trading markets are volatile and shift quickly in terms of liquidity, market depth, and trading dynamics. You are solely responsible for any and all trading and non-trading activity on and for your account on the Site. You acknowledge and agree: to be fully responsible and liable for your trading and non-trading actions and inactions on the Site and all gains and losses sustained from your use of the Site, BitGo, and any of the Services; to be responsible for any negative balance in your account(s) on the Site; to be fully responsible and liable for all of your obligations with respect to any financing activities on the Site; and, to be fully responsible for safeguarding access to, and any information provided through, the Site, BitGo, and any of the Services, including, but not limited to, private keys, user names, passwords, and bank account details.

There is no guarantee against losses on the Site. You may lose more than is in your various wallets on the Site if you engage in financing on the Site. When financing is used for trading, the margin loan carries risk if the value of your bitcoins drops. If the value of your bitcoins drops below a certain level, you are responsible for responding to this market circumstance with cash or additional Digital Tokens satisfactory to Bitfinex. Failure to respond can result in the forced-liquidation of Digital Tokens in your account. Bitfinex cannot guarantee to stop losses even with the ability to force-liquidate any of your positions (due to, for example, market volatility and liquidity). Bitfinex will not be and is not responsible for any Financing Provider losing funds or Digital Tokens to any Financing Recipient on the Site or for any losses incurred by a Financing Recipient.

Bitfinex allows trading participants to use third party peer-to-peer financing from other participants on the platform to trade Digital Tokens. Financing Recipients may obtain financing in one of two general ways: they may place bids for financing on the Site's separate, peer-to-peer financing order book (the <strong>"Financing Order Book"</strong>); or, they may elect to be automatically matched through the Site's order matching engine with one or more Financing Providers on the Financing Order Book at the best prevailing price on the Financing Order Book. Although Bitfinex is not a party to these financing contracts, Bitfinex enforces the contracts established between Financing Providers and Financing Recipients on the Financing Order Book.

The Financing Order Book operates independent of the spot contract trading order book (the **"Trading Order Book"**). Once the desired financing is secured by a Financing Recipient, both financed and unfinanced transactions on the Trading Order Book are indistinguishable from each other to the trade matching engine.

BitGo is not responsible for any trading or financing activity with respect to your Bitfinex account. BitGo's sole responsibilities are set forth in paragraphs 5 and 6 of these Terms of Service and BitGo's Terms of Use. You agree to hold Bitfinex and BitGo harmless from and against any losses from any trading or financing activities of any nature.

The amount of the financing, the term of the financing, and the interest rate are all commercial terms negotiated through the Financing Order Book between Financing Providers and Financing Recipients. For instance, assume that A has $30.00 (in dollars) in her account on the Site. A obtains $70.00 in financing at X interest rate for Y term on the Financing Order Book (thereby becoming a Financing Recipient) from B, a Financing Provider. With that aggregate amount of $100.00, A may purchase $100.00 in bitcoins on the Trading Order Book from C, or from one or more other sellers. A has the right to repay the financing (including any accrued interest) at any time without pre-payment or other penalty. Obtaining financing does not create any obligation to purchase bitcoins on the Trading Order Book. A may also replace financing from B at any time with more favorable financing.

In the above example, the bitcoins purchased by A ($100.00) are subject to a Lien in favor of B up to the total amount of financing secured from B ($70.00 plus any interest component). A may remove any amount of bitcoins from the Site that is not subject to the Lien. If the Financing Recipient's equity falls to or below 15%—calculated as the quotient (expressed as a percentage) obtained by dividing (a) the excess of (i) the market value of the purchased bitcoins over (ii) the total principal amount (plus accrued and unpaid interest) relating to all financing outstanding by (b) the market value used in (a)(i), above—Bitfinex will force the liquidation of the bitcoins in A's account without notice to A, return financing to the Financing Provider, with accrued interest, and return the balance to the Financing Recipient. Bitfinex does not make margin calls. For example, if the purchased bitcoins' value falls from $100.00 to $82.35, the difference between that value and the financing obtained by A would be $82.35 − $70.00, or $12.35. Taken as a percentage of the bitcoins' value, $12.35∕$82.35 equals 15%. In other words, if the value of the bitcoins fell to $82.35 in aggregate, A's bitcoins would be liquidated by Bitfinex on the Trading Order Book, B would be repaid, and any remaining difference ($12.35, exclusive of interest) would be A's to retain.

By contrast, if the market value of bitcoins rises, A may sell her bitcoins and repay the loan. For example, assume the value of A's bitcoins rises to $115.00. Now the difference between the bitcoins' value and the financing is $115.00 − $70.00, or $45.00. Taken as a percentage of the value of the bitcoins, $45.00∕$115.00 equals approximately 39%. Accordingly, A could remove part of her equity, but may not fall below her initial equity requirement. A could also sell the bitcoins on the Trading Order Book, repay the financing to B (plus any interest), and retain the balance on the transaction.

Alternatively, A could satisfy the Lien and unencumber the bitcoins by repaying the financing used to

purchase the bitcoins. Unencumbering the bitcoins simply refers to the process of using some combination of unrealized gain or additionally deposited funds, or both, for the purposes of paying off the financing and removing the Lien. In the above example, A could deploy the unrealized gain of $15.00 to partially unencumber the bitcoins owned by her, thereby reducing the financed amount outstanding to B.

You can use the trading features of the Trading Order Book through your 'Exchange Wallet.' You may access the Funding Order Book through your 'Trading Wallet.' Finally, you may deposit funds to Bitfinex using your 'Deposit Wallet.'

4. 4Agency: Neither Bitfinex nor BitGo acts as principals, counterparties, or market-makers in the transactions effected through trading on Bitfinex or in providing financing for financed trading on Bitfinex. However, Bitfinex administers and enforces contracts among parties engaged in financing activities on the Site. You hereby irrevocably appoint Bitfinex to act as your exclusive agent in respect of any contract on the Site in which you are a Financing Recipient. Specifically, you hereby grant Bitfinex agency, and you authorize and instruct Bitfinex: to implement, levy, monitor, and maintain a lien on all fiat amounts and Digital Tokens in your name or control on the Site in favor of one or more Financing Providers (a "Lien"); and, to liquidate any Digital Tokens in your name or control on the Site if necessary to ensure that any Financing Provider on the Site from whom you have obtained financing is repaid in full.

