# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ILYA LICHTENSTEIN, et al.,<br><br>*Defendants*.<br><br>*************<br><br>XYZ Inc.<br><br>*Intervenor, Claimant, and Third-Party Petitioner*. | Case No. 23-cr-239 (CKK)<br><br>**UNDER SEAL** |

### SEALED VERIFIED PETITION FOR HEARING TO ADJUDICATE THIRD-PARTY CLAIM OF XYZ INC. ASSERTING INTEREST IN FORFEITED PROPERTY

▅▅▅▅▅▅ ("Petitioner" or "XYZ Inc."), by and through its undersigned counsel, petitions this Court for an ancillary hearing, pursuant to 21 U.S.C. § 853(n) and Federal Rule of Criminal Procedure 32.2, and asserts its interest as a Petitioner with a superior interest to specific property subject to this Court's Second Amended Preliminary Consent Order of Forfeiture dated November 14, 2024 ("Forfeiture Order") in the above-captioned matter.

On December 17, 2024, the United States Attorney for the District of Columbia first posted a public notice of the Notice of Criminal Forfeiture Action (the "Notice"), which was based on the Second Amended Preliminary Order of Forfeiture (the "Preliminary Order"), pursuant to 18 U.S.C. § 982(a)(1), 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c) (ECF No. 178), and a Corrected Second Amended Attachment A listing the seized assets (ECF No. 198-1). By its minute order of November 21, 2024, the Court allowed non-parties until today, January 28, 2025, to file motions

to intervene and objections relevant to the restitution hearing presently scheduled for February 21, 2025. (ECF No. 185).

Petitioner is entitled to recover the property that has been ordered forfeited to the extent that it can establish by a preponderance of the evidence that it either (1) "has a legal right, title, or interest in the property" superior to the defendant at the time of the acts giving rise to the forfeiture, or (2) it is a bona fide purchaser for value (who reasonably had no cause to believe the property was subject to forfeiture when acquired). 21 U.S.C. § 853(n)(6).

As demonstrated below, Petitioner has a legal right, title, and interest in the Bitcoin ("BTC") and other assets subject to forfeiture and accordingly seeks an order that such property be returned to it, in the amount of 2770.48034004 BTC.[1]

## THE PARTIES

1.  Petitioner ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ with an office at ▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and is the successor in interest to ▆▆▆▆▆▆▆▆, the verified account holder at Bitfinex (▆▆▆▆▆▆) as of August 2, 2016.

2.  Defendants Ilya Lichtenstein and Heather Morgan ("Defendants") are individuals who engaged in a conspiracy to steal and launder approximately 120,000 BTC stolen in August 2016 from account holders of Bitfinex, a cryptocurrency exchange that had custody of assets belonging to its account holders.

---

[1] As explained herein, Petitioner held 2,705.40228000 BTC in its Bitfinex account prior to Defendants' theft. Petitioner losses, however, exceed this amount by ~65 BTC, because Petitioner held a substantial dollar denominated balance and other non-BTC assets (specifically, Litecoin) that Bitfinex forcibly sold in response to Defendants' theft. The value of Petitioner's non-BTC assets that were forcibly sold to cover Petitioner and other customer losses actually *exceeded* the BTC that Petitioner was left with after Defendants theft.

3.      The United States of America ("United States") has obtained a Preliminary Forfeiture Order that it seeks to enforce against assets that include Petitioner's property.

## PROCEDURAL HISTORY

4.      In February 2022, federal law enforcement placed the Defendants under arrest for involvement in a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and a conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. The United States filed a sealed complaint in the above-captioned case on February 7, 2022.  (ECF No. 1).

5.      On August 3, 2023, Defendant Ilya Lichtenstein pleaded guilty to one count of Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h).  (ECF No. 96).

6.      On August 3, 2023, Defendant Heather Morgan pleaded guilty to one count of Money Laundering Conspiracy, in violation of 18 U.S.C. § 371 and § 1956(a)(1)(B)(i), and one count of Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371.  (ECF No. 101).

7.      On December 17, 2024, the United States Attorney for the District of Columbia issued a Notice of Criminal Forfeiture Action to Petitioner, enclosing therewith a public notice of the same date, as well as the Second Amended Preliminary Order of Forfeiture (the "Preliminary Order"), pursuant to 18 U.S.C. § 982(a)(1), 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c) (ECF No. 178), and a Corrected Second Amended Attachment A (ECF No. 198-1).

8.      The assets identified in the Preliminary Order include approximately 111,157.48 BTC traced to the hack of Bitfinex.  Defendants targeted the largest account holders at Bitfinex, where Petitioner was among the largest account holders.  Prior to Defendants' hack, 2,720.07806 BTC held by Bitfinex as a custodian rightfully belonged to Petitioner.

