**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ILYA LICHTENSTEIN, et al.,<br><br>Defendants. | Case No. 23-CR-239 (CKK) |

# PETITIONER BITFINEX'S OPPOSITION TO NON-PARTY RICHARD ROE'S MOTION TO FILE OUT OF TIME MOTION TO INTERVENE AND VERIFIED ANCILLARY PETITION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

RELEVANT BACKGROUND ..... 3

A. Media Coverage and Three Government Press Releases Disclose There Will Be a Forfeiture Proceeding ..... 3

B. The Government Provides Court-Ordered Notice That Exceeds Statutory Requirements and Another Press Release Disclosing There Will Be a Forfeiture Proceeding ..... 6

C. Claimants and Victims Timely Respond to the Government's Notice and Assert Their Claims ..... 8

D. Roe Files His Untimely Motion ..... 8

ARGUMENT ..... 9

I. Rule 6(b) Cannot Extend 21 U.S.C. § 853(n)(2)'s Mandatory Statutory Deadline ..... 10

II. Roe Has Not Established "Excusable Neglect" Under Rule 6(b) ..... 11

A. Roe Has Not Articulated Any Reason for Delay That Was Beyond His Control, and this Factor Is Dispositive Here ..... 12

1. The Government Provided Adequate Notice ..... 12

2. A Busy Schedule Is Not Sufficient to Establish Excusable Neglect ..... 15

B. Permitting Roe's Delay Would Be Prejudicial Because the Ancillary Proceedings Are Ongoing and Key Deadlines Have Already Passed ..... 20

C. The Length of Roe's Delay Weighs Against Granting His Motion ..... 21

D. Roe's Lack of Diligence Casts Doubt on His Assertion of Good Faith ..... 22

III. Roe Has Not Sought—Much Less Established—Equitable Tolling ..... 23

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. Pompeo*,
2018 WL 5297813 (D.D.C. Oct. 25, 2018) ....................23, 24

*Alexander v. Saul*,
5 F.4th 139 (2nd Cir. 2021) ....................12

*Argentine Republic v. Nat'l Grid. Plc.*
637 F.3d 365 (D.C. Cir. 2011). ....................10, 11

*Beecham v. XP Logistics*,
2019 WL 2053891 (D. Kan. May 8, 2019) ....................21, 22

*Bredell v. Kempthorne*,
290 F. App'x. 564 (4th Cir. 2008) ....................11

*Chambers v. Brown*,
2025 WL 654139 (M.D.N.C. Feb. 28, 2025) ....................21, 22

*In re CJ Holding Co.*,
27 F.4th 1105 (5th Cir. 2022) ....................22

*Clark v. Dist. of Columbia*,
2024 WL 3181440 (D.D.C. June 26, 2024) ....................22

*Doe v. Bd. of Trustees for Univ. of Ark.*,
2023 WL 8604171 (W.D. Ark. Dec. 12, 2023) ....................17, 18

*DSI Assocs. LLC v. United States*,
496 F.3d 175 (2d Cir. 2007) ....................10

*FG Hemisphere Assocs. v. Dem. Rep. of Congo*,
447 F.3d 835 (D.C. Cir. 2006) ....................18, 19

*Hawks v. J.P. Morgan Chase Bank*,
591 F.3d 1043 (8th Cir. 2010) ....................17

*Inst. for Policy Studies v. U.S.C.I.A.*,
246 F.R.D. 380 (D.D.C. 2007) ....................12

*Kingsburg Apple Packers, Inc. v. Ballantine Produce Co.*,
2010 WL 457474 (E.D. Cal., Feb. 3, 2010) ....................18, 19

*In re KMart Corp.*,
381 F.3d 709 (7th Cir. 2004) ....................21

*Martinez v. United States*,
578 F. App'x 192 (4th Cir. 2014) ....................11

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
507 U.S. 380 (1993)....................11, 12, 22

*In re RML, LLC*,
657 B.R. 709 (Bankr. S.D.N.Y. 2023)....................21

*Robinson v. Dep't of Homeland Sec. Off. of Inspector Gen.*,
71 F.4th 51 (D.C. Cir. 2023)....................23, 24

*Robinson v. Wix Filtration Corp. LLC*,
599 F.3d 403 (4th Cir. 2010) ....................11

*Sherrod v. Breitbart*,
720 F.3d 932 (D.C. Cir. 2013) ....................1, 10, 11

*Smith v. Look Cycle USA*,
933 F. Supp. 2d 787 (E.D. Va. 2013) ....................2, 11

*In re Smith*,
2013 WL 3156639 (Bankr. D.D.C. June 21, 2013) ....................11

*Thompson v. E.I. DuPont de Nemours & Co.*,
76 F.3d 530 (4th Cir. 1996) ....................11

*In re Tronox Inc.*,
626 B.R. 725, *on reconsideration in part,* 2022 WL 628097 (Bankr. S.D.N.Y. Mar. 3, 2022) *and aff'd,* 2023 WL 2744136 (S.D.N.Y. Mar. 31, 2023)....................20

*In re Tronox*,
626 B.R. 688 (Bankr. S.D.N.Y. 2021)....................17

*United States v. Aguirre*,
476 F. App'x 333 (5th Cir. May 12, 2012)....................17

*United States v. Alvarez*,
710 F.3d 565 (5th Cir. 2013) ....................9

*United States v. Carmichael*,
440 F. Supp. 2d 1280 (M.D. Ala. 2006) ....................14

*United States v. Davenport*,
668 F.3d 1316 (11th Cir. 2012) ....................9

*United States v. Eckenberg*,
918 F. Supp. 2d 1089 (D. Or. 2013) ....................14

*United States v. Javat*,
2020 WL 13077201 (S.D. Fla. Aug. 28, 2020)....................10

*United States v. Kahnawake-Mohawk Indus., Inc.*,
2010 WL 3119186 (E.D.N.Y. Aug. 3, 2010)....................14

*United States v. Loria*,
2009 WL 3103771 (W.D.N.C. Sept. 21, 2009) ....................14, 22

*United States v. Lyons*,
2013 WL 1694865 (D. Mass. Apr. 12, 2013) ....................22

*United States v. Marion*,
562 F.3d 1330 (11th Cir. 2009) ....................9

*United States v. Pavlock*,
2014 WL 11381028 (N.D. W. Va. Mar. 4, 2014)....................22

*United States v. Preston*,
123 F. Supp. 3d 24 (D.D.C. 2015)....................9

*United States v. Rashid*,
373 F. App'x 234 (3rd Cir. 2010) ....................10

*United States v. Suarez*,
2016 WL 10892252 (S.D. Fla. Dec. 6, 2016) ....................22

*United States v. Watson*,
2024 WL 3580765 (D. Minn. July 30, 2024) ....................14

*In re Vitamins Antitrust Class Actions*,
327 F.3d 1207 (D.D.C. 2003) ....................12

**Statutes**

9 U.S.C. § 12....................11

21 U.S.C. § 853....................9, 10

21 U.S.C. § 853(n) ....................10, 11

21 U.S.C. § 853(n)(1) ....................8, 12

21 U.S.C. § 853(n)(2) ....................1, 11, 22, 23

21 U.S.C. § 853(n)(2)'s....................10, 23

21 U.S.C. § 853(n)(4) ....................20

21 U.S.C. § 853(n)(7) ....................9

42 U.S.C. § 2000e-16(c) ....................24

**Rules**

Fed. R. Bankr. P. 9006(b)(1)....................22

Fed. R. Civ. P. 6(b) .................... *passim*

Fed. R. Civ. P. 24....................10

Fed. R. Civ. P. 60(b) ....................11, 17

Fed. R. Crim. P. 32.2 .................... *passim*

iFinex Inc. and BFXNA Inc. (together, "**Bitfinex**"), through its attorneys at Gibson, Dunn & Crutcher LLP and Kirkland & Ellis LLP, respectfully submit this memorandum of law in opposition to Non-party Richard Roe's ("**Roe**") Motion to File Out of Time Motion to Intervene and Verified Ancillary Petition Under Seal. ECF No. 311 (the "**Motion**").[1] Bitfinex respectfully requests that this Court deny that Motion.