5. 5Wallets, Key Distributions & Bitgo:

   1. 5.1Multi-Signature Wallet Key Distribution: Multi-Signature Wallets require multiple permissions—through private keys—to transmit funds from a bitcoin wallet. In a traditional bitcoin wallet, each address in that wallet has one associated private key that vests full power in the key holder to sign for and transmit funds from that address. So-called "m of n" multi-signature addresses allow for bitcoin addresses with two or more (n) associated private keys which can be configured to require some subset of them in order to sign transactions from those addresses. For example, each Multi-Signature Wallet is built on a '2 of 3' multi-signature configuration; there are three associated private keys, and any two of those keys can sign for transactions. Notwithstanding the distribution of the private keys and subject to any valid liens, encumbrances, and pending settlements, all bitcoins in your Multi-Signature Wallets belong to and are owned by you. You may, at any time, withdraw bitcoins from your Multi-Signature Wallet to the extent that they are not encumbered by any Liens. You agree that you will not withdraw any amount or bitcoins from the Site that are subject to or encumbered by any Lien, and agree to allow Bitfinex to block a withdrawal, as appropriate, for Encumbered Wallets.

   2. 5.2U.S. Persons Engaged in Financing: If you are a verified U.S. Person engaged in financing on the Site, your financing transactions will be undertaken through Encumbered Wallets. One private key for each Encumbered Wallet is distributed to each of you, BFXNA, and BitGo. For the avoidance of doubt, this structure applies only to wallets of verified U.S. Persons containing bitcoins subject to one or more Liens. One key should be in your exclusive control at all times.

   3. 5.3Other Wallets: If you are not a U.S. Person but are engaged in financing on the Site, or if you are a U.S. Person not engaged in financing on the Site, your transactions on the Site will be undertaken through Unencumbered Wallets. Two private keys for each Unencumbered Wallet

are distributed to Bitfinex and one private key is distributed to BitGo. With respect to the Bitfinex private keys, one private key is an operational key and one is a backup key. The backup key is broken up into multiple parts and requires multiple agents of Bitfinex in order to reconstruct it.

4. 5.4 BitGo's Role: BitGo provides certain services to Bitfinex. In connection with its provision of those services to Bitfinex, BitGo holds one private key for each Multi-Signature Wallet and uses those keys to sign transactions as directed by Bitfinex. Unless compelled by an arbitrator or otherwise required by applicable law, BitGo will only use a private key to sign a Multi-Signature Wallet transaction that is first signed by Bitfinex. For the avoidance of doubt, you acknowledge, understand, and agree that BitGo will not use any private key it holds to co-sign multi-signature transactions as directed by you without the consent of Bitfinex unless compelled by an arbitrator under these Terms of Service.

5. 5.5 Instructing BitGo: In the event of any dispute or disagreement between you and BFXNA as to claims on the bitcoins in an Encumbered Wallet, you may instruct BitGo to stop using the private key held by BitGo to sign transactions from the Encumbered Wallet by using the credentials communicated to you by BitGo to access the Encumbered Wallet interface on BitGo and clicking on the "freeze wallet" button. After contacting BitGo, you may agree and settle any dispute with BFXNA or you may compel BFXNA, you, and BitGo to submit to arbitration as set out in these Terms of Service, wherein the merits of any competing arguments and claims about the bitcoins in the Encumbered Wallet shall be finally and conclusively resolved. Any costs of BitGo associated with any customer complaint or instructions to BitGo (separate and apart from arbitral proceedings, if any) shall be borne by the complaining or instructing customer. Any costs of BFXNA associated with any customer complaint or instructions to BFXNA (separate and apart from arbitral proceedings, if any) shall be borne by the complaining or instructing customer. Either BFXNA or BitGo may also invoke arbitration at any time and for any reason. Any and all transactions and activities in your Bitfinex accounts shall cease as of the time that arbitration is invoked or compelled by any party to these Terms of Service, except where necessary to satisfy any Liens or to protect BFXNA. Without limitation, the arbitrator shall be empowered to require you, BitGo, or BFXNA to sign transactions in accordance with her determination. The results of any arbitration under this Agreement shall be finally and conclusively binding on you, BitGo, and Bitfinex. For the avoidance of doubt, BitGo's sole responsibility to you is to act on your instruction to stop co-signing transactions from an Encumbered Wallet associated with your Bitfinex account within a reasonable time after you so instruct BitGo.

6. 6 Account Closure: If and when you close your account with Bitfinex and there is a Lien outstanding against any of your funds or Digital Tokens, Bitfinex may satisfy the Lien or invoke arbitration under these Terms of Service, or both. If and when you close your account and there is no Lien outstanding against any of your wallets, funds, or Digital Tokens, this Agreement shall terminate upon account closure. If and when BitGo closes your account and there is a Lien outstanding against any of your wallets, funds, or Digital Tokens, Bitfinex may satisfy the Lien or invoke arbitration under these Terms of Service, or both. If and when BitGo closes your account and there is no Lien outstanding against any of your wallets, funds, or Digital Tokens, this Agreement shall terminate upon account closure. If and when Bitfinex closes your account and there is a Lien outstanding against any of your wallets,

funds, or Digital Tokens, Bitfinex may satisfy the Lien or invoke arbitration under these Terms of Service, or both. If and when Bitfinex closes your account and there is no Lien outstanding against any of your wallets, funds, or Digital Tokens, this Agreement shall terminate upon account closure.

7. 7Arbitration: Any dispute, controversy, or claim, arising only from the invocation of arbitration pursuant to paragraphs 5 or 6 of these Terms of Service, shall be exclusively referred to and finally resolved under arbitration in accordance with the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association, as they may be amended from time to time. The number of arbitrators shall be one. The arbitrator shall be Michael J. Lee, an attorney in San Diego, California or a substitute arbitrator agreed to by a majority of the three parties to these Terms of Service. The seat or legal place of the arbitration shall be San Diego, California. The language of the arbitral proceedings shall be English. Arbitral proceedings may only determine the existence, amounts, and entitlements of any Liens and the existence, amounts, and entitlements of any multi-signature bitcoin wallet in respect of which you hold one of the private keys. The party at fault or the party determined to be more liable than the others, as may be, shall pay the costs of the arbitration and the other parties' costs. Bitfinex and BitGo each reserves the right to require that you post security or a bond as against any costs awards prior to the commencement of the arbitration.

8. 8No Class Proceedings: You, BitGo and Bitfinex, agree that any party hereto may bring claims against the other(s) only on an individual basis and not as a plaintiff or class member in any purported class or representative action or proceeding. Unless the parties agree otherwise, the arbitrator may not consolidate or join more than one Person's or party's claims and may not otherwise preside over any form of a consolidated, representative, or class proceeding. The arbitrator may award relief, including monetary, injunctive, and declaratory relief, only in favor of the party seeking relief, and only to the extent necessary to provide relief necessitated by that party's claim(s). Any relief awarded cannot affect other BitGo or Bitfinex users.