**BACKGROUND**

9. In 2016, Bitfinex was one of the world's largest cryptocurrency exchanges. It enabled its users to trade crypto assets and provided for custody of customer's crypto assets. Bitfinex did so in an agency capacity, facilitating custody of its customers' assets while making clear that the account holders, and not Bitfinex, held ownership of the assets in the customers' accounts.

10. Attached are copies of the Bitfinex Terms of Service in place before and after the the 2016 hack, pulled from the internet archive, web.archive.org. *See* **Exhibit A** (June 9, 2016 Terms of Service) and **Exhibit B** (August 8, 2016 Terms of Service).

11. Bitfinex's Terms of Service provided that Bitcoin in customer accounts was the property of the customers, not the property of Bitfinex. The Bitfinex Terms of Service make clear that Petitioner's spot purchases of BTC on the Bitfinex platform occurred between fully funded buyers and sellers on the Site. Ex. A at § 3. The Terms of Service further make clear that Bitfinex and BitGo (which assisted with custody), served only in an agency capacity and that "[n]either Bitfinex nor BitGo acts as principals, counterparties, or market-makers in the transactions effected through trading on Bitfinex." Ex. A at § 4.4. Moreover, the Terms of Service provide that "all bitcoins in your Multi-Signature Wallets belong to and are owned by you." *See* Ex. A at § 5.1.

12. On August 2, 2016, approximately 120,000 Bitcoin were stolen from wallets associated with Bitfinex, "including funds belonging to customers" of the Bitfinex exchange. (ECF No. 95 at ¶ 14). Those 120,000 BTC made up about 36.06% of the total assets on Bitfinex.

13. Following the hack and theft of users' BTC, Bitfinex comingled the remaining assets in its custody as part of a unilateral decision to "ratably allocate" the losses from the hack among all its users. As part of this process, Bitfinex forcibly sold or converted 36.06% of

customers' non-BTC. Bitfinex imposed a haircut across customer balances such that they reflected only 63.95% of their pre-hack balance.

14. This 36.06% forced sale and haircut was particularly injurious to Petitioner, as it held, in addition to a substantial BTC position, an even more substantial position in U.S. dollars (USD), which was supposed to be stable, and the crypto currency Litecoin.

15. In 2022, the Defendants were arrested on money laundering charges in connection with the Bitfinex hack. At the time, the government was able to recover approximately 94,643.29837084 Bitcoin, as well as other crypto assets, from the wallet Defendants used in the hack. *See, e.g.*, ECF Nos. 146 at 25, 202 at 4. Subsequent to Defendants' arrest, the government seized 16,514.182 additional BTC traceable to the hack. Criminal Complaint ¶ 6, ECF No. 1-1. Thus, altogether, the government was able to recover 111,157.48 BTC, representing the vast majority of the BTC stolen from Bitfinex account holders.

## PETITIONER'S PROPERTY

16. The seized property that Petitioner seeks to be released and returned to it consists of BTC owned by Petitioner that was custodied through Bitfinex and other assets that Bitfinex forcibly converted to BTC to partially cover the BTC losses that account holders like Petitioner suffered.

17. Petitioner held account ▮ on Bitfinex at the time of the hack. In total, Petitioner held 2,705.40228 BTC in its Bitfinex account prior to the hack. Petitioner also held 111,000 Litecoin and $2,589,401.30 USD in its Bitfinex account prior to Bitfinex's forced haircuts, which were a direct response to the hack.

18. Petitioner deposited its own BTC and LTC into its Bitfinex account. It also traded various pairs of both and lent various cryptocurrencies on Bitfinex. From March 21, 2013 through

5

August 2, 2016, Petitioner's deposit, trading and lending activity, among other things, on Bitfinex resulted in more than 80,000 lines of transactions. An excerpt of the resulting voluminous data, which was generated by Bitfinex, relating just to the BTC deposits into Petitioner's account is attached as **Exhibit C**.[2] Therefore, Petitioner acquired the legal right to the BTC (and other cryptocurrencies) in its wallets as of August 2, 2016.