## INTRODUCTION

The Court should deny Roe's motion for leave to file an ancillary petition over two months after the statutory deadline established by Congress for three reasons. ***First,*** the forfeiture statute requires that third parties file petitions asserting a right to property subject to a preliminary order of forfeiture by no later than the earlier of 30 days from the receipt of actual notice, or after the final publication of the government's notice of forfeiture. *See* 21 U.S.C. § 853(n)(2). Roe, a sophisticated individual who admits to closely following the course of these proceedings for years, concededly missed the mandatory statutory period by more than 55 days. His motion was also filed over 120 days after the government published the notice of forfeiture. Accordingly, Roe's request to file an untimely petition is barred by the operative statute: 21 U.S.C. § 853(n)(2).

Roe cannot excuse his late filing by establishing "excusable neglect" under Federal Rule of Civil Procedure 6(b). D.C. Circuit precedent makes clear that "[m]otions under Federal Rule of Civil Procedure 6(b) cannot extend statutory time limits." *See, e.g., Sherrod v. Breitbart,* 720 F.3d 932, 938 (D.C. Cir. 2013). Because the time limit for Roe's petition is statutory, a showing of excusable neglect cannot extend the deadline.

[1] On April 21, 2025, Roe filed papers that were docketed as "Motion for Leave to File Out of Time Motion," ECF No. 310, and "Motion to File Out of Time Motion to Intervene and Verified Ancillary Petition Under Seal," ECF No. 311. Bitfinex assumes that ECF No. 311 is Roe's motion for leave to file an untimely ancillary petition, and ECF No. 310 is Roe's motion for leave to file his untimely motion under seal.

***Second,*** even under Rule 6(b)'s excusable neglect standard—which does not apply here and so the Court does not need to reach this analysis—Roe has failed to establish that his untimely petition can be considered "excusable." Rule 6(b) allows for non-statutory filing deadlines to be extended only in "extraordinary case[s]" that meet "a very high bar." *Smith v. Look Cycle USA*, 933 F. Supp. 2d 787, 791 (E.D. Va. 2013). This is not one of those extraordinary cases.

Roe argues that his failure to meet the deadline is excusable because he has a "busy schedule," Roe Aff. ¶ 3, and because the details of this proceeding have "not been widely publicized in the U.S. news" such that he did not have a sufficient opportunity to find out about the proceeding, Roe Mot. ¶12. Those arguments are unsupported by the law and the facts. Roe's assertion that there has not been widespread news coverage of this proceeding, including of the forfeiture proceeding, is false. The media coverage of this proceeding has been overwhelming—two documentaries on Netflix and CNBC have been released and countless news stories have been published regarding every aspect of the case.

The government also made extensive efforts to notify potential victims of their opportunity to be heard. The government's notification process included four government press releases on the internet that stated there will be a formal, criminal forfeiture proceeding for third-party claimants to submit claims. With the Court's approval, the government also created a case-specific website in October 2024 requesting statements from potential third-party victims, including Bitfinex accountholders, and providing case information as well as Department of Justice ("DOJ") contact information. This process was more extensive than the notice required by statute, and it was expressly approved by this Court. ECF No. 145. The government also filed its notice of forfeiture on the official government forfeiture website on December 17, 2024, as required by the applicable statute. These notification procedures worked: 17 petitioners in total, including five

*pro se* individuals, filed timely claims. And 10 of the 17 petitioners, including four of the five *pro se* individuals, previously submitted victim statements to the DOJ.

Roe vaguely claims that while he was tracking the proceedings through basic internet searches for years, he was too busy in the six months prior to his April 2025 discovery of the forfeiture to run the basic internet searches that would have revealed he could submit a forfeiture claim. Roe is by all accounts a sophisticated and educated person. Recognizing that while he has a profession that can demand a busy schedule, five *pro se* petitioners had no problem finding the information they needed to file a timely petition. Roe admits that when he took the time to do a search that requires only a few minutes, he found information about this forfeiture proceeding. Roe's failure to timely assert a claim in this proceeding is not excusable and certainly does not meet the "very high bar" required by Rule (6)(b).

***Third***, Roe also does not even attempt to establish equitable tolling in his motion, a higher standard that requires more than excusable neglect, and has therefore forfeited that argument. In any event, Roe cannot show equitable tolling is appropriate here given his failure to meet the lower bar of excusable neglect.

The Court should deny Roe's request for leave to file an untimely ancillary petition.

## RELEVANT BACKGROUND

### A. Media Coverage and Three Government Press Releases Disclose There Will Be a Forfeiture Proceeding

The media coverage of the hack, arrest, prosecution, and asset forfeiture have all been covered in exacting detail, for years. In August 2016, Defendant Lichtenstein hacked into Bitfinex's systems and stole 119,754 Bitcoin from Bitfinex, one of the largest ever cryptocurrency thefts. Substantial media coverage followed the hack, the arrest of Defendants, the Federal Bureau

of Investigation's seizure of approximately 109,728.542 Bitcoin and other assets, and the DOJ prosecution, including the forfeiture of the seized assets.[2]

On August 3, 2023, the U.S. Attorney's Office for the District of Columbia, the DOJ's Office of Public Affairs, and the IRS each issued three separate press releases announcing Defendants' guilty pleas and providing the following notification that third parties could submit claims for seized or forfeited property:

> Consistent with standard practice in criminal forfeiture cases, there will be a formal process at the conclusion of the case pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure for third-party claimants to submit claims for any seized and forfeited property.

Declaration of Christopher Martin ("Martin Decl.") Exs. A, B, and C.