9. 9Prohibited Uses: You may not:
    1. 9.1use the Site, BitGo, or any Services in order to disguise the proceeds of, or to further, any breach of applicable laws or regulations, or to deal in any contraband Digital Tokens, funds, or proceeds;
    2. 9.2trade or obtain financing on the Site, or use BitGo or any Services, with anything other than funds, keys, or Digital Tokens that have been legally obtained by you and that belong to you;
    3. 9.3use the Site, BitGo, or any Services to interfere with or subvert the rights or obligations of Bitfinex or Bitgo or the rights or obligations of any other Site customer or any other third party;
    4. 9.4use the Site, BitGo, or any Services to engage in conduct that is detrimental to Bitfinex, to BitGo, or to any other Site customer or any other third party;
    5. 9.5falsify any account registration details provided to Bitfinex or to BitGo;
    6. 9.6falsify or materially omit any information or provide misleading information requested by Bitfinex or BitGo in the course of, directly or indirectly relating to, or arising from your activities on the Site, BitGo, or the use of any Services, including at registration;
    7. 9.7reverse-engineer, decompile, or disassemble any software running on the Site or BitGo; or,
    8. 9.8attempt to harm Bitfinex or BitGo through your access to the Site, BitGo, or any Services, except that nothing in this subparagraph shall be construed as limiting your free speech rights

under applicable law.

Any use as described in this paragraph shall constitute a **"Prohibited Use."** If either BitGo or Bitfinex determines that you have engaged in any Prohibited Use, Bitfinex or BitGo, or both of them, may address such Prohibited Use through an appropriate sanction, in their sole and absolute discretion. Such sanction may include, but is not limited to, making a report to law enforcement or other authorities and closing your account(s) on the Site.

10. 10Anti-Money Laundering and Counter-Terrorist Financing: Bitfinex is committed to providing you with safe, compliant, and reputable Services. Accordingly, Bitfinex insists on a comprehensive and thorough customer due diligence process and implementation and ongoing analysis and reporting. This includes monitoring of and for suspicious transactions and mandatory reporting to international regulators.

   Bitfinex reserves the right to refuse registration to, or to bar transactions from or to, anyone from or in jurisdictions that do not meet international AML–CTF standards as set out by the FATF; to anyone that is a Politically Exposed Person within the meaning of the FATF's 40 Recommendations; or, that fails to meet any customer due diligence standards, requests, or requirements of BitGo or Bitfinex. In lieu of refusing registration, Bitfinex may perform enhanced customer due diligence procedures. At all times, you may be subject to enhanced customer due diligence procedures in your use of the Site, BitGo, and any Service.

11. 11Intellectual Property: Bitfinex and the Bitfinex logos, trade names, word marks, and design marks (the **"Bitfinex Marks"**) are trademarks of iFinex. You agree not to copy, display, or use the Bitfinex Marks or other content without express, prior, written permission to do so. Unless otherwise indicated, all materials on Bitfinex are © iFinex. BitGo and the BitGo logos, trade names, word marks, and design marks (the **"BitGo Marks"**) are trademarks of BitGo or its subsidiaries.

12. 12Your Representations & Warranties: You represent and warrant to Bitfinex and to BitGo as follows:

    1. 12.1that you are 18 years of age or older (or that you are otherwise permitted to contract under applicable law);

    2. 12.2that you will not use the Site, BitGo, or any Services in order to disguise the proceeds of, or to further, any breach of applicable laws or regulations, or to deal in any contraband Digital Tokens or proceeds;

    3. 12.3that you will not trade or obtain financing on the Site, or use any Services, or BitGo, with anything other than funds or Digital Tokens that have been legally obtained by you and that belong to you;

    4. 12.4that you will not falsify any account registration details provided to Bitfinex or to BitGo;

    5. 12.5that you will not falsify or materially omit any information or provide misleading information requested by Bitfinex or BitGo in the course of, directly or indirectly relating to, or arising from your activities on the Site or use of any Services or of BitGo, including at registration; and,

    6. 12.6that you will fairly and promptly report all income associated with your activity on the Site and BitGo pursuant to applicable law and pay any and all taxes exigible thereon.

13. 13No Representations & Warranties: Bitfinex and BitGo make no representations, warranties, or guarantees to you of any kind. The Site and the Services are offered strictly on an as-is, where-is

basis and, without limiting the generality of the foregoing, are offered without any representation as to merchantability or fitness for any particular purpose.

14. 14SynapsePay: This application—being Bitfinex and the Services—is not directly supported by, endorsed, or certified by SynapsePay. SynapsePay gives no warranties and makes no claims about this application. By accepting these Terms of Service, you are also deemed to accept SynapsePay's terms and conditions of service and privacy policy. All funds held within the application are held at SynapsePay's partner bank(s) and are FDIC insured up to a balance of $250,000.00.

15. 15No Advice: Bitfinex and BitGo do not provide any investment advice or advice on trading techniques, models, algorithms, or any other schemes.

16. 16Limitation of Liability & Release: Important: Except as may be provided for in these Terms of Service, Bitfinex and BitGo assume no liability or responsibility for and shall have no liability or responsibility for any claim, application, loss, injury, delay, accident, cost, business interruption costs, or any other expenses (including, without limitation, attorneys' fees or the costs of any claim or suit), nor for any incidental, direct, indirect, general, special, punitive, exemplary, or consequential damages, loss of goodwill or business profits, work stoppage, data loss, computer failure or malfunction, or any and all other commercial losses (collectively, referred to herein as "Losses") directly or indirectly arising out of or related to:

    1. 16.1these Terms of Service;
    2. 16.2the Site, and your use of it;
    3. 16.3BitGo, and your use of it;
    4. 16.4your use of BitGo's services;
    5. 16.5the Services, and your use of any of them;
    6. 16.6the real or perceived value of any currencies or Digital Tokens traded on the Site, or the price of any Digital Token displayed on the Site at any time;
    7. 16.7any failure, delay, malfunction, interruption, or decision by BitGo or Bitfinex in operating the Site or providing any Service;
    8. 16.8any stolen, lost, or unauthorized use of your account information any breach of security or data breach related to your account information; or
    9. 16.9any offer, representation, suggestion, statement, or claim made about Bitfinex, BitGo, the Site, or any Service by any Associate.

You hereby agree to release the Associates from liability for any and all Losses, and you shall indemnify and save and hold the Associates harmless from and against all Losses. The foregoing limitations of liability shall apply whether the alleged liability or Losses are based on contract, negligence, tort, unjust enrichment, strict liability, or any other basis, even if the Associates have been advised of or should have known of the possibility of such losses and damages, and without regard to the success or effectiveness of any other remedies.

**Important**: Notwithstanding anything else in these Terms of Service, in no event shall the combined aggregate liability of all Associates for any Loss hereunder exceed the amount of the amounts paid to Bitfinex in fees in the transaction giving rise, or alleged to give rise, to the Loss. You shall indemnify

and hold the Associates harmless from any Losses in excess of such amount.