### THE THEFT AND PARTIAL RECOVERY OF STOLEN ASSETS FROM CUSTOMERS' BITFINEX ACCOUNTS

19.     In August 2016, after the hack, Petitioner received a portion of the value of the stolen BTC from Bitfinex as a result of Bitfinex's reallocation of the non-BTC assets referenced above. Petitioner therefore seeks recovery of its lost BTC as well as the net loss of BTC from the forced reallocation of assets by Bitfinex. After the re-allocation, Petitioner's account balances were as follows:

**Figure 1: Petitioner's Post-Hack Account Balances**

|  | BTC | LTC | USD |
|---|---|---|---|
| **Pre-Haircut** | 2,705.40228000 | 111,000.00000000 | 2,589,401.30 |
| **Haircut** | (975.75744033) | (40,034.37000000) | (933,919.37) |
| **Post Haircut** | 1,729.64483967 | 70,965.63000000 | 1,655,481.93 |

20.     The re-allocation of assets had the effect of forcibly converting 36.06% of Petitioner's LTC and USD to BTC. As part of this process, Bitfinex reduced Petitioner's LTC balance by 40,034.37 LTC and reduced the USD balance by $933,919.36. Based on the exchange

---

[2] Petitioner has additional available data related to its trading that will be presented as necessary.

rates used by Bitfinex at the time for the haircuts, the LTC converted by Bitfinex was equivalent to 248.65236792 BTC and the USD converted by Bitfinex was equivalent to 1,546.07053180 BTC, for a total of 1,794.72289972 BTC that Bitfinex generated by unilaterally converting Petitioner's non-BTC assets.

21. In other words, after the hack 1,729.64483967 BTC was allocated to Petitioner's account, but all of that BTC reflected a forced conversion of Petitioner's own non-BTC assets to BTC. The loss Petitioner suffered exceeded its pre-hack BTC holdings because Bitfinex did not even put the full amount of the 1,794.72289972 BTC generated by converting Petitioner's non-BTC assets into Petitioner's account. Instead, it put 65.07806005 BTC less into Petitioner's account, presumably by re-allocating that BTC into the wallets of other account holders.

22. Thus, Bitfinex provided Petitioner a net NEGATIVE recovery of 65.07806005 BTC because it sold off enough of Plaintiff's non-BTC assets to fund the purchase of 65.07806005 more BTC than Petitioner was left with.

23. Petitioner was the rightful owner of 2,705.40228000 before the hack and should be credited as the rightful owner of an additional 65.07806005 BTC, reflecting the value of Petitioner's non-BTC assets that were forcibly converted to BTC following the fact, but which BTC was not credited to Petitioner's account by Bitfinex.

24. Petitioner held BTC at the time of the hack in part because it wanted the upside (i.e. the potential appreciation) associated with BTC. As further described below, Petition was denied that upside by Defendants' theft, and Bitfinex is now trying to seize the assets' appreciation by claiming (falsely) that it is the lone victim of the theft.

25. Accordingly, Petitioner's legal interest in the seized BTC accounting for the unilateral re-allocation is Petitioner's pre-hack balance of 2,705.40228000 BTC, plus the net loss

7

of 65.07806005 BTC that Bitfinex took from Petitioner as part of the reallocation, which equals 2,770.48034004 BTC.

26. Petitioner never conveyed to Defendants, Bitfinex, or any anyone else any right to or ownership interest in the subject property that it was unable to recover.

## THE BFX TOKENS

27. After the hack, Bitfinex issued tokens (called "BFX") purporting to provide users a "contingent obligation" that Bitfinex *may*, at its "sole option," redeem the tokens for their stated dollar value in the future.

28. In essence, the tokens purported to unilaterally strip the upside in BTC's appreciation away from Petitioner and other account holders in favor of Bitfinex.

29. Petitioner and other Bitfinex users were told that BFX tokens were issued without any agreement that the receipt of those tokens relinquished any customer's legal interest in the stolen BTC, and expressly "without reduction of or other release or waiver of any claims [users] may have against the Bitfinex Group." Attached as **Exhibit D** is a copy of the BFX token terms issued by Bitfinex.

30. Bitfinex subsequently enabled trading such that BFX tokens could be sold on the secondary market. When trading commenced, BFX tokens immediately began trading at a steep discount to their purported face value, reflecting the fact that they were not actually worth even the stated face value that Bitfinex placed on them.

31. The steep discount was economically logical because their theoretical value was capped at $1, and no recovery was certain. Thus, the tokens provided no compensation for the lost upside in BTC holdings that Petitioner and other account holders suffered, and they did not convey the right to that upside to Bitfinex.

## LEGAL BASIS FOR PETITIONER'S RIGHT TO THE PROPERTY

32. Legal title to the subject property was vested, at all relevant times, with Petitioner, which deposited its own assets into its Bitfinex wallets, and traded with those assets. Through those actions, Petitioner was the legal owner of approximately 2,705 Bitcoin in its account prior to the hack. Petitioner held legal title to its Bitcoin in its Bitfinex accounts pursuant to Bitfinex's Terms of Service.