For years, media coverage of this case has referenced the seizure of assets, victim recovery, and the forfeiture action.[3] Many of these articles specifically mentioned "a court process by which victims can reclaim the stolen assets" and the need for accountholders to file claims.[4]

---

[2] *See, e.g.,* Reuters, *Bitfinex hacker, Heather Morgan plead guilty in $4.5B crypto laundering scheme*, New York Post (Aug. 3, 2023), https://nypost.com/2023/08/03/ilya-lichtenstein-heather-morgan-plead-guilty-to-crypto-laundering ("Deputy Attorney General Lisa Monaco said at the time the $3.6 billion in assets recovered was the biggest financial seizure in Justice Department history. The DOJ has since recovered $475 million more, and the couple in court on Thursday agreed to jointly forfeit $72 million."); Lindrea, Brayden, *How much Bitcoin does the US hold, and where did it come from?*, MSN (Mar. 7, 2025), https://www.msn.com/en-us/money/economy/how-much-bitcoin-does-the-us-hold-and-where-did-it-come-from/ar-AA1AqHhD; Turner Wright, Judge Says it Could Be 'Improper' to Order Bitfinex Hack Funds Returned, Coin Telegraph (Jan. 31, 2025), https://cointelegraph.com/news/judge-improper-order-funds-returned-bitfinex-hack.

[3] *See, e.g.*, Sabrina Willmer, *"Crocodile of Wall Street" spouse pleads guilty in Bitcoin heist tied to Bitfinex hack*, Fortune (Aug. 3, 2023), https://fortune.com/2023/08/03/bitcoin-heist-tied-to-bitfinex-hack-case-sees-guilty-plea/; Olga Kharif, *Who will get crypto back after arrests in $3.6-billion bitcoin hack?*, L.A. Times (Feb. 9, 2022), https://www.latimes.com/business/story/2022-02-09/bitfinex-who-will-get-crypto-back-after-arrests-in-3-6-billion-bitcoin-hack; Katie Benner, *Justice Dept. Seizes $3.6 Billion in Bitcoin and Arrests Married Couple*, N.Y. Times (Feb. 8, 2022), https://www.nytimes.com/2022/02/08/us/politics/ilya-lichtenstein-heather-morgan-bitcoin-laundering.html.

[4] *See, e.g.*, Emma Newbery, *Will Bitfinex Hack Victims Get Their Bitcoin Back?*, The Motley Fool, (Feb. 10, 2022), https://www.nasdaq.com/articles/will-bitfinex-hack-victims-get-their-bitcoin-back; Joseph Cioffi et al., *When stolen crypto is recovered, who is entitled to restitution?*, Reuters

In fact, there have been two documentaries about the case, both of which discuss the dispute over who should receive the seized Bitcoin. CNBC released a documentary in October 2022 titled "Crocodile of Wall Street and the Battle over Billions in Stolen Bitcoin." CNBC, *Crocodile of Wall Street and the Battle over Billions in Stolen Bitcoin*, CNBC (Oct. 18, 2022), https://www.youtube.com/watch?v=d6EXbQ6jqIM. That documentary discusses Bitfinex's statement about its right to the seized Bitcoin, the contrary positions of two *pro se* petitioners in this case, and a statement from an interviewed lawyer that there will be a fight as to "whether or not the government gets to keep [the Bitcoin], whether or not Bitfinex gets to keep it, [and] whether or not the customers get it back." *Id.* at 40:35-42:08. Netflix also released a documentary on December 6, 2024, shortly before the government first published notice of the forfeiture action, titled "The Biggest Heist Ever." Netflix, *Biggest Heist Ever*, Netflix (Dec. 6, 2024), https://www.netflix.com/title/81600031. In that documentary, one of the *pro se* petitioners in this case discusses how the government told him that he "will have the opportunity to get [his] seized assets back." *Id.* at 1:14:02-1:14:14 (Francisco Cavazos: "The lawyers for the Department of Justice reached out, and they say that during the sentencing, I will be able to state my case, and because I am a victim, I will have the opportunity to get my seized assets back.").

---

(Dec. 9, 2024), https://www.reuters.com/legal/legalindustry/when-stolen-crypto-is-recovered-who-is-entitled-restitution-2024-12-09/ ("Third parties, including Bitfinex customers, will have the ability to file an objection to the DOJ's position by Jan. 28, 2025, and argue why they are the true victims."); Kelvin Maina, *Court Orders Return of $9 Billion Bitcoin to Bitfinex in Landmark Ruling,* Brave New Coin (Jan. 16, 2025), https://bravenewcoin.com/insights/court-orders-return-of-9-billion-bitcoin-to-bitfinex-in-landmark-ruling ("The DOJ has set up a website to gather statements from those who believe they qualify as victims, and third parties have until January 28, 2025, to file objections or assert a claim" and has "said there will be a court process by which victims can reclaim their stolen assets").

**B. The Government Provides Court-Ordered Notice That Exceeds Statutory Requirements and Another Press Release Disclosing There Will Be a Forfeiture Proceeding**

On October 8, 2024, the government moved for an order to establish an alternative means to notify potential hack victims of their rights under the Crime Victim's Rights Act. ECF No. 141. On October 10, 2024, the Court granted the motion and directed the government to effectuate its proposed notice process that was more extensive than the notice required by statute or DOJ policy. ECF No. 145.

1. The DOJ's Case Specific Website: This Court-approved notification process included establishing a case-specific website and posting a link on the DOJ's website for large cases. *Id.* On October 17, 2024, the U.S. Attorney's Office for the District of Columbia published a webpage about this case on its website. Martin Decl. Ex. D. The case-specific website provided information about the case as well as an email address to contact the prosecutors and requested impact statements "from all persons potentially harmed by the defendants' conduct, including affected accountholders at the Bitfinex virtual currency exchange." *Id.* The webpage also informed potential victims that they had "[t]he reasonable right to confer with the attorney for the government in the case." *Id.* On or around October 31, 2024, the DOJ published a webpage on the portion of the DOJ's website containing "Information for Victims in Large Cases" that described the case and provided a link to the case-specific website. *Id.* Ex. E.

2. The DOJ's Press Release About the Case-Specific Website: On November 7, 2024, the U.S. Attorneys' Office for the District of Columbia issued a press release that announced the establishment of the case-specific website and solicited information from anyone potentially harmed by the Bitfinex Hack, including Bitfinex accountholders:

> **Notice to the public to solicit and receive information from all persons potentially harmed by the Bitfinex Hack, including affected Bitfinex accountholders**

> The Department of Justice has established a website to provide any person who claims status as a potential crime victim of the crimes described below to assert any rights under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, and with the opportunity to complete a statement to relay information about how they may have been harmed by the charged conduct and/or offenses. . . . If you wish to complete a statement about the impact of the offenses on you and/or to relay information about how you may have been victimized, please send that statement to the United States to be conveyed to the U.S. District Court judge who will make decisions in the case, including by sentencing the defendants. Specifically, please submit a statement by no later than November 13, 2024, via email to USADC.BitfinexHack2016@usdoj.gov. As stated above, the sentencings are currently scheduled for November 14 and 15, 2024.
>
> Additional information is available on the Department of Justice's website for large cases, https://www.justice.gov/usao-dc/2016-bitfinex-hack.

*Id*. Ex. F (emphasis in original).