17. 17No Waiver: Any failure by Bitfinex or BitGo to exercise any of their respective rights, powers, or remedies under these Terms of Service, or any delay by Bitfinex or BitGo in doing so, does not constitute a waiver of any such right, power, or remedy. The single or partial exercise of any right, power, or remedy by Bitfinex or BitGo does not prevent either from exercising any other rights, powers, or remedies.

18. 18Force Majeure: Bitfinex and BitGo are not responsible for damages caused by delay or failure to perform undertakings under these Terms of Service when the delay or failure is due to fires; strikes; floods; power outages or failures; acts of God or the state's enemies; lawful acts of public authorities; any and all market movements, shifts, or volatility; computer, server, or Internet malfunctions; delays or defaults caused by common carriers; acts or omissions of third parties; or, any other delays, defaults, failures or interruptions that cannot reasonably be foreseen or provided against. In the event of force majeure, Bitfinex and BitGo are excused from any and all performance obligations.

19. 19Assignment: These Terms of Service, and any of the rights, duties, and obligations contained herein, are not assignable by you without prior written consent of Bitfinex and BitGo. These Terms of Service, and any of the rights, duties, and obligations contained herein, are freely assignable by Bitfinex or BitGo, or both of us, without notice or your consent. Any attempt by you to assign these Terms of Service without written consent is void.

20. 20Severability: If any provision of these Terms of Service, as amended from time to time, is determined to be invalid, void, or unenforceable, in whole or in part, by any court of competent jurisdiction, such invalidity, voidness, or unenforceability attaches only to such provision and everything else in these Terms of Service continues in full force and effect.

# Exhibit 3

**Perkins Coie**

Perkins Coie LLP
3150 Porter Drive
Palo Alto, CA 94304-1212

T. +1.650.838.4300
F. +1.650.838.4350
perkinscoie.com

November 12, 2024

Kevin R. Feldis
KFeldis@perkinscoie.com
D.  +1.650.838.4837
F.  +1.907.263.6455

Judge Kollar-Kotelly
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington D.C. 20001

**Re:**     Sentencing in *USA v. Lichtenstein*, Criminal Case No. 23-cr-239

Dear Judge Kollar-Kotelly:

We write on behalf of our client, a former Bitfinex account holder whose account was hacked (the "Hack") and whose assets were directly stolen and laundered by the defendants in the above captioned case. To protect our client's identity as a victim, we will refer to our client as "Victim Account Holder 1" or "Victim AH 1." We ask that this Court at sentencing include an award of in-kind restitution to Victim AH 1, or in the alternative, refrain from entering any restitution order until Victim AH 1, and others who may be similarly situated, have had an equal and fair opportunity to be heard in a separate hearing for purposes of considering and calculating restitution.[1]

For the reasons discussed below, we disagree with the United States' position that there are no identifiable victims of the crimes charged in this case. That argument ignores both the purpose and plain language of the applicable victim's right statutes. It also relies on an incorrect and overly narrow understanding of what conduct falls within the scope of the money laundering conspiracy and who was directly and proximately harmed. The illogic of the government's position is evidenced by, among other things, defendants' admissions in the *Statement of the Offense* that they illegally accessed and stole "funds belonging to customers" and then laundered those customer assets to cover their tracks and prevent recovery of the stolen assets. Far from being a victimless crime, the charged conduct directly resulted in Bitfinex customer assets being stolen and never returned.

The conduct that resulted in this harm, as referenced throughout documents in the court docket, was well within the scope of the conspiracy charged. On this point, we specially note that the money laundering conspiracy (agreement to launder stolen assets) necessarily started *before* the hack and included the plan to immediately transfer assets out of customer accounts and into the spiderweb of locations carefully described in the government's initial criminal Complaint and Statement of Facts. *See* Docket 1. The suggestion that the conspiracy started *after* the Hack, as the government has now argued, runs counter to the facts as recited in the Criminal Information to which defendants pled guilty, which charges that the conspiracy began at least in August of 2016 (the same month as the Hack) and includes the overt act of setting up multiple Bitfinex accounts

---

[1] Victim AH 1 has diligently pursued this claim through counsel. Counsel for Victim AH 1 provided notice of the claim to the Department of Justice ("DOJ") in  May of 2022, met with the DOJ on August 29, 2024, and November 8, 2024, and exchanged emails with the DOJ throughout this period.

November 12, 2024
Page 2

in other people's names prior to the Hack. The government's sentencing memorandum also describes that the defendants began setting up fictitious accounts as early as August 2016. Laundering the stolen assets was a necessary part of the theft. It also defies common sense to suggest that the defendants did not begin planning where they were immediately going to move/launder the stolen assets until after the Hack.

We similarly disagree with the United States' recommendation that, despite not being a victim, Bitfinex should be awarded more than seven billion dollars in restitution. Such a recommendation ignores the factual basis for the defendants' guilt – considering they stole "funds belonging to account holders" – as well as the fact that Bitfinex never held the stolen assets nor promised to return the stolen assets to its customers. Why the United States chose to advocate solely for the interest of Bitfinex, to the detriment of account holders, is unknown.

What is known, however, is that the United States did not consult with Victim AH 1, or provide an opportunity for other victims to object, before entering into plea agreements compelling defendants to agree to an award of restitution to Bitfinex but not to any of the individual account holders who were harmed. Even now, and despite being aware of Victim AH-1's claims and the fact that Bitfinex never compensated Victim AH-1 for the losses incurred, the United States appears unwilling to change course.

What follows is a discussion of (1) Victim AH 1's status as a victim and the inequity of denying Victim AH 1 that status, (2) how the harm suffered by Victim AH 1 falls squarely within the scope of the conspiracy charged, and (3) a request for an opportunity to be heard or to provide further information for the court's consideration. We recognize that the court may have questions, and this may require a presentation of additional facts. We are prepared to answer any questions and provide more evidence. In the meantime, we respectfully maintain that entering the restitution order requested by the government would be an injustice that would harm our client now and would prejudice our client's ability to file a claim and recover assets in future forfeiture proceedings.