33. The Bitfinex Terms of Service make clear that all spot purchases of BTC occurred between fully funded buyers and sellers on the Site, that Bitfinex served only in an agency capacity, and that "[n]either Bitfinex nor BitGo acts as principals, counterparties, or market-makers in the transactions effected through trading on Bitfinex." Ex. A at §§ 3, 4.4.

34. Bitfinex records will be able to establish the particular sellers with whom each transaction was matched and enable tracing of the relevant BTC to the stolen assets.[3]

35. Moreover, the Terms of Service provided that Petitioner's assets would be held in Multi-Signature Wallets established with BitGo and that "all bitcoins in your Multi-Signature Wallets belong to and are owned by you." Ex. A at § 5.1. Those terms confirm that Bitfinex operated as a platform to facilitate custody and exchange of its customers' BTC, and not as a bank in which deposits might be considered to be the assets of the company.

---

[3] To the extent complete tracing was to establish that Petitioner's BTC was not among the BTC stolen by Defendants (and BTC wallets were drained in descending order of the BTC balance, with Petitioner having one of the largest Bitfinex balances), the effect of the reallocation was to use Petitioner's assets to provide recoveries to other account holders whose assets were stolen. If that were the case, Petitioner would rightly step into the shoes of those other account holders, having the superior legal right to the seized BTC as an innocent owner (and *bona fide* purchaser) to the extent the reallocation provided such other account holders with BTC derived from Petitioner's non-BTC assets.

36. In short, pursuant to its Terms of Service, Bitfinex never had legal ownership of the BTC in Petitioner's account and served only as an agent facilitating the purchase, custody, and transfer of those Bitcoins between Petitioner and other account holders. Petitioner therefore had a legal right to the BTC in its account at the time of the hack, and to all other assets in its account, superior to that of any other potential claimant.

37. While Petitioner's receipt of BTC as part of the reallocation of assets might arguably transfer the right in a portion of that reallocated BTC to the accountholder(s) whose assets were used to obtain that BTC, it would transfer such legal right *only to the extent* that Petitioner received value above and beyond the value of its non-BTC assets that Bitfinex appropriated as part of the reallocation, which the reallocation did not. Rather, Bitfinex's unilateral rebalancing of assets forced an additional loss on Petitioner.

38. Petitioner's receipt (and subsequent sale for a substantial discount) of BFX tokens also did not make Petitioner whole, nor waive or compromise its legal right to or interest in the stolen BTC or its rights in the reallocation of its remaining non-BTC assets. The BFX Token Terms clearly state, "The token has been issued to you without reduction of or release or waiver of any claims you may have." **Exhibit D**. Nor could the BFX tokens constitute adequate consideration for relinquishment of any right or interest, as they represented only a contingent obligation to redemption at the "sole option" of Bitfinex at an unstated time in the future and with a limited upside not commensurate with the BTC taken from Petitioner. In any event, to the extent the BFX tokens are deemed relevant, Petitioner's recovery from those BFX tokens would account for only a tiny fraction of its lost BTC.

39. Petitioner never conveyed to Defendants, Bitfinex, or any anyone else any right to or ownership interest in the subject property that it was unable to recover. At no relevant time did any person or entity other than Petitioner have any title to that subject property.

40. Petitioner's right to the subject property renders the Forfeiture Order invalid as to the subject property.

41. Accordingly, Petitioner's net interest in the seized property totals 2770.48034004 BTC. Petitioner respectfully submits and requests that 2770.48034004 of the BTC forfeited by Defendants be transferred to Petitioner, as it holds a superior right, title, and interest in that BTC relative to Defendants and all other parties.

**WHEREFORE**, Petitioner respectfully requests that the subject property in the amount of 2,770.48034004 BTC be returned and that this Petition be granted in its entirety, together with such other and further relief as this Court deems equitable and proper.

Date: January 28, 2025                           Respectfully submitted,

/s/ Aitan D. Goelman
Aitan D. Goelman (DC Bar 446636)
Christopher R. MacColl (DC Bar 1049153)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
AGoelman@zuckerman.com
CMacColl@zuckerman.com

*Attorneys for Intervenor, Claimant, and Third-Party Petitioner*

## DECLARATION

I attest and declare under penalty of perjury of the law of the United States of America that the foregoing information provided in support of my claim is true and correct to the best of my knowledge and belief.

Executed at New York, New York

**January 28, 2025**

as Director

## DECLARATION

I attest and declare under penalty of perjury of the law of the United States of America that the foregoing information provided in support of my claim is true and correct to the best of my knowledge and belief.

Executed at New York, New York

as Director

**January 28, 2025**