3. Fourth Press Release Disclosing There Will Be a Forfeiture Proceeding: On November 14, 2024, Defendant Lichtenstein was sentenced, and the government issued another press release. That release again reiterated that "there will be a formal process pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure for third-party claimants to submit claims for any seized and forfeited property." *Id*. Ex. G. It also included a link to the government's case-specific webpage requesting impact statements from Bitfinex accountholders and providing contact information. *Id.*

4. Official Notice of Forfeiture Action: A month later, on December 17, 2024, the government published the official notice of the forfeiture action on www.forfeiture.gov. ECF No. 202 at 2; Declaration of Barry Berke ("Berke Decl.") Ex. 1. It also sent a copy of this notice directly to all individuals who "reasonably appear[ed] to be a potential claimant. . . ." ECF 202 at 5. The notice advised that anyone claiming an interest in the forfeited property "must file an ancillary petition within 60 days of the first date of publication (December 17, 2024) of this Notice on this official government website, pursuant to Rule 32.2 of the Federal Rules of Criminal

Procedure and 21 U.S.C. § 853(n)(1)." *Id.* This meant that by statute, individuals who did not receive direct notice had until February 17, 2025 to file petitions.[5] In an effort to accommodate *pro se* filers, the Court later extended the deadline by two days, to February 19, 2025. ECF No. 250 at 3.

### C. Claimants and Victims Timely Respond to the Government's Notice and Assert Their Claims

In total, 17 third parties filed timely petitions, including five *pro se* claimants. Over 20 potential victims submitted responses as a result of the case-specific website, including 10 of the 17 current third-party claimants in this forfeiture proceeding.[6] Four of the five *pro se* claimants here had no problem finding this information and contacted the government in response. Roe did not submit any response.

### D. Roe Files His Untimely Motion

On April 21, 2025, over 55 days after the statutory deadline, Roe filed a motion seeking leave to file an untimely ancillary petition. In his motion, Roe acknowledges that he "periodically checked for updates related to the Bitfinex hack," Roe Motion ¶ 12, including by "searching for terms such as 'Bitfinex,' 'hack,' 'cryptocurrency,' and other similar terms," Roe Aff. ¶ 5. He claims that despite his searches, "he was unaware of any opportunity to assert his rights in the forfeiture proceeding" because, in his estimation, "it has not been widely publicized in the U.S. news." *Id.* He also claims that "[o]ver the past six months, however, [he] ha[s] been especially busy, both professionally and personally" and that because of this, he did not "ha[ve] the time to conduct [his] research. . . ." *Id.* ¶ 6. He further claims that he did not learn that individuals may

[5] 30 days from the final date of the government's publication of the notice of forfeiture was February 15, a Saturday, so the deadline fell on the following Monday, February 17, 2025.
[6] ECF No. 173-1 at 3 (Zuijderwick), 11 (Paasch), 20 (Cavazos), 24 (Peters), 28 (Lankat), 29 (AH 1), 36 (Illescas), and 45 (Bielenia); ECF No. 175-1 at 1 (Newman), 2 (Bitfinex).

be able to file in this forfeiture proceeding until April 12, 2025 when he did his periodic check by typing "Bitfinex hack" into Google search and found relevant information. *Id.* ¶ 8.

As set forth in the concurrently-filed Declaration of Christopher Martin, an investigator at the global investigations firm Nardello, searching Google using the terms "Bitfinex" and "hack" identifies several government press releases and webpages. These include: the government's August 3, 2023 press releases notifying third parties that there will be a process to submit claims for seized or forfeited property; the DOJ's case-specific website requesting impact statements and providing DOJ contact information; and the DOJ's November 14, 2024 press release reiterating that there will be a formal process for third-party claimants to submit claims and providing a link to the case-specific website. Martin Decl. ¶ 5, Ex. I.

**ARGUMENT**

The statutory deadline set by 21 U.S.C. § 853 is mandatory and "[t]he failure to file a petition within this thirty-day time period extinguishes a third-party's interest" in the property subject to forfeiture. *United States v. Marion*, 562 F.3d 1330, 1339 (11th Cir. 2009) (citing 21 U.S.C. § 853(n)(7); Fed. R. Crim. P. 32.2(c)(2)); *see also United States v. Preston*, 123 F. Supp. 3d 24, 29 (D.D.C. 2015) ("If a third party chooses not to file a petition within the prescribed thirty days … she forfeits her interest in the property." (citation omitted) (alteration in original)); *United States v. Davenport,* 668 F.3d 1316, 1322, 1324-35 (11th Cir. 2012) (rejecting as time barred ancillary petition filed 22 days after 30-day deadline); *United States v. Alvarez*, 710 F.3d 565, 567–68 (5th Cir. 2013) (rejecting as untimely ancillary petition filed 44 days after 30-day deadline).

There is no dispute that Roe missed the statutory deadline to file an ancillary petition by nearly two months. Yet, Roe argues that he should still be allowed to file because, in his estimation, he has met the excusable neglect exception described in Federal Rule of Civil Procedure 6(b). But Rule 6(b) is inapplicable to Congressionally mandated statutory deadlines,

like the one set in 21 U.S.C. § 853. Even under Rule (6)(b), Roe has not met the high bar required to justify the extension of a mandatory statutory deadline because: Roe has not articulated any reason for delay that was beyond his control; the delay caused by Roe's belated filing would be prejudicial to the other participants who filed timely claims in the ongoing ancillary proceedings; and Roe did not exercise appropriate diligence in pursuing his claim. Roe also fails to make (and therefore forfeits) any argument that the Court should equitably toll the deadline. Roe's motion should be denied.

## I. Rule 6(b) Cannot Extend 21 U.S.C. § 853(n)(2)'s Mandatory Statutory Deadline

Roe argues that the Court should accept his untimely filing due to "excusable neglect" pursuant to Federal Rule of Civil Procedure 6(b).[7] But it is blackletter law that Rule (6)(b) cannot extend deadlines set by statute. As the D.C. Circuit held in *Sherrod v. Breitbart*, binding precedent, "[m]otions under Federal Rule of Civil Procedure 6(b) cannot extend statutory time limits." 720 F.3d at 938. Indeed, the D.C. Circuit made clear in *Argentine Republic v. Nat'l Grid. Plc.* that "[e]very court to have considered this question has held that Rule 6(b) may be used only to extend time limits imposed by the court itself or by other Federal Rules, but not by statute." 637 F.3d 365, 368 (D.C. Cir. 2011). Following this well-established limitation on Rule 6(b)'s scope, the D.C. Circuit in *Argentine Republic* affirmed the dismissal of a Rule 6(b) motion to extend a deadline to serve notice of a motion to vacate under 9 U.S.C. § 12. *Id.*

---

[7] Roe also includes a single citation, without discussion, to Federal Rule of Civil Procedure 24(a)(2), the civil rule regarding intervention, as a basis for his motion. Mot. at 1. But it is well established that Rule "24(a) governs intervention in civil proceedings **and has no applicability to criminal forfeiture proceedings**. . . . Section 853(n) of title 21 . . . provides the **exclusive means** for asserting a legal interest in property which has been ordered forfeited to the United States in a criminal case." *E.g.*, *United States v. Rashid*, 373 F. App'x 234, 238-39 (3rd Cir. 2010) (emphasis added); *DSI Assocs. LLC v. United States*, 496 F.3d 175, 183-84 (2d Cir. 2007) (same); *United States v. Javat*, 2020 WL 13077201, at *8-9 (S.D. Fla. Aug. 28, 2020) (holding that third-parties' motion to intervene to contest forfeiture suffered "fatal flaw" as "it has been brought pursuant to Federal Rule of Civil Procedure 24, which has no place in this criminal matter").