## I.    Victim AH 1 Was a Direct Victim of the Defendants' Conspiracy.

The facts underlying the Hack demonstrate that Bitfinex held the cryptocurrency assets of each customer in individually identifiable and segregated accounts when the Hack occurred.[2] The *Statements of the Offense* explain that "LICHTENSTEIN ultimately gained access to the keys, or credentials, used to authorize transactions involving virtual currencies held by [Bitfinex], *including funds belonging to customers of [Bitfinex]*. Def. Heather Morgan's Statement of the Offense and Related Conduct at 4, ¶ 14; Def. Ilya Lichtenstein's Statement of the Offense and Related Conduct at 4, ¶ 14 (emphasis added). After breaching Bitfinex's security, Defendants started stealing crypto

---

[2] *See e.g.*, Business Wire, *Bitfinex and BitGo Partner to Create World's First Real-Time Proof of Reserve Bitcoin Exchange*, (June 3, 2015), available at: https://www.businesswire.com/news/home/20150603005462/en/Bitfinex-and-BitGo-Partner-to-Create-World%E2%80%99s-First-Real-Time-Proof-of-Reserve-Bitcoin-Exchange (stating: "Bitfinex . . . for the first time ever offers complete segregation of all customer bitcoins" and noting "[t]he era of commingling customer Bitcoin and all of the associated security exposures is over." ). *See also* Bitfinex, *Bitfinex and BitGo Partner to Create World's First Real-Time Proof of Reserve Bitcoin Exchange* (available at: https://blog.bitfinex.com/announcements/bitfinex-and-bitgo-partner-to-create-worlds-first/).

November 12, 2024
Page 3

assets from the largest accounts first. Indeed, Victim AH 1's account may have been one of the larger accounts, and upon information and belief a significant portion (if not all) of Victim AH 1's assets were stolen directly from those accounts. Thus, Victim AH 1 was directly harmed when Mr. Lichtenstein, with Ms. Morgan's help, stole assets directly from customer accounts as part of a plan/conspiracy to launder those stolen assets, as has been described in great detail by the government.

The United States appears to contend that account holders were not victims because their assets were being held within accounts over which Bitfinex had custodial control. Even if true, this does not change the fact that the defendants gained access to and stole actual customer assets (Bitcoin, Ethereum, etc.) from individually segregated accounts containing assets purchased by individual account holders. There is no reason to award restitution to Bitfinex for assets purchased and owned by Bitfinex customers.

To the extent, if any, the United States believes that Bitfinex reimbursed account holders or covered their losses, it is also mistaken. Bitfinex responded to the Hack *not* by promising to return the stolen assets or replace them with identical assets, but rather by (i) unilaterally removing customer assets from their individual accounts to spread losses across all customers; (ii) issuing and depositing newly minted BFX tokens into account holders' accounts; (iii) listing BFX tokens on the Bitfinex platform for trading; and (iv) giving account holders who had not sold BFX on the Bitfinex platform or who purchased BFX after they were listed the opportunity to redeem BFX tokens for shares of iFinex.[3] The net result was that each account holder had at least 36% percent less assets and some quantity of newly minted unregistered Bitfinex securities. Account holders were not given a choice; the BFX tokens were issued "without release or waiver."[4]

The unsolicited deposits of BFX tokens remained outstanding until redeemed by Bitfinex or exchanged by customers for shares of iFinex Inc. (Bitfinex's owner) in what appeared to be another unregistered offering of securities designed to give Bitfinex a series of cash infusions.[5] Bitfinex published "terms for the BFX token" *after* depositing BFX into Victim AH 1's account, and those terms did not waive, replace, or abrogate any claims to the assets taken from the account. Importantly, Victim AH 1 did not agree to accept (nor wanted to hold) BFX tokens – in fact, Victim AH 1 disposed of the BFX tokens on the Bitfinex platform, and thus as soon as practicable,[6] causing Victim AH 1's account to remain thereafter at a significant net deficit. Accordingly, Bitfinex's deposit of a newly created token in Victim AH 1's account did not compensate for losses in that account and has no bearing on Victim AH 1's status as victim. It certainly did not make Bitfinex the sole victim entitled to restitution for assets Bitfinex never owned in the first place.

---

[3] Consent Motion for Order Authorizing Alternative Notification Procedures Out of an Abundance of Caution (the "Alternative Notification Motion") at 3; Bitfinex, *Interim Update: Incident Report for Bitfinex*, (Aug. 6, 2016) https://bitfinex.statuspage.io/incidents/8qd35qxs01mm.
[4] Bitfinex, *Interim Update: Incident Report for Bitfinex*, (Aug. 6, 2016) https://bitfinex.statuspage.io/incidents/8qd35qxs01mm.
[5] *Id.*
[6] Besides being forced to accept the BFX token, Victim Account Holder 1 was concerned that its issuance might be illegal and that holding it could expose him and his portfolio to risks.

November 12, 2024
Page 4

In short, the facts demonstrate that Victim AH 1 and other account holders were directly harmed by defendants' conspiracy, have never been appropriately compensated, and should be deemed as the defendants' victims for purposes of awarding restitution.[7]

## II.     Victim AH 1's Claim Is Based on Conduct That Falls Squarely Within the Scope of the Conspiracy Charged.

We respectfully disagree with the government's decision not to treat Victim AH 1 as a victim in the present case, including the government's assertion that account holders are not entitled to victim's rights and restitution under the CVRA and/or MVRA.

Under a plain reading of the MVRA, a "victim" means "any person directly harmed by the defendant's criminal conduct in the course of [a] scheme, conspiracy, or pattern."[8] That is what occurred here – Victim AH 1 was directly and proximately harmed by the Defendant's conduct in the course of the charged money laundering conspiracy. When the underlying offense of conviction is a conspiracy, courts look to "the defendant's criminal conduct *in the course of that conspiracy* as the basis for restitution." *United States v. Goodrich*, 12 F.4th 219, 228 (2d Cir. 2021) (emphasis added); *see also United States v. Battista*, 575 F.3d 226, 231 (2d Cir. 2009), overruled on other grounds by *Lagos v. United States*, 584 U.S. 577 (2018) (holding that in a case involving illegal wagering, a victim claimant was directly and proximately harmed even though the claimant was not defrauded by the illegal wagering directly.). "The requirement that the victim be "directly and proximately harmed" encompasses the traditional "but for" and proximate cause analyses." *In re Rendon Galvis*, 564 F.3d 170, 175 (2d Cir. 2009). Even though Defendants are not charged with the underlying Hack/theft itself, Victim AH 1 is a victim of the money laundering (and all the overt acts that went along with it), which was a "but for" cause of harm to Victim AH 1. *See also Battista*, 575 F.3d at 232 (finding NBA was "clearly harmed" although defendant did not "defraud the NBA directly"). As the charging documents, plea agreement and statement of facts establish, the conspiracy to engage in money laundering started at least as early as August of 2016, and included setting up fictitious accounts prior to the hack for the purpose of transferring and concealing the assets they planned to steal. The computer hacking and theft were of course separate crimes, but there can been little doubt that those crimes overlapped with, and were a critical component of, the conspiracy to launder assets, and moreover, that Victim AH 1 was directly harmed as a result. To suggest that the conspiracy to launder money started *after* the Hack (as the government now argues) defies the facts that have already been presented in this case.