Notably, Roe does not cite a *single case* in which a court relied on Rule 6(b) to extend the statutory deadline set by 21 U.S.C. § 853(n). Indeed, he does not cite a *single case in the criminal forfeiture context*, which makes sense given that Rule 6(b) cannot be used to extend the mandatory statutory deadline for ancillary petitions set by 21 U.S.C. § 853(n)(2). Roe's motion to apply Rule 6(b) here fails because it cannot extend the statutory deadline.

## II. Roe Has Not Established "Excusable Neglect" Under Rule 6(b)

Even if *Sherrod* and *Argentine Republic* do not control here, Roe has failed to overcome the "very high-bar" of excusable neglect under Rule 6(b). "'Excusable neglect is not easily demonstrated, nor was it intended to be.'" *In re Smith*, 2013 WL 3156639, at *4 (Bankr. D.D.C. June 21, 2013) (analyzing "excusable neglect" under Rule 60(b)) (quoting *Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 534 (4th Cir. 1996)). "This standard is a very high bar, applicable to only the extraordinary cases where injustice would otherwise result" absent relief. *Smith*, 933 F. Supp. 2d at 791 (citing *Bredell v. Kempthorne*, 290 F. App'x. 564, 565 (4th Cir. 2008)).

Courts must "take[] account of all relevant circumstances surrounding the party's omission." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). Courts have routinely found that "a party that fails to act with diligence will be unable to establish that [her] conduct constituted excusable neglect." *Martinez v. United States*, 578 F. App'x 192, 194 (4th Cir. 2014) (quoting *Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 413 (4th Cir. 2010)). The Supreme Court enumerated in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship* four factors "to consider when determining what kind of neglect will be considered 'excusable' . . .: (1) the danger of prejudice to the party opposing the modification, (2) the length of delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in

good faith." *In re Vitamins Antitrust Class Actions*, 327 F.3d 1207, 1209 (D.D.C. 2003) (citing *Pioneer Inv. Servs. Co.*, 507 U.S. at 395). All of these factors weigh in favor of denying Roe's motion.

### A. Roe Has Not Articulated Any Reason for Delay That Was Beyond His Control, and this Factor Is Dispositive Here

Under *Pioneer*, "the reason for the delay [i]s the most important" factor and is often dispositive. *Alexander v. Saul*, 5 F.4th 139, 150 & n. 5 (2nd Cir. 2021) (collecting cases from the First, Fourth, Sixth, Eighth, and Tenth Circuits); *see also Inst. for Policy Studies v. U.S.C.I.A.*, 246 F.R.D. 380, 383 (D.D.C. 2007) (same). Roe asserts two reasons to justify his delay—that he did not receive adequate notice of the forfeiture action and that he was too busy to timely discover his right to file a petition. Neither argument has merit.

#### 1. The Government Provided Adequate Notice

Roe asserts that the government's failure to provide direct notice justifies his delayed filing. Not so. The forfeiture statute expressly requires the government to provide notice by publication, as it did here. *See* 21 U.S.C. § 853(n)(1) ("[T]he United States shall publish notice of the order and its intent to dispose of the property in such manner as the Attorney General may direct."); Fed. R. Crim. P. 32.2(b)(6)(A) ("[T]he government must publish notice of the [forfeiture] order and send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding." ). The government routinely satisfies its notice obligations by publishing notice on www.forfeiture.gov.[8]

[8] The website specifically explains that while "civil and criminal forfeiture actions have traditionally been published in newspapers[,] [p]ublication of [criminal] forfeiture notices are now permitted on a government internet site under . . . Rule 32.2(b)(6) of the Federal Rules of Criminal Procedure." www.forfeiture.gov (last accessed May 5, 2025).

Beginning on December 17, 2025, the government published a notice of the forfeiture action on www.forfeiture.gov. ECF No. 202 at 5. The government informed the Court that it had "publish[ed] 'notice of the [forfeiture] order' and sen[t] notice to any person who reasonably appear[ed] to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding." *Id.* The government therefore informed the Court that "third parties who intend to assert claims over the forfeited properties have the ability to do so in the third-party ancillary proceeding. . . ." *Id.* This was all the government was required to do.

The government, in fact, went above and beyond its notice obligations. The government also informed the Court that, for purposes of identifying potential victims and informing them of their statutory rights under the Crime Victims Rights Act, "the government does not know the identity or contact information for all [Bitfinex] accountholders." ECF No. 141 at 8. The government therefore requested to use alternative means to notify potential victims of their rights, and the Court approved. *Id.*; ECF No. 145. These means consisted of creating a case-specific website requesting that potential victims submit statements to a government e-mail address provided on the website. Martin Decl. Ex. D (soliciting impact statements "from all persons potentially harmed by the defendants' conduct, including affected accountholders at the Bitfinex virtual currency exchange"). It appears that individuals who contacted the government received direct notice of the forfeiture action.[9] As detailed further below, Roe did not contact the

[9] *See, e.g.*, ECF 202 at 5 ("the government . . . 'sen[t] notice to any person who reasonably appear[ed] to be a potential claimant. . . ."); Peters Ancillary Petition, ECF No. 204 at ¶ 9 ("Mr. Peters received the DOJ Notice on December 17, 2024."); AH-1 Ancillary Petition, ECF No. 288 at 2 ("On December 17, 2024, the United States provided notice of that order to Petitioner . . . and issued a Public Notice of the Order . . . which was posted to the government's website. . . ."); Illescas Ancillary Petition, ECF No. 217 at 3 ("A Notice of Criminal Forfeiture Action was received by the Petitioner via email on December 17, 2024."); Bielenia Ancillary Petition, ECF no. 254 at 1 (stating that Bielenia "received from the DOJ . . . the 'Notice of Criminal Forfeiture Action' . . . on December 17, 2024," and also that on November 14, 2024, he "submitted a

government due to his own lack of diligence. Roe therefore did not "reasonably appear[] to be a potential claimant with standing" and thus did not receive direct notice. ECF No. 202 at 5. Accordingly, the government's publication notice procedures as to Roe were sufficient.

Courts throughout the country routinely reject untimely petitions where the petitioner did not receive direct notice of the forfeiture, even in circumstances where the government took fewer steps than it did here to provide notice of a criminal forfeiture proceeding. *See, e.g.*, *United States v. Carmichael*, 440 F. Supp. 2d 1280, 1281-82 (M.D. Ala. 2006); *United States v. Eckenberg*, 918 F. Supp. 2d 1089 (D. Or. 2013); *United States v. Kahnawake-Mohawk Indus., Inc.*, 2010 WL 3119186, at *1 (E.D.N.Y. Aug. 3, 2010). For example, in *United States v. Loria*, 2009 WL 3103771, at *1 (W.D.N.C. Sept. 21, 2009), the court rejected an untimely petition even though the petitioner did not receive direct notice. The court found that publication was sufficient because the government was unaware that the untimely petitioner, the defendant's wife, had a potential claim as "[t]here was also no indication that [she] had any business interests in the property to be forfeited." *Id*. Similarly, in *United States v. Watson*, 2024 WL 3580765, *1-2 (D. Minn. July 30, 2024), the court denied a third-party petition as untimely even though the petitioner did not receive direct notice despite filing a police report identifying the forfeited property as stolen.