Further, the government's position appears to rely solely on "information provided by counsel for iFinex" (Alternative Notification Motion at 3-4) without input from Victim AH 1 or others. This input from iFinex appears to have caused the government to conclude that Bitfinex was the only victim of Defendants' crimes, and the only party entitled to restitution. While we understand that the United States may have access to information to which we are not privy, we believe it is

---

[7] According to Bitfinex, the purpose of the BFX token was to approximate "what would happen in a liquidation scenario," and was not intended to compensate the accountholders of one of the largest security breaches in the history of cryptocurrency. *See* Bitfinex, *Security Breach & BFX Token FAQ* at Q6, https://blog.bitfinex.com/announcements/security-breach-faq/.

[8] 18 U.S.C. § 3663A(a)(2).

November 12, 2024
Page 5

important for this Court to obtain information from Victim AH 1 and others who were harmed by Defendants' crimes to ensure that the court has an opportunity to make determinations regarding the victims of Defendants' crimes and entitlement to restitution.

Even if there were no victims under the MVRA and CVRA, as the United States suggests, the argument that Bitfinex should be awarded over $7 billion in restitution would still be wrong. The government did not provide any notice or opportunity to be heard to Victim AH 1 before it negotiated plea agreements with the defendants and agreed that only Bitfinex was entitled to restitution. This lack of consideration for account holder victims and disregard of reasonable process raises significant concern about the government's agreement that Bitfinex is the sole victim. We ask that the Court refrain from accepting the government's agreement regarding Bitfinex's sole victim status and recognize Victim AH 1 as a victim entitled to restitution.

### III.    The Court Should Award Victim AH 1 Restitution or Hold a Separate Hearing to Determine Appropriate Restitution.

Although Victim AH 1 may have the right to make a claim to the stolen assets as part of the separate forfeiture proceedings related to this case, the award of restitution to Bitfinex under the terms of the Plea Agreements will hinder Victim AH 1's ability to recover what was stolen. The Plea Agreements state that the U.S. Department of Justice, Computer Crime & Intellectual Property Section and the Department of Justice "agree[d] to make a non-binding referral to the Money Laundering and Asset Recovery Section at the Department of Justice that any monies obtained from the defendant[s] through forfeiture be distributed to the victims of the offense in accordance with any restitution order entered in [the] case." Ilya Lichtenstein Plea Agreement, at 12, § 14(i); Heather Morgan Plea Agreement at 13, § 14(i). Because Victim AH 1 has been excluded as a victim entitled to restitution, if restitution is awarded to Bitfinex, and not Victim AH 1, the government's promised actions could adversely impact or completely foreclose any ability to recover the assets stolen from Victim AH 1. As such, Victim AH 1 respectfully requests an award of restitution—in-kind—of the assets removed from Victim AH 1's Bitfinex account or in an amount that fully compensates Victim AH 1 in-kind for the loss of those assets as a result of the Hack.

While we appreciate the dedicated efforts and good work that has gone into arresting and prosecuting Ilya Lichtenstein and Heather Morgan, and into recovering large volumes of stolen and laundered assets, we do not understand how or why the interests and rights of account holders who suffered losses have been ignored.[9] We can only assume that the government has had numerous conversations with Bitfinex, as reflected in the steps the United States has taken to agree to a single award of restitution in its favor. Victim AH 1 now requests an opportunity to be heard and present our client's losses to the court before any restitution order is entered in the *Lichtenstein* case.

---

[9] For instance, the government only provided seven days' notice to potential victims. DOJ, Press Release (Nov. 7, 2024), available at: https://www.justice.gov/usao-dc/pr/website-related-multi-billion-dollar-bitfinex-hack-established.

November 12, 2024
Page 6


Respectfully,

Kevin R. Feldis

# Exhibit 4

web.archive.org /web/20161103084718/https://www.bitfinex.com/bfx_token_terms



As you may know, certain property was stolen from iFinex Inc. and from BFXNA Inc. (collectively, the "**Bitfinex Group**") on August 2, 2016 (the "**Losses**"). Since then, the Bitfinex Group has been engaged in concerted efforts to stop the theft; investigate the security breach; secure all property within the Bitfinex.com platform; and co-ordinate with international law enforcement to identify the guilty parties, trace the property, and make recovery efforts for the benefit of our customers.

The Losses have been allocated ratably among Bitfinex Group customers with Bitfinex custody accounts in an effort to as closely as possible mirror what the Bitfinex Group considers would happen if it were placed into liquidation and its property distributed to its creditors. A pro rata share of the Losses is reflected in your account balance. In an effort to address your portion of the Losses, the Bitfinex Group is committing to deploy its efforts to make you whole to the extent of the full amount of your pro rata portion of the Losses.

To demonstrate this commitment, the Bitfinex Group is crediting to your account a token evidencing a limited-recourse, contingent obligation of the Bitfinex Group. The token is a notional credit, is dependent on the Bitfinex Group's recovery of Losses, and is subordinated to any claims against the Bitfinex Group not related to the Losses. Recovery may include any of the following: recovery of stolen property; funds raised in one or more financings; and available cash from ongoing operations. The token has been issued to you without reduction of or other release or waiver of any claims you may have against the Bitfinex Group. Similarly, the Bitfinex Group has not waived any claims or defences it may have under the Terms of Use or otherwise should you choose to assert any claims independent of the token. The obligation evidenced by the token bears no interest and is not entitled to dividends, distributions, or other income amounts of any kind. The token is intended to be redeemed to the extent of its ratable share of the recoveries and may in any event at any time be redeemed by the Bitfinex Group at the Bitfinex Group's sole option for its face value less the amount of any prior redemptions.

The token and your rights pursuant thereto may not be assigned except with notice to, and the prior consent of, the Bitfinex Group, on terms to be determined by the Bitfinex Group. Additional information about requirements for BFX token transfers.

**What is Clef?**

Clef is a new take on two-factor authentication. It makes logging in easier and more secure.

- **Secure:** Prevents key-logging and "fishing" attacks
- **Fast:** No need to type in username, password and two-factor tokens
- **Fun:** Point your phone at the waveform, and you're in.
- **Trusted:** Used by over 100,000 sites.

Learn more about Clef & Bitfinex

Ready to get started? Log in normally and go to **Security > Two-Factor Authentication** to configure Clef.

Enter the code given by your referrer, and get a 10% discount on your trading fees for the first 30 days. (Optional.)