The lack of direct notice is particularly unavailing in cases where, as here, media coverage provides another avenue for a claimant to learn of the forfeiture proceeding. For example, in

---

'Statement about the impact of the offense' . . . [i]n response to the notice published on the DOJ's Large Cases website"); Newman Ancillary Petition, ECF No. 203 at 3 ("Mr. Newman received the DOJ Notice on December 17, 2024."); Victim Impact Statements, ECF No. 173-1 at 36 (Illescas Impact Statement emailed to USADC-BitfinexHack on November 8, 2024); ECF No. 173-1 at 24, 29, 36, 45 (Peters, AH-1, Illescas, and Bielenia impact statements emailed to USADC-BitfinexHack2016); ECF No. 175-1 at 1 (Newman impact statement emailed to USADC-BitfinexHack2016).

*Carmichael*, 440 F. Supp. 2d at 1281-82, the court rejected an untimely petition despite the petitioner receiving no direct notice of the forfeiture order, because the government's published notice was "statutorily adequate" and that notice "followed a trial that was covered exhaustively by local print and television media." *Id.*

Contrary to Roe's assertions that this case "has not been widely publicized in the U.S. news," Mot. ¶ 12, the media has covered the entire course of this case in detail over many years. *See supra*, Background § A. In fact, Roe's own counsel published a news article soliciting clients to submit claims in the forfeiture proceeding *before the deadline*. Joseph Cioffi, Seiji Newman, and Adam Roe, *When Stolen Crypto is Recovered, Who is Entitled to Restitution?*, Reuters (Dec. 9, 2024), https://www.reuters.com/legal/legalindustry/when-stolen-crypto-is-recovered-who-is-entitled-restitution-2024-12-09/ ("A federal court has yet to rule on a proposed motion from the US government requesting crypto forfeited from a criminal case involving the 2016 hack on Bitfinex be returned to the exchange."). As discussed in more detail below, if Roe had done even the simplest Google search about the case, he would have been aware of his ability to assert a claim in this action. Roe's own lack of diligence in discovering the government's statutorily sufficient forfeiture notice in a highly publicized case precludes excusing Roe's neglect here.

**2. A Busy Schedule Is Not Sufficient to Establish Excusable Neglect**

The next reason Roe offers to justify his delay is that he has a "busy schedule" and did not have the time to conduct simple internet searches that would have put him on notice of his ability to file a petition. Roe Aff. ¶¶ 5-8. Even accepting Roe's assertion that he was unaware of the forfeiture matter until after the deadline as true, he has not shown *excusable* neglect.

Roe admits that he would conduct research related to his hacked Bitcoin "several times a year . . . [s]ince the hack" in 2016, "searching for terms such as 'Bitfinex,' 'hack,' . . . and other similar terms." *Id.* ¶ 5. While this must have put him on notice of this case, Roe nevertheless

claims he did not realize he had a right to assert a claim in the forfeiture action until April 2025, when he "did a periodic check by typing 'Bitfinex hack' into Google search," which led him to discover that he could submit a claim. *Id.* ¶¶ 5-8. Roe's purported excuse for not conducting even a two-word Google search sooner is he was busy: "Over the past six months, however, I have been especially busy, both professionally and personally. I have not had the time to conduct my research . . . ." *Id.* ¶ 6. Roe also states that "[i]t is not uncommon for me to work over 100 hours in a week" (*id.* ¶ 3), but he does not say that he did so during this six-month period.

If Roe had done basic research, he would have known of this case and his ability to assert a claim in this action—the information was at his fingertips all along. If Roe conducted an internet search in or before the last six months using the terms he regularly used, such as "Bitfinex" and "hack" (Roe Aff. ¶ 5), he would have discovered within minutes ample media coverage about the fight over ownership of the seized Bitcoins. The global media extensively publicized the forfeiture proceeding. This included substantial coverage of every aspect of this case, including fights over who had the right to receive the seized Bitcoin. *See supra* Background § A.

Aside from the ample media coverage of this case, the government's numerous publications regarding third parties' rights in this proceeding were sufficient to put Roe and similarly situated individuals on notice of their ability to file claims in this action. Even assuming that Roe became too busy to run an internet search during the six months prior to April 2025, by October 2024, Roe should have known from his prior internet searches that the government issued three press releases that stated: "[c]onsistent with standard practice in criminal forfeiture cases, there will be a formal process at the conclusion of the case pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure for third-party claimants to submit claims for any seized and forfeited property." Martin Decl. Exs. A, B, C, and I.

In October 2024, the government also created a webpage specific to this case that provided information about the case and an email address to contact the prosecutors. *Id.* Ex. D. The government's case-specific webpage requested impact statements "from all persons potentially harmed by the defendants' conduct, including affected accountholders at the Bitfinex virtual currency exchange." *Id.* Over 20 potential victims submitted responses, including *10* of the 17 current third-party claimants (*supra* n. 6), and it is our understanding that each of those individuals received direct notice of the forfeiture and the right to submit a petition, as did Bitfinex. *See supra* n. 9; *see also* Berke Decl. ¶ 2, Ex. 1.

Had Roe continued to run even the most basic internet search for "Bitfinex hack" during the six months prior to April 2025, *i.e.*, his busy period, it would have immediately pointed him to the four government press releases disclosing that there would be a forfeiture proceeding and the DOJ's case-specific websites providing DOJ contact information. Martin Decl. ¶ 5, Ex. I. But he did not. Likewise, if Roe had gone to the DOJ's home webpage and run a search for "Bitfinex," it would have immediately pointed him to the government press releases and the case-specific website providing notice of his rights. *Id.* ¶ 4, Ex. H. Moreover, beginning on December 17, 2024, the government published the notice of forfeiture on www.forfeiture.gov for at least 60 days.

Roe's busy schedule and lack of diligence cannot constitute excusable neglect. Under Rule 6(b), "'[e]xcusable neglect requires something more than a simple failure to meet the deadline due to a busy schedule.'" *Doe v. Bd. of Trustees for Univ. of Ark.*, 2023 WL 8604171, at *9 (W.D. Ark. Dec. 12, 2023) (quoting *Hawks v. J.P. Morgan Chase Bank*, 591 F.3d 1043, 1048 (8th Cir. 2010)) (alteration in original); *see also United States v. Aguirre*, 476 F. App'x 333, 334 (5th Cir. May 12, 2012) (rejecting excusable neglect under Rule 60(b) where the reason for the petitioner's delay was "based upon her husband's incarceration, her new role as the single parent of six

children, and her lack of legal knowledge"); *In re Tronox,* 626 B.R. 688, 734 (Bankr. S.D.N.Y. 2021) (rejecting argument under bankruptcy analogue to Rule 6(b) that being "busy or distracted by other personal circumstances" excused creditors from filing untimely claims because, "[a]s a general rule, 'excusable neglect' requires something more than a simple failure to meet the deadline due to a busy schedule.'" (citation omitted)). Thus, for example, in *Doe*, a *pro se* litigant was not excused from missing the deadline to oppose a summary judgment motion where "the delay in her response was due to her workload and a serious but not-to-be-further specified 'personal family matter involving a minor dependent." *Doe*, 2023 WL 8604171, at *9. There, the court found that the *pro se* litigant's "schedule [is] analogous to a lawyer's heavy caseload," which cannot serve as excusable neglect. *Id*. Here, just as a "lawyer's heavy caseload" cannot justify excusable neglect, a doctor's busy schedule is not enough to satisfy the excusable neglect standard.