**Default currency for fees**
Your default currency to deduct fees from (for margin trading, and exchange depending on Exchange fee setting)

# Exhibit 5

| # | DESCRIPTION | CURRENCY | AMOUNT | BALANCE | DATE | WALLET |
|---|---|---|---|---|---|---|
| 123121002 | Extraordinary loss adj of 1441.2373 ETC for 4088.7903 BFX @ 2.837 on wallet funding | ETC | -1441.23732 | 2554.76268 | 02/08/2016 18:00 | funding |
| 123121004 | Extraordinary loss adj of 1441.2373 ETC for 4088.7903 BFX @ 2.837 on wallet funding | BFX | 4088.790277 | 121982.8857 | 02/08/2016 18:00 | funding |
| 122928856 | Extraordinary loss adj of 17969.3327 USD for 17969.3327 BFX @ 1.0 on wallet funding | BFX | 17969.33269 | 17969.33269 | 02/08/2016 18:00 | funding |
| 122928858 | Extraordinary loss adj of 165.4219 BTC for 99924.7627 BFX @ 604.06 on wallet funding | BTC | -165.4219162 | 293.2298048 | 02/08/2016 18:00 | funding |
| 122928850 | Extraordinary loss adj of 0.0005 USD for 0.0005 BFX @ 1.0 on wallet margin | USD | -0.00048213 | 0.00085463 | 02/08/2016 18:00 | margin |
| 122928852 | Extraordinary loss adj of 0.0005 USD for 0.0005 BFX @ 1.0 on wallet margin | BFX | 0.00048213 | 0.00048213 | 02/08/2016 18:00 | margin |
| 122928854 | Extraordinary loss adj of 17969.3327 USD for 17969.3327 BFX @ 1.0 on wallet funding | USD | -17969.33269 | 31852.75589 | 02/08/2016 18:00 | funding |
| 122928860 | Extraordinary loss adj of 165.4219 BTC for 99924.7627 BFX @ 604.06 on wallet funding | BFX | 99924.76271 | 117894.0954 | 02/08/2016 18:00 | funding |

| # | DESCRIPTION | CURRENCY | AMOUNT | BALANCE | DATE | WALLET |
|---|---|---|---|---|---|---|
| 123117424 | Extraordinary loss adj of 1714.8974 ETC for 4865.1638 BFX @ 2.837 on wallet funding | ETC | -1,714.90 | 3039.857 | 02/08/2016 18:00 | funding |
| 123117426 | Extraordinary loss adj of 1714.8974 ETC for 4865.1638 BFX @ 2.837 on wallet funding | BFX | 4,865.16 | 172078.8 | 02/08/2016 18:00 | funding |
| 122935698 | Extraordinary loss adj of 30355.0134 USD for 30355.0134 BFX @ 1.0 on wallet funding | BFX | 30,355.01 | 30355.01 | 02/08/2016 18:00 | funding |
| 122935700 | Extraordinary loss adj of 226.5646 BTC for 136858.5839 BFX @ 604.06 on wallet funding | BTC | -226.56 | 401.6123 | 02/08/2016 18:00 | funding |
| 122935702 | Extraordinary loss adj of 226.5646 BTC for 136858.5839 BFX @ 604.06 on wallet funding | BFX | 136,858.58 | 167213.6 | 02/08/2016 18:00 | funding |
| 122935696 | Extraordinary loss adj of 30355.0134 USD for 30355.0134 BFX @ 1.0 on wallet funding | USD | -30,355.01 | 53787.04 | 02/08/2016 18:00 | funding |

Exhibit 6

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**COURT CASE NUMBER: 1:23-CR-00239; NOTICE OF FORFEITURE**

Notice is hereby given that on November 14, 2024, in the case of <u>U.S. v. Ilya Lichtenstein and Heather Rhiannon Morgan</u>, Court Case Number 1:23-CR-00239, the United States District Court for the District of Columbia entered an Order condemning and forfeiting the following property to the United States of America:

Approximately 94,643.29837084 Bitcoin (BTC) (after required fees) seized from wallets recovered from Defendants' online storage account (22-IRS-000070), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about February 04, 2022

Approximately 117,376.52651940 Bitcoin Cash (BCH) (after required fees) seized from wallets recovered from Defendants' online storage account (22-IRS-000071), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about February 04, 2022

Approximately 117,376.58178024 in Bitcoin Satoshi Vision (BSV) (after required fees) seized from wallets recovered from Defendants' online storage account (22-IRS-000072), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about February 04, 2022

Approximately 118,102.03258447 in Bitcoin Gold (BTG) (after required fees) seized from wallets recovered from Defendants' online storage account (22-IRS-000073), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about February 04, 2022

$43,354 in U.S. Currency (22-IRS-000074), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about January 05, 2022 at 75 Wall Street, Apartment 33M, New York, NY 10005

Assorted U.S. and Canadian gold coins, worth between approximately $160,000 and $300,000, which were excavated and recovered by law enforcement from LOCATION 1, a premises in California known to the Defendants and the Government (22-IRS-000496), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about April 13, 2022 at LOCATION 1, California

Approximately 2,818.199 BTC (after required fees) seized from wallets recovered from Defendants' online storage account (23-FBI-007297), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 12,267.025 BTC (after required fees) seized from wallets contained on an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (23-FBI-007298), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 1,155.901 BTC (after required fees) seized from wallets recovered

from Defendants' online storage account. Those wallets were also contained on an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (23-FBI-007299), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 290,729 USDT (after required fees) seized from wallets recovered from Defendants' online storage account. Those wallets were also contained on an an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (23-FBI-007300), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 5,990 USDT (after required fees) seized from wallets contained on an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (23-FBI-007301), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 1000.06 in Ether (ETH) (after required fees) seized from wallets recovered from Defendants' online storage account (23-FBI-007302), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 1,030,436.50 aUSDT (after required fees) seized from wallets recovered from Defendants' online storage account. Those wallets were also contained on an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York 10005 (23-FBI-007303), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 7.998 BTC (after required fees) seized from wallets contained on an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (23-FBI-007306), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 1,770.049 ETH (after required fees) seized from wallets contained on an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (23-FBI-007307), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 1,401.567 ETH (after required fees) seized from wallets recovered from Defendants' online storage account (23-FBI-007308), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 1,066 in Wrapped Ether (WETH) (after required fees) seized from wallets recovered from Defendants' online storage account. Those wallets were also contained in an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005

(23-FBI-007309), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 264.863 BTC (after required fees) seized from wallets contained on an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (23-FBI-007439), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 0.196 BTC (after required fees) seized from wallets contained on an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (23-FBI-007440), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 901,014 USDC (after required fees) seized from wallets recovered from Defendants' online storage account. Those wallets were also contained on an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (23-FBI-007494), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 1,767.624 ETH (after required fees) seized from wallets contained on an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (23-FBI-007509), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 2.42401 in BTC (after required fees) seized from wallets recovered from Defendants' online storage account. Those wallets were also contained on an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (23-FBI-007511), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about July 20, 2023

Approximately 17,572,068.53 aUSDC (after required fees) seized from wallets recovered from Defendants' online storage account. Those wallets were also contained on an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (23-FBI-007514), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan

Approximately 3,542,129.56 Yearn Vault USDT (yvUSDT) (after required fees) seized from wallets recovered from Defendants' online storage account. Those wallets were also contained on an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (23-FBI-007515), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan

Approximately $2,460,375.00 seized from the Flagstar bank account corresponding to Signature Bank account number 1503814168 (23-IRS-000901), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about

May 30, 2023 at Flagstar Bank, N.A.