Bitfinex understands that Roe was busy, but, however busy he was, he could have discovered that he could submit a claim in this proceeding well in advance of the deadline. Roe has not explained why, despite his busy schedule, he was not able to take a few minutes to conduct internet research into a case he was aware of and "independent[ly] research[ed] . . . several times a year," and where he had a large amount of money at stake. Roe Aff. ¶ 5. He does not explain why, at any point in the last nearly 10 years since the hack occurred or three years since the Bitcoins were seized, he did not contact a lawyer or contact the government, despite apparently being at least generally aware of the government seizure of the Bitcoins at issue and this case.

Roe cites just two inapposite cases, *Kingsburg Apple Packers, Inc. v. Ballantine Produce Co.*, 2010 WL 457474, at *8-9 (E.D. Cal., Feb. 3, 2010) and *FG Hemisphere Assocs. v. Dem. Rep. of Congo*, 447 F.3d 835 (D.C. Cir. 2006), to support that the reason for his delay is excusable. Mot. ¶¶ 11-16. Neither involved a criminal forfeiture action. Neither involved circumstances with

a similar statutory scheme setting a 30-day deadline for third-party petitions. And neither involved a statute permitting notice by publication to extinguish a party's interest in the subject of the lawsuit. Instead, *Kingsburg* involved a court extending a court-ordered deadline to file claims under the Perishable Agricultural Commodities Act where a "sales representative" received documents related to the case but discarded it believing it had "been delivered to the wrong recipient" and was unaware of his employer's need to file a claim. *Kingsburg Apple Packers, Inc.*, 2010 WL 457474, at *9.

The second case Roe relies on, *FG Hemisphere*, is equally unavailing. In *FG Hemisphere*, the Democratic Republic of Congo ("DRC") sought relief from a default judgment where the judgment creditor provided notice of the judgment and motion to execute in English, while DRC's official language is French, and "DRC was plainly hampered by its devastating civil war, which cost over three million lives, shattered the DRC's already shaky political structure, and set off hyperinflation." *FG Hemisphere*, 447 F.3d at 840-41. The court found that the DRC's delay in responding was excusable in large part because it was "out of the DRC's control." *Id.* at 840-41. The considerations there were also entirely different, as the case involved a "foreign sovereign's interest—and [the court's] interest in protecting that interest—in being able to assert defenses based on its sovereign status." *Id.* at 838.

Here, by contrast, Roe—a sophisticated individual who was aware of the seizure of Bitcoin and this criminal action—simply failed to exercise any diligence, including setting up an internet alert or contacting the government or a lawyer to pursue his rights. Roe's supposedly busy schedule does not constitute excusable neglect, and his claims that this case has not been widely covered in the news are incorrect.

### B. Permitting Roe's Delay Would Be Prejudicial Because the Ancillary Proceedings Are Ongoing and Key Deadlines Have Already Passed

Roe's total control over the delay warrants a finding that he does not satisfy the excusable neglect standard. In any case, the Court should also deny Roe's Motion because it risks substantially delaying the forfeiture proceeding and thus prejudicing the existing petitioners and the government. The forfeiture statute expressly contemplates a speedy resolution to the ancillary forfeiture proceeding. *See* 21 U.S.C. § 853(n)(4) ("The hearing on the petition shall, to the extent practicable and consistent with the interests of justice, be held within thirty days of the filing of the petition."). The Court noted this exact concern in its Order setting a filing deadline. ECF No. 250 at 2-3 ("[F]or purposes of proceeding **expeditiously** with the restitution hearing and ancillary proceeding, this Court sets a final deadline of Wednesday, February 19, 2025, for the filing of any ancillary petitions by third parties who have not previously filed anything with the Court.") (emphasis added). The petitioners have been waiting since 2016 to recover their stolen Bitcoin, and any further delay is prejudicial.

Granting Roe's Motion would require the Court, the government, and the existing petitioners to adjudicate an additional petition in an already ongoing and complex forfeiture proceeding. Roe offers to mitigate this prejudice by agreeing "to a reasonable extension of the [expired April 21] deadline for any motions to dismiss[.]" Mot. at 5, n. 2. This is no concession—as a matter of course, the Court should not permit Roe to intervene without being subject to a motion to dismiss under Federal Rule of Criminal Procedure 32.2. Ruling on Roe's motion, and then a round of briefing to dismiss Roe's petition, could delay this proceeding by months.

Finally, granting Roe's petition is prejudicial because it could open the floodgates to new claims. "It is well-settled that if the allowance of late-filed claims on the grounds of excusable neglect would 'open the floodgates' to a large number of new claims, and if those additional claims

would have a large impact on the recoveries of other creditors, then permitting the late-filed claims would be a form of prejudice that weighs against a finding of excusable neglect. *In re Tronox Inc.,* 626 B.R. at 725, *on reconsideration in part,* 2022 WL 628097 (Bankr. S.D.N.Y. Mar. 3, 2022) *and aff'd,* 2023 WL 2744136 (S.D.N.Y. Mar. 31, 2023).

Enforcement of the deadline here is necessary to ensure an orderly and expeditious conclusion to these proceedings just as enforcement of claims deadlines in bankruptcy are critical. In *In re KMart Corp.*, 381 F.3d 709, 714 (7th Cir. 2004), for example, the bankruptcy court rejected an untimely claim that represented only a small fraction of the unsecured claims against the debtor, Kmart. The court found that if it "allowed all late-filed claims of nearly a million dollars where a simple 'innocent mistake' . . . was to blame for the tardiness of the proof of claim, . . . Kmart could easily find itself faced with a mountain of such claims, with a corresponding price tag in the millions of dollars." *Id.* In fact, in the bankruptcy context, "'Floodgates' concerns, in particular, have repeatedly been credited in case law applying *Pioneer*[,]" the standard Roe seeks to apply here. *In re RML, LLC*, 657 B.R. 709, 727 (Bankr. S.D.N.Y. 2023).

Here, as in those bankruptcy cases, there is a similar risk of opening the floodgates to scores of new and untimely claims. Given the need for finality, the Court should not accept Roe or any other subsequent untimely petitions as this would drastically delay the proceedings and prejudice Bitfinex and other participants.