Approximately $352,381.55 seized from Wells Fargo bank account number 5361262370 (23-IRS-000902), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about May 16, 2023 at Wells Fargo Bank, N.A.

Approximately $228,266.02 seized from JPMorgan Chase bank account number 877916952 (23-IRS-000903), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about May 01, 2023 at JPMorgan Chase Bank

Approximately 71.9992991 Ethereum Classic (after required fees) seized from wallets recovered from an online storage account & an external hard drive recovered from the residence at 75 Wall Street, Apartment 33M, New York 10005 (24-FBI-008216), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about January 26, 2024

Approximately 2,088,133.214436 USDT tokens (USDT) (after required fees) seized from wallets recovered from the Defendants' online storage account (24-FBI-008263), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about December 18, 2023

Approximately 8,984,961.413084 USDC tokens (USDC) (after required fees) seized from wallets recovered from the Defendants' online storage account (24-FBI-008264), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about December 18, 2023

Approximately 18.50708 Ether (ETH) (after required fees) seized from wallets recovered from Defendants' online storage account (24-FBI-008265), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about December 18, 2023

Approximately 153.369826 stkAAVE (after required fees) seized from wallets recovered from Defendants' online storage account (24-FBI-008266), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about December 18, 2023

Approximately 128,337.930125 CRV (after required fees) seized from wallets recovered from Defendants' online storage account (24-FBI-008268), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about December 18, 2023

Approximately 5,364,110.706859 DAI (after required fees) seized from wallets recovered from Defendants' online storage account (24-FBI-008269), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about December 18, 2023

Approximately 925.8408005 Bitcoin (after required fees) seized from wallets recovered from Defendant's online storage account. Those wallets were also contained in an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (25-FBI-000217), which was seized from Ilya Lichtenstein and Heather Rhiannon

Morgan on or about October 27, 2023

Approximately 369.1226146 Bitcoin (after required fees) seized from wallets recovered from Defendant's online storage account. Those wallets were also contained in an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (25-FBI-000218), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about October 31, 2023

Approximately 168.133162 Bitcoin (after required fees) seized from wallets recovered from Defendant's online storage account. Those wallets were also contained in an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (25-FBI-000219), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about November 17, 2023

Approximately 287.916982 Bitcoin (after required fees) seized from wallets recovered from Defendant's online storage account. Those wallets were also contained in an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (25-FBI-000220), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about November 20, 2023

Approximately 517.84913 Bitcoin (after required fees) seized from wallets recovered from Defendant's online storage account. Those wallets were also contained in an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (25-FBI-000221), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about November 21, 2023

Approximately 840.5640305 Bitcoin (after required fees) seized from wallets recovered from Defendant's online storage account. Those wallets were also contained in an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (25-FBI-000222), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about November 22, 2023

Approximately 77.87556314 Bitcoin (after required fees) seized from wallets recovered from Defendant's online storage account. Those wallets were also contained in an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (25-FBI-000223), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about November 29, 2023

Approximately 177.909315 Ethereum (after required fees) seized from wallets recovered from Defendant's online storage account. Those wallets were also contained in an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (25-FBI-000224), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about November 29, 2023

Approximately 67.73298035 Bitcoin (after required fees) seized from wallets recovered from Defendant's online storage account. Those wallets were also contained in an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (25-FBI-000225), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about January 11, 2024

Approximately 120.3560735 Bitcoin (after required fees) seized from wallets recovered from Defendant's online storage account. Those wallets were also contained in an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (25-FBI-000226), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about January 18, 2024

Approximately 65.7115558 Bitcoin (after required fees) seized from wallets recovered from Defendant's online storage account. Those wallets were also contained in an external hard drive that was recovered from the Defendants' residence at 75 Wall Street, Apartment 33M, New York, NY 10005 (25-FBI-000227), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about January 25, 2024

Approximately 841.3236683 Ethereum (after required fees) seized from wallets recovered from an online storage account & an external hard drive recovered from the residence at 75 Wall Street, Apartment 33M, New York (25-FBI-000228), which was seized from Ilya Lichtenstein and Heather Rhiannon Morgan on or about January 26, 2024

The United States hereby gives notice of its intent to dispose of the forfeited property in such manner as the United States Attorney General may direct. Any person, other than the defendant(s) in this case, claiming interest in the forfeited property must file an ancillary petition within 60 days of the first date of publication (December 17, 2024) of this Notice on this official government internet web site, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure and 21 U.S.C. § 853(n)(1).  The ancillary petition must be filed with the Clerk of the Court, 333 Constitution Ave., NW, Washington, DC  20001, and a copy served upon Assistant United States Attorney Rick Blaylock, 601 D Street, N.W., Washington, DC  20530.  The ancillary petition shall be signed by the petitioner under penalty of perjury and shall set forth the nature and extent of the petitioner's right, title or interest in the forfeited property, the time and circumstances of the petitioner's acquisition of the right, title and interest in the forfeited property and any additional facts supporting the petitioner's claim and the relief sought, pursuant to 21 U.S.C. § 853(n).

Following the Court's disposition of all ancillary petitions filed, or if no such petitions are filed, following the expiration of the period specified above for the filing of such ancillary petitions, the United States shall have clear title to the property and may warrant good title to any subsequent purchaser or transferee.

The government may also consider granting petitions for remission or

mitigation, which pardon all or part of the property from the forfeiture.  A petition must include a description of your interest in the property supported by documentation; include any facts you believe justify the return of the property; and be signed under oath, subject to the penalty of perjury, or meet the requirements of an unsworn statement under penalty of perjury.  *See* 28 U.S.C. Section 1746.  For the regulations pertaining to remission or mitigation of the forfeiture, see 28 C.F.R. Sections 9.1 - 9.9.  The criteria for remission of the forfeiture are found at 28 C.F.R. Section 9.5(a).  The criteria for mitigation of the forfeiture are found at 28 C.F.R. Section 9.5(b).  The petition for remission need not be made in any particular form and may be filed online or in writing.  You should file a petition for remission not later than 11:59 PM EST 30 days after the date of final publication of this notice.  *See* 28 C.F.R. Section 9.3(a).  The https://www.forfeiture.gov/FilingPetition.htm website provides access to a standard petition for remission form that may be mailed and the link to file a petition for remission online.  If you cannot find the desired assets online, you must file your petition for remission in writing by sending it to Assistant United States Attorney Rick Blaylock, 601 D Street, N.W., Washington, DC  20530.  This website provides answers to frequently asked questions (FAQs) about filing a petition for remission.  You may file both an ancillary petition with the court and a petition for remission or mitigation.