### C. The Length of Roe's Delay Weighs Against Granting His Motion

The length of Roe's delay also favors denying his motion, particularly given that he was in full control of his ability to ascertain the necessary facts. Roe asserts that a two-month delay is negligible, citing cases with what he describes as "comparable circumstances," in which "courts have found excusable neglect for two-month" delays. Mot. ¶¶ 20-21. But those cases are not

comparable. Indeed, none are in the context of a criminal forfeiture action.[10] In the criminal forfeiture context, courts routinely find that petitions filed *less* than two months after the deadline set by 21 U.S.C. § 853(n)(2) are untimely. *E.g.*, *Loria*, 2009 WL 3103771, at *1 (dismissing petition filed 33 days late); *United States v. Lyons*, 2013 WL 1694865, at *1 (D. Mass. Apr. 12, 2013) (holding petition filed three days late was time barred); *United States v. Suarez*, 2016 WL 10892252, at *1 (S.D. Fla. Dec. 6, 2016) (holding that petitioner's submission submitted 23 days late was untimely); *United States v. Pavlock*, 2014 WL 11381028, at *1 (N.D. W. Va. Mar. 4, 2014) (holding that petition submitted 48 days late was time barred). This factor therefore weighs against Roe.

**D. Roe's Lack of Diligence Casts Doubt on His Assertion of Good Faith**

When assessing excusable neglect, "lack of diligence can at least cast doubt on a claim of good faith." *In re CJ Holding Co.*, 27 F.4th 1105, 1118 (5th Cir. 2022) (performing excusable neglect analysis under the *Pioneer* factors pursuant to the bankruptcy analogue to Rule 6(b), Fed. R. Bankr. P. 9006(b)(1)).

---

[10] Those cases are also inapposite because, unlike here, the requested late filing had no impact on the progress of the cases. In *Beecham v. XP Logistics*, 2019 WL 2053891, at *3-4, (D. Kan. May 8, 2019), the court granted a defendant leave to file an answer out of time where no scheduling order had been filed. In *Chambers v. Brown*, 2025 WL 654139, at *9-10 (M.D.N.C. Feb. 28, 2025), the court found that the length of a two-month delay in filing answers weighed neither for nor against a finding of excusable neglect because the delay had not materially impacted or threatened to impact judicial proceedings. And in *Clark v. Dist. of Columbia*, 2024 WL 3181440, at *61-63 (D.D.C. June 26, 2024), the court found that enlarging the time for the plaintiffs to file a motion for class certification pursuant to a local civil rule had no impact on a case given that the defendants' motion to dismiss was still pending at the time of the deadline and the court granted the motion to dismiss without prejudice. Here, by contrast, the Court has set an order regarding scheduling. The court set a filing deadline and briefing schedule on motions to dismiss. Roe's untimely petition, unlike the late answers in *Chambers* and *Beecham* and the untimely class certification motion in *Clark*, would disrupt the schedule set by the Court and prejudice another party—Bitfinex—by delaying the pleadings stage of this proceeding.

As discussed in detail above, Roe did not exercise diligence: despite being aware of this case and the seizure of his purported Bitcoins, he failed to take simple steps to even uncover, let alone assert, his rights. This factor therefore also weighs in favor of denying Roe's motion.

**III. Roe Has Not Sought—Much Less Established—Equitable Tolling**

Given that Rule 6(b) does not apply, the only way Roe could conceivably excuse his tardy filing would be to establish that 21 U.S.C. § 853(n)(2)'s mandatory statutory deadline is subject to equitable tolling and that he satisfies the test for equitable tolling. Yet Roe never even mentions equitable tolling in his motion, thereby forfeiting the argument.

Nor could Roe establish equitable tolling even if it were available under Section 853(n)(2). To do so, Roe would have to show: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" that was "beyond his control." *Robinson v. Dep't of Homeland Sec. Off. of Inspector Gen.*, 71 F.4th 51, 58 (D.C. Cir. 2023) (brackets omitted). "Equitable tolling is appropriate only in rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Id.* (quotation marks omitted). "It is *not* available to a litigant who misses a deadline because of a garden variety claim of excusable neglect or a simple miscalculation." *Id.* (emphasis added; quotation marks omitted). Indeed, "the test for equitable tolling does not focus on whether or not the [party opposing relief] should have done more. Instead, the test for equitable relief focuses on whether [the moving party] took sufficient actions to diligently preserve her legal rights." *Aaron v. Pompeo*, 2018 WL 5297813, at *7 (D.D.C. Oct. 25, 2018). Therefore, "[c]ourts are much less likely to use their equitable powers to forgive late filings 'where the claimant failed to exercise due diligence in preserving his legal rights," which is the case here. *Id.*

Roe has identified no "extraordinary circumstance" that was "beyond his control" and prevented him from timely filing his petition, as 17 other third-party claimants did. *Robinson*, 71 F.4th at 58. Nor has he explained why enforcing the statutory deadline here would be "unconscionable." *Id.* Rather, even if he did not receive direct notice of the forfeiture action, Roe failed to act diligently to protect his rights.

Roe's lack of diligence, discussed in detail above, precludes equitable tolling here. For example, in *Aaron v. Pompeo*, this Court refused to equitably toll the 90-day deadline under 42 U.S.C. § 2000e-16(c) for the plaintiff to file certain claims after a final decision by the Equal Employment Opportunity Commission ("EEOC"). 2018 WL 5297813, at *11. There, the plaintiff argued that her untimely filing should be excused because the EEOC "did not take sufficient steps to ensure that notice [of the EEOC's decision] was received by Plaintiff." *Id.* at *7. The Court rejected this argument in part because the plaintiff had provided the incorrect mailing address to the EEOC, but also because "there [was] no evidence that Plaintiff took any other actions to diligently pursue her rights, such as inquiring with the EEOC as to the status of her appeal." *Id.* Therefore, the Court found that "even if the EEOC took only minimal steps to notify Plaintiff of its final determination, Plaintiff's own lack of diligence and the absence of extraordinary circumstances preclude equitable tolling." *Id.* at *8.

The same is true here. Despite periodically researching this case, and thus knowing since 2016 that his Bitcoin had been stolen and since 2022 that it had been seized by the government, Roe failed to diligently take any action to protect his rights. He did not contact the government, he did not contact a lawyer, and he did not perform even simple internet research that would have put him on notice of his rights here. As such, even if Roe had argued that the Court should equitably toll his filing deadline, which he has not, the Court should not do so here.

**CONCLUSION**

Bitfinex respectfully requests that this Court deny Roe's Motion because the ancillary petition he requests leave to file is concededly untimely and therefore barred. Rule 6(b) cannot be used to extend the statutory deadline to file an ancillary petition. Nor can Roe establish his neglect is excusable under Rule 6(b). The Court should not open this forfeiture proceeding to untimely petitions.

Dated: May 6, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/ *Barry Berke*

Barry H. Berke (admitted *pro hac vice*)
Daniel M. Ketani (admitted *pro hac vice*)
Trevor Gopnik (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Tel: (212) 351-4000
bberke@gibsondunn.com
dketani@gibsondunn.com
tgopnik@gibsondunn.com

Stephanie L. Brooker
(D.C. Bar No. 475321)
1700 M Street N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
sbooker@gibsondunn.com

KIRKLAND & ELLIS LLP

Mark C. Holscher (admitted *pro hac vice*)
555 S. Flower Street
Los Angeles, California 90071
Tel: (213) 680-8190
mark.holscher@kirkland.com

Laura Vartain (admitted *pro hac vice*)
555 California Street
San Francisco, California 94104
Tel: (415) 439-1400
laura.vartain@kirkland.com